## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **NATSOURCE LLC**<br>100 William Street<br>Suite 2005<br>New York, NY 10038<br><br>      Plaintiff<br><br>     v.<br><br>**FLAVIO RUFINO GAZANI**<br>1830 17th Street, N.W.<br>Apt. 403<br>Washington, DC 20009<br><br>      Defendant | )<br>)<br>)<br>)<br>)<br>)   Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT

Plaintiffs Natsource LLC ("Natsource"), by counsel, for its complaint against Flavio Rufino Gazani ("Gazani"), hereby states as follows:

### Introduction

1.    This is a federal question action with supplemental state law claims for temporary, preliminary and permanent injunctive relief and monetary damages resulting from Gazani's violation of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, breach of the duty of loyalty owed by an employee to his employer both during his employment and after his employment was terminated, misappropriation of trade secrets and conversion.

### Parties

2.    Natsource is a New York limited liability company maintaining its principal place of business located at 100 William Street, New York, New York.

3.     Flavio Gazani ("Gazani") is an individual who, upon information and belief, resides at 1830 17th Street, NW, Apt. 403, Washington, D.C. and, upon information and belief, a citizen of Brazil.  Gazani is a former Senior CDM/JI Regulatory Analyst for Natsource.

**Jurisdiction and Venue**

4.     Jurisdiction in this Court is invoked pursuant to 28 U.S.C. § 1331.  The federal question cause of action are violations of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, arising out of Gazani's unlawful actions with regard to his employment with Natsource which took place on Natsource's computer network within this judicial district.

5.     Pursuant to 28 U.S.C. § 1367(a), this Court also has supplemental jurisdiction over certain state claims of breach of fiduciary duty of loyalty, misappropriation of trade secrets and conversion that form part of the same case or controversy violation of federal law.

6.     Venue in this Court is proper under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendant Gazani resides in the District of Columbia and a substantial part of the events giving rise to the claims occurred in this judicial district.

**Facts**

7.     Natsource is in the business of providing asset management, advisory and research and transaction services in the global environmental assets markets.  A majority of Natsource's revenue is earned by identifying opportunities to purchase and sell Certified Emission Reductions ("CERs") generated pursuant to the Clean Development Mechanism ("CDM") created by the Kyoto Protocol to the United Nations Framework Convention on Climate Change ("the Kyoto Protocol").  A substantial portion of

2

Natsource's future income is expected to be earned by identifying opportunities to purchase and sell Emission Reduction Units ("ERUs") generated pursuant to the Joint Implementation Mechanism ("JI") created by the Kyoto Protocol.

8.    Natsource Advisory & Research LLC ("NAR") is a Delaware limited liability company wholly owned subsidiary of Natsource and maintains its principal place of business within Natsource's offices at 1730 Rhode Island Avenue NW, Washington, D.C. NAR provides support for the asset management business of Natsource by identifying and analyzing the viability of CDM and JI projects in developing countries to reduce emissions of greenhouse gases. NAR analyzes the potential outputs of those projects and assesses the various risks that the CERs and ERUs generated by the project will not be delivered. After doing a full assessment on a proposed CDM or JI project, NAR issues a report used by Natsource to assess whether a project will be attractive for Natsource and the entities advised by Natsource.

9.    The CER emissions credits that result from a particular CDM project are very valuable in the international market. The global environmental treaty under which parties are required to reduce their greenhouse gas emissions allows signatory countries and entities within those countries to purchase CER emissions credits and use them to meet emissions caps as opposed to obtaining them through actual reduction in greenhouse gas emissions. Some may find it more attractive to purchase CERs, created by projects that Natsource has sourced, rather than undertaking CDM projects on their own or pursuing emissions reductions projects at their own facilities. Countries and entities can also invest in CDM projects in order to gain credits to sell to others. Thus, CERs are also commodities that can be traded, bought and sold on an international

3

market. Thus, Natsource's revenues rely heavily on its ability to successfully identify high CER producing projects.

10.     Beginning on or about October 1, 2005, Gazani was employed by Natsource as a Senior CDM/JI Regulatory Analyst in its Washington, D.C. office. In order to employ Gazani, a Brazilian national, Natsource filed and obtained a change of status with the United States Customs and Immigration Service to obtain an H1-B work visa for Gazani.

11.     In his position, Gazani was responsible for analyzing laws and regulations related to CDM and JI greenhouse gas emission reduction projects and activities identified through the Kyoto Protocol process. He had further responsibility for tracking and assessing the decisions, policies and precedents of the CDM Executive Board and JI Supervisory Committee, two United Nations bodies that oversee the CDM or JI projects, the policies of countries in which the CDM or JI projects were located, as well as the policies of developed countries affecting approval and crediting of CDM or JI projects. Gazani also assisted in the assessment and validation of projects identified as of interest to Natsource and the entities advised by Natsource.

12.     At the beginning of his employment, Gazani was issued a company laptop computer from which he could directly access Natsource's internal computer network when he was in the office, and remotely access Natsource's network when he was traveling or at home. Gazani also had the ability to access Natsource's network remotely from any other computer with Internet access. Upon information and belief, Gazani had a home desktop computer with this capability. At the time he was issued the laptop, Gazani was warned that it was a violation of company policies to access outside websites,

such as MSN, for the purpose of sending or retrieving personal e-mail. The reason for this was to avoid viruses surfacing on the laptop or Natsource's computer network.

13.    The regulatory and industry information obtained by analysts like Gazani is processed using a proprietary and trade secret Delivery Risk Model ("the DRM") that Natsource treats and maintains as a trade secret. The DRM is the most critical piece of confidential business information held by Natsource and is central to the company's identity in the market.

14.    The DRM is a project assessment model containing Excel spreadsheets, statistical software and other programming applications, which provides a discrete methodology for distilling various pieces of information about an identified CDM or JI project and then determining the attractiveness of that particular CDM or JI project. NAR begins with a global list of thousands of potential CDM or JI projects. All such projects involve inherent risks and economic constraints that must be understood and managed in order to assemble a portfolio of projects that provides an acceptable return on investment. Natsource is able, by using the DRM and the intellectual capital of its employees, to winnow this list to a small, manageable group of potential projects with the best investment potential. Natsource does this by using the DRM to analyze a wide range of data and information about each CDM or JI project. This analysis provides Natsource a unique ability to asses with precision the long-term prospects and success of CDM or JI projects. Upon information and belief, no other entity in the international marketplace has the capability to make as sophisticated an analysis in such an efficient manner.

15.    The DRM is so valuable that Natsource has been approached by several private and public sector entities expressing interest in Natsource's licensing or selling

the DRM. Natsource has declined such overtures because the trade advantage represented by the DRM far outweighs the potentially significant licensing or sale revenue. Natsource has also declined inquiries for Natsource's assistance in developing similar models. To do so would dilute the value of the DRM.

16. Natsource is part of a relatively new and competitive market for greenhouse gas asset management. Natsource has several competitors seeking to invest in the global development of CDM and JI projects. Natsource is in the top tier among greenhouse gas asset management firms. Only one or two other companies can credibly claim the same. While each competitor has its own method for determining the potential success and risk involved in CDM and JI projects, none of Natsource's competitors have the DRM.

17. The DRM was developed by Natsource over the course of approximately two years, after which it became functional approximately 18 months ago. The DRM is a dynamic model that is regularly updated and adjusted by Natsource's analysts depending on various economic, regulatory and legal changes in the international community. Natsource has invested millions of dollars in manpower, resources and training to develop the DRM. It is the life blood of Natsource's core business.

18. The DRM is stored on Natsource's internal computer network. Access to the DRM is strictly limited to only those who must access the program for work, so that Natsource can maintain the DRM's inherent independent economic value and safeguard it from being exploited by the public or Natsource's competitors in the industry. Natsource, which has approximately 40 employees, provides five or six Natsource employees with full access to the DRM files on the network. Access is provided by

6

Natsource's network administrator, a technology employee who has no other responsibility for using the DRM. Internally, the DRM also requires a separate password to access it.

19.    From the beginning of his employment and due to the responsibilities of his position, Gazani was one of the employees granted access to the DRM and provided with the password to it in order to update files related to various regulatory and legal developments.

20.    Access to the output assessments developed by the DRM on particular projects is also limited. Each output assessment on a CDM or JI project can only be accessed through a specific path within Natsource's network. The network administrator has the ability to limit which employees can and cannot access the output assessment. Natsource grants access to a small and specific group of Natsource employees who have a business need to see the assessment. The network path to the output assessment is then distributed in an e-mail to those permitted access. During Gazani's employment, each e-mail distributed regarding the development of an output assessment contained the following disclaimer: "These DRM outputs should not be circulated outside the company without prior arrangement." On limited occasions, a DRM output assessment has been distributed outside of Natsource as the result of a specific business or financial request. Such distribution is made only with explicit agreement that the output assessment be kept strictly confidential. Natsource has nearly 600 output assessments regarding various projects on its network.

21.    No employee is allowed access to the DRM or the output assessments without the explicit authorization of Ben Feldman, Managing Director at Natsource.

Each employee also is warned orally by Feldman that the DRM is the heart of Natsource's business and must not be disclosed to anyone else. Employees are on notice that improper disclosure of the DRM to any unauthorized individual is grounds for immediate termination from employment.

22.     Separately, every Natsource employee requires a login and password to access the Natsource network as a whole, wherein the DRM is contained. Every employee must change his or her password every two weeks or lose access to the network. Thus, the DRM has three levels of electronic protection and its output assessments have two levels.

23.     Upon information and belief, beginning in or before May 2006, Gazani attempted to access confidential proprietary information of Natsource that was not germane to his position at the time he made the requests and obtained the information. In May 2006, Gazani e-mailed to his personal e-mail address confidential and proprietary information, including DRM related material, regarding CDM projects in Brazil. On June 20, 2006, Gazani sent an e-mail to Natsource's network administrator, Michael Grande, seeking to obtain access to a specific output assessment. Grande responded that he needed "the OK from Ben Feldman first." Instead of asking Feldman to grant him access, Gazani sought the assistance of two other Natsource employees with access to the DRM, Aline Ribas and Rina Cerrato, to get the output assessment. The fact that Gazani did not go to Feldman, and the fact that the output assessment was not at the time he made the request necessary to his job, strongly suggest that he sought the assessment for impermissible or unlawful reason.

24.    On or about July 13, 2006, Gazani sought more confidential proprietary information from Cerrato.  In an instant message exchange, Gazani asked Cerrato for Natsource's list of vendors, known as Project Development Document ("PDD") writers. Natsource partners with PDD writers in the development of projects that Natsource determines should be successful.  There are a couple dozen PDD writers in the industry, but Natsource's PDD list contains only those PDD writers whom Natsource knows to be effective.  Cerrato provided Gazani with the PDD writers list.  Gazani promised that he "won't do anything with it," demonstrating his knowledge that it was confidential proprietary information of Natsource.

25.    In September 2006, Gazani continued to access confidential, proprietary and trade secret information that, in hindsight, was obtained for his own personal benefit. First, Gazani requested the password to the DRM update files, a particular section of the DRM, from Marcela Aray, another employee with DRM access.  Gazani was authorized to access the DRM, but apparently had forgotten the password.  Aray thought the request was unusual because Natsource was not engaged in updating the files during that time of the year.  However, because Gazani was authorized, Aray provided him with the DRM password.

26.    At about the same time, Gazani sought from Feldman permission to access all the DRM output assessments.  Gazani represented to Feldman that absent direct access, Gazani would have to wait for information from others in order to perform other functions of his job.  Feldman granted Gazani's request based upon Gazani's representation that it was for Natsource's business purposes.  Feldman also thought that Gazani's access to the additional output assessment would allow Gazani to improve his

9

work performance, which had not been satisfactory over the preceding months. At the time Gazani was provided with access to the DRM output network drive where the assessments are kept, Feldman again reminded Gazani about the confidential, proprietary and trade secret nature of the output assessments. Gazani acknowledged the confidential nature of his access and the importance of maintaining the confidentiality of the DRM.

27.    Upon information and belief, Gazani has taken other substantial steps, the full extent of which are not presently known, to engage in direct competition with Natsource. Upon information and belief, Gazani's business, International Solutions, advertised on a United States government program website called Methane to Markets by setting up a Project Network Member Profile on the website. The address for International Solutions is listed as 4000 Massachusetts Avenue, NW, Washington D.C., one of Gazani's previous residence addresses, and the telephone number is that for Gazani's cellular telephone. Gazani is listed in the Methane to Markets website as the Director and contact for International Solutions. The description of International Solution services was providing "consulting services for implementation of CDM projects, mainly in Brazil and other Latin American countries," which is among the businesses engaged in by Natsource.

28.    Upon information and belief, International Solutions has been in the business of partnering on CDM projects and selling and purchasing CERs since as early as August 2005. That month, a Brazilian law firm released a newsletter regarding its partnership with International Solutions on CDM projects and the sale and purchase of CERs. That was the same month Gazani accepted employment with Natsource.

29.    In September 2006, Gazani contacted Michael Grande, the network administrator at Natsource. Gazani's laptop computer had stopped working. Grande was unable to restart the computer. Upon information and belief, Gazani's computer had obtained a virus, causing its malfunction. Instead of waiting for Grande to fix Gazani's laptop, Gazani agreed to have a new laptop issued to him. Then, Gazani was told by Feldman and Grande that Gazani absolutely could not access his MSN personal e-mail account on Natsource's laptop or computer network because it could result in exposure to a computer virus. Feldman also asked Grande to prevent Gazani from being able to create this same damage to the second laptop computer issued to him. As network administrator, Grande prevented Gazani from having rights to download programs from the Internet. But this did not prevent Gazani from accessing his MSN personal e-mail account on the Internet through Natsource's laptop and computer network.

30.    Shortly after Gazani got a new laptop, he asked Grande to install a program for work purposes, since Gazani did not have the rights to download programs from the Internet. When Grande went to do it, he saw Gazani's personal MSN e-mail account on the screen. Grande immediately reminded Gazani that he was prohibited from accessing his personal e-mail on his Natsource laptop.

31.    Through this personal e-mail account, Gazani had the ability to send and receive attachments, which could include programs, data, reports or spreadsheets, including any part, or the entirety, of the DRM and any or all output assessments. Using this personal e-mail account, Gazani could download and send such files from Natsource's computer network without detection. Gazani's company-issued laptop computer also had a USB port through which Gazani had the ability to download from

11

Natsource's computer network and store onto portable electronic media any programs, data, reports or spreadsheets, including any part, or the entirety, of the DRM and any or all output assessments. As recently as September 27, 2006, upon information and belief, Gazani possessed on a portable CD ROM disk components of the DRM and its inputs, as well as the results of all of Natsource's DRM assessments from the inception of the model through September 27. Gazani had no business reason to have this confidential, proprietary and trade secret information on this portable electronic format. Moreover, he possessed this information at a time when he knew his employment was in jeopardy. On information and belief, Gazani intended to use this property for his own use and the use of his competing business, International Solutions.

32.    Gazani, while possessing confidential proprietary and trade secret information and while still in the employ of Natsource, began to compete directly with Natsource at sometime prior to September 26, 2006. On that date, Gazani transmitted an e-mail solicitation to one of Natsource's PDD writers, found on the confidential proprietary list Cerrato provided to Gazani. Gazani used his personal MSN e-mail account to send the correspondence. Gazani represented to the vendor, Quality Tonnes, that he was contacting the vendor "on behalf of International Solutions (IS), which is a Brazilian company focused on the CDM market."

33.    In the e-mail, Gazani further states:

> There is relatively low awareness of the potential
> opportunities in developing countries like Brazil. IS has
> identified a significant number of potential projects which
> could generate more than 7 million CERs. The company
> also has an existing sales force as well as many high-level
> government / industry contacts. From my evaluation of
> Quality Tonnes, I feel there may be an opportunity for you
> to partner with IS to bring projects to the market. I would

like to speak to you more about these potential opportunities. Please feel free to contact me at any time; otherwise I will follow up with you in a couple of days.

34.    Natsource has participated in CDM project work in Brazil and regularly looks to identify new opportunities in that country. Gazani's job as a Senior Research Analyst for Natsource involved the same identification of potential projects in Brazil as well as in other areas of the world. The projects referred to in Gazani's e-mail to Quality Tonnes were either projects that Natsource had identified as prospects or that Gazani had identified and never disclosed to Natsource, his employer. Natsource does not know the extent to which Gazani has diverted or endeavored to divert potential projects to International Solutions. The fact that Gazani has represented to PDD writers that he has diverted projects that should have been Natsource opportunities shows his intentional and malicious actions to harm Natsource and compete against it. QT responded back to Gazani immediately with a show of interest in Brazilian projects. On information and belief, Gazani has followed up on this communication in further competition with Natsource.

35.    Gazani used his personal MSN e-mail account as an instrument of his illegal and disloyal acts. It was through this account that Gazani contacted Natsource's partners to develop business on behalf of his competing enterprise, International Solutions. Without discovery, Natsource is not aware of the full extent of Gazani's unlawful acts, including misappropriation of trade secrets, taken through his network access and/or company-issued laptop computer.

36.    Gazani's efforts to compete with his employer coincided with Natsource's increasing dissatisfaction with Gazani's work performance. Starting in about July 2006, Gazani's supervisor, Feldman, found Gazani's work to be unsatisfactory. Feldman met

with Gazani at the time and told Gazani that he needed to improve his work dramatically or he could be terminated.

37.     On September 26, 2006, Gazani was scheduled to travel to a meeting of the CDM Executive Board, but he neglected to ensure that he was registered and was ineligible to attend. His presence at the meeting was a core responsibility of his job and his participation was critical to Natsource's business. That same day, after learning of this, Feldman expressed extreme frustration with Gazani's failure. Gazani immediately emailed a third party that may have assisted him in his unlawful efforts and expressed a need to "act faster now." That evening, Gazani sent the e-mail solicitation to Quality Tonnes described in paragraphs 32 through 33 of this Complaint. The next day, September 27, upon information and belief, Gazani accessed Natsource's trade secret information on a portable CD ROM as described in Paragraph 31

38.     Feldman met with Gazani on September 28, 2006 regarding Gazani's continued performance problems and failure to attend the CDM Executive Board meeting. Feldman explained to Gazani that unless there was very significant turnaround in Gazani's performance in the next one to two months, Feldman would terminate his employment.

39.     At the meeting on September 28, Gazani asked for a couple of days to consider whether he wanted to seek other employment or attempt to improve his performance. Feldman agreed. That Monday, October 2, 2006, Gazani attended a meeting in London with another potential business partner on behalf of Internationals Solutions. Several days later, Gazani provided a verbal notice of resignation to Feldman and requested a transition period in which to find other employment. Feldman agreed to

14

allow Gazani to stay at Natsource through December 15, 2006. Feldman also told Gazani

that Natsource wished to be supportive of Gazani's attempt to find other employment and

gave Gazani Thursday afternoons off with pay to search for a job.

40.    Gazani also requested that he be allowed to take off Friday, October 20, to

meet with a lawyer in Miami, Florida, regarding his immigration status. Feldman agreed

to the request. Upon information and belief, Miami, Florida is where Gazani has

represented to others that his business, International Solutions, is located. Upon further

information and belief, one of Gazani's business partners in International Solutions lives

in Miami.

41.    During the week of October 9, 2006 and while an employee of Natsource,

Gazani followed up with Quality Tonnes by leaving a telephone message for Seth

Baruch, its Managing Partner, to set up a meeting for October 13, 2006. Upon

information and belief, Gazani planned to attend the meeting and further his own

personal business interests in direct competition with his employer. On October 12,

Baruch alerted Feldman to Gazani's e-mail and telephone solicitations.

42.    After receiving this information, Feldman confronted Gazani on

October 12, 2006 about his solicitation and competing business. Gazani denied any

wrongdoing. Feldman advised Gazani that he was terminated effective immediately and

that he was required to immediately return all Natsource property. Feldman also

requested on behalf of Natsource access to any home computer of Gazani through which,

and until his termination, Gazani had remote access to Natsource's computer network and

confidential proprietary and trade secret information. Feldman asked for this access so he

could be assured that Gazani did not retain possession of any Natsource confidential

proprietary and trade secret information, specifically the DRM and its output

assessments. Gazani refused Feldman's request. Feldman informed Gazani that

Natsource would pursue all available legal steps to protect its business.

43.     Subsequently, Natsource obtained a forensic computer evaluation of

Gazani's laptop computer. This evaluation uncovered numerous emails sent to or from

Gazani acting in his capacity as an agent for International Solutions where he engaged in

acts competitive to Natsource during his employment with Natsource. This evaluation

also uncovered the access of Natsource confidential, proprietary and trade secret

information from a portable CD ROM disk on Gazani's laptop computer. This evaluation

also uncovered many individuals who acted in concert with Gazani, and who, on

information and belief, are still acting in concert with Gazani to use Natsource

confidential and trade secret information for purposes of competing against Natsource in

the international market, most specifically in Brazil.

44.     Natsource will suffer irreparable harm if Gazani, or any other person or

entity, has the DRM and the analytic output which determines which are the most

attractive CDM and JI projects in which to invest, and uses it to divert projects to

International Solutions, or discloses it to any other competitor, individuals or entity

outside of Natsource. Moreover, if others were to learn through the results of the output

assessments which projects had been selected by Natsource and analyzed under the DRM

as attractive opportunities, Natsource would lose a valuable competitive advantage and be

severely damaged in the industry.

45.     On October 13, 2006, counsel for Natsource sent by electronic and

overnight mail, as well as courier, a cease and desist letter to Gazani, directing him to

16

cease all misappropriation of Natsource confidential proprietary and trade secret information. The letter requested Gazani to immediately contact counsel for Natsource, return all Natsource property and make all necessary assurances that no use would be made of the DRM or any other confidential proprietary information of Natsource.

46.     Counsel for Gazani responded and provided Natsource with Gazani's affidavit, swearing that he only used the DRM twice yearly, he did not now or ever have any DRM output assessments, and he would return the one CD ROM disk in his possession that contained Natsource files. Subsequent to this affidavit, Natsource received the report from the computer forensic evaluation on Gazani's Natsource computer and learned that Gazani's representations regarding the DRM output assessments were materially false. The next business day, Gazani returned to Natsource the disc that purported to contain unidentified Natsource files that he had retained, but the disk was blank. Accordingly, Natsource must protect its valuable property from further unlawful use by seeking temporary, preliminary and permanent injunctive relief.

### Count I -- Violation of Computer Fraud and Abuse Act (18 U.S.C. § 1030)

47.     Natsource reasserts and incorporates by reference the allegations made in Paragraphs 1 through 46 of this Complaint.

48.     As an employee of Natsource, Gazani without authorization or exceeding his authorization to access Natsource confidential information on a protected computer, obtained Natsource confidential information;

49.     Gazani transmitted Natsource confidential information to his personal files and, upon information and belief, to unauthorized individuals outside of Natsource;

50.     Gazani's actions were committed knowingly and with an intent to defraud Natsource;

51.    Gazani's actions were intentional and caused damage to Natsource;

52.    Gazani's actions resulted in Gazani obtaining valuable confidential proprietary information of Natsource, which he used for his personal benefit;

53.    Gazani's actions in fact have caused loss to Natsource to an amount which is presently incalculable, but is certainly in excess of $5000.

### Count II -- Breach Of The Duty Of Loyalty

54.    Natsource reasserts and incorporates by reference the allegations made in Paragraphs 1 through 53 of this Complaint.

55.    As an employee of Natsource, Gazani owed Natsource a duty of loyalty that any agent owes his principal. This duty included, but was not limited to, the duty to take no action while employed by Natsource that was contrary to the interests of Natsource, and the duty after his employment ended not to use confidential information gained while employed by Natsource for his own benefit or to the detriment of Natsource. Gazani's duty also included obtaining and continuing customer and business relationships for the benefit of Natsource and not Gazani's own personal benefit.

56.    Through the conduct alleged herein, Gazani has breached his duty of loyalty to Natsource.

57.    Gazani's breach of his duty of loyalty has resulted in monetary damage to Natsource which is at present incalculable, but will be determined through discovery and litigation.

### Count III -- Misappropriation of Trade Secrets

58.    Natsource reasserts and incorporates by reference the allegations made in Paragraphs 1 through 57 of this Complaint.

18

59.    The DRM and its output assessments constitute trade secrets within the meaning of D.C. Code Ann. § 36-401.

60.    At all relevant times, Gazani has been aware of his obligation not to misappropriate Natsource's trade secrets.

61.    Upon information and belief, Gazani willfully and maliciously misappropriated or intends to misappropriate Natsource's trade secrets in violation of D.C. Code Ann. § 36-401 *et seq.* and for his own benefit without Natsource's consent and to its detriment.

62.    Upon information and belief, unless Gazani is restrained, he will or will continue to disclose, misappropriate and exploit Natsource's trade secrets, thereby creating the potential for the loss of Natsource's business and the good will, all of which would be irreparable.

63.    Under D.C. Code §§ 36-402 and 36-403, Natsource is entitled to an injunction permanently prohibiting Gazani from further misappropriating Natsource's trade secrets, and to the extent current misappropriation can be remedied by money damages, to an award of monetary damages to cover actual loss and unjust enrichment, loss of good will, and punitive damages which is at present incalculable but will be determined through discovery and litigation.

## Count IV -- Conversion

64.    Natsource reasserts and incorporates by reference the allegations made in Paragraphs 1 through 63 of this Complaint.

65.    Upon information and belief, Gazani improperly obtained access to and downloaded Natsource's proprietary and trade secret information, and thus took possession of it.

66.    Gazani emailed Natsource confidential and proprietary information to his own personal email account.

67.    Natsource has expended innumerable resources and time to the development of its proprietary and trade secret information.

68.    After Gazani's termination, Natsource directed him to return any and all electronic information, programs or models belonging to Natsource. As of the date of this Complaint, upon information and belief, Gazani has not returned all such information.

69.    By retaining Natsource's proprietary and trade secret information, Gazani has unlawfully converted Natsource's property and denied Natsource's ownership rights to such.

70.    Gazani's conduct has resulted in monetary damage to Natsource which is at present incalculable but will be determined through discovery and litigation. Natsource is also entitled to punitive damages, because the actions committed in pursuit of the conversion were willful and malicious.

### Prayer For Relief

Wherefore, having set forth its causes of action, Natsource prays for the following relief:

(a)    temporary, preliminary and permanent injunctive relief directing Gazani to cease the disclosure or improper use of any Natsource trade secrets, and to return all of

Natsource's documents, electronically stored programs, models and information, and any equipment in his possession;

(b)     an order directing Gazani, and those working in concert with him, to provide an accounting of any copies made of Natsource's confidential, proprietary and trade secret information; to disclose all devices where the copies are stored or ever have been stored; to allow a third party forensic inspection of Gazani's personal and business computers for Natsource's confidential, proprietary and trade secret information; to disclose the identity of all business partners of Gazani, as well as the identity of all third parties to which he disclosed Natsource's confidential, proprietary and trade secret information; and to execute an affidavit subject to the penalty of perjury, attesting that Gazani has deleted and/or returned all Natsource's confidential, proprietary and trade secret information and has not disclosed it to any third parties other than those specifically identified;

(c)     damages in an amount to be proved at trial appropriate to the harm caused by Gazani's conduct;

(d)     its attorneys fees and costs; and

(e)     any other relief the Court deems appropriate.

Respectfully submitted,

NATSOURCE LLC

Scot A. Hinshaw

_Susan Wiltsie_
_____
Susan F. Wiltsie

Susan F. Wiltsie (DC Bar #429625)
Scot A. Hinshaw (DC Bar #449723)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| NATSOURCE LLC     88888 | FLAVIO R. GAZANI |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Susan F. Wiltsie
Scot A. Hinshaw
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 20006 (202) 955-1500

CASE NUMBER  1:06CV01843

JUDGE: Richard W. Roberts

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 10/27/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- O 1 U.S. Government Plaintiff
- ⊙ 3 Federal Question (U.S. Government Not a Party)
- O 2 U.S. Government Defendant
- O 4 Diversity (Indicate Citizenship of Parties in item III)

## III CITIZ
FOR PLAIN

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | O 1 | ⊙ 1 | Incorporated or Principal Place of Business in This State | O 4 | O 4 |
| Citizen of Another State | O 2 | O 2 | Incorporated and Principal Place of Business in Another State | ⊙ 5 | O 5 |
| Citizen or Subject of a Foreign Country | O 3 | O 3 | Foreign Nation | O 6 | O 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**O A. Antitrust**

☐ 410 Antitrust

**O B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**O C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))
Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**⊙ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**O E. General Civil (Other)    OR    O F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☒ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| O  G. *Habeas Corpus/ 2255* | O  H. *Employment Discrimination* | O  I. *FOIA/PRIVACY ACT* | O  J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| O  K. *Labor/ERISA (non-employment)* | O  L. *Other Civil Rights (non-employment)* | O  M. *Contract* | O  N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

⊙ 1 Original Proceeding  O 2 Removed from State Court  O 3 Remanded from Appellate Court  O 4 Reinstated or Reopened  O 5 Transferred from another district (specify)  O 6 Multi district Litigation  O 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Diversity case under 28 USC 1332 for breach of fiduciary duty of loyalty, tortious interference with contract, trade secret misappropriation and conversion.

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ Over $75,000 | Check YES only if demanded in complaint<br>**JURY DEMAND:**   YES ☒   NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE  October 26, 2006   27   SIGNATURE OF ATTORNEY OF RECORD   *Susan Wiltsie*

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
#### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.   RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.