# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

## PLAINTIFF'S MOTION FOR
## TEMPORARY AND PRELIMINARY INJUNCTIVE RELIEF

Pursuant to Fed. R. Civ. P. 65, Plaintiff Natsource LLC ("Natsource") moves for temporary and preliminary injunctive relief against Defendant Flavio Rufino Gazani ("Gazani"), and those working in concert with him. Gazani was terminated from his position as Senior CDM/JI Regulatory Analyst on October 12, 2006. Natsource has filed an action alleging that Gazani has (1) violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, which provides for a private right of action, (2) breached his fiduciary duty of loyalty, (3) misappropriated trade secrets, and (4) converted Natsource property, denying Natsouce full ownership therein.

The complaint also alleges that during his employment, Gazani had a competing business and provided confidential, proprietary and trade secret information to his business and used it for his own benefit. This trade secret information is the heart of Natsource's business and the key to its success in the market. Upon learning of Gazani's unlawful actions, Natsource immediately terminated his employment and requested the return of all company information and to review his home computer for Natsource confidential, proprietary and trade secret information. Gazani has refused to allow Natsource this access.

Natsource is unaware of the extent of Gazani's misappropriation, disclosure and continued use of its trade secrets. Immediately after Gazani was terminated, Natsource began an investigation into his misappropriation and disloyalty. The initial information uncovered by Natsource was troubling as to his disloyal conduct, but was inconclusive as to whether Gazani had misappropriated Natsource's key piece of intellectual property, the DRM. Accordingly, Natsource sought and obtained an affidavit from Gazani swearing under oath that he never had access to the DRM as an employee and does not have it now. At the time of Gazani's termination, Natsource began a forensic examination of his laptop computer. That examination concluded on Tuesday, October 24 - three business days after Gazani swore in his affidavit that he did not have any DRM files. That computer examination uncovered conclusive evidence that Gazani perjured himself in his affidavit. In short, in addition to his other unlawful conduct, he has sections of the DRM and all of the DRM output assessments on a CD-ROM and has been using this information to compete against Natsource.

Natsource now has a thick paper trail demonstrating the depth of Gazani's unlawful conduct. During his employment with Natsource, he systematically copied and stored Natsource's confidential, proprietary and trade secret information to portable media that he could walk away with from Natsource. Gazani already has caused significant harm to Natsource; continued use or disclosure of this information will cause irreparable harm to Natsource's core business.

Natsource seeks a temporary and preliminary injunctive order directing Gazani, and all those working in concert with him, to (1) cease any unlawful use or disclosure, or assisting in such, of Natsource confidential, proprietary and trade secret information;

2

(2) return all Natsource confidential, proprietary and trade secret information; (3) provide

an accounting of any copies made of Natsource's confidential, proprietary and trade

secret information; (4) disclose all devices where the copies are stored, or have been

stored, and take all steps necessary to disable, erase, or return all copies; (5) allow a third

party forensic inspection of Gazani's personal and business computers for Natsource's

confidential, proprietary and trade secret information; (6) disclose the identity of all

business partners of Gazani, as well as the identity of all third parties to which he

disclosed Natsource's confidential, proprietary and trade secret information; and

(7) execute an affidavit subject to the penalty of perjury, attesting that he has deleted

and/or returned all Natsource's confidential, proprietary and trade secret information and

has not disclosed it to any third parties other than those listed pursuant to part (6).

Natsource should also be permitted to disclose the existence of its Complaint against

Gazani and the substance of any temporary restraining order issued by the Court to other

members of the industry and its competitors.  The grounds for this Motion are stated in

the accompanying Memorandum.

Natsource requests an immediate, Emergency hearing on this Motion.

Respectfully submitted,

NATSOURCE LLC

_Susan Wiltsie_
_____
Counsel

Susan F. Wiltsie (DC Bar #429625)
Scot A. Hinshaw (DC Bar #449723)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

4

## CERTIFICATE OF SERVICE

I certify that on the 26th day of October, 2006 the foregoing Plaintiff's Motion for

Temporary and Preliminary Injunctive Relief, supporting memorandum and draft order

were served by electronic mail and overnight mail upon:

> Flavio Gazani
> 1830 17th Street, NW
> Apt. 403
> Washington, DC 20009

and by electronic mail and hand delivery upon:

> Christine A. Samsel, Esq.
> Akin, Gump, Strauss, Hauer and Feld LLP
> 1333 New Hampshire Avenue, NW
> Washington, D.C. 20036

*Susan Wiltsie*

_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR TEMPORARY RESTRAINING ORDER

### I. JURISDICTION

Plaintiff Natsource LLC ("Natsource") brings this suit in federal court under

federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court also has

jurisdiction over Natsource's supplemental state law claims pursuant to 28 U.S.C.

§1367(a), under which Natsource seeks temporary and preliminary injunctive relief or it

will suffer irreparable harm. Affidavits in support of this Memorandum are attached

hereto.

### II. PRELIMINARY STATEMENT

**A.    Nature of the Action**

This is a motion for temporary injunctive relief seeking to prevent the disclosure

and misuse of Natsource's confidential, proprietary and trade secret information by a

former employee, Flavio Rufino Gazani (hereinafter "Gazani") and anyone working in

concert with him. Such confidential, proprietary and trade secret information includes

specifically Natsource's Delivery Risk Model ("the DRM"), output assessments of the

DRM and product development information assessed and distilled by Natsource in

conjunction with the DRM. Natsource further seeks temporary injunctive relief (1) to

prohibit Gazani from making any unlawful use or disclosure, or assisting in such, of Natsource confidential, proprietary and trade secret information; (2) to order the return by Gazani of all Natsource confidential, proprietary and trade secret information; (3) to direct Gazani to provide an accounting of any copies made of Natsource's confidential, proprietary and trade secret information; (4) to order the disclosure of all devices where the copies are stored, and to take all steps necessary to disable, erase, or return all copies; (5) to allow a third party forensic inspection of Gazani's personal and business computers for Natsource's confidential, proprietary and trade secret information; (6) to order the disclosure of the identity of all business partners of Gazani, as well as the identity of all third parties to which he disclosed Natsource's confidential, proprietary and trade secret information; and (7) to require Gazani to execute an affidavit subject to the penalty of perjury, attesting that he has deleted and/or returned all Natsource's confidential, proprietary and trade secret information and has not disclosed it to any third parties other than those listed pursuant to part (6). Natsource seeks to have this injunctive relief also apply to anyone working in concert with Gazani. Natsource also requests that it be permitted to alert members of the industry and its competitors of the existence of this action and the substance of any temporary restraining order placed on Gazani.

Gazani has violated federal law with regard to computer fraud and abuse, breached his fiduciary duty of loyalty, misappropriated Natsource's trade secrets and converted certain intellectual property belonging to Natsource thereby denying Natsource of its ownership therein. At some point prior to his termination from employment with Natsource, Gazani set up a new enterprise called International Solutions in direct competition with Natsource. During the last several months of his employment or longer,

Gazani proceeded to access and obtain Natsource's coveted and confidential trade secret information for his own benefit and the benefit of International Solutions, denying Natsource its ownership value therein. Gazani did this using two laptop computers issued to him by Natsource, one of which he made inoperable during his employment.

The evidence of Gazani's unlawful behavior has only recently come to light and continues to develop. However, Natsource will suffer irreparable harm to its business if it does not immediately stop Gazani from using its trade secret information, namely its Delivery Risk Model ("the DRM") and the output assessments therefrom. This information is not generally known to the public, is kept highly confidential through electronic and distribution protections, and is of enormous independent economic value. It will cause incalculable damage to Natsource if the DRM or its output assessments are used by Gazani or another competitor or generally disclosed to the public. Natsource has proof that Gazani had portions of the DRM itself and all of the results of every DRM assessment from the model's inception through September 27, 2006 on a portable CD-ROM disk. Natsource does not know where this CD-ROM is, but assumes Gazani still has it. Natsource knows that Gazani has been misappropriating this valuable confidential and trade secret information and has been using it to compete unlawfully against Natsource.

Without a Temporary Restraining Order, Natsource will be irreparably harmed by such use or disclosure. Gazani would remain free to use Natsource's core instrument for determining project and business investment against Natsource, causing the loss of substantial business and revenue and a severe risk of disclosure of the DRM to other of Natsource's competitors. Gazani's flagrant disregard of his fiduciary obligations have

been demonstrated by his brash actions to compete against Natsource while still employed by the company, his misappropriation of irreplaceable trade secrets, and, most recently, his perjury regarding his misdeeds (described below). Thus, Natsource has some indication of what levels of deceit Gazani is capable of in order to carry out his plan to unlawfully compete against Natsource using Natsource's property. Natsource requires immediate relief as well as discovery of certain information to determine the extent of current damage to Natsource within the international marketplace.

**B.    Recent Background Regarding this Action**

Natsource began preparing these papers immediately after learning of Gazani's communications with Natsource vendors on behalf of his competing company, International Solutions, while he still was employed by Natsource. On October 12, 2006, at the time he was terminated and refused to submit his home desktop computer for inspection to determine the extent of misappropriation, Gazani was told that legal action would be taken if he did not comply. On October 13, 2006, a letter from undersigned counsel was sent by electronic mail, overnight mail and process server to Gazani's Washington, D.C. address. A copy of the letter is attached hereto at Tab A. Gazani was not at home, but the letter was ultimately received by someone sharing his apartment. On Tuesday, October 17, undersigned counsel was contacted by an attorney for Gazani in Maine who represented that Gazani received the letter. Undersigned counsel also represented to Gazani's counsel that the underlying action and this motion would be filed on October 18, 2006. Gazani's counsel then represented that Gazani obtained Christine Samsel, Esq. of Akin Gump in Washington, D.C. as counsel. Later that day, Ms. Samsel sent to the undersigned counsel a letter vehemently denying that Gazani had engaged in

any wrongdoing and, most particularly, denying that he even had access to the DRM, Natsource's key piece of intellectual property, when he was employed. Ms. Samsel offered that Gazani would sign an affidavit on these points. It was on the basis of these representations that Natsource did not file for a temporary restraining order last week.

In fact, on October 20, Gazani executed an affidavit, attached to this Motion at Tab B, where he swore, under penalty of perjury, that he "did not have access to . . {the} DRM program at work" and that he currently does not have "any part of Natsource's DRM program, any of its output assessments, or any lists of projects favorably assessed by the DRM." He also swore that he had only one disk of Natsource files, which he would return.

On Tuesday, October 24, 2006, the consulting forensic expert[1] that undersigned counsel retained to review Gazani's Natsource laptop computer completed his work. His investigation uncovered irrefutable evidence that in the weeks leading up to Gazani's termination from employment, he had <u>all</u> of Natsource's DRM output assessments, and sections of the DRM itself, on a CD-ROM disk, which he accessed from his laptop.

Natsource assumes he has retained the CD-ROM at home or elsewhere because he swore in his affidavit that he had no such information and, of course, he hasn't returned it. On Wednesday, October 25, 2006, the undersigned counsel received the disk referenced in Gazani's affidavit from Gazani's counsel. It was blank. Accordingly, Natsource has been duped. Gazani used his perjury to buy another week in which he could misappropriate Natsource's intellectual property for his own benefit, for the benefit

---

[1] The affidavit of Philip Rodokanakis, CFE, is attached hereto at Tab C.

of his company, International Solutions, causing continued and irreparable harm to Natsource.

As required by Fed. R. Civ. P. 65(b), Natsource notified Gazani of this action and Motion. Before filing, undersigned counsel provided notice by telephone and electronic mail to Ms. Samsel that the underlying action and instant motion were being filed today. Natsource requests an immediate Emergency Hearing on this Motion. Natsource certifies that it will immediately notify, Ms. Samsel, Gazani's counsel of the hearing date and time as soon as one is assigned.

## III. FACTS

### A.    Natsource's Business

Natsource is in the business of providing asset management, advisory and research services and transaction services in the global energy and emissions markets. (*See* Affidavit of Benjamin Feldman, ¶ 3, at Tab D). A majority of Natsource's revenue is earned by identifying opportunities to purchase and sell Certified Emission Reductions ("CERs") generated pursuant to the Clean Development Mechanism ("CDM") created by the Kyoto Protocol to the United Nations Framework Convention on Climate Change ("the Kyoto Protocol"). (Id.) In the future, Natsource plans to use the same processes of research and assessment to identify opportunities to purchase and sell Emission Reduction Units ("ERUs") generated pursuant to the Joint Implementation Mechanism ("JI"). (Id.) Natsource Advisory & Research LLC ("NAR"), a wholly-owned subsidiary of Natsource, analyzes the potential outputs of CDM (and in the future, JI) projects and assesses the various risks that the CERs and ERUs generated by the project will not be delivered. (Id., ¶ 4).

6

**B.     The Delivery Risk Model ("the DRM"), Its Value and Protection**

Natsource analysts process regulatory and industry information related to the CDM's using a proprietary and confidential Delivery Risk Model ("the DRM") that Natsource treats and maintains as a trade secret. (Feldman Aff., ¶ 5). The DRM is the most critical piece of confidential business information held by Natsource and is central to the company's identity in the market. (Id.) The DRM is a project assessment model containing Excel spreadsheets, statistical software and other programming applications, which provides a discrete methodology for distilling various pieces of information about an identified CDM or JI project and then determining the attractiveness of that particular CDM or JI project. (Id.) No other entity in the international marketplace is known to have the capability to make the same sophisticated analysis in the same efficient manner as Natsource can with the DRM. (Id.)

The DRM is extremely valuable. Natsource has been approached by several private and public sector entities expressing interest in Natsource's licensing or selling the DRM. (Feldman Aff., ¶ 6). Natsource has declined such overtures because the trade advantage represented by the DRM far outweighs the potentially significant licensing or sale revenue. (Id.) Natsource has also declined inquiries for Natsource's assistance in developing similar models. (Id.) To do so would dilute the value of the DRM. (Id.) The DRM was developed by Natsource over the course of approximately two years, after which it became functional approximately 18 months ago. (Id., ¶ 8) The DRM is a dynamic model that is regularly updated and adjusted by Natsource's analysts depending on various economic, regulatory and legal changes in the international community. (Id.) Natsource has invested millions of dollars in manpower, resources and training to develop the DRM. (Id.) It is the life blood of Natsource's core business.

The DRM is stored on Natsource's internal computer network. (Feldman Aff., ¶ 9). All employees at Natsource need a login and password to access the computer network generally. (*See* Affidavit of Michael Grande, ¶ 4, at Tab E.) Every employee must change his or her password every 14 days or lose access to the network. (Id.) Access can also be done remotely by those with access to the Internet through either a home desktop or laptop computer. (Id.) Remote access using a login and password provides an employee with general access to Natsource's computer network. (Id.) Only authorized employees are provided with remote access capability. (Id.)

Access to the DRM is strictly limited to only those who must access the program for work, so that Natsource can maintain the DRM's inherent independent economic value and safeguard it from being exploited by the public or Natsource's competitors in the industry. (Feldman Aff., ¶ 9). Natsource, which has approximately 40 employees, provides five or six Natsource employees with full access to the DRM files on the network. (Id.; Grande Aff., ¶ 5). Access is provided by Natsource's network administrator, a technology employee who has no other responsibility for using the DRM. (Id.) Internally, the DRM also requires a separate password to access it. (Feldman Aff., ¶ 9).

Access to the output assessments developed by the DRM on particular projects is also limited. (Feldman Aff., ¶ 10; Grande Aff., ¶ 5). Each output assessment on a CDM or JI project can only be accessed through a specific path within Natsource's network. (Id.) The network administrator has the ability to limit which employees can and cannot access the output assessment. (Id.) Only a small and specific group of Natsource employees who have a business need to see the assessment are granted access. (Id.) An

announcement that an output assessment is available on the network is sent by e-mail to those employees with access. (Feldman Aff., ¶ 10) During the relevant time period, each e-mail regarding an output assessment contained the following disclaimer: "These DRM outputs should not be circulated outside the company without prior arrangement." (Id.) On limited occasions, a DRM output assessment has been distributed outside of Natsource as the result of a specific business or financial request. (Id.) Such distribution is made only after explicit agreement is obtained that the output assessment will be kept strictly confidential. (Id.) Natsource has nearly 600 output assessments regarding various projects on its network. (Id.)

No employee is allowed access to the DRM or the output assessments without the explicit authorization of Benjamin Feldman, Managing Director of Natsource. (Feldman Aff., ¶ 11; Grande Aff., ¶ 5). Feldman explains to each employee granted access that the DRM is the heart of Natsource's business and must not be disclosed to anyone else. (Feldman Aff., ¶ 11) Employees are put on notice that improper disclosure of the DRM to any unauthorized individual is grounds for immediate termination from employment. (Id.)

## C. Gazani's Access to Natsource's Trade Secrets

In late July 2005, the Defendant, Flavio Rufino Gazani, accepted a position with Natsource as a Senior CDM/JI Regulatory Analyst at Natsource. (Feldman Aff., ¶ 12). Gazani started work in October 2005. (Id.) In his position, Gazani was one of the employees granted access to the DRM and provided with the password to it in order to update files related to various regulatory and legal developments. (Id.; Grande Aff., ¶ 7)

At the beginning of his employment, Gazani was issued a company laptop from which he could directly access Natsource's internal computer network when he was in

9

the office and remotely access Natsource's network when he was traveling or at home.

(Grande Aff., ¶6). Gazani also had the ability to remotely access Natsource's network

from any other computer with internet access, including Gazani's home desktop. (Id.)

At the time he was issued the laptop, Gazani was warned that it was a violation of

company policies to access outside websites for the purpose of sending or retrieving

personal email, such as MSN. (Id.) The reason for this was to avoid viruses surfacing on

the laptop or Natsource's computer network. (Id.)

On June 20, 2006, Gazani sent an e-mail to Natsource's network administrator,

Michael Grande, seeking to obtain access to a specific DRM output assessment.

(Feldman Aff., ¶ 14; Grande Aff., ¶ 8). Grande responded that he needed "the OK from

Ben Feldman first." (Id.) Instead of asking Feldman to grant him access, Gazani sought

the assistance of two other Natsource employees with access to the DRM, Aline Ribas

and Rina Cerrato, to get the output assessment. (Feldman Aff., ¶ 14) In hindsight,

Gazani appears to have been trying to obtain project assessments that he otherwise had no

business need to know. (Id.)

On July 13, 2006, Gazani asked another employee for Natsource's list of vendors,

known as Project Development Document ("PDD") writers. (Feldman Aff., ¶ 15).

Natsource partners with PDD writers in the development of projects that Natsource

determines should be successful. (Id.) There are a couple dozen PDD writers in the

industry, but Natsource's PDD list contains only those PDD writers whom Natsource

knows to be effective. (Id.) The employee provided Gazani with the PDD writers list.

(Id.) Gazani volunteered that he "won't do anything with it," demonstrating his

knowledge that it was confidential proprietary information of Natsource. (Id.)

In September 2006, Gazani contacted Grande again because Gazani's laptop computer had stopped working. (Grande Aff., ¶ 9). Grande found it to be completely unusable. (Id.) It would not even start. (Id.) Gazani did not want to wait for Grande to try and fix the laptop, so Grande ordered Gazani a new one. (Id.) After he was given a new one, Grande and Feldman told Gazani that he absolutely could not access his MSN personal e-mail account on Natsource's laptop or computer network because it could result in exposure to a computer virus. (Feldman Aff., ¶ 17; Grand Aff., ¶ 9). Feldman also instructed Grande to prevent Gazani from doing anything on his next Natsource laptop that would cause the same type of damage to it. (Id.) Thus, Grande prevented Gazani from having the network rights to download programs from the Internet. (Grande Aff., ¶ 9)

Shortly after Gazani got a new laptop, he asked Grande to install a program for work purposes, since Gazani did not have the rights to download programs from the Internet. (Grande Aff., ¶ 10). When Grande went to do download the program for Gazani, Grande saw Gazani's personal MSN e-mail account on the screen. (Id.) Grande immediately reminded Gazani that he was not supposed to access his personal e-mail. (Id.)

At about the same time, Gazani asked Feldman for permission to access all the DRM output assessments. (Feldman Aff., ¶ 18). Gazani represented to Feldman that without this access, Gazani would have to wait for information from others in order to perform other functions of his job. (Id.) With no reason to doubt Gazani, Feldman granted his request based upon Gazani's representation that it was for Natsource's business purposes. (Id.) Feldman also thought that Gazani's access to the additional

output assessments would allow him to improve his work performance, which had not been satisfactory over the preceding months. (Id.) At the same time, Feldman again reminded Gazani about the confidential, proprietary and trade secret nature of the output assessments. (Id.) Gazani acknowledged the confidential nature of his access and the importance of maintaining the confidentiality of the DRM. (Id.) In September, Gazani also asked another Senior CDM/JI Regulatory Analyst through electronic instant messaging for the access password to the DRM update files. (*See* Marcela Aray Affidavit, ¶¶ 2-5, at Tab F.) Aray found it unusual that Gazani would ask for access to the DRM update files because it was not the time of year that Natsource engaged in updating activities. (Id.) However, since Gazani was authorized to have access to the DRM, Aray gave him the access password. (Id.)

Natsource now assumes that these requests were for the purposes of creating at least one CD ROM disk of Natsource's valuable confidential, proprietary and trade secret information so that he could misappropriate this information and convert it to his own use. Through his personal e-mail account, Gazani also had the ability to send and receive attachments, which could include programs, data, reports or spreadsheets, including of the DRM files Gazani could access. (Grande Aff., ¶ 11). Using this personal e-mail account, Gazani could download and send such files from Natsource's computer network without being detected. (Id.) Gazani's company-issued laptop computer also had a USB port through which Gazani had the ability to download from Natsource's computer network and store onto portable electronic media any programs, data, reports or spreadsheets, including the DRM files Gazani could access. (Id.)

**D.    Gazani's Disloyalty and Termination**

Natsource has learned that, during his employment with Natsource, Gazani had his own business called International Solutions. (Feldman Aff., ¶ 16). Natsource located an August 2005 newsletter wherein a Brazilian law firm discusses partnering with International Solutions on the development of CDM projects and the buying and selling of CERs. (Affidavit of Gisela Schon, ¶¶ 3-5, at Tab G.). August 2005 was the same month that Gazani accepted employment with Natsource. International Solutions is also advertised on a United States government program website called Methane to Markets. (Feldman Aff., ¶ 16). The address for International Solutions is listed on the website as 4000 Massachusetts Avenue, NW, Washington D.C., one of Gazani's previous residence addresses, and the telephone number is that for Gazani's cellular telephone. (Id.) Gazani is listed in the Methane to Markets website as the Director and contact for International Solutions. (Id.) The description of International Solutions' services is providing "consulting services for implementation of CDM projects, mainly in Brazil and other Latin American countries," which is among the businesses engaged in by Natsource. (Id.)

During the last week of September 2006, Gazani had a significant work performance failure that caused Feldman to discuss with Gazani the possible termination of his position. (Feldman Aff., ¶ 19). Specifically, a week earlier Gazani had failed to attend a CDM Executive Board meeting in Germany, required by his job, because he neglected to ensure that he was registered for it. (Id.) Feldman was very upset about Gazani's failure and did not hide it. (Id., ¶ 29). After Feldman got upset at Gazani, Gazani emailed a third-party, a man by the name of Eric Cullenberg, and noted "I'm thinking positively and need to act faster now. Need your help." (Id.) Mr. Cullenberg

apparently had access to Gazani's personal computer files and then sent him a form solicitation of PDD writing vendors. (Id.) The next day, September 27, 2006, someone using Gazani's Natsource laptop computer or Gazani himself accessed the results of all of Natsource's DRM assessments and components of the DRM model and its inputs from a portable CD ROM disk in the laptop's disk drive. (Id., ¶ 30) This CD ROM, a portable electronic format, contains the raw data from every DRM assessment done for the last 18 months. (Id.) This is confidential trade secret information that that no one else in the industry possesses and that Gazani swore (falsely) in his affidavit of October 20 that he never had accessed to and currently does not have.

On September 28, just before Gazani's trip, Feldman met with Gazani to express disapproval over Gazani's performance and advise Gazani that unless he dramatically improved in the next one to two months, he would be discharged. (Id., ¶ 20). Gazani asked for a couple of days to consider whether he wanted to seek other employment or attempt to improve his performance. (Id.) Feldman agreed to give him the time. (Id.) After returning from London the next week, Gazani gave Feldman verbal notice of his resignation and requested a transition period in which to find other employment. (Id.) Feldman agreed to allow Gazani to stay at Natsource through December 15, 2006. (Id.) Feldman also told Gazani that Natsource wished to be supportive of his attempt to find other employment and gave him Thursday afternoons off with pay to search for a job. (Id.)

Unbeknownst to Natsource, Gazani had also arranged a business meeting on behalf of International Solutions in London just before the executive board meeting in Germany. (Feldman Aff., ¶ 32). Though he could not make the trip to the CDM

Executive Board meeting, Gazani asked Feldman if he could still travel to London to "visit with his father." (Id.) That Monday, October 2, Gazani met with a PPD writing vendor in London. (Id.). The purpose of this meeting and other work that Gazani did while he was in London, ostensibly on Natsource business, was to develop a CDM project on behalf of his competing company, International Solutions. (Id., at ¶ 32).

Then, on October 12, 2006, Feldman received an email from Seth Baruch, Managing Partner of Quality Tonnes ("QT"). (Feldman Aff., ¶ 21). Natsource works with QT on various CDM projects. (Id.) In the email, Mr. Baruch forwarded an electronic correspondence to Feldman that was sent the evening of September 26, 2006, by Gazani. (Id.) That same evening Gazani was to attend a staff dinner at Feldman's house, but sent an instant message to Feldman excusing himself from the dinner because Gazani felt ill. (Id.) Gazani used his personal MSN e-mail account to send the correspondence. (Id.) In it, Gazani represented to Baruch that Gazani was contacting him "on behalf of International Solutions (IS), which is a Brazilian company focused on the CDM market." (Id.) In the correspondence, Mr. Gazani further stated:

> There is relatively low awareness of the potential
> opportunities in developing countries like Brazil. IS has
> identified a significant number of potential projects which
> could generate more than 7 million CERs. The company
> also has an existing sales force as well as many high-level
> government / industry contacts. From my evaluation of
> Quality Tonnes, I feel there may be an opportunity for you
> to partner with IS to bring projects to the market. I would
> like to speak to you more about these potential
> opportunities. Please feel free to contact me at any time;
> otherwise I will follow up with you in a couple of days.
> (Id.)

Natsource has done CDM project work in Brazil and regularly looks to identify new opportunities in that country. (Feldman Aff., ¶ 22). Since October 2005, Natsource

has been involved in the development of and monetization of CERs generated by a project in Salvador, Brazil. (Id.) During his employment at Natsource, Gazani was personally involved in the project. (Id.) In April 2006, Feldman also visited Brazil in an effort to cultivate more CDM projects. (Id.) Gazani knew about the trip. (Id.) After the trip, Natsource developed a Technology CDM Opportunity Guide regarding CDM project opportunities in Brazil to share with business partners. (Id.) The internal Natsource version of the guide had valuable Natsource information, not included in the externally shared version, regarding the prospects of particularly attractive CDM projects identified, including the potential CER output. (Id.) In May 2006, Gazani emailed the guide to his personal email address for no legitimate business reason. (Id.)

Gazani's job as a Senior CDM/JI Research Analyst for Natsource involved the same identification of potential projects in Brazil as well as in other areas of the world. (Feldman Aff., ¶ 23). The projects referred to in Gazani's e-mail to QT were either projects that Natsource had identified as prospects or that Gazani had identified and never disclosed to Natsource. (Id.) Natsource is unaware of the extent to which Gazani has diverted or tried to divert potential projects to International Solutions. (Id.) However, Gazani's statement that he has "identified a significant number of potential projects which could generate more than 7 million CERs" means that he used the DRM and/or its output assessments to evaluate the potential attractiveness of these projects. (Id., ¶¶ 21, 23)

Feldman confronted Gazani the same day about his solicitation of QT and competing business. (Feldman Aff., ¶ 24). Gazani denied any wrongdoing, but the paper trail demonstrates otherwise. Feldman advised Gazani that he was terminated effective

immediately and that Gazani was required to immediately return all Natsource property. (Id.) Feldman also requested access to any home computer of Gazani's through which he had remote access to Natsource's computer network and confidential, proprietary and trade secret information during his employment. (Id.) Feldman needed assurance that Gazani did not retain possession of any Natsource confidential proprietary and trade secret information, specifically the DRM and its output assessments. (Id.) Gazani refused Feldman's request, and Feldman informed Gazani that Natsource would pursue all available legal steps to protect its business. (Id.)

Natsource will suffer incalculable harm if Gazani, or any other person or entity, has the DRM and the analytic output which determines which are the most attractive CDM and JI projects in which to invest, and uses it to divert projects to International Solutions, or discloses it to any other competitor, individuals or entity outside of Natsource. (Feldman Aff., ¶ 25). The DRM is central to Natsource's business. (Id.) Moreover, if others were to learn through the output assessments or the raw data results of the assessments which projects had been selected by Natsource and analyzed under the DRM as attractive opportunities, Natsource would lose a valuable competitive advantage and be severely damaged in the industry. (Id.)

## IV. ARGUMENT

Gazani has violated the Computer Fraud and Abuse Act, breached his fiduciary duty of loyalty, misappropriated Natsource trade secrets, and converted Natsource property to his own use. He has done this by working on behalf of a competing business, International Solutions, while still employed with Natsource and soliciting work on behalf of International Solutions using Natsource trade secret information. He took these unlawful actions while simultaneously improperly seeking and gaining access to the

DRM, Natsources most critical trade secret instrument in its business, and the DRM's associated output assessments. Natsource believes that this sequence of events and access to information are not coincidental. Rather, he identified attractive projects for International Solutions using Natsource's DRM information and copied that information to a portable CD ROM to use to compete against Natsource. Moreover, when given the chance to come clean, Gazani decided to perjure himself and act as if he never had dominion over what the forensic proof demonstrates he did have – at least components of the DRM model, its inputs and the results of every DRM assessment performed since the inception of the DRM model. At least as of the last week of September, and likely still today, Gazani had that information on a CD ROM. Natsource is confident, based on the evaluation of Gazani's laptop, that Gazani continues to have control and dominion over the DRM, its output assessments and base proprietary information owned by Natsource and is using this intellectual property of Natsource for his own benefit and for the benefit of his company, International Solutions, which is directly competing with Natsource in the marketplace. Allowing Gazani to continue to possess and misappropriate Natsource's trade secret information threatens the value of the DRM and threatens the viability of that section of Natsource's business.

A.    **TRO/Preliminary Injunction Standard**

When a departing employee violates his fiduciary duty of loyalty by actively competing with his employer and misappropriating confidential proprietary and trade secret information to the detriment of the employer, the Court may enter a temporary restraining order or preliminary injunction if the employer demonstrates that: (1) there is a substantial likelihood that the plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if the injunction is not granted; (3) an injunction will not substantially

injure the other party; and (4) the public interest will be furthered by an injunction.

Morgan Stanley DW, Inc. v. Rothe, 150 F. Supp. 2d 67, 72 (D.D.C. 2001) (citing Mova

Pharmaceutical Company v. Shalala, 1340 F.3d 1060, 1066 (D.C. Cir. 1998).

**B.**     **Natsource Has a Strong Likelihood of Success on the Merits**

    1.     <u>Violation of the Computer Fraud and Abuse Act</u>

The Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030 (2006), among

other prohibitions, prohibits employees from using their employer's computers to send

proprietary information to a competitor. <u>Storage Centers Inc. v. Safeguard Self Storage

Inc.</u>, 119 F. Supp. 2d 1121 (W.D. Wash. 2000); *see also* <u>Charles Schwab & Co. v. Carter</u>,

2005 U.S. Dist. LEXIS 21348 (N.D. Ill. 2005). The facts now known establish numerous

violations of the CFAA. Gazani has violated of 18 U.S.C. §1030(a)(2)(C) which

provides that "whoever . . intentionally accesses a computer without authorization or

exceeds authorized access, and thereby obtains . . . information from any protected

computer if the conduct involved an interstate or foreign communication . . . shall be

punished." Gazani also violated 18 U.S.C. §1030(a)(4) which provides that a person

violates the CFAA if he "knowingly and with intent to defraud, accesses a protected

computer without authorization, or exceeds authorized access and by means of such

conduct furthers the intended fraud and obtains anything of value. . . " Finally, the facts

articulated above establish a violation of 18 U.S.C. §1030(a)(5)(A)(iii): "whoever . . .

intentionally accesses a protected computer without authorization, and as a result of such

conduct, causes damage" violates the CFAA.

Specifically, Gazani violated the CFAA by exceeding the authorized use he was

allowed by Natsource to intentionally obtain valuable confidential and trade secret

information, which he then intentionally used for purposes of competing with Natsource,

resulting in loss to Natsource. Through his personal e-mail account, Gazani had the

ability to send and receive attachments, which could include programs, data, reports or

spreadsheets, including of the DRM files Gazani could access. (Grande Aff., ¶ 11).

Using this personal e-mail account, Gazani could download and send such files from

Natsource's computer network without being detected. (Id.) Gazani's company-issued

laptop computer also had a USB port and CD ROM disk drive through which Gazani had

the ability to download from Natsource's computer network and store onto portable

electronic media any programs, data, reports or spreadsheets, including the DRM files

Gazani could access. (Id.; Rodokankis Aff., ¶ 3) Natsource now knows that Gazani had

a CD ROM that included all of the DRM output assessments, which he was not

authorized to have, and which he accessed on his Natsource laptop.

When Natsource issued Gazani a Natsource company laptop, he was told that he

was prohibited from accessing internet programs, such as his MSN personal email

account, from his laptop because of the risk that it could result in exposure to a computer

virus. Gazani did this anyway in direct violation of Natsource's policies. This improper

and unauthorized use of his laptop either contributed to or caused that laptop to be

damaged beyond repair. When Gazani was provided with a second laptop computer, he

was again reminded of Natsource's prohibition against accessing internet programs from

his laptop, and, this time Natsource added protections to the computer to try to ensure

against further problems. Nevertheless, Gazani again accessed his MSN account from his

company issued laptop in direct violation of Natsource's instructions.

Now that Natsource has completed forensic evaluation of Gazani's Natsource

computer, it is clear that Gazani used his MSN account to send email on behalf of his

competing company, International Solutions, regarding opportunities that either Gazani had identified using confidential information or learned through the DRM output assessments. Specifically, Gazani passed along information to QT by email, regarding projects in Brazil that were attractive, but were little known in the market. This MSN email was sent from Gazani's laptop computer in violation of Natsource's prohibition against accessing Gazani's personal email on the laptop and in violation of his duty of loyalty.

Significantly, Natsource believes this email communication resulted from the misuse of valuable confidential information belonging to Natsource that Gazani had obtained without proper authorization and information that he was prohibited from sending outside of the company. Gazani had access to Natsource's DRM and the output assessments from the DRM only for business purposes. Gazani circumvented Natsource protocols and obtained DRM output assessments at a time when he had no Natsource business need for this information. On the rare occasions where these output assessments are distributed outside of the company, it is only when an explicit agreement is obtained that the output assessment will be kept strictly confidential.

Even more alarming is that Gazani possesses a CD ROM with components of the DRM and the results of all DRM assessments on it. Gazani was not authorized to have this information on portable media and certainly was not authorized to use it to compete with Natsource. All these actions were taken in direct violation of the CFAA. *See e.g.*, EF Cultural Travel BV v. Explorica, 274 F.3d 577 (1st Cir. 2001) (company's unauthorized access to price list of competitor found to be a violation of CFAA );

Shurgard Storage, 119 F.Supp.2d 1121 (employees who used employer computers to send trade secret information to competitor violated CFAA).

Because of this unauthorized access, Gazani has obtained valuable confidential information of Natsource and Natsource has suffered harm including, but not limited to, the diminution in value of the confidential, proprietary and trade secret information disclosed by Gazani, the loss of goodwill in the market caused by Gazani's disclosure of this information, the cost of evaluating and repairing Gazani's first laptop, the cost of diagnostic and forensic measures incurred to evaluate harm to Natsource's systems and intellectual property, and other harm that has not yet been fully determined. These damages are recoverable as losses under the CFAA. *See* Explorica, 274 F.3d at 580.

2.    Breach of the Duty of Loyalty

As an employee of Natsource, Gazani owed a fiduciary duty to Natsource. This duty included an obligation of "undivided and unselfish loyalty to the corporation," such that "there shall be no conflict between duty and self-interest." Mercer Management Consulting, Inc. v. Wilde, 920 F. Supp. 219 (D.D.C. 1996) (citing Guth v. Loft, 5 A.2d 503, 510 (1939); *see also* Restatement (Second) of Agency, § 387 ("unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency.") Similarly, "an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency." Restatement (Second) of Agency § 393.

An employee may lawfully plan to go into competition with his employer while still employed, so long as "no unfair acts are committed or injury done." Mercer Management Consulting, 902 F. Supp. at 232. In this case, it is undeniable that Gazani leaped over the line between legality and disloyalty by absconding with opportunities for

attractive CDM projects in Brazil that he identified and should have provided to his employer as part of his job. It is also evident in Gazani's data dump of DRM-related materials onto a CD ROM, and his communication with Quality Tonnes, that he unlawfully converted Natsource property for his own and made, or passed along assessments Natsource made regarding attractive investment projects. Finally, Gazani also caused the malfunction of Natsource's laptop computer issued to him in his position, destroying unknown amounts of information. Because International Solutions was in the same business as Natsource since August 2005, the month Gazani was hired, Gazani may have been planning his unlawful actions since the time he applied for a position, if not before. Gazani's email records establish that he competed directly with Natsource, using Natsource confidential information, during and after his employment with Natsource.

Thus, Natsource is more than likely to succeed in its claim against Gazani for the violation of his duty of loyalty.

3.    <u>Misappropriation of Trade Secrets</u>

Under the District of Columbia Trade Secrets Act, D.C. Code §36-401 *et seq.*, a trade secret is

> ...information, including a formula, patter, compilation, program, device, method, technique or process, that: (A) derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) is the subject of reasonable efforts to maintain its secrecy.

Misappropriation of such a trade secret occurs when it is disclosed or used without express or implied consent by a person who "used improper means to acquire knowledge of the trade secret." Such improper means includes theft, misrepresentation, breach of a duty to maintain secrecy, or espionage through electronic or other means. D.C. Code §

36-402 provides that "actual or threatened misappropriation" of trade secrets may be enjoined.

Here, the facts demonstrate that Natsource derives precious economic value, actual and potential, from the DRM and its output assessments because they are not generally known or readily ascertainable to the general public. If the DRM or its output assessments were released to a competitor, that competitor would have the benefit of that value and Natsource would lose a competitive advantage and unique ability to evaluate CDM and JI projects. The DRM's value is further demonstrated by the several requests Natsource has received to sell it or build a similar program for others in the market. This demonstrates the industry's knowledge that the DRM has its own economic value and is highly coveted.

The fact that Natsource provides multiple layers of electronic and administrative protection to the DRM demonstrates how important it is to the company to maintain its secrecy. First, Natsource provides the DRM and its output assessments with multiple layers of protection within its computer network. To get to this trade secret information, a person must be an employee with a network login and password. (Michael Grande., Aff., ¶ 4). Within the network a person must have specific network rights to access the DRM and the output assessments. (Id.) Currently, only six employees have access to the DRM and a larger but defined group has access to its output assessments. (Feldman Aff., ¶ 9). Finally, the DRM itself has a third layer of protection in the form of an additional program password. (Id.)

Natsource does not distribute the output assessments publicly, and employees are specifically warned about not disclosing the DRM or its output assessments. (Feldman

Aff., ¶ 11). Natsource's significant efforts to protect these trade secrets demonstrates the importance of maintaining their secrecy. Natsource's evidence in this regard shows that it is likely to succeed on its trade secret claim.

    4.    Conversion

Conversion is "an unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of his right to such property. Blanken v. Harris, Upham & Co., Inc., 359 A.2d 281, 283 (D.C. 1976) (citation omitted). "To constitute conversion of chattel, there must be an unauthorized assumption of the right to possession or ownership." Chase Manhattan Bank v. Burden, 489 A.2d 494, 495 n.4 (D.C. 1985) (quoting Hobson's Truck Sales, Inc. v. Carroll Trucking, Inc., 276 N.E.2d 89, 90 (1971)).

Gazani's possession of the DRM and its output assessments to evaluate potential CDM projects for his own personal gain denies Natsource of its ownership value in the DRM and its output. This conversion of Natsource property was purposeful and for the improper purpose of directly competing against Natsource while Gazani was still an employee. Natsource did not give Gazani its consent for him to use the DRM in this manner and objects to that use. Moreover, if Gazani continues to have possession of the DRM and its output assessments, as Natsource suspects, Gazani's unlawful dominion over such Natsource property is continuing. Natsource also seeks further discovery on this issue.

## C.    Natsource Will Suffer Irreparable Harm if Injunctive Relief is Not Granted

Natsource can only suspect the worst and seek relief from this Court to protect its invaluable trade secret interests. Based on Gazani's acts to date, he has no hesitation about unlawfully using Natsource's trade secrets for his own personal benefit and that of

his company, International Solutions. Natsource has a reasonable fear that Gazani will unlawfully continue to use and disclose the DRM and its output assessments to his own benefit. The facts clearly demonstrate the inherent value and the market edge provided to Natsource by this unique programming. The facts are also irrefutable that Gazani possessed a portable version of Natsource's DRM components, all the results of its assessments and more confidential information. Gazani's possession of this information coincided with his boss' dissatisfaction with his performance, and his shortly preceded his planned resignation. Natsource will face incalculable harm if the DRM or its output assessments are used against it or provided to its competitors or the public in general. Gazani has no argument that his use or disclosure of the DRM or its output assessments will not irreparably harm Natsource.

Therefore, Natsource respectfully asks that this Court (1) prohibit Gazani from making any unlawful use or disclosure, or assisting in such, of Natsource confidential, proprietary and trade secret information; (2) order the return by Gazani of all Natsource confidential, proprietary and trade secret information; (3) direct Gazani to provide an accounting of any copies made of Natsource's confidential, proprietary and trade secret information; (4) order the disclosure of all devices where the copies are stored, and to take all steps necessary to disable, erase, or return all copies; (5) allow a third party forensic inspection of Gazani's personal and business computers for Natsource's confidential, proprietary and trade secret information; (6) order the disclosure of the identity of all business partners of Gazani, as well as the identity of all third parties to which he disclosed Natsource's confidential, proprietary and trade secret information; and (7) require Gazani to execute an affidavit subject to the penalty of perjury, attesting

that he has deleted and/or returned all Natsource's confidential, proprietary and trade secret information and has not disclosed it to any third parties other than those listed pursuant to part (6). Though information continues to develop, Natsource also believes that Gazani is not acting alone. Natsource seeks the Court's agreement that an such relief also apply to those working in concert with Gazani.

**D.    Balance of the Equities Weighs in Natsource's Favor**

Like the previous two factors, the balance of the equities prong strongly militates in favor of granting Natsource's motion for injunctive relief. In order to protect the very existence of Natsource's core business, Gazani must be prohibited from taking any further action to use or disclose Natsource's confidential and trade secret property. Because Gazani has no right to this property, he can not claim to suffer any harm by being ordered to return this information to Natsource and disclose all individuals and entities to whom he has provided it. Using an outside forensic expert, Gazani's privacy interests in his home computer and other electronic media will be preserved.

Conversely, for the reasons articulated above, Natsource will suffer irreparable harm to its business if this action is not taken against Gazani. The scale in this case weighs heavily in favor of injunction. Because Gazani already has sworn falsely in an affidavit that he did not ever have access to DRM information that he not only accessed, but possessed a portable copy of for no legitimate reason, Natsource can no longer rely on even Gazani's sworn statements. Thus, Natsource relies on the power of this Court to prevent it from suffering further, irreparable harm.

**E.    Injunction Is in Public Interest**

For the reasons discussed in this Memorandum, the public interest is solidly in Natsource's favor. Natsource spent countless amounts of time and money to develop a

novel program that allows it to make a valuable business judgment that cannot be made as efficiently by any of its competitors. This confidential and trade secret technology is valuable and socially and environmentally worthwhile on a global scale. Gazani has willfully and maliciously used it for his own personal business benefit without Natsource's consent. Any continued efforts to do so irreparably jeopardizes Natsource's business. If left unchecked, the end result will be the ruination of Natsource as its reward for diligently developing a commercially valuable program. The public interest favors lawful competition; Gazani's efforts are unlawful. The public has no interest in a marketplace that rewards unlawful behavior over ingenuity.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Natsource's Motion for a Temporary Restraining Order and order that Gazani, and those working in concert with him, (1) cease any unlawful use or disclosure, or assisting in such, of Natsource confidential, proprietary and trade secret information; (2) return all Natsource confidential, proprietary and trade secret information; (3) provide an accounting of any copies made of Natsource's confidential, proprietary and trade secret information; (4) disclose all devices where the copies are stored, or have ever been stored, and take all steps necessary to disable, erase, or return all copies; (5) allow a third party forensic inspection of Gazani's personal and business computers for Natsource's confidential, proprietary and trade secret information; (6) disclose the identity of all business partners of Gazani, as well as the identity of all third parties to which he disclosed Natsource's confidential, proprietary and trade secret information; and (7) execute an affidavit subject to the penalty of perjury, attesting that he has deleted and/or returned all Natsource's confidential, proprietary and trade secret information and has not disclosed it to any third

parties other than those listed pursuant to part (6).  Natsourse also requests that it be

permitted to disclose to members of the industry and its competitors the existence of this

action and the substance of any temporary restraining order issued by the Court.

Respectfully submitted,

NATSOURCE LLC

_Susan Wiltsie_

Counsel

Susan F. Wiltsie (DC Bar #429625)
Scot A. Hinshaw (DC Bar #449723)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202)  778-2201 (facsimile)



HUNTON & WILLIAMS LLP
1900 K STREET, N.W.
WASHINGTON, D.C. 20006-1109

TEL      202 • 955 • 1500
FAX      202 • 778 • 2201


SUSAN F. WILTSIE
DIRECT DIAL: 202-955-1546
EMAIL:  swiltsie@hunton.com

FILE NO: 67857.1

October 13, 2006


**BY COURIER, ELECTRONIC MAIL**
**AND OVERNIGHT DELIVERY**

Mr. Flavio Rufino Gazani
1830 17th Street, N.W., #403
Washington, D.C. 20009

Dear Mr. Gazani:

Our firm represents Natsource LLC and Natsource Advisory & Research LLC (collectively, "Natsource"). As you know, your employment with Natsource was terminated effective yesterday, October 12, 2006. It has come to our attention that you have been and are currently serving as the Director of International Solutions, which is, or seeks to be, a competitor to Natsource and that you are in possession of certain of Natsource's confidential and trade secret information. The purpose of this letter is to place you on notice concerning certain of your continuing legal obligations to Natsource. As a former employee, you are not permitted to possess, use or reveal trade secret or other confidential information to the general public, especially Natsource's competitors.

This information specifically includes the valuable information concerning Natsource customers and potential investments you learned as a Natsource employee and possessed in both electronic and hard copy. The use and disclosure of such information is prohibited under the laws of most states, including Virginia, Maryland and the District of Columbia. In addition to private legal remedies including damages and injunctive relief, there are potential criminal consequences for the theft of trade secrets, including 18 U.S.C. § 1832 which provides for fines and up to a ten-year term of imprisonment. Should you refuse to return to Natsource all of its physical and intellectual property or cause any harm to Natsource by using or disclosing its trade secret and confidential information for your benefit or the benefit of any Natsource competitor, Natsource will seek all available legal remedies against you. This includes seeking immediate action by a court to prevent you from using this information, including in connection with your activities at International Solutions.

We understand that while you were still a Natsource employee, you used confidential customer and other proprietary information and approached at least one existing business contact of



Mr. Flavio Rufino Gazani
October 13, 2006
Page 2

Natsource seeking to enter into a business relationship with them that would be the same relationship as they have with Natsource. This action was a violation of your fiduciary duty of loyalty to the company. Should any damages occur as a result of your actions, Natsource will pursue legal action against you.

In addition, you must not retain in your possession nor remove, transfer or duplicate any of Natsource's confidential information, including, without limitation electronic or hard copies of trade secret and confidential information of Natsource in your possession. <u>Any such property or information must be returned immediately to Natsource's office, or you will face legal repercussions for your refusal to do so.</u>

Natsource's primary objective in this matter is to protect and account for its confidential and trade secret information and to otherwise protect itself from unfair competition. You may avoid the consequences of litigation by immediately contacting me to (a) arrange a return of Natsource's property, and (b) agree upon a methodology to ensure Natsource that its rights will not be subject to further infringement.

Also, we are concerned that certain electronically stored information in your possession relevant to this matter will be destroyed or overwritten. You are now on notice that litigation is anticipated with respect to the above-referenced matters and you must refrain from altering and/or erasing active, deleted files or file fragments on any electronic media that may have any relation to this matter. This prohibition also applies to any hard copy documents or information in your possession.

Please contact me, or have your attorney, contact me immediately regarding these matters.

Thank you.

Sincerely,

Susan Wiltsie

Susan F. Wiltsie

SFW:rij

## AFFIDAVIT OF FLAVIO RUFINO GAZANI

Flavio Rufino Gazani, being duly sworn and subject to the penalty of perjury, deposes and states:

1.    I am over the age of eighteen (18) and am otherwise competent to make this affidavit. I am not under the influence of any medications and know of no reason why I would not otherwise be able to truthfully swear to the facts in this Affidavit.

2.    I was formerly employed by Natsource LLC ("Natsource") as a Senior CDM/JI Regulatory Analyst. In my position, I did not have access to Natsource's Delivery Risk Model ("DRM") program. My only involvement with the DRM program was in the twice-yearly update of the program and my involvement was limited to the "carbon regulatory risk," which is a small part of the risk assessed by the program. The DRM program required a password to access, and I did not have such a password at any time during my employment by Natsource.

3.    While employed by Natsource, I did not use my personal home laptop to do any Natsource work. After the termination of my Natsource employment, I did not retain any hardcopies of any Natsource documents or other information, other than my own immigration paperwork and related personnel documentation. I also do not have any part of Natsource's DRM program, any of its output assessments, or any lists of projects favorably assessed by the DRM. I did retain one computer disk containing a few Natsource files on which I worked and intended to return to Natsource. After

signing this Affidavit, I will deliver the computer disk to Natsource's attorneys.  I

will not keep copies of this information and do not intend to use it for my own

benefit or disclose it to others.  I do not otherwise have any Natsource property.

4.    While I was an employee of Natsource, I made an inquiry to Quality

Tonnes, a non-exclusive contractor in product development services.  I contacted

Quality Tonnes on behalf of International Solutions, a company of which I am a

Director, regarding the development of projects in Brazil.  No confidential or

proprietary information was used in connection with these communications.


_____
Flavio Rufino Gazani

Subscribed and sworn to me, a notary public, this 26th day of October,

2006, at Miami Beach    FLA.            .
         [City]            [State]

Judith E. Robertson
Commission #DD220794
Expires: Jun 08, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

_____
Notary Public

My Commission Expires:  6|8|07

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

**<u>AFFIDAVIT OF PHILIP RODOKANAKIS</u>**

Philip Rodokanakis, being duly sworn, deposes and states:

1.    I am over the age of eighteen (18) and am otherwise competent to make this affidavit. The information contained in this affidavit is based on my personal knowledge.

2.    I am the Managing Partner of U.S. Data Forensics, LLC, doing business in Bethesda, Maryland. My office is at 4520 East West Highway, Suite 640, Bethesda, Maryland. I have a Master's degree in Education with a concentration in Human Services and a bachelor's degree is Business Administration.

1.    I am a Certified Fraud Examiner and a retired Federal Special Agent, Criminal Investigator, with more than 30 years of experience in investigating white collar crimes. While in federal service, I was trained to conduct forensic examinations of computer systems and have continued undertaking this specialized training since I retired from the federal government. I also teach a "Computer Forensics and Incident Response" course for The Learning Tree International, a company specializing in training Information Technology and Management professionals. Over the last ten years, I have

conducted numerous computer forensic examinations. A copy of my curriculum vitae is attached hereto and is made a part of this affidavit (Exhibit No. 1).

2.      My work involves the analysis and reconstruction of computer data contained on various electronic media. I am often asked to work on potential or active litigations involving the creation, destruction of recovery of computer data on laptop or desktop computers and computer disks.

3.      I have been retained by the law firm of Hunton Williams, LLP, counsel for the Plaintiff, as a consulting expert to provide computer forensic services.

4.      In this case, I have been asked to analyze a laptop computer belonging to Natsource LLC that was issued to Flavio Gazani, a former employee. We obtained the laptop on Friday, October 13, 2006, from Benjamin Feldman at Natsource's offices in Washington, D.C. We then secured the laptop within U.S. Data Forensics LLC offices in Maryland. I began my analysis of the hard disk drive contained in this laptop computer the following week.

5.      I have acquired a forensically sound image of the hard disk drive that was removed from the laptop computer assigned to Gazani. This image was used to conduct my examination of the data stored on the hard disk drive of Gazani's laptop computer.[1]

6.      Computers using the Microsoft Windows operating system, use Microsoft's Internet Explorer (IE) as the default Internet browser,[2] which was what was

---

[1] The National Institute of Justice (NIJ) provides guidelines and minimal standards for conducting examinations of computer systems that are forensically sound. (See: U.S. Department of Justice, Office of Justice Programs, National Institute of Justice, Special Report: "Forensic Examination of Digital Evidence: A Guide for Law Enforcement," April 2004, NCJ #199408). I have followed these guidelines and standards in this case.

[2] Third party browsers can also be installed and used to surf the Internet.

2

used on Mr. Gazani's laptop. When IE accesses a page on the Internet, a temporary file is automatically generated to temporarily cache the data retrieved from the website to the hard disk drive of the computer used to access the page in question. These temporary files are stored in a folder named "Temporary Internet Files." Artifacts from HTML-formatted[3] files accessed on the web can usually be found in this folder for a long time after the user first accessed a particular page on any given website.

7.     Artifacts are files or other objects left behind on a computer's hard disk drive during routine use of the system. For example, when a user accesses various pages on the Internet, the accessed page is temporarily saved on the user's hard disk drive as an artifact. Computer users normally do not have ready access to these artifacts and are not aware of their existence. An artifact is a one dimensional view—a snapshot. The user, however, has multidimensional access to the hot links embedded on the first page such that he or she can access a wealth of additional information that may not be accessible via the artifact.

8.     Accordingly, when accessing a web-based email account, IE leaves an HTML-formatted file in the Temporary Internet Files folder. These temporary files contain the text of the message that was accessed by the user.

9.     When examining the laptop assigned to Mr. Gazani, numerous files were located in the Temporary Internet Files folder under his user account on the hard disk drive. I was asked to search the file names within the laptop for any reference to the Discovery Risk Model or "DRM." I was also asked to search for references in any files

---

[3] HTML: Hyper Text Mark-Up Language, the commonly used coding to format files usually stored on Internet servers.

or any email correspondence regarding "International Solutions." Lastly, I searched for email correspondence from or to flaviogazani@msn.com.

10.    My search revealed email messages with the acronym DRM and the phrase "International Solutions." I also found some emails with attachments that referenced DRM. There were numerous other emails sent to and from flaviogazani@msn.com. Lastly, I found several shortcut files that show someone opened up and viewed files with "DRM" acronym in the file name, including Excel spreadsheets, contained on a CD-ROM disk in the laptop's CD-ROM disk drive. These shortcuts show that the files were last accessed on the CD-ROM on September 27, 2006.

11.    I provided the emails and a list of all the DRM shortcuts and file names to counsel for Natsource in an electronic format for review on October 23, 2006. The data stored on the laptop's hard disk drive has not been altered in any way and remains in the same condition as when it was turned over to us. I currently retain possession of the laptop computer in a secured area within U.S. Data Forensics, LLC.

12.    I have attached to this Affidavit as Exhibits 2, 3, and 4, three documents that I found on the hard drive of Mr. Gazani's computer.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of 4 pages including this signature page, is true and correct. Executed on October 25, 2006.


_____

Phillip Rodokanakis



# Phillip A. Rodokanakis, CFE

## CURRICULUM VITAE

## PROFESSIONAL EXPERIENCE

Phillip A. Rodokanakis is Managing Partner of U.S. Data Forensics, LLC and a team member of the Forensic Accounting and Dispute Analysis department of Klausner Dubinsky + Associates, P.C.

Mr. Rodokanakis is a Certified Fraud Examiner (CFE) with 30 years experience in international and domestic investigations.  Mr. Rodokanakis brings to U.S. Data Forensics, LLC, a combination of technical expertise in the Information Technology field and many years of investigative experience in conducting white collar crime investigations.  He has participated in prosecutions of numerous complex financial frauds. As an investigative manager, he has first hand experience in management reviews and surveys, organizational development, vulnerability assessments, financial controls, and property accountability.

Mr. Rodokanakis is a computer forensics and data recovery expert with a solid professional background in computer forensics and advanced Information Technology systems. He has conducted numerous forensic examinations of computer systems and provides services as an expert witness. Mr. Rodokanakis also teaches Computer Forensics and Incident Response courses for The Learning Tree International, a world leader in hands-on training for Management and Technology Professionals. Given his expertise, he has also appeared as a guest on a number of radio and TV shows.

As a federal special agent Mr. Rodokanakis conducted a broad range of criminal, civil, and administrative investigations in more than 60 countries. He interacted with senior public and private sector officials at the highest executive levels, both in the United States and overseas.

Some of the highlights of Mr. Rodokanakis' career include:

- He has been called to testify as an expert witness in fraud examinations and has experience in providing support to a law firms engaged in civil litigations involving a complex fraudulent schemes.

- He serves as a consultant to askSam Systems, Inc., a software developer of a unique free-flow database application. His focus is on developing customized systems that can be used in criminal and fraud investigations or litigation support. One such system was developed for the Special Court to Sierra Leone, that is the United Nations War Tribunal set up to investigate and prosecute the war crimes and other atrocities committed during the civil war in that country.

- As the Director for Investigative Technology at the Department of Interior (DOI) Office of Inspector General (OIG), he was tasked with establishing an Investigative Technology Unit whose primary mission was threefold: Computer Forensics, Network Security, and Data Mining. He directed a software development team that implemented a new Investigative Management System over a nationwide virtual private network. He undertook computer forensic examinations and provided technical support to major fraud investigations.

- He served as the Special Agent-in-Charge of the DOI/OIG, where he directed all investigative operations in the Eastern Division, with territorial responsibility for 32 States south and east of the Rockies as well as the District of Columbia, Puerto Rico and the Virgin Islands. He oversaw complex criminal and civil investigations, including the fraudulent underpayment of oil, natural gas, and coal royalties, environmental crimes with a particular focus in oil and natural gas operations on the Outer Continental Shelf, white collar crimes perpetrated against Indian tribes, crimes relating to Indian gaming, thefts and major embezzlements, procurement and credit card frauds, employee integrity, and other crimes involving Departmental programs and employees. A number of the royalty investigations he managed resulted in multi-million dollar settlements in favor of the Government—one such settlement exceeded $56 million.

- While working for the U.S. Agency for International Development (USAID) OIG he held an appointment in the Foreign Service of the United States. He was appointed the Special Agent-in-Charge of the Singapore Field Office, where he was a member of the American Embassy Country Team and administered an annual $3.0 million joint operating expense budget in conjunction with the audit office. In this capacity, Mr. Rodokanakis had investigative responsibility over all USAID operations in the Near East and Far East, in connection with the $600 million economic assistance program.

- As the Deputy Inspector General for Investigations at USAID, he directed the operations of the Washington Divisional Office. He supervised many diverse criminal, civil, and administrative investigations and coordinated prosecutions in a number of different federal as well as State court districts.

- He also held other management positions with USAID, such as Regional Inspector General for Investigations for the OIG having responsibility for West and Central Africa. He spent five years in that office and oversaw a number of fraud investigations impacting the multi-million U.S. Foreign Aid program to Africa.

- He has also served as an adjunct college instructor. He was accredited by the Texas Education Agency to teach all Law Enforcement and Criminal Justice courses. He has extensive experience as trainer and instructor. He has developed training modules and delivered specialized training presentations in the areas of computer forensics and white collar crime investigations.

Areas of Mr. Rodokanakis' practice include:

- Computer Crimes
- Computer Forensics
- Fraud Investigations
- Corporate Investigations
- Litigation Support
- Forensic Accounting
- Due Diligence
- Asset Searches

## PROFESSIONAL AFFILIATIONS

- Association of Certified Fraud Examiners (ACFE)
- Washington Metro Chapter of Certified Fraud Examiners (past Chapter President & Member of the Board of Directors)
- High Technology Criminal Investigations Association (HTCIA)
- Federal Law Enforcement Officers Association (FLEOA)
- Criminal Investigation Division Agents Association (CIDAA)
- High Tech Crimes Consortium (HTCC)

## ARTICLES & PRESENTATIONS

- Fear of Flying: Acceptable Levels of Risk are Necessary to a Successful OIG Investigative Program; The Journal of Public Inquiry, 1995

- The Internet: An Investigative Tool; presentation to the Washington Chapter of CFEs and the working group of OIG Special Agents-in-Charge, 2001

- The Criminal Referral Process; presentation to DOI Mineral Management Service (MMS) inspector personnel in several different office locations, 2002

- askSam Software Suite: How to use askSam software to manage and organize fraud investigations and provide litigation support; presentation given to the Washington Chapter of CFEs and numerous audit and investigative professionals that specialize in white-collar crime investigations, 2002 & 2003

- Electronic Investigations: The Internet as an Investigative Tool; presentation to the 14th Annual Fraud Conference, sponsored by the Association of Certified Fraud Examiners, 2003

- Cryptography: Password Protection & File Encryption; presentation to the MD Chapter of the ACFE and the ISACA joint meeting, May 2004

- Incident Response: Preparedness is Essential in Today's Computing Environment; presentation to the MD Chapter of the ACFE and the ISACA joint meeting, May 2004

- IP Tracing: A primer in Tracing IP and Email Addresses; presentation to the MD Chapter of the ACFE and the ISACA joint meeting, May 2004

- Fraud Initiatives: An introduction to the CFE Fraud Prevention check-up; presentation to the annual conference of the Chief Financial Officers of the Association of American Railroads, May 2005

- Computer Detectives: A primer about Computer Forensics and what this technology entails; presentation given at the NBC4 Digital Expo show, August 2005

- Computer Forensics: The FAQs, The DOs, and the DON'Ts; presentations given to numerous Law Firms, Accounting Firms, Bar Associations, and other professional associations, 2004 to Present

Additionally, Mr. Rodokanakis has developed training modules and delivered specialized training presentations in the areas of computer forensics and white collar crime investigations.

Mr. Rodokanakis gives regular presentations to Law Firms, Accounting Firms, Bar Associations, and other professional associations on Computer Forensics, Computer Crimes, and other topics as they relate to litigation support and fraud investigations.

Mr. Rodokanakis has given numerous in-service training presentations at various federal agencies. He also regularly authors a number of Opinion Editorials that have been published in local newspapers on political and public accountability subjects.

## EDUCATION AND TRAINING

- 1975  University of Maryland, A.A., Management
- 1976  U.S. Army Criminal Investigator Course (Commandant's List)
- 1976  University of Maryland Certificate of Studies, Law Enforcement
- 1977  University of Maryland, B.S., Business Administration
- 1978  International Drug Enforcement Training, DEA
- 1979  Boston University, Ed. M. (Master of Education), in Human Services
- 1990  USAID Senior Management Course
- 1994  Certified Fraud Examiner, ACFE
- 1996  Criminal Investigations in an Automated Environment (Computer Forensics), Federal Law Enforcement Training Center (FLETC)
- N/A   University of Phoenix, MBA Candidate *(Completed approximately 1/2 of the course requirements)*

Mr. Rodokanakis has received specialized training in Computer Fraud, Computer Forensics, Information Technology, Data Mining, Government Fraud, White Collar Crimes, Public Corruption, Money Laundering, Forensic Accounting, and Financial Investigations.

| Message0413 | |
|---|---|
| Subject: | Technology CDM Opportunity Guide |
| From: | Flavio Gazani |
| Date: | 5/16/2006 12:21:43 PM |
| To: | 'flaviogazani@msn.com' |

| Message Body |
|---|
| to read |

| Attachment |
|---|
| Technology CDM Opportunity Guide.doc |

### Outlook Header Information

Conversation Topic: Technology CDM Opportunity Guide
Subject: Technology CDM Opportunity Guide
From: Flavio Gazani
Sender Name: Flavio Gazani
To: 'flaviogazani@msn.com'
Delivery Time: 5/16/2006 12:21:43 PM
Creation Time: 5/16/2006 12:21:31 PM
Submit Time: 5/16/2006 12:21:43 PM
Importance: Normal
Priority: Normal
Sensitivity: Normal
Flags: 19 = Read, Unmodified, Has Attachment
Size: 63314

MSN Home | My MSN | Hotmail | Shopping | Money | People & Chat    Sign Out.net    Web Search: [G]

msn    Hotmail    Today | Mail | Calendar | Contacts    Options | Help
Free Newsletter

flaviogazani@msn.com

Reply | Reply All | Forward | ✕ Delete | Junk | Put in Folder ▾ | Print View | Save Address

Inbox

Sent Messages

Drafts

Trash Can

Credit Car...

internet a...

IS

Trips

True Love

Report Junk E-Mail

Report and Block Sender

Sign in

New Instant Message

Add Messenger Contacts

△ | ▽ | ✕ | Inbox

| | |
|---|---|
| From : | Eric Cullenberg <cullenberg@yahoo.com> |
| Reply-To : | Eric Cullenberg <cullenberg@yahoo.com> |
| Sent : | Tuesday, September 26, 2006 2:14 PM |
| To : | Flavio Gazani <flaviogazani@msn.com> |
| Subject : | Re: Send me a file please |

ï»¿

**Carbon Ventures (US)**

Â

Mike Scott, Princeton, NJ, US

+1 609.243.9811

Â

Â

mscott@environcorp.com

Hi Mike,

I found your contact information on your company website in my research. Currently I am living in Washington DC, but I have a company in Brazil focused on the CDM market. My ultimate goal has always been to bring CDM projects in Brazil to the global market. So I started a company in Brazil with my brother.

As lâ€™m sure you are aware, this is a very critical time in the marketplace. There is still relatively low awareness of the potential opportunities in developing countries like Brazil. Right now we have a significant number of potential projects, some of which are close to contract. We also have an existing sales force as well as many high-level government / industry contacts. In short, we have almost all of the pieces we need to be extremely successful.

From my evaluation of Carbon Venturesâ€™ position in the market, I feel there may be an opportunity for us to partner to bring our projects to the market. I would conservatively estimate we have business opportunities that could generate approximately 30 million CERâ€™s. I hope you would agree this is significant volume. I would like to speak to you more about this.

I hope my email finds you well and I look forward to discussing this with you in greater detail. Please feel free to contact me at any time; otherwise I will follow up with you in a few days.

Best regards,

Flavio Gazani

Â

Â


----- Original Message ----
From: Flavio Gazani <flaviogazani@msn.com>
To: cullenberg@yahoo.com
Sent: Tuesday, September 26, 2006 2:08:05 PM
Subject: Send me a file please

Babes,

SN Hotmail - Message

When you have a chance please send me (to this msn email) one of the emails I sent to the potential partners. They are in the Flavio folder inside of another Flavio folder in My Documents. I named 1st contact_(name of the company) Carbon Ventures, Ecofys... You can send any of them. I want to write an email to Quality Tonnes and send asap. My goal is to schedule a meeting with them this week.

Now that it sank in the fact the I'm not going to attend the EB meeting in Gremany, my boss is pretty mad. Of course he is also blaming on me for not having checked. Even though we never had a problem before. I'm thinking positively and need to act faster now. Need your help.


Thanks,
Fla

_____

Try the new Live Search today! Â Â
http://imagine-windowslive.com/minisites/searchlaunch/?locale=en-us&FORM=WLMTAG

                             △ | ▽ | ✕ | 🖃 Inbox

🖂 | 🖂 | 🖂

Get the latest updates from MSN

MSN Home  |  My MSN  |  Hotmail  |  Shopping  |  Money  |  People & Chat          Sign Out.net     Web Search:     G

 Hotmail     Today  |  Mail  |  Calendar  |  Contacts          Options  |  Help

flaviogazani@msn.com          Free Newsletter

✎ Reply|✎ Reply All|↪ Forward|✗ Delete|🗔 Junk|⬆ Put in Folder ▾|🖶 Print View|🖹 Save Address

Inbox

Sent Messages

Drafts

Trash Can

Credit Car...

internet a...

IS

Trips

True Love

Report Junk E-Mail

Report and Block Sender

Sign in

New Instant Message

Add Messenger Contacts

⬆ | ⬇ | ✗ | 🗁 Inbox

From :     Eric Cullenberg <cullenberg@yahoo.com>
Sent :     Monday, October 9, 2006 10:26 AM
To :       Flavio Gazani <flaviogazani@msn.com>
Subject :  Fw: IT email


----- Forwarded Message ----
From: Eric Cullenberg <ecullenberg@internationalsolutions.com.br>
To: Flavio Gazani <fgazani@internationalsolutions.com.br>; Paulo Gazani
<pgazani@internationalsolutions.com.br>
Sent: Monday, October 9, 2006 10:26:26 AM
Subject: IT email

Dear John:

My apologies for taking some time to respond. This is something we needed to consider carefully.

I certainly understand your position in regards to what you are able to offer. In order for us to consider moving ahead with IT power we would need further discussion on the following:

**Regarding the credits:**

While we appreciate your offer, it is less attractive than others we've reviewed. We'd prefer to work on a 50% split on the credits-- and then try to negotiate a very favorable success fee from the clients (thus increasing the value IT Power's share). Additionally since our current business pipeline has been created with minimal capital/resources, we need to consider our incremental sales/agents fees. These could be as high as 10% in some cases although as the volume increases we're starting to be able to negotiate this down.

By the way, in your proposal do you envision the client or IT Power covering the costs of registration?

**Regarding commercialization:**

We appreciate your straightforward approach. At what stage of the project have you envisioned this sale?

I did enjoy meeting you and I think we might work well together. We are in the process of securing funding for our business while we look for partnerships to close our contracts. If we reached an agreement on the revenue split and commercialization, could you envision an investment scenario whereby IT Power invested in IS? I realize this might seem somewhat out of context, but I am looking for ways to make your offer more attractive to our management team.

Warm regards,
Flavio

Dear Flavio,

It was very good to meet with you.

As discussed, we have a strong team and very good reputation at getting projects validated. As partners I think that we'll be in a very strong position. We are able to undertake all of the work in writing the PDDs and getting the projects approved in Brazil. This will obviously reduce your costs and exposure considerably and also create a good foundation for you to win future work. For this we will need to receive at least 20% of the CERs, which is lower than we receive for the same commitment on many other projects. You will be able to retain the remainder of the CERs secured for your input.

In addition, we're very interested in buying the remaining CERs from these projects for US$10.

I look forward to discussing this with you further.

Best regards,

John

Dr John Green
Director

E-mail: jg@carbonresource.com
Direct Tel: +44 (0)117 980 9441
Fax: +44 (0)117 9809401
Web: www.carbonresource.com

Carbon Resource Management Limited
Technology House, 16-18 Whiteladies Road,
Bristol BS8 2LG, UK.

>>> Flavio Gazani <fgazani@internationalsolutions.com.br> 10/04/06 02:01am >>>
Dear Nick and John:

I want to thank you both for meeting with me on Monday. I was very encouraged by
our conversation and I hope we can continue move our discussions forward. It does
seems as if we have the potential to do business together in Brazil and Latin America in
a way that would be mutually beneficial.

As a next step, would you like me to put together a couple of proposal options? I have
some thoughts regarding how we might go about developing a partnership. If you have
anything specific in mind already, please let me know. Otherwise I will plan to have
something ready early next week.

Best regards,
Flavio

Get the latest updates from MSN

MSN Home  |  My MSN  |  Hotmail  |  Search  |  Shopping  |  Money  |  People & Chat                    Feedback  |  Help
© 2006 Microsoft  TERMS OF USE  Advertise  TRUSTe Approved Privacy Statement  GetNetWise  Anti-Spam Policy

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT OF BENJAMIN FELDMAN

Benjamin Feldman, being duly sworn, deposes and states:

1. I am over the age of eighteen (18) and am otherwise competent to make this affidavit. The information contained in this affidavit is based on my personal knowledge.

2. I am a Managing Director of Natsource LLC ("Natsource"), employed in its Washington, D.C. office located at 1730 Rhode Island Avenue, NW, Suite 1015.

3. Natsource is in the business of providing asset management, advisory and research and transaction services in the global environmental assets markets. A majority of Natsource's revenue is earned by identifying opportunities to purchase and sell Certified Emission Reductions ("CERs") generated pursuant to the Clean Development Mechanism ("CDM") created by the Kyoto Protocol to the United Nations Framework Convention on Climate Change ("the Kyoto Protocol"). A substantial portion of Natsource's future income is expected to be earned by identifying opportunities to purchase and sell Emission Reduction Units ("ERUs") generated pursuant to the Joint Implementation Mechanism ("JI") created by the Kyoto Protocol.

4.    Natsource Advisory & Research LLC ("NAR"), a wholly-owned subsidiary of Natsource, provides support for the asset management business of Natsource by identifying and analyzing the viability of CDM and JI projects in developing countries to reduce emissions of greenhouse gases.  NAR analyzes the potential outputs of those projects and assesses the various risks that the CERs and ERUs generated by the project will not be delivered.

5.    The regulatory and industry information obtained by Natsource analysts is processed using a proprietary and confidential Delivery Risk Model (the "DRM") that Natsource treats and maintains as a trade secret.  The DRM is the most critical piece of confidential business information held by Natsource and is central to the company's identity in the market.  The DRM is a project assessment model containing Excel spreadsheets, statistical software and other programming applications, which provides a discrete methodology for distilling various pieces of information about an identified CDM or JI project and then determining the attractiveness of that particular CDM or JI project.  I do not know of any other entity in the international marketplace that has the capability to make the same sophisticated analysis in the same efficient manner as Natsource can with the DRM.

6.    The DRM is so valuable that Natsource has been approached by several private and public sector entities expressing interest in Natsource's licensing or selling the DRM.  Natsource has declined such overtures because the trade advantage represented by the DRM far outweighs the potentially significant licensing or sale revenue.  Natsource has also declined inquiries for Natsource's assistance in developing similar models.  To do so would dilute the value of the DRM.

2

7.    Natsource is part of a relatively new and competitive market for greenhouse gas asset management. Natsource has several competitors seeking to invest in the global development of CDM and JI projects. Natsource is in the top tier among greenhouse gas asset management firms. Only one or two other companies can credibly claim the same. While each competitor has its own method for determining the potential success and risk involved in CDM and JI projects, none of Natsource's competitors have the DRM.

8.    The DRM was developed by Natsource over the course of approximately two years, after which it became functional approximately 18 months ago. The DRM is a dynamic model that is regularly updated and adjusted by Natsource's analysts depending on various economic, regulatory and legal changes in the international community. Natsource has invested millions of dollars in manpower, resources and training to develop the DRM. It is the life blood of Natsource's core business.

9.    The DRM is stored on Natsource's internal computer network. Access to the DRM is strictly limited to those Natsource employees who must access the program for work, so that Natsource can maintain the DRM's inherent independent economic value and safeguard it from being exploited by the public or Natsource's competitors in the industry. Natsource, which has approximately 40 employees, provides five or six Natsource employees with full access to the DRM files on the network. Access is provided by Natsource's network administrator, a technology employee who has no other responsibility for using the DRM. Internally, the DRM also requires a separate password to access it.

3

10.    Access to the output assessments developed by the DRM on particular projects is also limited. Each output assessment on a CDM or JI project can only be accessed through a specific path within Natsource's network. The network administrator has the ability to limit which employees can and cannot access the output assessment. Only a small and specific group of Natsource employees who have a business need to see the assessment are granted access. When ready, I send an e-mail containing the network path to the output assessment to employees permitted access. To the best of my knowledge, during the relevant time period, each e-mail I distributed regarding the development of an output assessment contained the following disclaimer: "These DRM outputs should not be circulated outside the company without prior arrangement." On limited occasions, a DRM output assessment has been distributed outside of Natsource as the result of a specific business or financial request. Such distribution is made only after I obtain explicit agreement that the output assessment will be kept strictly confidential. Natsource has nearly 600 output assessments regarding various projects on its network.

11.    No employee is allowed access to the DRM or the output assessments without explicit authorization from me. I explain to each employee granted access that the DRM is the heart of Natsource's business and must not be disclosed to anyone else. I put employees on notice that improper disclosure of the DRM to any unauthorized individual is grounds for immediate termination from employment.

12.    In late July 2005, Defendant, Flavio Rufino Gazani, accepted an offer to be a Senior CDM/JI Regulatory Analyst at Natsource. He came to work at Natsource in the beginning of October. In his position, he was one of the employees granted access to

4

the DRM and provided with the password to it in order to update files related to various regulatory and legal developments.

13.    I have recently learned that during his employment at Natsource, Mr. Gazani took numerous steps to compete directly with Natsource and used confidential, proprietary and trade secret information in the process. His actions, demonstrated by the numerous e-mail and other correspondence I have found have led me to fear that Natsource's DRM and DRM output assessments are in grave danger of being released generally to Natsource's competitors or used by Mr. Gazani for his own personal benefit. The damage that could occur from such a disclosure of DRM related materials is incalculable.

14.    I have learned that on June 20, 2006, Mr. Gazani sent an e-mail to Natsource's network administrator, Michael Grande, seeking to obtain access to a specific DRM output assessment. Mr. Grande responded that he needed "the OK from Ben Feldman first." Instead of asking me to grant him access, Mr. Gazani sought the assistance of two other Natsource employees with access to the DRM, Aline Ribas and Rina Cerrato, to obtain the output assessment. I have attached the relevant e-mail chain to this affidavit at Tab 1. In hindsight, Mr. Gazani appears to have been trying to obtain project assessments that he otherwise had no business need to know.

15.    I have also become aware of an instant message exchange from July 13, 2006, wherein Gazani asked another employee for a list of Natsource vendors known as Project Development Document ("PDD") writers. I have attached the exchange to this affidavit at Tab 2. Natsource partners with PDD writers in the development of projects that Natsource determines should be successful. There are over 25 PDD writers in the

industry, but Natsource's PDD list contains only those PDD writers whom Natsource knows to be effective. The employee provided Mr. Gazani with the PDD writers list. Mr. Gazani volunteered that he "won't do anything with it," which indicates to me that he knew that it was confidential proprietary information of Natsource. (Tab 2).

16.    I have learned that Mr. Gazani is associated with a business called International Solutions. The business is advertised on a United States government program website called Methane to Markets. I have attached a print out from the website at Tab 3 to this affidavit. The address for International Solutions is listed as 4000 Massachusetts Avenue, NW, Washington D.C., one of Mr. Gazani's previous residence addresses, and the telephone number is that for Mr. Gazani's cellular telephone. Mr. Gazani is listed in the Methane to Markets website as the Director and contact for International Solutions. The description of International Solution services was providing "consulting services for implementation of CDM projects, mainly in Brazil and other Latin American countries," which is among the business engaged in by Natsource.

17.    In September 2006, I learned that Mr. Gazani caused damage to his Natsource laptop computer and that it was not working. After he was given a new one, I told Mr. Gazani that he absolutely could not access his MSN personal e-mail account on Natsource's laptop or computer network because it could result in exposure to a computer virus. I also instructed Mr. Grande to prevent Mr. Gazani from doing anything on his computer that would cause this type of damage again.

18.    At about the same time, Mr. Gazani asked me for permission to access all the DRM output assessments. Mr. Gazani represented to me that without this access, he would have to wait for information from others in order to perform other functions of his

job. Without the knowledge I have now, I granted Mr. Gazani's request based upon his representation that it was for Natsource's business purposes. I also thought that Mr. Gazani's access to the additional output assessments would allow Mr. Gazani to improve his work performance, which had not been satisfactory over the preceding months. At the same time, I again reminded Mr. Gazani about the confidential, proprietary and trade secret nature of the output assessments. Mr. Gazani acknowledged the confidential nature of his access and the importance of maintaining the confidentiality of the DRM.

19.     During the last week of September, Mr. Gazani had a significant work performance failure that caused me to discuss with him the possible termination of his position. Specifically, on September 26, Mr. Gazani advised me that he had failed to secure registration to attend a meeting of the CDM Executive Board in Germany on September 26 through September 29. Mr. Gazani's job required his attendance, but because he neglected to ensure he was registered for it, he was ineligible to attend.

20.     On September 28, I met with Mr. Gazani to express my disapproval of his performance and advise him that unless he dramatically improved in the next one to two months, he would be discharged. Mr. Gazani asked for a couple of days to consider whether he wanted to seek other employment or attempt to improve his performance. I agreed to give him the time. The next week, Mr. Gazani gave me oral notice of his resignation and requested a transition period in which to find other employment. I agreed to allow Mr. Gazani to stay at Natsource through December 15, 2006. I also told Mr. Gazani that Natsource wished to be supportive of his attempt to find other employment and gave him Thursday afternoons off with pay to search for a job.

21.      On October 12, 2006, I received an e-mail from Seth Baruch, Managing

Partner of Quality Tonnes ("QT"). Natsource works with QT on various CDM projects.

In the e-mail, Mr. Baruch forwarded to me an electronic correspondence that was sent the

evening of September 26, 2006, by Mr. Gazani. I have attached the correspondence to

this affidavit at Tab 4. Mr. Gazani used his personal MSN e-mail account to send the

correspondence. In it, Mr. Gazani represented to Mr. Baruch that Mr. Gazani was

contacting him "on behalf of International Solutions (IS), which is a Brazilian company

focused on the CDM market." In the correspondence, Mr. Gazani further stated:

> There is relatively low awareness of the potential
> opportunities in developing countries like Brazil. IS has
> identified a significant number of potential projects which
> could generate more than 7 million CERs. The company
> also has an existing sales force as well as many high-level
> government / industry contacts. From my evaluation of
> Quality Tonnes, I feel there may be an opportunity for you
> to partner with IS to bring projects to the market. I would
> like to speak to you more about these potential
> opportunities. Please feel free to contact me at any time;
> otherwise I will follow up with you in a couple of days.
> (Tab 4)

22.      Mr. Gazani must be well aware that Natsource has participated in CDM

project work in Brazil and regularly looks to identify new opportunities in that country.

Since October 2005, Natsource has been involved in the development of and

monetization of CERs generated by a project in Salvador, Brazil. I have attached to this

Affidavit, a photo copy of the "tombstone" that is displayed in my office and was created

to commemorate the project, at Tab 5. As recently as September 29, 2006, Mr. Gazani

was personally involved in Natsource's continued work on this CDM project in Brazil. I

have attached an email from Mr. Gazani regarding this work to this affidavit at Tab 6. In

April 2006, I also visited Brazil in an effort to cultivate more CDM projects. Mr. Gazani

knew that I took that trip because I discussed it with him on a number of occasions. When I returned I assisted in the development of a Technology CDM Opportunity Guide regarding CDM project opportunities in Brazil to share with our business partners. The internal version of the guide had valuable Natsource information, not included in the externally shared version, regarding the prospects for particularly attractive types of CDM projects, including Natsource's assessment of the potential CER output of each project. The information is based upon our extensive analysis of United Nations regulatory policy, in-country regulatory and economic conditions and project technology performance. Some of the information contained in this document was heavily derived from DRM information and Natsource expertise. I learned on October 24, 2006, that in May 2006, Mr. Gazani e-mailed the internal Natsource version of the Technology CDM Opportunity Guide to his personal MSN e-mail account.[1] Attached at Tab 7 is Mr. Gazani's May e-mail, attaching the document. I have not included the guide because I do not want to make public the information contained in it. Because Mr. Gazani could log onto the Natsource Network remotely, there was no business reason for him to send this confidential business information to his personal e-mail account.

23.    Mr. Gazani's job as a Senior CDM/JI Research Analyst for Natsource involved the same identification of potential projects in Brazil that he discusses in his solicitation to QT. It appears that the projects referred to in Mr. Gazani's e-mail to QT were either projects that Natsource had identified as prospects or that Mr. Gazani had

---

[1] I discovered this information as a result of the recent forensic evaluation of the second Natsource laptop computer issued to Mr. Gazani. Later in this affidavit, I discuss other information obtained as a result of the forensic evaluation.

identified during his employment with Natsource, using Natsource intellectual property, but never disclosed to Natsource.

24.    I confronted Mr. Gazani about his solicitation of QT and about his competing business on the same day I learned about the QT e-mail. Mr. Gazani denied any wrongdoing, but this was not believable in the face of the e-mail correspondence to QT. I advised Mr. Gazani that he was terminated effective immediately and that he was required to immediately return all Natsource property. I also requested access to any home computer of Mr. Gazani's through which he had remote access to Natsource's computer network and confidential proprietary and trade secret information during his employment. I needed to be assured that Mr. Gazani did not retain possession of any Natsource confidential proprietary and trade secret information, specifically the DRM and its output assessments. Mr. Gazani refused my request. I informed Mr. Gazani that Natsource would pursue all available legal steps to protect its business.

25.    Natsource will suffer incalculable harm if Mr. Gazani, or any other person or entity, has the DRM or the analytic output which determines which are the most attractive CDM and JI projects in which to invest, and uses it to divert projects to International Solutions, or discloses it to any other competitor, individuals or entity outside of Natsource. The DRM is central to Natsource's business. Moreover, if others were to learn through the output assessments which projects had been selected by Natsource and analyzed under the DRM as attractive opportunities, Natsource would lose a valuable competitive advantage and be severely damaged in the industry.

26.    After terminating Mr. Gazani, I was extremely concerned that he had used the DRM and its output assessments to his own benefit because he represents in his

10

correspondence to QT that he has identified projects that could generate more than 7 million CERs. I was also concerned that he would continue to use the DRM and its output assessments to his benefit, or for the benefit of others, or try to sell them. Thus, with the assistance of counsel, Natsource prepared to apply for a temporary restraining order based on the information above. But first, Natsource's counsel sent a letter to Mr. Gazani noting his misconduct and admonishing him not to use or disclose Natsource confidential, proprietary and trade secret information. In response, Mr. Gazani provided an affidavit that stated he had limited involvement with the DRM at Natsource and that he did not currently possess any DRM related files. Based on Mr. Gazani's sworn representations, Natsource decided not to file for the temporary restraining order.

27.    However, after obtaining the affidavit, Natsource obtained the results of a forensic evaluation of the second Natsource laptop computer issued to Mr. Gazani during his employment. It demonstrates further evidence of Mr. Gazani's aggressive efforts to compete with Natsource during his employment. It also shows that the representations he made in his affidavit are false and that he had possession of the results of Natsource's DRM assessments of every CDM or JI project that existed as of September 27, 2006.

28.    I have reviewed numerous e-mails and email lists recovered by Philip Rodokanakis from the Natsource laptop computer issued to Mr. Gazani. Those e-mails, some of which are attached at Tabs 7 through 9 to this Affidavit, demonstrate Mr. Gazani's concerted effort to compete with Natsource during his employment. From my review, it is clear that Mr. Gazani was engaged in the business planning, marketing and development of funding for International Solutions at least as far back as August 2006 and continuing through his last day of employment with Natsource.

29.    An example shortly before Mr. Gazani's termination was that on September 26, 2006, within hours after I reprimanded him for not arranging to attend the CDM Executive Board meeting, Mr. Gazani had an e-mail exchange with Eric Cullenberg, who I understand is Mr. Gazani's roommate. I have attached a copy to this Affidavit at Tab 8. In the exchange, Mr. Gazani sought a copy "of the emails I sent to the potential partners." He also referenced scheduling a meeting with Quality Tonnes. Mr. Gazani then alerted Mr. Cullenberg that Mr. Gazani's "boss" (presumably a reference to me) "is pretty mad" that Mr. Gazani was not going to attend the executive board meeting. Mr. Gazani continued "I'm thinking positively and need to act faster now. Need your help." Mr. Cullenberg responded to the e-mail by sending a solicitation Mr. Gazani previously sent to Michael Scott of Carbon Ventures. In it, Mr. Gazani again noted the number of potential CDM projects he has identified in Brazil.

30.    From Mr. Rodokanakis' work, it is clear that the next evening, September 27, 2006, someone using the Natsource laptop computer issued to Mr. Gazani, after he rendered the first laptop inoperable, accessed a file containing the results of every DRM assessment performed since the inception of the model from a portable CD ROM disk in the laptop's CD ROM drive. Several files containing components of the DRM model and/or inputs were also opened from the CD ROM disk at that time. From what I have been shown by Mr. Rodokanakis, it is clear that someone has copied to a portable CD ROM disk the very trade secret information we must protect. It is also clear that someone using Mr. Gazani's laptop was actively accessing that portable information. Natsource has never authorized this material to be circulated beyond Natsource employees.

31.     There was no Natsource business need for Mr. Gazani to have such a copy of the output assessments. Indeed, in his affidavit he swore under threat of perjury that "his only involvement with the DRM program was in the twice-yearly update of the program and my involvement was limited to . . . a small part of the risk assessed by this program." By what I have seen on October 24, that is obviously false.

32.     But that is not the only information I have recently discovered that demonstrates Mr. Gazani's pattern of lying to protect his own business interests. On September 30, Mr. Gazani took a trip to London that he told me he had previously planned to take to visit his father after going to the CDM Executive Board meeting. I have now discovered from my review of Mr. Gazani's e-mails that while in London, and while still a Natsource employee, Mr. Gazani developed CDM project opportunities on behalf of International Solutions. I have attached an e-mail exchange between Mr. Gazani and John Green, Director of Carbon Resource, to this Affidavit at Tab 9. Carbon Resource is a PDD writing vendor. In the e-mail, Mr. Gazani thanked Mr. Green for meeting with him on Monday, October 2, and talked about the "potential to do business together in Brazil and Latin America." Mr. Gazani went on to negotiate how Carbon Resource and International Solutions would split the CERs from the CDM projects.

33.     Natsource has no information about who currently possesses the CD ROM disk accessed from Mr. Gazani's computer that contains the results of all of Natsource's DRM assessments. Because I know that it was accessed through a CD ROM disk on Mr. Gazani's laptop on September 27, 2006, and because I know that he has not returned it to Natsource, I assume that Mr. Gazani still possesses this valuable property of Natsource or, at a minimum, he has knowledge of its location. This CD ROM could cause

catastrophic injury to Natsource's business.  Moreover, Mr. Gazani's perjury in his

affidavit demonstrates to me that Natsource cannot trust his word on anything.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States of America that the foregoing affidavit, consisting of 14 pages

including this signature page, is true and correct.  Executed on October 26, 2006.

Benjamin Feldman

From: Flavio Gazani
Sent: Tuesday, June 20, 2006 10:41 AM
To: Rina Cerrato
Cc: Aline Ribas
Subject: RE: map drive


Ok. Thanks!


Flavio Gazani

Senior CDM/JI Regulatory Analyst

Natsource LLC

1730 Rhode Island Ave.,NW Suite 1015

Washington, DC 20036

Tel 202 496 1423 x233

Fax 202 496 1416

_____

From: Rina Cerrato
Sent: Tuesday, June 20, 2006 10:40 AM
To: Flavio Gazani
Cc: Aline Ribas
Subject: RE: map drive

Hi Flavio,

Pending on Ben's ok to resolve the issue, you can always find the outputs that are on that drive in the project's folder in our DRM drive.

Regards,

Rina

_____

From: Flavio Gazani
Sent: Tuesday, June 20, 2006 10:38 AM
To: Aline Ribas
Cc: Rina Cerrato
Subject: FW: map drive

I do not have access to this drive (refer to Mike's email below). Please advise me.

Thanks,

Flavio Gazani

Senior CDM/JI Regulatory Analyst

Natsource LLC

1730 Rhode Island Ave.,NW Suite 1015

Washington, DC 20036

Tel 202 496 1423 x233

Fax 202 496 1416

---

From: Mike Grande
Sent: Tuesday, June 20, 2006 10:36 AM
To: Flavio Gazani
Subject: RE: map drive

Sure, I need the OK from Ben Feldman first.  He has requested that I get his permission before anyone gets access

---

From: Flavio Gazani
Sent: Tue 6/20/2006 10:34 AM
To: Mike Grande
Subject: map drive

Hi Mike,

I need to map the following drive - \\nsfs3\DRM_Outputs$

Could you please advise me on how to do it?

Thanks,

Flavio Gazani

Senior CDM/JI Regulatory Analyst

Natsource LLC

1730 Rhode Island Ave.,NW Suite 1015

Washington, DC 20036

Tel 202 496 1423 x233

Fax 202 496 1416

Fw: map drive

**FRGazani**: Rina, qick ? Where did you save the list of PDD writers that you put together?
**Rina Natsource**: mmmm not sure, one sec
**Rina Natsource**: on my desktop
**FRGazani**: sorry to bother you. I know our are busy.
**Rina Natsource**: file is only in draft and I will be incorporating changes pending on discussion with Ben
**FRGazani**: I would like to take a look at it if you don't mind. I want to see
**Rina Natsource**: sure. it's on its way
**FRGazani**: thanks
**FRGazani**: I won't do anything with it
**Rina Natsource**: promise?
**FRGazani**: ha
**FRGazani**: of course
**Rina Natsource**: ok :-)
**Rina Natsource**: there it goes
**FRGazani**: Valeu!

## Project Network Member Profile

**Methane to Market**

| International Solutions | |
|---|---|
| Location | 4000 Massachusetts Ave., NW<br>Washington, DC 20016<br>United States |
| Contact | Flavio Gazani, Director |
| Phone | 202-487-3607 |
| Fax | |
| Description of Services | International Solutions provide consulting services for implementation of Clean Development Mechanism - CDM projects, mainly in Brazil and other Latin American countries. |
| Area of Interest | Coal Mines, Landfills |
| Type of Organization | Private Sector |

Update My Information

**From:** SJBaruch@aol.com [mailto:SJBaruch@aol.com]
**Sent:** Thursday, October 12, 2006 4:20 PM
**To:** Ben Feldman
**Subject:** Re: CDM project opportunities in Brazil

In a message dated 9/26/2006 9:55:11 P.M. Eastern Standard Time, flaviogazani@msn.com writes:

Dear Mr. Baruch,

I□ contacting you on behalf of International Solutions (IS), which is a
Brazilian company focused on the CDM market.

As I□ sure you are aware, this is a very critical time in the marketplace.
There is still relatively low awareness of the potential opportunities in
developing countries like Brazil. IS has identified a significant number of
potential projects which could generate more than 7 million CERs. The

company also
has an existing sales force as well as many high-level government / industry
contacts.

From my evaluation of Quality Tonnes, I feel there
may be an opportunity for you to partner with IS to bring projects to the
market.
I would like to speak to you more about these potential opportunities.
Please feel free to contact me at any time; otherwise
I will follow up with you in a couple of days.

Best regards,
Flavio Gazani
(202) 487-3607

---

Share your special moments by uploading 500 photos per month to Windows Live
Spaces
http://clk.atdmt.com/MSN/go/msnnkwsp0070000001msn/direct/01/?
href=http://www.get.live.com/spaces/features

**Conestoga-Rovers & Associates Investments Ltd.**

has entered into a forward sale of

# 2,100,000 CERs

Certified Emission Reductions

from the

**Canabrava Landfill Gas**

**Capture & Destruction Project**

**Salvador, Brazil**

**October 6, 2005**

**Natsource Asset Management LLC**

**From:** Flavio Gazani
**Sent:** Friday, September 29, 2006 9:38 AM
**To:** Ben Feldman
**Subject:** RE: canabrava project in Brasil

Hi Ben,

Answering your question, Canabrava is included in the list of projects approved with conditions. No mention to LoA issued. The only date they show is the date when the project was submitted for approval on March 22nd 2006.

PC news (below) mentions that Brazil has approved 93 projects and the list of approved projects in the MCT website has 93 projects which lead us to conclude that list is up to date, but they don't show the dates so we can't tell which ones were last approved.

## 28.09.06  Brazil approves new batch of projects

The progress of greenhouse reduction projects in Brazil has quickened in recent weeks as the United Nations body that oversees the clean development mechanism issued credits to companies in the South American country. At government level, 93 projects have now been approved.

Best,
Flavio

P.S. Congratulations!

---

**From:** Ben Feldman
**Sent:** Friday, September 29, 2006 9:06 AM
**To:** Flavio Gazani
**Subject:** canabrava project in Brasil

10/26/2006

Hi Flavio

Can you please check and see if he Canabrava LFG project has received and LOA from Brazil or where it is in the process?

Thanks

Ben

Ben Feldman
Managing Director
Natsource LLC
Tel 202 496 1423 x228
Fax 202 496 1416

**Please note our new address:**
1730 Rhode Island Avenue NW, Suite 1015
Washington, DC 20036

| Message0413 | |
|---|---|
| **Subject:** | **Technology CDM Opportunity Guide** |
| **From:** | Flavio Gazani |
| **Date:** | 5/16/2006 12:21:43 PM |
| **To:** | 'flaviogazani@msn.com' |
| **Message Body** | |
| to read | |
| **Attachment** | |
| Technology CDM Opportunity Guide.doc | |

| **Outlook Header Information** |
|---|
| Conversation Topic: Technology CDM Opportunity Guide |
| Subject: Technology CDM Opportunity Guide |
| From: Flavio Gazani |
| Sender Name: Flavio Gazani |
| To: 'flaviogazani@msn.com' |
| Delivery Time: 5/16/2006 12:21:43 PM |
| Creation Time: 5/16/2006 12:21:31 PM |
| Submit Time: 5/16/2006 12:21:43 PM |
| Importance: Normal |
| Priority: Normal |
| Sensitivity: Normal |
| Flags: 19 = Read, Unmodified, Has Attachment |
| Size: 63314 |

msn  Hotmail          Today | Mail | Calendar | Contacts          Options | Help

flaviogazani@msn.com                                              Free Newsletter

✍ Reply|✍ Reply All|✍ Forward|✕ Delete|✉ Junk|✍ Put in Folder ▾|🖨 Print View|🖹 Save Address

Inbox
Sent Messages
Drafts
Trash Can
Credit Car...
internet a...
IS
Trips
True Love
Report Junk E-Mail
Report and Block Sender

Sign in

New Instant Message
Add Messenger Contacts

| | |
|---|---|
| From : | Eric Cullenberg <cullenberg@yahoo.com> |
| Reply-To : | Eric Cullenberg <cullenberg@yahoo.com> |
| Sent : | Tuesday, September 26, 2006 2:14 PM |
| To : | Flavio Gazani <flaviogazani@msn.com> |
| Subject : | Re: Send me a file please |

⬆ | ⬇ | ✕ | 🖹 Inbox

ï»¿

## Carbon Ventures (US)

Â

Mike Scott, Princeton, NJ, US

+1 609.243.9811

Â

Â

mscott@environcorp.com

Hi Mike,

I found your contact information on your company website in my research. Currently I am living in Washington DC, but I have a company in Brazil focused on the CDM market. My ultimate goal has always been to bring CDM projects in Brazil to the global market. So I started a company in Brazil with my brother.

As Iâ€™m sure you are aware, this is a very critical time in the marketplace. There is still relatively low awareness of the potential opportunities in developing countries like Brazil. Right now we have a significant number of potential projects, some of which are close to contract. We also have an existing sales force as well as many high-level government / industry contacts. In short, we have almost all of the pieces we need to be extremely successful.

From my evaluation of Carbon Venturesâ€™ position in the market, I feel there may be an opportunity for us to partner to bring our projects to the market. I would conservatively estimate we have business opportunities that could generate approximately 30 million CERâ€™s. I hope you would agree this is significant volume. I would like to speak to you more about this.

I hope my email finds you well and I look forward to discussing this with you in greater detail. Please feel free to contact me at any time; otherwise I will follow up with you in a few days.

Best regards,

Flavio Gazani

Â

Â


----- Original Message ----
From: Flavio Gazani <flaviogazani@msn.com>
To: cullenberg@yahoo.com
Sent: Tuesday, September 26, 2006 2:08:05 PM
Subject: Send me a file please

Babes,

When you have a chance please send me (to this msn email) one of the emails I sent to the potential partners. They are in the Flavio folder inside of another Flavio folder in My Documents. I named 1st contact_(name of the company) Carbon Ventures, Ecofys... You can send any of them. I want to write an email to Quality Tonnes and send asap. My goal is to schedule a meeting with them this week.

Now that it sank in the fact the I'm not going to attend the EB meeting in Gremany, my boss is pretty mad. Of course he is also blaming on me for not having checked. Even though we never had a problem before. I'm thinking positively and need to act faster now. Need your help.


Thanks,
Fla

_____

Try the new Live Search today! Â Â
http://imagine-windowslive.com/minisites/searchlaunch/?locale=en-us&FORM=WLMTAG



MSN Home | My MSN | Hotmail | Shopping | Money | People & Chat      Sign Out      Web Search: [G]

msn  Hotmail          Today | Mail | Calendar | Contacts          Options | Help

flaviogazani@msn.com          Free Newsletter

Reply|Reply All| Forward|✕ Delete| Junk| Put in Folder ▾| Print View| Save Address

Inbox
Sent Messages
Drafts
Trash Can
Credit Car...
internet a...
IS
Trips
True Love
Report Junk E-Mail
Report and Block Sender

Sign in

New Instant Message
Add Messenger Contacts

| | | |
|---|---|---|
| From : | Eric Cullenberg <cullenberg@yahoo.com> | ⌃ \| ⌄ \| ✕ \| Inbox |
| Sent : | Monday, October 9, 2006 10:26 AM | |
| To : | Flavio Gazani <flaviogazani@msn.com> | |
| Subject : | Fw: IT email | |

----- Forwarded Message ----
From: Eric Cullenberg <ecullenberg@internationalsolutions.com.br>
To: Flavio Gazani <fgazani@internationalsolutions.com.br>; Paulo Gazani
<pgazani@internationalsolutions.com.br>
Sent: Monday, October 9, 2006 10:26:26 AM
Subject: IT email

Dear John:

My apologies for taking some time to respond. This is something we needed to consider carefully.

I certainly understand your position in regards to what you are able to offer. In order for us to consider moving ahead with IT power we would need further discussion on the following:

**Regarding the credits:**

While we appreciate your offer, it is less attractive than others we've reviewed. We'd prefer to work on a 50% split on the credits-- and then try to negotiate a very favorable success fee from the clients (thus increasing the value IT Power's share). Additionally since our current business pipeline has been created with minimal capital/resources, we need to consider our incremental sales/agents fees. These could be as high as 10% in some cases although as the volume increases we're starting to be able to negotiate this down.

By the way, in your proposal do you envision the client or IT Power covering the costs of registration?

**Regarding commercialization:**

We appreciate your straightforward approach. At what stage of the project have you envisioned this sale?

I did enjoy meeting you and I think we might work well together. We are in the process of securing funding for our business while we look for partnerships to close our contracts. If we reached an agreement on the revenue split and commercialization, could you envision an investment scenario whereby IT Power invested in IS? I realize this might seem somewhat out of context, but I am looking for ways to make your offer more attractive to our management team.

Warm regards,
Flavio

Dear Flavio,

It was very good to meet with you.

As discussed, we have a strong team and very good reputation at getting projects validated. As partners I think that we'll be in a very strong position. We are able to undertake all of the work in writing the PDDs and getting the projects approved in Brazil. This will obviously reduce your costs and exposure considerably and also create a good foundation for you to win future work. For this we will need to receive at least 20% of the CERs, which is lower than we receive for the same commitment on many other projects. You will be able to retain the remainder of the CERs secured for your input.

In addition, we're very interested in buying the remaining CERs from these projects for US$10.

I look forward to discussing this with you further.

Best regards,

John

Dr John Green
Director

E-mail: jg@carbonresource.com
Direct Tel: +44 (0)117 980 9441
Fax: +44 (0)117 9809401
Web: www.carbonresource.com

Carbon Resource Management Limited
Technology House, 16-18 Whiteladies Road,
Bristol BS8 2LG, UK.

>>> Flavio Gazani <fgazani@internationalsolutions.com.br> 10/04/06 02:01am >>>
Dear Nick and John:

I want to thank you both for meeting with me on Monday. I was very encouraged by
our conversation and I hope we can continue move our discussions forward. It does
seems as if we have the potential to do business together in Brazil and Latin America in
a way that would be mutually beneficial.

As a next step, would you like me to put together a couple of proposal options? I have
some thoughts regarding how we might go about developing a partnership. If you have
anything specific in mind already, please let me know. Otherwise I will plan to have
something ready early next week.

Best regards,
Flavio

Get the latest updates from MSN

MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat        Feedback | Help
© 2006 Microsoft TERMS OF USE  Advertise  TRUSTe Approved Privacy Statement  GetNetWise  Anti-Spam Policy

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT OF MICHAEL GRANDE

Michael Grande, being duly sworn, deposes and states:

1.      I am over the age of eighteen (18) and am otherwise competent to make this affidavit.  The information contained in this affidavit is based on my personal knowledge.

2.      I am currently employed at Natsource LLC ("Natsource") in its New York, NY office located at 100 William Street, Suite 2005, New York, New York.  My position is Network Administrator.

3.      In my position at Natsource, I am responsible for issuing company laptop computers to new employees authorized to have such equipment.  I am also responsible for maintaining and administrating the internal computer network of Natsource, including setting up access to employees to any files or drives on the network.

4.      All employees at Natsource need a login and password to access the computer network generally.  Every employee must change his or her password every 14 days or lose access to the network.  Access can also be done remotely by those with access to the Internet through either a home desktop or laptop computer.  Remote access using a login and password provides an employee with general access to Natsource's

computer network. Only authorized employees are provided with remote access capability.

5.      I am also responsible for providing access to Natsource's Delivery Risk Model ("the DRM"), which is contained in various files on Natsource's network. Access to these files can be limited to certain individuals. Based on the authorization from Natsource's Managing Director, Benjamin Feldman, I limit each employees access to the DRM files as instructed. Currently, only six employees have full administrative rights to access, change, add and download information to the DRM files. Other employees are also provided "read only" rights to various DRM files. When working remotely or directly on the network, files can be attached to an email and emailed to any personal or business email account.

6.      At the beginning of his employment, Gazani was issued a company laptop from which he could directly access Natsource's internal computer network when he was in the office and remotely access Natsource's network when he was traveling or at home. Gazani also had the ability to remotely access Natsource's network from any other computer with internet access, including Gazani's home desktop, if he has one. At the time he was issued the laptop, Gazani was warned that it was a violation of company policies to access outside websites for the purpose of sending or retrieving personal email, such as MSN. The reason for this was to avoid viruses surfacing on the laptop or Natsource's computer network.

7.      At the direction of Mr. Feldman, I provided administrative rights to Mr. Gazani to the DRM files. Mr. Gazani also has remote access authorization because he traveled.

2

8.      On June 20, 2006, Gazani sent me an e-mail seeking to obtain access to a specific output assessment. The email is attached to this affidavit at Tab 1. I responded that he needed "the OK from Ben Feldman first." I do not know what he did after that to get access.

9.      In September 2006, Mr. Gazani contacted me again because his laptop computer had stopped working. I found it to be completely unusable. It would not even start. Mr. Gazani did not want to wait for me to try and fix the laptop, so I ordered him a new one. When Mr. Gazani got the new laptop computer, I told him that he absolutely should not access his MSN personal e-mail account on Natsource's laptop or computer network because it could result in exposure to a computer virus. Mr. Feldman also asked me to prevent Mr. Gazani from downloading programs from the internet to help prevent viruses. So, I prevented Mr. Gazani from having the network rights to download programs from the Internet.

10.     Shortly after Mr. Gazani got a new laptop, he asked me to install a program for work purposes, since he did not have the rights to download programs from the Internet. When I went to do download the program for Mr. Gazani, I saw Mr. Gazani's personal MSN e-mail account on the screen. I immediately reminded Mr. Gazani that he was not supposed to access his personal e-mail.

11.     Through his personal e-mail account, Mr. Gazani had the ability to send and receive attachments, which could include programs, data, reports or spreadsheets, including of the DRM files Mr. Gazani could access. Using this personal e-mail account, Mr. Gazani could download and send such files from Natsource's computer network without being detected. Mr. Gazani's company-issued laptop computer also had a USB

port through which Mr. Gazani had the ability to download from Natsource's computer network and store onto portable electronic media any programs, data, reports or spreadsheets, including the DRM files Mr. Gazani could access.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of four pages including this signature page, is true and correct. Executed on October ___, 2006.

Michael Girardo

4

1730 Rhode Island Ave.,NW Suite 1015

Washington, DC 20036

Tel 202 496 1423 x233

Fax 202 496 1416

---

From: Mike Grande
Sent: Tuesday, June 20, 2006 10:36 AM
To: Flavio Gazani
Subject: RE: map drive

Sure, I need the OK from Ben Feldman first. He has requested that I get his permission before anyone gets access

---

From: Flavio Gazani
Sent: Tue 6/20/2006 10:34 AM
To: Mike Grande
Subject: map drive

Hi Mike,

I need to map the following drive - \\nsfs3\DRM_Outputs$

Could you please advise me on how to do it?

Thanks,

Flavio Gazani

Senior CDM/JI Regulatory Analyst

Natsource LLC

1730 Rhode Island Ave.,NW Suite 1015

Washington, DC 20036

Tel 202 496 1423 x233

Fax 202 496 1416

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

## AFFIDAVIT OF MARCELA ARAY

Marcela Aray, being duly sworn, deposes and states:

1.    I am over the age of eighteen (18) and am otherwise competent to make this affidavit. The information contained in this affidavit is based on my personal knowledge.

2.    I am currently employed at Natsource LLC ("Natsource") in its Ottawa, Ontario, Canada office. My position is Senior CDM/JI Project Analyst.

3.    One aspect of my employment is to take various regulatory, economic, political and other demographic information and run it through a computer model at Natsource called the Delivery Risk Model ("the DRM"). The DRM is a critical part of Natsource's business and a tightly held company secret. Only I and several other Natsource employees have access to it to process information and obtain an output assessment. Besides having access to the DRM given to us by the network administrator, Michael Grande, we have also placed an internal access password on the DRM program. The DRM is unique to Natsource and not possessed by any of Natsource's competitors in the market.

4.      During my employment, I had the opportunity to work with Flavio Rufino Gazani of Natsource's Washington, D.C. office on several issues while he was employed by Natsource. Because we were in different offices we often communicated by electronic mail and frequently by instant messaging provided through America Online.

5.      Sometime in September 2006, Mr. Gazani asked me through instant messaging for the access password to the DRM update files. I found it unusual that Mr. Gazani would ask for access to the DRM update files because it was not the time of year that we are engaged in updating activities. However, since Mr. Gazani was authorized to have access to the DRM, I gave him the access password.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of 2 pages including this signature page, is true and correct. Executed on October 17, 2006.

Marcela Aray

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

### AFFIDAVIT OF GISELA SCHON

Gisela Schon, being duly sworn, deposes and states:

1.      I am over the age of eighteen (18) and am otherwise competent to make this affidavit.  The information contained in this affidavit is based on my personal knowledge.

2.      I am an employee of Hunton & Williams LLP.  I have no other personal knowledge or relationship to the parties to this lawsuit.  I am a native of Brazil and can speak, interpret and translate Portuguese.

3.      I have reviewed a newsletter at the following website link on the internet at http://www.dazibao.com.br/boletim/0003/des_04.php.  A copy of the newsletter is attached to this affidavit at Tab 1.

4.      The newsletter is produced by the Brazilian law firm of Pinheiro Pedro Advogados.  The entire website and newsletter is in Portuguese.  The newsletter discusses the firm's involvement in Clean Development Mechanism projects for the environment.  The newsletter is dated August 2005.

5.      The end of the newsletter has the following paragraph, translated into English:

Pinheiro Pedro Advogados has partnered with International Solutions, able in the setup of CDM projects and the gathering of resources necessary for their implementation, including strategic assistance in the sale and purchase of carbon credits in the international financial market.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of two pages including this signature page, is true and correct.  Executed on October 18, 2006.

_____
Gisela Schon

DAZIBAO - Jornal Mural do escritório Pinheiro Pedro Advogados

10/26/2006



**P I N H E I R O**
**P E D R O**
**A D V O G A D O S**

**OPINIÃO**
Antonio Fernando Pinheiro Pedro

**OBSERVATÓRIO JURÍDICO**
Tutela Inibitória Coletiva
Os Bons Negócios estão verdes
O Desmatamento da BR-163
Festa do seguro-fiança?
Inovações da nova lei das PPPs

**DESTAQUES**
Curso na UE de Maringá
Lançado o livro "Direito
Ambiental Visto Por Nós
Advogados"
VI Conferência dos Advogados
no Maranhão
Escritório Pinheiro Pedro
Advogados cria Departamento
de MDL.

**CANAIS**
Página Inicial
E-mail
Sair do Dazibao
**EDIÇÕES ANTERIORES**
Edição 001
Edição 002

# DAZIBAO

INFORMATIVO DIGITAL DO ESCRITÓRIO PINHEIRO PEDRO ADVOGADOS
EDIÇÃO 03 - AGOSTO DE 2005

## Escritório Pinheiro Pedro Advogados cria Departamento de MDL

O Escritório Pinheiro Pedro Advogados criou um departamento exclusivo para oferecer consultoria em questões relativas à elaboração e aprovação de projetos de Mecanismo de Desenvolvimento Limpo (MDL).





*Oriana Rey, Simone Paschoal Nogueira e Daniela Stump*

Envolvido com a questão das mudanças climáticas há vários anos, destacamos a participação do escritório nas COPs 6, 6½, 8 e 10 da Convenção-Quadro da ONU sobre Mudanças Climáticas, como membro da Câmara de Comércio Internacional - Comitê Brasileiro e do Conselho Empresarial Brasileiro para o Desenvolvimento Sustentável - CEBDS. Auxiliou também o Deputado Federal Mendes Thame na organização do Grupo de Trabalho responsável pela elaboração do Projeto de Lei 5067/2005, texto substitutivo do PL 3902/04, que trata sobre a instituição da Política Nacional de Mudanças Climáticas.

Pinheiro Pedro Advogados conta com a parceria da empresa International Solutions, capacitada para a formatação de projetos de

DAZIBAO - Jornal Mural do escritório Pinheiro Pedro Advogados

MDL e captação de recursos para sua implementação, incluindo assessoria estratégica na venda e compra de créditos de carbono no mercado financeiro internacional.

O Informativo Digital DAZIBAO é gratuito e distribuído pelo escritório Pinheiro Pedro Advogados. Todos os Direitos Reservados.

Site melhor visualizado em Internet Explorer - Todos os Direitos Reservado
Desenvolvido por Jotac Design e Hospedado por Jotac Host

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

## TEMPORARY RESTRAINING ORDER

Upon consideration of Plaintiff Natsource LLC ("Natsource's"), Motion for

Temporary and Preliminary Injunctive Relief, its Supporting Memorandum, and its

Exhibits and Affidavits, and all arguments submitted in support thereof, the Court finds

as follows:

1.      Natsource will be irreparably harmed in the international market for

providing asset management, advisory and research services and transaction services in

the global energy and emissions markets, specifically identifying opportunities for Clean

Development Mechanism ("CDM") projects relating to the generation, purchase and sale

of Certified Emission Reductions ("CERs") if Defendant Flavio Rufino Gazani

("Gazani") is permitted to use Natsource's confidential, proprietary and trade secret

information, or disclose such information to any of Natsource's competitors, the public at

large, or for his own personal benefit.  Natsource's injury is one of Gazani's possession

and disclosure of critical trade secret information that Gazani improperly used at

Natsource during his employment as a Senior CDM/JI Regulatory Analyst in breach of

his duty of loyalty.  During his employment, Gazani actively engaged in competition with

Natsource and gained access to Natsource's most valuable trade secret project risk

assessment model and its output assessments in order to use them for his own benefit. After Gazani's termination, he refused to allow Natsource any assurance that its trade secret was not being misappropriated and used by him to compete with Natsource. It was only when he was threatened with this action that he provided Natsource with an affidavit swearing under oath that he had not misappropriated -- and indeed never even had access to -- Natsource's critical assessment model or its outputs. Yet, subsequently, the expert that Natsource hired to evaluate Gazani's laptop computer completed his investigation and uncovered clear unrefutable evidence that Gazani has converted Natsource's intellectual property for his own use and is misappropriating it by using it to compete against Natsource in the international market.

2.      Natsource must now involve the Court in obtaining the assurance it needs that Gazani will cease his current acts of misappropriating Natsource's confidential, proprietary and trade secret information. His misdeeds cannot be reversed, if not stopped, will cause an irreparable diminution in the value of Natsource's confidential, proprietary and trade secret information.

3.      The irreparable harm described above far outweighs any harm to Gazani if he, and those working in concert with him, are (1) ordered to cease any unlawful use or disclosure of Natsource confidential, proprietary and trade secret information; (2) ordered to return all Natsource confidential, proprietary and trade secret information; (3) directed to provide an accounting of any copies made of Natsource's confidential, proprietary and trade secret information; (4) ordered to disclose all devices where the copies are stored, and to take all steps necessary to disable, erase, or return all copies; (5) required to allow a third party forensic inspection of Gazani's personal and business computers for

Natsource's confidential, proprietary and trade secret information; (6) ordered to disclose the identity of all business partners of Gazani, as well as the identity of all third parties to which he disclosed Natsource's confidential, proprietary and trade secret information; and (7) required to execute an affidavit subject to the penalty of perjury, attesting to the deletion and/or return all Natsource's confidential, proprietary and trade secret information and has not disclosed it to any third parties other than those listed pursuant to part (6). Natsource should also be permitted to alert industry members and its competitors regarding the existence of a Complaint against Gazani and this Temporary Restraining Order. In addition, Natsource is likely to prevail on the merits of its claims that Gazani violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, breached his duty of loyalty, misappropriated trade secrets, and converted Natsource property for his own personal gain.

4.    This Order is issued to prevent further irreparable injury from Gazani's misuse of confidential, proprietary and trade secret information until such time as a preliminary injunction hearing can be held.

5.    This Order is in the public interest.

**WHEREFORE**, it is hereby **ORDERED** that the following shall be effective until such time that the Court otherwise orders:

(1)    Gazani, and those working in concert with him, is directed not to use or disclose, or aid the use or disclosure of, Natsource confidential, proprietary and trade secret information;

(2)    Gazani, and those working in concert with him, is ordered to return all Natsource confidential, proprietary and trade secret information;

3

(3)    Gazani, and those working in concert with him, is directed to provide an accounting of any copies made of Natsource's confidential, proprietary and trade secret information;

(4)    Gazani, and those working in concert with him, is ordered to disclose all devices where the copies are, or have been, stored, and to take all steps necessary to disable, erase, or return all copies;

(5)    Gazani, and those working in concert with him, is required to allow a third party forensic inspection of Gazani's personal and business computers for Natsource's confidential, proprietary and trade secret information;

(6)    Gazani, and those working in concert with him, is ordered to disclose the identity of all business partners of Gazani, as well as the identity of all third parties to which he disclosed Natsource's confidential, proprietary and trade secret information;

(7)    Gazani, and those working in concert with him, is required to execute an affidavit subject to the penalty of perjury, attesting to the deletion and/or return of all Natsource's confidential, proprietary and trade secret information and has not disclosed it to any third parties other than those he lists pursuant to paragraph (6) of this Order;

(8)    Natsource may notify other industry members and its competitors regarding the Complaint filed against Gazani in this Court and the issuance of this Temporary Restraining Order, including providing a copy of the Order itself;

(9)    Natsource shall post a bond in the amount of $_____; and it is further

**ORDERED** that Flavio Rufino Gazani, and those working in concert with him, may apply for a modification of dissolution of this Order on two days' notice, or such shorter notice as the Court may prescribe; and it is further

**ORDERED** that a Preliminary Injunction hearing be set for the ___ day of

_____, 2006, at _____ a.m./p.m.

**IT IS SO ORDERED** this __ day of October, 2006, at _____ a.m./p.m., and shall be effective for 10 days.

_____
United States District Judge

Copies to:

Susan F. Wiltsie, Esq.
Scot A. Hinshaw, Esq.
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006

Flavio Gazani
1830 17th Street, NW
Apt. 403
Washington, DC 20009

Christine A. Samsel, Esq.
Akin, Gump, Strauss, Hauer and Feld LLP
1333 New Hampshire Avenue, NW
Washington, D.C. 20036