**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **NATSOURCE LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | **Civil Action No.:  06 CV 1843** |
| **FLAVIO RUFINO GAZANI,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**DEFENDANT FLAVIO GAZANI'S OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER**

Defendant Flavio Gazani, through counsel specially appearing on his behalf for purposes

of this Motion only, and without waiving his objections to the lack of service of the Complaint in

this action and the Court's lack of personal jurisdiction over Mr. Gazani, hereby opposes the

Motion for Temporary Restraining Order of Plaintiff Natsource LLC ("Natsource"), as follows:

**I.    INTRODUCTION**

Natsource is attempting to strongarm a Brazilian national who is well-known in his field

and has published, taught, and spoken extensively on his area of expertise in order to prevent him

from pursuing his livelihood and punish him for attempting to leave Natsource.  Natsource

induced Mr. Gazani to work for Natsource specifically in order to exploit his vast knowledge in

the field, as evidenced by the H-1B visa paperwork submitted by Natsource on behalf of Mr.

Gazani.  However, when Mr. Gazani announced his intention to leave Natsource at the end of

this year, providing Natsource with plenty of notice so it would have time to secure a

replacement, Natsource retaliated by advancing his termination date and severing his

employment immediately, leaving Mr. Gazani in the untenable position of having to either leave the country or secure a new visa sponsor within ten days. Natsource not only has violated District of Columbia law by failing to pay Mr. Gazani promptly upon terminating his employment despite repeated requests for payment, it also has shown no intention of providing Mr. Gazani with return airfare to Brazil, as required by federal law, again despite Mr. Gazani's repeated requests. This lawsuit is yet another unfair tactic employed by Natsource in an effort to prevent Mr. Gazani from pursuing his livelihood.

Mr. Gazani does not have any documents or other property of Natsource, as he has attested under oath. During his employment, Mr. Gazani was granted access to information, primarily information of Natsource Advisory & Research LLC ("NAR"), which is not a party hereto, in order to perform his job with Natsource. That information was not labeled confidential, nor did Natsource ever ask or require Mr. Gazani to sign a confidentiality agreement or non-compete agreement. Mr. Gazani was permitted to, and did, access information remotely during his employment with Natsource in the course of performing his duties for Natsource. Mr. Gazani had information on a disk that he used in the course of performing his duties. That CD was promptly returned to Natsource, and Mr. Gazani has attested under oath that he does not possess any other information or copies of Natsource information. Mr. Gazani admittedly explored post-Natsource business opportunities shortly before resigning from Natsource, but he did not use or disclose any confidential information in so doing. And contrary to Natsource's intimations, Natsource was well aware of Mr. Gazani's business with his brother in Brazil, International Solutions, at the time it hired Mr. Gazani.

Looking beyond Natsource's speculation and conjecture, there is absolutely no evidence of any continued possession, use or disclosure of any confidential information of Natsource.

Once the smoke and mirrors are cleared away, and looking behind the buzzwords spouted by Natsource at the actual evidence (or, more accurately, the lack thereof) it is evident that Natsource cannot prevail on its Motion for Temporary Restraining Order or on any of its claims. *The only factual contention Natsource makes that is supported by any evidence whatsoever is that Mr. Gazani was authorized to have access to– and actually accessed – Natsource information during the course of his employment with Natsource.* There is nothing more. There is no evidence of any use or disclosure of any information at all by Mr. Gazani, let alone trade secret information of Natsource. This is a transparent attempt to restrain Mr. Gazani from fairly engaging in his business pursuits, as evidenced by the relief sought by Natsource, which includes the right to broadcast its scurrilous allegations throughout the industry and sully Mr. Gazani's reputation.

## II.    BACKGROUND FACTS[1]

### A.    Industry Background

Countries that are signatories to the Kyoto Protocol have committed to reduce their emissions of greenhouse gases. One way that developed countries can obtain credits to comply with the Kyoto Protocol is by buying credits from projects that are implemented in developing countries to reduce emissions. There is therefore a need for representatives on the side of buyers, and on the side of sellers, as well as a need to develop projects that will generate these credits that can be bought and sold. Natsource is on the buyers' side of the transaction, facilitating purchases of credits from existing projects being implemented in developing countries.

---

[1] The facts set forth in this brief that are taken from Plaintiff's papers are accepted as true for purposes of opposing this Motion only.

Mr. Gazani was hired for Natsource's Greenhouse Gas-Credit Aggregation Pool ("GG-CAP") to "make GG-CAP and greenhouse gas (GHG) emissions purchases on behalf of corporate clients to ensure clients' compliance with the Kyoto Protocol and the EU Emissions Trading Scheme" and to "facilitate transfer of Certified Emission Reductions from CDM [Clean Development Mechanism] projects to buyers' registries." (*See* Affidavit of Flavio Gazani ("Gazani Aff."), filed concurrently herewith, ¶ 2 and Exhibit B thereto (excerpts from immigration paperwork).)

Mr. Gazani, a Brazilian national, is well-known in his field and has published, taught, and spoken extensively on his area of expertise, Clean Development Mechanism ("CDM") created by the Kyoto Protocol, through which developing countries sell credits. (Gazani Aff., ¶ 1 and Exhibit A thereto (Curriculum Vitae).) The company Mr. Gazani had set up in 2004 (International Solutions), well before his employment with Natsource, was designed to identify potential projects for reducing emissions that did not exist yet (primarily in Mr. Gazani's home country of Brazil), and to consult with project developers to put the idea to paper, thereby generating credits that could later be sold. (Gazani Aff., ¶ 4 .) This is the topic of Mr. Gazani's lengthy book, which was published in 2002 (again, well before his employment with Natsource) and even contains a checklist for identifying such projects. (Gazani Aff., ¶¶ 2, 4 and Exhibit A thereto (Curriculum Vitae).) International Solutions has not been an operating company since it was set up (*e.g.*, it has no revenues, etc.). (Gazani Aff., ¶ 4.) Moreover, even if it were operational, it would not be conducting the same business that Natsource does.[2] (*See, e.g.*,

---

[2] Natsource in its Brief appears to fundamentally misunderstand the nature of the business Mr. Gazani contemplated. Specifically, Mr. Gazani would be conceiving projects that did not yet exist, whereas Natsource was involved with assessing and selling credits for projects that already had been put to paper or were in the implementation stages.

Plaintiff's TRO Memorandum, p. 7 (DMR distills information about "an identified CDM or JI project" to assess the risk of purchasing certain credits – it does not as a general rule contemplate new potential projects that have not yet been put to paper); Gazani Aff., ¶ 4.)

### B.    Mr. Gazani's Employment With Natsource

Mr. Gazani was recruited away from his former employer to work with Natsource, and went to work for the company in October 2005.  (Gazani Aff., ¶ 2.)  He initially began as a CDM Regulatory Analyst, and was later promoted to Senior CDM/JI Regulatory Analyst.  (Complaint, ¶ 10; Gazani Aff., ¶ 2.)  Natsource specifically sought to exploit Mr. Gazani's vast knowledge in this field, as evidenced by the H-1B visa paperwork submitted by Natsource on behalf of Mr. Gazani.  (Complaint, ¶ 10; Gazani Aff., ¶ 2 and Exhibit B thereto (excerpts from immigration paperwork).)  Mr. Gazani was neither asked nor required to execute any confidentiality agreement or non-compete agreement prior to commencing his employment or at any time during the course of his employment with Natsource.  (Gazani Aff., ¶ 3; *see generally* Natsource's Complaint and moving papers (no reference to any non-compete or confidentiality agreement).)

It was no secret that Mr. Gazani was involved with International Solutions.  Before he was even hired by Natsource, Mr. Gazani advised Natsource of his involvement with that company.  (Gazani Aff., ¶ 5; *see also* Affidavit of Benjamin Feldman[3] ("Feldman Aff."), ¶ 16 (stating that Mr. Feldman "ha[s] learned" that Mr. Gazani is associated with International Solutions, but failing to mention that this was learned *before* Mr. Gazani began working with Natsource.).)  A pre-hire Google search would have revealed that Mr. Gazani had been a Director

_____

[3] All affidavits referenced herein other than Mr. Gazani's were submitted by Natsource in support of its Motion.

of that entity before his employment with Natsource. (Gazani Aff., ¶ 5 and Exhibit F thereto (printout of U.S. government program website "Methane to Markets" Project Network Member Profile, which has been available online since before Mr. Gazani's employment with Natsource).) Indeed, when Mr. Gazani announced he was leaving Natsource and was considering returning to Brazil to identify opportunities to develop CDM projects there, his supervisor indicated that Natsource would be interested in working with Mr. Gazani to pursue such projects. (Gazani Aff., ¶ 6.) Far from being competitive, Mr. Gazani's planned business of generating additional credits to be available for purchase would be a symbiotic relationship with Natsource's business; without the generation of credits, there would be nothing for Natsource buyers to purchase. (*Id.*)

C.    **The Information At Issue**

According to Natsource, the Delivery Risk Model ("DRM") is its "life blood."[4] (Feldman Aff., ¶ 9.) The DRM calculates the risk to buyers of various projects (*i.e.,* the risk that the credits generated by the project will not be delivered.). (Plaintiff's TRO Memorandum, p. 6.) Natsource provides five or six employees with full access to the DRM files on its network, and provided such access to Mr. Gazani. (Feldman Aff., ¶¶ 9, 12; Affidavit of Michael Grande ("Grande Aff."), ¶¶ 5, 7.) According to Natsource, only those Natsource employees with a business need for the information are granted access. (Feldman Aff., ¶ 10.) Mr. Gazani had such business need. (Feldman Aff., ¶ 12.)

Notably, Natsource does not claim that it requires employees who use the DRM to execute any type of confidentiality agreement. The disclaimer that accompanies the email

---

[4] As outlined below, it appears that the DRM and related information actually belong to NAR, not Natsource. NAR is not a party to this action.

distributing DRM output assessments makes no reference to trade secrets or proprietary or confidential information; it merely says "These DRM outputs should not be circulated outside the company without prior arrangement." (Feldman Aff., ¶ 10; *see also* Complaint and moving papers generally regarding purported efforts to ensure confidentiality.)  Essentially, other than standard computer passwords and word of mouth, Natsource does not claim to take any other steps to protect its "life blood," including the simple step of marking the documents "confidential" or requiring confidentiality agreements of its employees.

Natsource also claims that, in May 2006, Mr. Gazani emailed to his personal email address a document entitled "Technology CDM Opportunity Guide" that Natsource shared with business partners regarding project opportunities in Brazil.  (Plaintiff's TRO Memorandum, p. 16.)  Preliminarily, Mr. Gazani was still working with Natsource in May 2006.  (Gazani Aff., ¶ 7.)  The document was not marked confidential and was intended for distribution.  (Gazani Aff., ¶ 7; Plaintiff's TRO Memorandum, p. 16.)  What Natsource neglects to mention is that Mr. Gazani contributed to the content of that document based on information provided by one of his contacts in Brazil, and the remainder of the information was publicly available.  (Gazani Aff., ¶ 7.)  There was nothing in the Guide that Mr. Gazani either did not already know or could not get publicly (and in any event, the information contained therein would be long outdated, being about six months old).  (*Id.*)  Accordingly, even if Mr. Gazani had emailed the document to his personal email account for later perusal, it was not unlawful.[5]

---

[5] Natsource makes great weight of the fact that Mr. Gazani occasionally accessed his personal email account from his company laptop computer (*see, e.g.,* Plaintiff's TRO Memorandum, pp. 20, 21), without noting that this was routinely done in the office by Natsource employees, who did this rather than use the company's email system for personal email messages.  (Gazani Aff., ¶ 8.)  While this may have been a violation of internal company policy (which has not been established), it certainly is not unlawful.

### D.    The Termination Of Mr. Gazani's Employment

Mr. Gazani recently announced his intention to leave Natsource at the end of the year, providing Natsource with plenty of notice so it would have time to secure a replacement. (Gazani Aff., ¶ 9; Feldman Aff., ¶ 20.)  Natsource retaliated against Mr. Gazani by advancing his termination date and severing his employment immediately, effective October 12, 2006, leaving Mr. Gazani in the untenable position of having to either leave the country or secure a new visa sponsor within ten days.  (Gazani Aff., ¶ 9; Feldman Aff., ¶ 24.)  Natsource demanded at that time that Mr. Gazani allow it unfettered access to his home computer, which Mr. Gazani declined to do without seeking legal counsel first.  (Gazani Aff., ¶ 9; Feldman Aff., ¶ 20.)

Natsource did not tender payment of Mr. Gazani's accrued compensation within one business day, as required by District of Columbia wage payment laws, despite requests by Mr. Gazani's counsel that it tender such payment.  (Gazani Aff., ¶ 10.)  *See* D.C. Code § 32-1303. Nor has Natsource responded to Mr. Gazani's repeated requests to cover his return airfare to Brazil, as it is required to do under federal law as Mr. Gazani's H-1B visa sponsor.  (Gazani Aff., ¶ 10.)

### E.    Mr. Gazani's Efforts To Pursue Other Business Endeavors.

Not long before he announced his intent to resign his employment with Natsource, Mr. Gazani began exploring the possibility of pursuing other business opportunities through his pre-existing company, International Solutions.  (Gazani Aff., ¶ 11.)  To that end, Mr. Gazani contacted a few CDM project developers (referred to by Natsource as "Project Development Document writers" or "PDD writers") from his personal MSN email account, including one that was a non-exclusive vendor of Natsource, Quality Tonnes.  (Gazani Aff., ¶ 11; Feldman Aff., ¶ 21; Plaintiff's TRO Memorandum, p.15.)  Mr. Gazani's email did not utilize or disclose any

information of Natsource, let alone any information that could conceivably be deemed to be a trade secret; rather, it was merely an inquiry about a potential partnership with International Solutions.[6] (*See* Feldman Aff., ¶ 21 and Exhibit 4 thereto; Gazani Aff., ¶ 11.) Mr. Gazani also made virtually identical inquiries of a couple of other CDM project developers he located on the internet, including Carbon Ventures, which is not a vendor used by Natsource. (Gazani Aff., ¶ 12; Feldman Aff., ¶ 32 and Exhibit 8 thereto.) None of the other CDM project developers Mr. Gazani contacted was a vendor of Natsource to Mr. Gazani's knowledge. (Gazani Aff., ¶ 12.) Natsource has not claimed, nor could it, that the identity of the one CDM project developer Mr. Gazani contacted that was a vendor of Natsource s is anything other than publicly available information. (*See* Gazani Aff., ¶ 12.)

Mr. Gazani did, in fact, engage in personal and other business endeavors while on a trip to London, but this trip did ***not***, contrary to Natsource's representations, involve any Natsource business; it was done during personal (non-work) time for Mr. Gazani approved by Mr. Feldman, Mr. Gazani's supervisor. (Gazani Aff., ¶ 13; *see also* Plaintiff's TRO Memorandum, p. 15.) It is evident here that Natsource is not merely trying to prevent disclosure of its "life blood," but any effort whatsoever by Mr. Gazani to work in his chosen field.

---

[6] Specifically, the email read "Dear Mr. Baruch, I am contacting you on behalf of International Solutions (IS), which is a Brazilian company focused on the CDM market. As I [am] sure you are aware, this is a very critical time in the marketplace. There is still relatively low awareness of the potential opportunities in developing countries like Brazil. IS has identified a significant number of potential projects which could generate more than 7 million CERs [Certified Emission Reductions]. The company also has an existing sales force as well as many high-level government/industry contacts. From my evaluation of Quality Tonnes, I feel there may be an opportunity for you to partner with IS to bring projects to the market. I would like to speak to you more about these potential opportunities. Please feel free to contact me at any time; otherwise, I will follow up with you in a couple of days. Best regards, Flavio Gazani [cell phone number]."

**F.**    **Events Subsequent To The Termination Of Mr. Gazani's Employment**

Continuing its strong-arm tactics, the day after Mr. Gazani's abrupt termination, counsel

for Natsource and NAR forwarded a harshly-worded cease-and-desist letter to Mr. Gazani by

courier, electronic mail and overnight delivery.  (Gazani Aff., ¶ 14 and Exhibit C thereto.)  The

letter went so far as to advise Mr. Gazani that he could face "up to a ten-year term of

imprisonment." (*Id.*)  Mr. Gazani's counsel responded at length on October 18, offering to return

the single disk of information Mr. Gazani still had in his possession after his abrupt termination,

and offering an affidavit from Mr. Gazani confirming that he did not have any other information

of Natsource.  (Gazani Aff., ¶ 14 and Exhibit D thereto.)  Natsource and NAR's counsel accepted

this offer, and Mr. Gazani executed an affidavit confirming that he had returned all information

(including the disk referenced above), did not have any additional information (including

copies), and does not intent to use it for his own benefit or disclose it to others.  The affidavit and

disk were provided to Natsource's counsel on October 20, 2006.[7]  (Gazani Aff., ¶ 14 and Exhibit

E thereto.)  On October 26, 2006, counsel for Mr. Gazani was advised that Natsource intended to

pursue a temporary restraining order, preliminary injunction, and lawsuit.  (Gazani Aff., ¶ 14.)

This action followed.

---

[7] Mr. Gazani had three disks in his possession, two of which are believed to be blank.
Because Mr. Gazani's counsel had represented to Natsource's counsel that she would not review
the disk before turning it over to assuage Natsource's concerns about confidentiality, Mr.
Gazani's counsel erroneously sent the wrong disk – which apparently turned out to be blank – to
Natsource's counsel.  As soon as this was brought to the attention of Mr. Gazani's counsel, the
remaining two CDs (one believed to be blank and one of which had some information on it)
immediately were messengered to counsel for Natsource.

III.    <u>LEGAL STANDARD</u>

"It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997).  Moreover, where (as here, in part) the relief sought is mandatory rather than prohibitory, the request for relief "is subject to heightened scrutiny and should not be issued unless the facts and law ***clearly favor the moving party***." *Dahl v. HEM Pharma. Corp.,* 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Morgan Stanley Morgan Stanley DW, Inc. v. Rothe,* 150 F. Supp. 2d 67, 72 n.2 (D.D.C. 2001).

Natsource correctly cites the legal standard for obtaining a temporary restraining order or preliminary injunction against a former employee, as follows:  Natsource must demonstrate that: (1) there is a substantial likelihood that Natsource will succeed on the merits; (2) Natsource will be irreparably injured if the injunction is not granted; (3) an injunction will not substantially injure Mr. Gazani; and (4) the public interest will be furthered by an injunction.  (Plaintiff's TRO Memorandum at pp. 18-19, citing *Morgan Stanley DW, Inc., supra,* 150 F. Supp. 2d at 72 (citing *Mova Pharma. Co. v. Shalala,* 1340 F.3d 1060, 1066 (D.C. Cir. 1998).)  *See also Delaware & Hudson Ry. Co. v. United Transp. Union*, 450 F.2d 603 (D.C. Cir. 1971); *Howard Univ. v. Nat'l Collegiate Athletic Ass'n*, 675 F. Supp. 652, (D.D.C. 1987) (standard for granting temporary restraining order in D.C. Circuit same as standard for granting preliminary injunction).

As a threshold matter, however, Natsource must demonstrate that this Court has personal jurisdiction over Mr. Gazani and that there is a reasonable probability that it will have subject matter jurisdiction over this action. *Hitchman Coal & Coke Co. v. Mitchell,* 245 U.S. 229, 234-235, 38 S. Ct. 65, 66-67 (1917);  *In re Rationis Enters., Inc. of Panama,* 261 F.3d 264, 267-271 (2d Cir. 2001); *Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d

464, 471 (5th Cir. 1985); *Barwood, Inc. v. District of Columbia,* 202 F.3d 290, 294 (D.C. Cir.

2000).  Moreover, Natsource must establish that it has standing to seek the relief requested.

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S. Ct. 2130, 2139 (1992); *The Wilderness*

*Soc'y v. Norton,* 434 F.3d 584, 589 (D.C. Cir. 2006).  Natsource cannot meet its burden on any of

these issues.

IV.    **NATSOURCE CANNOT ESTABLISH PERSONAL JURISDICTION OR A**
         **REASONABLE PROBABILITY OF SUBJECT MATTER JURISDICTION**

        Mr. Gazani has not been served with the Summons and Complaint in this action.

Accordingly, this Court lacks personal jurisdiction over Mr. Gazani, and cannot properly enjoin

him.[8]  *Hitchman Coal & Coke Co., supra,* 245 U.S. at 234-235, 38 S. Ct. 66-67; *In re Rationis*

*Enter., Inc. of Panama,* 261 F.3d at 267-271.

        Moreover, Natsource cannot establish a reasonable probability that this Court will have

subject matter jurisdiction over this action, and Natsource is precluded from obtaining injunctive

relief on that basis as well.  *See Enterprise Int'l, Inc., supra,* 762 F.2d at 471; *Barwood, Inc.,*

*supra,,* 202 F.3d at 294.  Specifically, as set forth in detail below (*see* Section VI.B, *infra*),

Natsource's claim for violation of the Computer Fraud and Abuse Act, the sole basis for federal

jurisdiction here, is frivolous and will be subject to a motion to dismiss, on the ground that, *inter*

*alia,* Mr. Gazani admittedly was one of the Natsource employees authorized to access the

information he is alleged to have improperly accessed during the course of his employment.

Indeed, Mr. Gazani is informed and believes that the only reason this sham claim was asserted

was to establish federal jurisdiction.  Natsource's Motion should be denied on these bases.

_____

        [8] It also should be noted that Mr. Gazani most likely will not be able to be served by
standard service of process, given that he is being forced to return to Brazil as a result of
Natsource's abrupt termination of his employment and his inability to locate within the requisite
time frame a new employer sponsor for his H-1B visa.

V.    **NATSOURCE APPEARS TO LACK STANDING TO OBTAIN A TRO**

Constitutional standing is a necessary element of any claim for injunctive relief. *Lujan, supra,* 504 U.S. at 560, 112 S. Ct. at 2139; *The Wilderness Soc'y, supra,* 434 F.3d at 589. Specifically, the plaintiff must have suffered an "injury in fact" – an invasion of a legally protected interest which is concrete and particularized, as well as actual or imminent, rather than conjectural or hypothetical. *Id.*

Natsource here appears to lack the requisite standing. Specifically, Mr. Gazani is informed and believes that the information that Natsource contends Mr. Gazani has used or disclosed belongs not to Natsource, but to *NAR,* a separate legal entity that charges different Natsource entities for its use, but which is not a party to this action. (Gazani Aff., ¶ 15.) Moreover, in its Complaint, Natsource asserts that "NAR provides support for the asset management business of Natsource by identifying an analyzing the viability of CDM and JI projects in developing countries to reduce emissions of greenhouse gases. NAR analyzes the potential outputs of those projects and assesses the various risks that the CERs and ERUs generated by the project will not be delivered. After doing a full assessment on a proposed CDM or JI project, NAR issues a report used by Natsource to assess whether a project will be attractive for Natsource and other entities advised by Natsource." (Complaint, ¶ 8.) The Delivery Risk Model ("DRM") is the system used to determine the potential success and risk involved in CDM and JI projects. (*Id.*, ¶ 16.) It is DRM information that Natsource contends Mr. Gazani misappropriated; accordingly, it appears that NAR, not Natsource, would be the only proper plaintiff here. Mr. Gazani respectfully requests that competent evidence be submitted on this point by Natsource if the Court is inclined to grant Natsource's Motion.

## VI.    NATSOURCE CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS

It is particularly important for Natsource to demonstrate a substantial likelihood of success on the merits in order to obtain the relief sought. *Morgan Stanley DW, Inc., supra*, 166 F.3d at 73. This it cannot do.

### A.    The Purported Evidence Cited By Natsource Is Misleading And/Or Not Competent, And Many Inferences Natsource Makes Are Unreasonable And Speculative

Natsource takes great liberties with the "facts" it cites in its Motion, and relies primarily on rhetoric and buzzwords in an effort to obtain the relief it seeks. For instance, Natsource repeatedly claims that Mr. Gazani improperly downloaded programs onto his company-issued laptop that caused it to become inoperable. (*See, e.g.,* Plaintiff's TRO Memorandum , p. 3 ("Gazani did this using two laptop computers issued to him by Natsource, one of which he made inoperable during his employment"), p. 20 ("This improper and unauthorized use of his laptop either contributed to or caused that laptop to be beyond repair"), p. 23 (". . .Gazani also caused the malfunction of Natsource's laptop computer issued to him in his position, destroying unknown amounts of information).) This is simply fabricated. The *only* evidence submitted by Natsource on this topic is the affidavit of Natsource's Network Administrator, who testified that the computer had "stopped working," was "completely unusable," and "would not even start." (Grande Aff., ¶ 9.) There is absolutely no testimony that Mr. Gazani "caused the malfunction" or "contributed to" it. (*See generally* Grande Aff.)

Likewise, Natsource plays fast and loose with the facts when it repeatedly claims that Mr. Gazani "accessed the results of all of Natsource's DRM assessments and components of the DRM model and its inputs from a portable CD ROM disk in the laptop's disk drive . . This CD ROM, a portable electronic format, contains the raw data from every DRM assessment done for

the last 18 months." (Plaintiff's TRO Memorandum, p. 14 (emphasis in original); *see also* Plaintiff's TRO Memorandum, pp. 3, 5, 18, 21.) In support of this proposition, Natsource cites the Affidavit of Mr. Feldman, who was Mr. Gazani's former supervisor and does not purport to be a computer expert, but instead apparently relies for his testimony on information culled "from Mr. Rodokanakis' work." (Plaintiff's TRO Memorandum, p. 14; Feldman Aff., ¶ 30.) However, Mr. Rodokanakis, the forensic computer expert proffered by Natsource, testified to no such thing; he avers only that "someone opened up and viewed files with 'DRM' acronym in the file name, including Excel spreadsheets, contained on a CD-ROM disk in the laptop's CD-ROM disk drive." That is a far cry from the representation made by Natsource. Notably, even Natsource claims that the information was *accessed* – not copied or downloaded – and that this occurred while Mr. Gazani still was actively employed with Natsource. It is a huge, illogical leap to claim that Mr. Gazani was up to nefarious pursuits merely because he accessed information he was fully authorized by Natsource to see during the course of his employment.

Similar examples of misrepresentations and misleading (by omission or otherwise) statements abound. Natsource discusses at length a purported "significant performance failure" by Mr. Gazani. Specifically, Natsource claims that Mr. Gazani "had failed to attend a CDM Executive Board meeting in Germany, required by his job, because he neglected to ensure that he was registered for it." (Plaintiff's TRO Memorandum, p. 13.) What Natsource fails to reveal, however, is that Natsource was *prohibited* by the United Nations Secretariat from having representatives at such meetings. To circumvent this prohibition, Natsource would register its representatives through a non-governmental organization (NGO) that was permitted to attend. (Gazani Aff., ¶ 16.) With respect to the meeting at issue, Mr. Gazani *could not* have registered himself (which is likely why Plaintiff's TRO Memorandum craftily phrases Mr. Gazani's

15

purported performance issue as "neglect[ing] to *ensure* that he was registered for it" rather than "neglecting to *register* for it."). (Plaintiff's TRO Memorandum, p. 13.)  What actually occurred was that the NGO that was allowing Natsource to circumvent the prohibition on attendance had failed to register Mr. Gazani for the meeting.  (Gazani Aff., ¶ 16.)   This is yet another example of Natsource utilizing artful pleading to make Mr. Gazani look like the wrongdoer.

Tellingly, Natsource bases its entire Motion on assumptions, and instead of focusing on what Mr. Gazani *did* do (other than conduct that was within his authority as an employee, such as asking for passwords he apparently already had or access to information he had authority to see), Natsource focuses on what Mr. Gazani "*had the ability to do*" (send and receive attachments, download information and store it) and "*could*" *do* (download and send files from his computer). (Plaintiff's TRO Memorandum, pp. 12, 20.)   This is nothing more than what *any* employee with computer access could do.  Such speculative "evidence" is not sufficient to meet Natsource's burden here.

**B.     Natsource Is Not Likely To Prevail On Its Claim For Violation Of The Federal Computer Fraud & Abuse Act**

Natsource claims that Mr. Gazani violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, by "exceeding the authorized use he was allowed by Natsource to intentionally obtain valuable confidential and trade secret information, which he then intentionally used for purposes of competing with Natsource, resulting in loss to Natsource." (Plaintiff's TRO Memorandum, p. 19.)  The facts as alleged by Natsource simply will not support such a claim.

The CFAA, in relevant part, prohibits an individual from (1) intentionally accessing a computer without authorization or exceeding authorized access, and thereby obtaining information from any protected computer if the conduct involved an interstate or foreign

communication; (2) knowingly and with intent to defraud, accessing a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthering the intended fraud and obtaining anything of value; or (3) intentionally accessing a protected computer without authorization, and as a result of such conduct, causing damage. 18 U.S.C. §§ 1030(a)(2)(C), (a)(4), & (a)(5)(A)(iii).

The purpose of the CFAA was to create a cause of action against computer hackers. *See, e.g., In re AOL, Inc. Version 5.0 Software Litigation,* 168 F. Supp. 2d 1359, 1370 (S.D. Fla. 2001) (concluding phrase "without authorization" in the CFAA "contemplate[s] a situation where an outsider, or someone without authorization, accesses a computer"); *see also* 101 S. Rpt. 544 (1990) (indicating that a civil cause of action was created under the CFAA to redress damage and loss caused by "individuals who create computer viruses and other harmful security threats," and "new computer abuse techniques such as computer viruses and worms").

Here, Natsource claims that Mr. Gazani violated the CFAA by (1) downloading and sending files "on behalf of his competing company," from Natsource's computer through a personal email account; (2) "possess[ing] a CD ROM with components of the DRM and the results of all DRM assessments on it;" and (3) damaging his laptop computer beyond repair, purportedly by accessing his MSN personal email account. Even if true, none of this conduct constitutes a violation of the CFAA.

As a preliminary matter, the CFAA defines "exceeds authorized access" as "access[ing] a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter." 18 U.S.C. § 1030(e)(6). Natsource concedes, however, that Mr. Gazani was one of the six individuals at the company with ***full and***

*unrestricted access* to the information at issue. (*See* Grande Aff., ¶¶ 5, 7.) Thus, no violation of the CFAA could have occurred by reason of Mr. Gazani's accessing Natsource information.[9]

Similarly, in *International Association of Machinists & Aerospace Workers v. Werner-Matsuda*, 390 F. Supp. 2d 479 (D. Md. 2005), the plaintiff union alleged that the defendant union member had violated the CFAA by transmitting confidential union member lists, which she was authorized to access, to a rival union in violation of a Registration Agreement she had signed as a prerequisite to gaining access to the membership lists. The Court concluded that although the defendant might have breached the Registration Agreement by using the information she obtained for purposes contrary to the policies established by the union constitution, it did not follow that she was not authorized to access the information, or had exceeded her authorized access, in violation of the CFAA. *Id.* at 498; *see also, e.g., Lockheed Martin Corp. v. Speed*, No. 6:05-cv-1580-Orl-31KRS, 2006 U.S. Dist. LEXIS 53108, at **11-16 (M.D. Fla. Aug. 1, 2006) (attached hereto as Exhibit A) (concluding that because employer allowed employees to access company computer system, including precise information at issue, employees did not violate the CFAA by allegedly downloading and copying proprietary company information before moving to competitor, as they were not without authorization or exceeding authorized access). Thus, even accepting Natsource's allegations as true, it can show no violation of the CFAA as Mr. Gazani admittedly had access to the precise information at issue.

---

[9] Natsource attempts to confuse the issue by arguing that Mr. Gazani was not entitled to access *his MSN personal email account* from his Natsource-issued laptop computer; however, that does not constitute "accessing a protected computer. . .." and is not prohibited by the CFAA. Nor has Natsource provided any evidence that the purported damage to Mr. Gazani's laptop was caused by his MSN personal email or other prohibited Internet programs that Mr. Gazani purportedly downloaded. (*See* Section VI.A, *supra*.)

Even ignoring the fact that Mr. Gazani was authorized to access to the information at issue, Natsource's claim for violation of Section 1030(a)(2)(C) of the CFAA must fail. Section 1030(a)(2)(C) prohibits "intentionally accessing a computer . . . if the conduct involved an interstate or foreign communication." 18 U.S.C. § 1030(a)(2)(C). Natsource makes no claim in either its Complaint or TRO Memorandum that Mr. Gazani accessed its computer systems by means of interstate or foreign communications.[10]

Finally, the substance of the emails sent by Mr. Gazani further reflect that no violation of the CFAA occurred, as they are merely standard solicitation emails and do not reflect the transmission of any allegedly proprietary information. (*See* footnote 6, *supra*.) Accordingly, Natsource has not established a likelihood of success on the merits of its CFAA claim, and is not entitled to injunctive relief.

**C.     Natsource Is Not Likely To Prevail On Its Claim For Breach Of The Duty Of Loyalty**

Natsource will not be able to demonstrate any breach of the duty of loyalty by Mr. Gazani. Mr. Gazani was entitled to make preparations for his post-Natsource business endeavors, and as demonstrated above, he neither used nor disclosed any confidential Natsource information, nor did he solicit for himself any business opportunities of the company. *See, e.g., PM Servs. Co. v. Odoi Assocs.*, No. 03-1810 (CK), 2006 U.S. Dist. LEXIS 655, at *86-87 (D.D.C. Jan. 4, 2006) (attached hereto as Exhibit B). Even if Mr. Gazani had not disclosed his intent to leave Natsource and work with his own company, which he did, and even if International Solutions were a competitor of Natsource, which it is not, a failure to disclose plans

---

[10] Although  Natsource does allege that Mr. Gazani sent emails internationally in his capacity as an agent for International Solutions while employed with Natsource, this does not constitute accessing and obtaining information *from Natsource's computer* through interstate or foreign communication.

19

to compete with the employer is not a breach of the duty of loyalty. *Id.; see also Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250 (D.D.C. 1997) (agent may make arrangements or plan to go into competition with his principal before terminating his agency); Restatement 2d of Agency, § 387 (agent is not necessarily prevented from acting in good faith outside his employment, even in a manner that injuriously affects his principal's business). The case cited by Plaintiff, *Mercer Mgmt. Consulting v. Wilde*, 920 F. Supp. 219 (D.D.C. 1996), is inapposite in that it involved corporate officers and directors, who obviously owe a higher duty of loyalty to their employer. Mr. Gazani was neither an officer nor a director of Natsource. (*See* Plaintiff's TRO Memorandum, p.22.) Natsource cannot show that it is likely to prevail on this claim.

D.    **Natsource Is Not Likely To Prevail On Its Claim For Misappropriation Of Trade Secrets**

In order to state a claim for misappropriation of trade secrets, Natsource first must demonstrate that its own protectable trade secret is at issue. Natsource then must demonstrate that Mr. Gazani either (1) acquired the trade secret by improper means, or (2) disclosed or used the trade secret without consent after acquiring the information under circumstances giving rise to a duty to maintain its secrecy or limit its use. D.C. Code § 36-401(2); *see also Catalyst & Chem. Servs., Inc. v. Global Ground Support,* 350 F. Supp. 2d 1, 7 (2004). "'Trade secret' means information that . . . (A) Derives actual or potential independent economic value, from not being generally known to, and not being readily ascertainable by, proper means by another who can obtain economic value from its disclosure or use; and (B) *Is the subject of reasonable efforts to maintain its secrecy*." D.C. Code § 36-401(4) (emphasis added).

Preliminarily, as discussed above, Natsource does not appear to be the proper party to assert a claim of misappropriation of trade secrets, given that the subject DRM and

related information appears to belong to NAR rather than Natsource. Natsource also will have difficulty establishing that the information is a "trade secret" given that it did not even take the most basic step of requiring confidentiality agreements of employees like Mr. Gazani to whom it granted access to this information. *See, e.g., Catalyst & Chem. Servs., Inc., supra,* 350 F. Supp. 2d at 7 (implementing confidentiality agreements is a reasonable effort at maintaining secrecy); *MicroStrategy Inc. v. Bus. Objects, S.A.,* 331 F. Supp. 2d 396 (E.D. Va. 2004) (reasonable efforts taken to maintain secrecy include such things as implementing confidentiality agreements); *DT Products, Inc. v. Lexmark Intern., Inc.,* 274 F.Supp.2d 880 (E.D.Ky. 2003) ("A failure to require . . . confidentiality agreement to protect alleged trade secrets is one clear way to waive any trade secret protection that might exist" (citing *Auto Channel, Inc. v. Speedvision Network, LLC,* 144 F.Supp.2d 784, 795 (W.D.Ky. 2001), *aff'd* 124 Fed. Appx. 329 (6th Cir. 2005), *cert. denied,* 126 S. Ct. 384, 163 L.Ed.2d 170 (2005).

Moreover, Natsource will be unable to establish that Mr. Gazani acquired the purported trade secret through improper means, given that he admittedly was one of the employees granted full access to the information, and Natsource claims to have given access only to those employees who had a need for the information. As set forth in detail above, Natsource will be unable to demonstrate that Mr. Gazani used or disclosed any trade secret information of Natsource. Indeed, all that is proffered is speculation and conjecture; there is not a shred of competent evidence – or even incompetent evidence – showing that Mr. Gazani used or disclosed any such information.

### E.         Natsource Is Not Likely To Prevail On Its Claim For Conversion

In order to establish a claim of conversion, Natsource must demonstrate:  (1) the unlawful exercise; (2) of ownership, dominion, or control; (3) of another's personal property; (4) in denial

or repudiation of that person's property right. *Bynum v. Equitable Mortg. Group*, No. 99 CV

2266-SBC-JMF, 2005 U.S. Dist. LEXIS 6363, at *48 (D.D.C. April 27, 2005) (attached hereto as

Exhibit C); *Equity Group, Ltd., v. Painewebber Inc.*, 839 F. Supp 930, 933 (D.D.C. 1993);

*O'Callaghan v. District of Columbia*, 741 F. Supp 273, 279 (D.D.C. 1990). Natsource cannot

satisfy these elements.

  Natsource must first establish that the property at issue belongs to it rather than to NAR.

Even if Natsource can establish this, it will be unable to prevail on this claim, because ***intangible***

property interests, such as those at issue here, are not subject to conversion. *Equity Group, Ltd.,*

*v. Painewebber Inc.*, 839 F. Supp 930, 933 (D.D.C. 1993) (conversion claim will not be

expanded to encompass appropriation of intangibles such as a business or a marketing system or

databases); *see also Kaempe v. Myers*, No. 01-02636 (ESH), 2002 U.S. Dist. LEXIS 27610, at

*3-4 (D.D.C. March 22, 2002) (attached hereto as Exhibit D) (no conversion claim for intangible

property; granting motion to dismiss regarding conversion of patent rights); *Primedical, Inc. v.*

*Allied Inv. Corp.*, No. 90-1802 (NHJ), 1994 U.S. Dist. LEXIS 4517, 1994 WL 149139, at *7

(D.D.C. March 31, 1994) (attached hereto as Exhibit E) (citing *Equity Group*, 839 F. Supp. at

933 ("some courts have loosened the restriction and have permitted suits for conversion of

intangibles, but the process of expansion has stopped with the kind of intangible rights which are

customarily merged in, or identified with some document. Thus, a plaintiff may bring a suit for

conversion of a promissory note, a check, a bank book, or an insurance policy, but not for

conversion of a debt, the good will of a business, or an idea.") (citing *Equity Group*, 839 F. Supp.

at 933; W. Page Keeton *et al.*, *Prosser and Keeton on the Law of Torts* §§ 15, at 92 (5th ed.

1984)) (internal citations omitted).

Moreover, Natsource will be unable to demonstrate that Mr. Gazani exercised unlawful dominion or control over Natsource's property, or that he did so in denial or repudiation of Natsource's property right, given that Mr. Gazani was fully authorized to access the information during his employment with Natsource, and he returned all such property promptly after his abrupt termination. Accordingly, Natsource cannot demonstrate a likelihood of prevailing on this claim either.

## VII.    NATSOURCE CANNOT ESTABLISH A SUBSTANTIAL THREAT OF IMMINENT IRREPARABLE INJURY

Natsource *already has* from Mr. Gazani the information that he acquired during the course of his employment. Natsource *already has* an affidavit from Mr. Gazani attesting that he does not have any documents or additional information of Natsource. Natsource *already has* an affidavit from Mr. Gazani confirming that he will not use or disclose any confidential information of Natsource. There is no imminent injury threatened, let alone irreparable injury, and alleged past harm (even if Natsource could demonstrate any) is insufficient. *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S. Ct. 1660, 1665 (1983). For this reason also, the relief sought by Natsource should be refused.

## VIII.    NATSOURCE CANNOT ESTABLISH THAT THE THREATENED INJURY OUTWEIGHS POTENTIAL DAMAGE TO MR. GAZANI, OR THAT THE INJUNCTION SERVES THE PUBLIC INTEREST

Natsource cannot demonstrate that it would be appropriate to punish a former employee for announcing his resignation to pursue other business endeavors particularly where, as here, Natsource was aware of the business endeavor even before he commenced employment, that business endeavor is not competitive, and the former employee has engaged in no unfair practices. Natsource seeks, based solely on innuendo and rhetoric, to conduct a forensic inspection of Mr. Gazani's personal computer, force Mr. Gazani to disclose the identity of all of

his business partners, and get the Court's blessing to allow Natsource to broadcast its spurious allegations against Mr. Gazani to the industry in which Mr. Gazani is attempting to find gainful employment after being abruptly terminated by Natsource. This surely does not serve the public interest, and it tramples Mr. Gazani's privacy rights. Mr. Gazani has already attested that he has returned all Natsource information, that he has no Natsource documents or other property, and that he is not using or disclosing any Natsource information. Giving Natsource anything more would simply be punitive.

## IX.   CONCLUSION

For all of the foregoing reasons, Mr. Gazani respectfully submits that Natsource's Motion for Temporary Restraining Order should be denied.

Dated this 30th day of October, 2006.

Respectfully submitted,

By: _____/s/_____

Ronald M. Johnson, Esq. (DC Bar No. 262311)
Christine A. Samsel, Esq. (DC Bar No. 474988)
AKIN GUMP STRAUSS HAUER & FELD, LLP
133 New Hampshire Avenue, NW
Washington, DC 20036
(202) 887-4000 (Phone)
(202) 887-4288 (Fax)

Attorneys for Defendant
Flavio Gazani

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, has been hand-served upon the following person:

> Susan F. Wiltsie
> Hunton & Williams LLP
> 1900 K Street, NW
> Washington, DC  20006
> Attorneys for Plaintiff

Dated this 30th day of October, 2006.

_____
Christine A. Samsel, Esq.

25

Exhibit A

LEXSEE 2006 USDISTLEXIS 53108

**LOCKHEED MARTIN CORPORATION, Plaintiff, -vs- KEVIN SPEED, STEVE FLEMING, PATRICK ST. ROMAIN, L-3 COMMUNICATIONS CORPORATION, & MEDIATECH, INC., Defendants. L-3 COMMUNICATIONS CORPORATION, Third Party Plaintiff, vs. JACK KELLY, THOMAS DORSEY, MICHAEL HOMAN, and THOMAS HULL, Third Party Defendants.**

**Case No. 6:05-cv-1580-Orl-31KRS**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION**

*2006 U.S. Dist. LEXIS 53108; 19 Fla. L. Weekly Fed. D 939*

**August 1, 2006, Decided**
**August 1, 2006, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff aerospace government contractor alleged defendant former employees accessed its computers, copied proprietary information, and delivered trade secrets to defendant rival, the employee's subsequent employer, in violation of the Computer Fraud and Abuse Act, *18 U.S.C.S. § 1030(g)*. The employees filed motions to dismiss.

**OVERVIEW:** The contractor alleged that it incurred costs in responding to the offenses and in conducting a damage assessment. Thus, a § 1030(a)(5)(B)(i) "loss," as defined in § 1030(e)(11), was sufficiently alleged. But, because the contractor permitted the employees to access the company computer, and to the precise information at issue, they were not without authorization and did not exceed authorized access. Section § 1030(a)(4) did not reach the employees because they had access authorization. The gist of the complaint was aimed at the employees' actions after they accessed the information. The contractor's remedial measures, while "losses" under § 1030(e)(11), did not fit in the definition of "damage" under § 1030(e)(8), which was aimed at the impairment rendered to the computer and its information. Copying a computer's information was relatively common and typically did not, by itself, permanently delete the original files. Absent an allegation of permanent deletion or removal, the claim under § 1030(a)(5)(A)(i) failed. The claim under § 1030(a)(5)(A)(ii) failed because the employees accessed with authorization and did not cause damage, as those terms were contemplated and defined.

**OUTCOME:** The employees' motions to dismiss were granted. The dismissal of the claims was without prejudice and with leave to amend.

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Motion Practice > Content & Form*
[HN1] In ruling on a motion to dismiss, the court must view the complaint in the light most favorable to the plaintiff, and must limit its consideration to the pleadings and any exhibits attached thereto. *Fed. R. Civ. P. 10(c)*. The court will liberally construe the complaint's allegations in the plaintiff's favor, and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the plaintiff cannot prove any set of facts that support a claim for relief. In ruling on a motion to dismiss, conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
*Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements*
[HN2] In reviewing a complaint on a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, the rule to be applied is that courts must be mindful that the Federal Rules of Civil Procedure require only that the complaint contain a short and plain statement of the claim showing that the

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

pleader is entitled to relief. This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. Instead, the complaint need only contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory. A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests.


*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > General Overview*
[HN3] The Computer Fraud and Abuse Act, primarily a criminal statute, provides a civil cause of action in *18 U.S.C.S. § 1030(g)*.


*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
[HN4] See *18 U.S.C.S. § 1030(g)*.


*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
[HN5] The Computer Fraud and Abuse Act's private cause of action sets forth a two-part injury requirement, where a plaintiff must: (1) suffer a root injury of damage or loss; and (2) suffer one of five operatively-substantial effects in *18 U.S.C.S. § 1030(a)(5)(B)(i)-(v)*.


*Computer & Internet Law > Civil Actions > Damages*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
[HN6] *18 U.S.C.S. § 1030(g)* first requires civil litigants to suffer "damage" and/or "loss." The alleged wrongful taking of trade secrets does not, by itself, fit within the grouping of "damage" or "loss." Where a plaintiff alleged it incurred costs in responding to the offenses and in conducting a damage assessment, these costs are explicitly identified in the Computer Fraud and Abuse Act's definition of "loss."


*Computer & Internet Law > Civil Actions > Damages*

*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
[HN7] The Computer Fraud and Abuse Act defines "damage" as any impairment to the integrity or availability of data, a program, a system, or information. *18 U.S.C.S. § 1030(e)(8)*.


*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Copyright Infringement Actions*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
[HN8] The Computer Fraud and Abuse Act defines "loss" as any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service. *18 U.S.C.S. § 1030(e)(11)*.


*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Copyright Infringement Actions*
[HN9] *18 U.S.C.S. § 1030(g)* requires civil litigants to allege one of the following five effects set forth in § 1030(a)(5)(B): (i) loss to one or more persons during any one-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting one or more other protected computers) aggregating at least $ 5,000 in value; (ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals; (iii) physical injury to any person; (iv) a threat to public health or safety; or (v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security. *18 U.S.C.S. § 1030(a)(5)(B)*.


*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*

[HN10] *18 U.S.C.S. § 1030(a)(4)* of the Computer Fraud and Abuse Act provides that whoever knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $ 5,000 in any one-year period, shall be punished as provided in *18 U.S.C.S. § 1030(c)*.

**Governments > Legislation > Interpretation**
[HN11] In the Eleventh Circuit, there is a presumption that, in drafting a statute, Congress said what it meant and meant what it said. The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. Words carry their ordinary meaning, unless otherwise defined. If Congress has used clear statutory language, a court need not consider extrinsic materials, such as legislative history, and certainly should not derive from such materials a meaning that is inconsistent with the statute's plain meaning. Even where Congress has used statutory language that is not entirely transparent, courts are to resort to canons of construction to determine the meaning of a particular statutory provision by focusing on the broader, statutory context. There is one instance where extrinsic materials are permitted to define a term: when the statutory language either produces a clearly absurd result or presents a substantial ambiguity.

**Governments > Legislation > Interpretation**
[HN12] "Authorization" is commonly understood as the act of conferring authority; permission.

**Computer & Internet Law > Civil Actions > General Overview**
**Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act**
**Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements**
[HN13] The Computer Fraud and Abuse Act (CFAA) defines "exceeds authorized access" as to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter. *18 U.S.C.S. § 1030(e)(6)*. The CFAA targets access "without authorization" in six separate offenses (*18 U.S.C.S. § 1030(a)(1)*, (2), (3), (4), (5)(A)(ii), (a)(5)(A)(iii)), only three of which also reach persons "exceeding authorized access" (*18 U.S.C.S. § 1030(a)(1)*, (2), (4)). Thus, it is plain that

Congress singled out two groups of accessers, those "without authorization" (or those below authorization, meaning those having no permission to access whatsoever - typically outsiders, as well as insiders that are not permitted any computer access) and those exceeding authorization (or those above authorization, meaning those that go beyond the permitted access granted to them - typically insiders exceeding whatever access is permitted to them).

**Computer & Internet Law > Civil Actions > General Overview**
**Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act**
**Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements**
[HN14] Where Congress targeted actions other than access in the Computer Fraud and Abuse Act, such as "communication" or "delivery" of confidential information, it explicitly provided such language. *18 U.S.C.S. § 1030(a)(1)*.

**Computer & Internet Law > Civil Actions > General Overview**
**Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act**
**Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements**
[HN15] "Without authorization" as used in the Computer Fraud and Abuse Act means no access authorization and "exceeds authorized access" means to go beyond the access permitted.

**Computer & Internet Law > Civil Actions > General Overview**
**Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act**
**Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements**
[HN16] When Congress aimed at an entire spectrum of wrongdoers in the Computer Fraud and Abuse Act, it did just that; it omitted any mention of "authorization." In *18 U.S.C.S. § 1030(a)(4)*, and others like it ( *18 U.S.C.S. § 1030(a)(1)*, (2)), Congress singled out those accessing "without authorization" (or below authorization) and those "exceeding authorization" (or above authorization), while purposefully leaving those in the middle untouched (those accessing with authorization), regardless of their subjective intent.

Case 1:06-cv-01843-RWR    Document 5-2    Filed 10/30/2006    Page 5 of 12

Page 4

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Civil Actions > Damages*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
[HN17] In *18 U.S.C.S. § 1030(a)(5)(A)(i)*, Congress targeted all transmitters, regardless of authorization. Section 1030(a)(5)(A)(i) provides that whoever knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer, shall be punished as provided in *18 U.S.C.S. § 1030(c)*. *18 U.S.C.S. § 1030(a)(5)(A)(i)*. Here, even transmitters with authorization do not escape liability, unless the damage they cause is permitted.

*Computer & Internet Law > Civil Actions > General Overview*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
*Governments > Legislation > Interpretation*
[HN18] The Computer Fraud and Abuse Act is a criminal statute with a civil cause of action. To the extent "without authorization" or "exceeds authorized access" can be considered ambiguous terms, the rule of lenity, a rule of statutory construction for criminal statutes, requires a restrained, narrow interpretation.

*Computer & Internet Law > Civil Actions > Damages*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*
*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
[HN19] *18 U.S.C.S. § 1030(a)(5)(A)(i)* provides that whoever knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer, shall be punished as provided in *18 U.S.C.S. § 1030(c)*. The Computer Fraud and Abuse Act defines "damage" as any impairment to the integrity or availability of data, a program, a system, or information. *18 U.S.C.S. § 1030(e)(8)*. The loss of trade secrets does not constitute "damage" under the statute.

*Computer & Internet Law > Civil Actions > Damages*
*Computer & Internet Law > Criminal Offenses > Computer Fraud & Abuse Act*

*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > Elements*
[HN20] *18 U.S.C.S. § 1030(a)(5)(A)(ii)* of the Computer Fraud and Abuse Act provides that whoever intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage, shall be punished as provided in *18 U.S.C.S. § 1030(c)*.

**COUNSEL:** [*1] For Lockheed Martin Corporation, a Maryland Corporation, Plaintiff: Creighton R. Magid, Nathaniel H. Akerman, Dorsey & Whitney LLP, Washington, DC; Kay L. Wolf, Lori R. Benton, M. Susan Sacco, Ford & Harrison LLP, Orlando, FL.

For Kevin Speed, Steve Fleming, Defendants: William Cooper Guerrant, Jr., Hill, Ward & Henderson, P.A., Tampa, FL.

For Patrick St. Romain, Defendant: Benjamin H. Hill, III, William Cooper Guerrant, Jr., Hill, Ward & Henderson, P.A., Tampa, FL.

For L-3 Communications Corporation, Defendant: Christine M. Fitzgerald, Jason Habinsky, Jeffrey R. Coleman, Ned H. Bassen, Nicolas Swerdloff, Lisa M. Pisciotta, Hughes, Hubbard & Reed, New York, NY; David B. King, Thomas A. Zehnder, King, Blackwell, Downs & Zehnder, P.A., Orlando, FL; Juan J. Farach, Jr., Shubin & Bass, P.A., Miami, FL.

For Mediatech, Inc., a Delaware corporation, Defendant: K. Judith Lane, Smith, Hood, Perkins, Loucks, Stout, Daytona Beach, FL.

For Jack Kelly, Thomas Dorsey, Michael Homan, Thomas Hull, Third Party Defendants: Kevin K. Ross, Michael V. Elsberry, Terry C. Young, Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, FL.

**JUDGES:** GREGORY A. PRESNELL, UNITED STATES DISTRICT [*2] JUDGE.

**OPINION BY:** GREGORY A. PRESNELL

**OPINION:**

   **ORDER**

   This matter comes before the Court upon the Motion to Dismiss by Defendants Kevin Speed ("Speed") and Steve Fleming ("Fleming") (Doc. 53), to which Plaintiff Lockheed Martin Corporation ("Lockheed" or "the company") responded in opposition (Doc. 71), and the Motion to Dismiss by Patrick St. Romain ("St. Romain") (Doc. 68), to which Lockheed responded in opposition (Doc. 75). Lockheed alleges that three of its former em-

ployees accessed Lockheed computers, copied proprietary information, and delivered trade secrets to Defendant L-3 Communications Corporation ("L-3") in violation of the Computer Fraud and Abuse Act ("CFAA"), *18 U.S.C. § 1030*. For the reasons herein stated, the Court grants the Motions to Dismiss.

## I. Background

Lockheed and L-3, rivals in the defense and aerospace industries, made competing bids on the United States Air Force ("USAF") contract known as the Aircrew Training and Rehearsal Support contract ("ATARS I"). USAF ultimately awarded ATARS I to Lockheed in June 2000. ATARS I is scheduled to terminate on September 30, 2006, and the contract for ATARS II, an extension of ATARS I valued [*3] at one billion dollars, is scheduled to be awarded in the third quarter of 2006. Lockheed alleges that L-3, in an effort to gain an unfair advantage in its bid for ATARS II, conspired with three Lockheed employees -- Speed, Fleming, and St. Romain (collectively, "the Employees") -- to wrongfully obtain ATARS trade secrets. The particular allegations against the Employees are as follows:

(1) Speed, a Lockheed program manager, held ultimate responsibility for ATARS I. (Compl. PP 24-25.) Speed had "complete access to ATARS confidential and proprietary and trade secret protected information." (Compl. P 24.) Speed resigned from Lockheed on March 4, 2005 and thereafter became employed with L-3. n1 Shortly before resigning, Speed allegedly copied 200 documents (forty-four of which related to ATARS) from his Lockheed computer by burning them onto a compact disc ("CD"). (Compl. P 50(a).)

n1 After resigning, Speed joined Defendant Mediatech, a Lockheed subcontractor assigned to ATARS I, which allegedly acted as a hiring front for L-3. The hiring front was designed to mask Speed's role in developing a competitive ATARS II bid for L-3. While the Complaint is unclear as to the exact relationship between Mediatech and L-3, Speed admits that he is currently employed by L-3. (Doc. 53 at 1.)

[*4]

(2) Fleming, a Lockheed senior manager, "had unrestricted access to [Lockheed's] shared network drives, including data folders containing ATARS confidential and proprietary and trade secret protected information." (Compl. P 27.) Fleming resigned from Lockheed on March 18, 2005 and, like Speed, became employed with L-3. Shortly before resigning, Fleming allegedly: (a) burned 262 files onto a CD; (b) synchronized nine Lock-

heed data files to his BlackBerry personal digital assistant ("PDA"); and (c) on his last day of work, copied sixty-three data files onto two CDs, including "the most recent and detailed ATARS program review." (Compl. P 50(b)-(d).)

(3) St. Romain, a Lockheed site manager, "had access to the confidential and proprietary and trade secret protected financial, technical and strategic data concerning [ATARS I]." (Compl. P 28.) St. Romain resigned from Lockheed on March 25, 2005. On St. Romain's last day of employment, he allegedly "synchronized his [Lockheed] computer to a Dell PDA, thereby removing [Lockheed] documents to his PDA." (Compl. P 50(e).)

Based on these allegations relating to the Employees, Lockheed asserts that this Court has federal question subject [*5] matter jurisdiction pursuant to the CFAA.

## II. Standard of Review

[HN1] In ruling on a motion to dismiss, this Court must view the complaint in the light most favorable to the Plaintiff. *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)*, and must limit its consideration to the pleadings and any exhibits attached thereto. *FED. R. CIV. P. 10(c); see also GSW, Inc. v. Long County, Ga., 999 F.2d 1508, 1510 (11th Cir. 1993)*. The Court will liberally construe the complaint's allegations in the Plaintiff's favor, *Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S. Ct. 1843, 23 L. Ed. 2d 404 (1969)*, and will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)*. In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003)*.

[HN2] In reviewing a complaint on a motion to dismiss under Federal Rule of Civil Procedure ("Rule") *12(b)(6)* [*6] , the rule to be applied is that, "courts must be mindful that the Federal Rules [of Civil Procedure] require only that the complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief." *U.S. v. Baxter Int'l, Inc., 345 F.3d 866, 880 (11th Cir. 2003) (citing FED. R. CIV. P. 8(a))*. This is a liberal pleading requirement, one that does not require a plaintiff to plead with particularity every element of a cause of action. *Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)*. Instead, the complaint need only "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Id.* (internal citation and quotation omit-

Case 1:06-cv-01843-RWR    Document 5-2    Filed 10/30/2006    Page 7 of 12

Page 6

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

ted). "A complaint need not specify in detail the precise theory giving rise to recovery. All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests." *Sams v. United Food and Commercial Workers Int'l Union, 866 F.2d 1380, 1384 (11th Cir. 1989).*

## III. [*7] Discussion

## A. Lockheed Adequately Alleges Injury Under § 1030(g)

[HN3] The CFAA, primarily a criminal statute, provides a civil cause of action in *§ 1030(g):*

> [HN4] Any person who suffers *damage* or *loss* by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B). Damages for a violation involving only conduct described in subsection (a)(5)(B)(i) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

*18 U.S.C. § 1030(g)(2002)* (emphasis added).

Thus, before reaching the merits of the alleged violations, [HN5] the CFAA's private cause of action sets forth a two-part [*8] injury requirement, where a plaintiff must: (1) suffer a root injury of damage or loss; and (2) suffer one of five operatively-substantial effects in *subsection (a)(5)(B)(i)-(v).*

[HN6] *Subsection (g)* first requires civil litigants to suffer "damage" n2 and/or "loss." n3 The primary injury that Lockheed alleges is the loss of its trade secrets. As this Court has held before, the alleged wrongful taking of trade secrets does not, by itself, fit within the grouping of "damage" or "loss." *Resdev, LLC v. Lot Builders Ass'n, 2005 U.S. Dist. LEXIS 19099, No. 6:04-CV-1374, 2005 WL 1924743, at * 4 (M.D. Fla. Aug. 10, 2005)* ("Res-

Dev's position fails to acknowledge that allegedly ill-gotten revenues from a trade secret are neither a 'but-for' nor a proximate consequence of 'damage,' and nor do they fit within the grouping of 'loss.'"). Lockheed, however, also alleges that the unauthorized actions of the Employees caused Lockheed to incur costs in "responding to the . . . offenses" and in "conducting a damage assessment." (Compl. PP 70, 75, 79.) These costs are explicitly identified in the CFAA's definition of "loss." n4 Lockheed, therefore, sufficiently alleges loss pursuant to *§ 1030(g).*

> n2 [HN7] The CFAA defines "damage" as: "any impairment to the integrity or availability of data, a program, a system, or information[.]" *18 U.S.C. § 1030(e)(8).*

[*9]

> n3 [HN8] The CFAA defines "loss" as follows:

> > any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]

> *18 U.S.C. § 1030(e)(11).*

> n4 *See, supra*, note 3.

[HN9] *Subsection (g)* also requires civil litigants to allege one of the following five effects set forth in *§ 1030(a)(5)(B):*

> (i) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $ 5,000 in value;

Case 1:06-cv-01843-RWR    Document 5-2    Filed 10/30/2006    Page 8 of 12

Page 7

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

(ii) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(iii) physical injury to any person;

(iv) a [*10] threat to public health or safety; or

(v) damage affecting a computer system used by or for a government entity in furtherance of the administration of justice, national defense, or national security[.]

*18 U.S.C. § 1030(a)(5)(B).*

For each of the alleged violations of the CFAA, Lockheed invokes *§ 1030(a)(5)(B)(i)*, alleging that each violation "caused loss of $ 5,000 in value in the aggregate, including the cost of [Lockheed] responding to the . . . offense and conducting a damage assessment." (Compl. PP 70, 75, 79.) While the Complaint does not explicitly state that the only alleged losses available under the statute (responding to the offense and subsequent damage assessment) amounted to $ 5,000, the Court finds that the liberal pleading requirements at this motion-to-dismiss stage do not require such particularity.

Thus, Lockheed sufficiently alleges a *§ 1030(a)(5)(B)(i)* loss pursuant to *§ 1030(g)*. The Court now turns to the three alleged violations of the CFAA.

**B. Lockheed Fails to Adequately Allege Violations of § 1030(a)(4)**

Count I alleges that Defendants violated [HN10] *§ 1030(a)(4) of the CFAA*, which provides that whoever [*11]

knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $ 5,000 in any 1-year period[.]

*18 U.S.C. § 1030(a)(4).*

The Employees assert that the they did not access "without authorization" or "exceed[] authorized access" in violation of the statute because Lockheed permitted the Employees, as a function of their respective positions, to access the precise information at issue. Lockheed does not disagree that the Employees were permitted access to the information; instead, Lockheed contends that the Employees' interpretation of "authorization" is too narrow, arguing that the term is properly interpreted in light of the Second Restatement of Agency. Lockheed cites to the Restatement for the proposition that "the authority of an agent terminates if, without knowledge of the principal, he acquires adverse interest or if he is otherwise guilty of a serious breach [*12] of loyalty to the principal." *Restatement (Second) of Agency § 112* (1958) (hereinafter "*Restatement § 112*"). Because the Employees accessed information with intent to steal and deliver to a competitor, Lockheed argues, the Employees acquired adverse interests, terminated their agency authority, and therefore accessed "without authorization." In support of this reliance on *Restatement § 112*, Lockheed cites two cases: *International Airport Centers, L.L.C. v. Citrin, 440 F.3d 418, 420-21 (7th Cir. 2006)* and *Shurgard Storage Centers, Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1125 (W.D. Wash. 2000).*

The Court is not persuaded by the analysis in either *Citrin* or *Shurgard*. Both cases rely heavily on extrinsic materials, particularly the Second Restatement of Agency (*Citrin* and *Shurgard*) and legislative history (*Shurgard*), to derive the meaning of "without authorization." Because the plain language of the statute is sufficient to interpret the disputed terms, this Court need not resort to extrinsic materials. [HN11] In the Eleventh Circuit, there is a presumption that, in drafting a statute, [*13] "Congress said what it meant and meant what it said." *Shotz v. City of Plantation, Florida, 344 F.3d 1161, 1167 (11th Cir. 2003).* "The first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *Id.* (internal quotation omitted). Words carry their ordinary meaning, unless otherwise defined. *Am. Bankers Ins. Group v. United States, 408 F.3d 1328, 1332 (11th Cir. 2005).* If Congress has used clear statutory language, a court need not consider extrinsic materials, such as legislative history, and certainly should not derive from such materials a meaning that is inconsistent with the statute's plain meaning. *Shotz, 344 F.3d at 1167.* Even where Congress has used statutory language that is not entirely transparent, courts are to resort to canons of construction to determine "the meaning of a particular statutory provision by focusing on the broader, statutory context." *Id. at 1167* (internal quotations omitted). There is one instance where extrinsic materials are permitted to define a term: when the statutory

Case 1:06-cv-01843-RWR    Document 5-2    Filed 10/30/2006    Page 9 of 12

Page 8

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

language either [*14] produces a clearly absurd result or presents a substantial ambiguity. *Id. at 1167.*

The term, "without authorization," is not defined by the CFAA. Nonetheless, [HN12] "authorization" is commonly understood as "[t]he act of conferring authority; permission." *The American Heritage Dictionary*, 89 (1976). On the other hand, [HN13] the CFAA defines "exceeds authorized access" as follows: "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]" *18 U.S.C. § 1030(e)(6)*. The CFAA targets access "without authorization" in six separate offenses (*§ § 1030(a)(1), (a)(2), (a)(3), (a)(4), (a)(5)(A)(ii), (a)(5)(A)(iii)*), only three of which also reach persons "exceeding authorized access" (*§ § 1030(a)(1), (a)(2), (a)(4)*). Thus, it is plain from the outset that Congress singled out two groups of accessers, those "without authorization" (or those *below* authorization, meaning those having no permission to access whatsoever - typically outsiders, as well as insiders that are not permitted *any* computer access) and those exceeding authorization (or those [*15] *above* authorization, meaning those that go beyond the permitted access granted to them - typically insiders exceeding whatever access is permitted to them).

By applying the plain meaning of the statutory terms to the facts of this case, it is clear that the Employees accessed *with* authorization, did not exceed their authorization, and thus did not violate *§ 1030(a)(4)*. The analysis is not a difficult one. Because Lockheed permitted the Employees to access the company computer, they were not without authorization. Further, because Lockheed permitted the Employees to access the precise information at issue, the Employees did not exceed authorized access. The Employees fit within the very group that Congress chose not to reach, *i.e.*, those with access authorization. It follows that *§ 1030(a)(4)* cannot reach them. The gist of Lockheed's complaint is aimed not so much at the Employees' improper access of the ATARS information, but rather at the Employees' actions subsequent to their accessing the information. As much as Lockheed might wish it to be so, *§ 1030(a)(4)* does not reach the actions alleged in the Complaint. *See Int'l Ass'n of Machinists & Aero. Workers v. Werner-Matsuda, 390 F. Supp. 2d 479, 498 (D. Md. 2005)* [*16] ("Thus, to the extent that Werner-Masuda may have breached the Registration Agreement by *using* the information obtained for purposes contrary to the policies established by the IAM Constitution, it does not follow, as a matter of law, that she was not authorized to access the information, or that she did so in excess of her authorization in violation of the . . . CFAA."). [HN14] Where Congress targeted actions other than access, such as "communication" or "delivery" of confidential information, it explicitly provided such language. *See 18 U.S.C. § 1030(a)(1)*.

### 1. Disagreement with Citrin and Shurgard

The Court acknowledges that the Seventh Circuit in *Citrin*, following *Shurgard*, came to a different conclusion with respect to the application of "without authorization." In *Citrin*, an employee accessed his company laptop and deleted the data in it by using a secure-erasure program, which rendered the deleted material irretrievable. *Citrin, 440 F.3d at 419.* The employee's access was "without authorization" at the point "he resolved to destroy files that incriminated himself and other files that were also the property of his employer, [*17] in violation of the duty of loyalty that agency law imposes on an employee." *Id. at 420* (relying on *Shurgard* and *Restatement § 112*). To the extent *Citrin* holds that an employee accesses "without authorization" at the moment the employee acquires a subjectively adverse interest to the employer, the Court respectfully disagrees.

First, by reading *Restatement § 112* legalese into the meaning of "without authorization," the term becomes equipped with a breadth that effectively shaves "exceeds authorized access" down to a mere sliver of what its plain meaning suggests. *Citrin's* use of "without authorization" appears to cover anyone without authorization to begin with (*e.g.*, outsider) or an agent that terminates his authority, including the acquiring of adverse interests. As for "exceeds authorized access" *Citrin* used the following example to illustrate the "paper thin" range that it covers on its own:

> [F]or example, the former employee of a travel agent, in violation of his confidentiality agreement with his former employer, used confidential information that he had obtained as an employee to create a program that enabled his new travel company [*18] to obtain information from his former employer's website that he could not have obtained as efficiently without the use of that confidential information. The website was open to the public, so he was authorized to use it, but he exceeded his authorization by using confidential information to obtain better access than other members of the public. n5

*Citrin, 440 F.3d at 420.*

Page 9

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

n5 Here, *Citrin* was drawing on the circumstances in *EF Cultural Travel BV v. Explorica, Inc.,* 274 F.3d 577, 583-84 (1st Cir. 2001).

Thus, it appears that *Citrin* relegates the work performed by "exceeds authorized access" to those outside the principal-agent relationship *(e.g.,* ex-employee) that are permitted a minimum level of access to a computer, and then exceed that access. But this effectively turns the plain reading of the statutory definition of "exceeds authorized access" on its head. The statutory definition appears purposefully aimed at the company *insider* that already has [*19] authorization - not the non-agent *outsider* with public access to a company website. n6 n7 *Citrin* agreed that the CFAA's distinguished use of "without authorization" and "exceeds authorized access" resulted in "[m]uddying the picture some." *Id.* In this Court's view, the plain meaning brings clarity to the picture and illuminates the straightforward intention of Congress, *ie.,* [HN15] "without authorization" means no access authorization and "exceeds authorized access" means to go beyond the access permitted. While *Citrin* attempts to stretch "without authorization" to cover those *with* access authorization (albeit those with adverse interests), Congress did not so stipulate.

n6 To reiterate, the CFAA defines "exceeds authorized access" as follows: "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]" *18 U.S.C. § 1030(e)(6).*

n7 Even assuming that "without authorization" is to be understood in light of *Restatement § 112,* the reach attributed to "exceeding authorized access," would be less than what *Citrin* gives it credit for. In *Citrin's* example, an ex-employee accessing a company website open to the public was deemed to have a threshold level of authorization that was exceeded by using confidential information to gain better access. But the term "exceeding authorized access" presumes, it would seem, a threshold level of access that is not wide-open to the public. It is odd to consider any internet passerby to the company website as having company authorization. Thus, under a *Citrin* reading, the coverage exclusively belonging to "exceeding authorized access" would be even more limited, presumably applying to those permitted some type of access above what the common public is permitted, but who are non-agents

(such as, perhaps, independent contractors and clients). A more straightforward application of the statute (under either the *Citrin* reading or this Court's reading) is to identify that ex-employee for what he is: an outsider who is simply *without* authorization -- not someone who is *exceeding* authorization.

[*20]

Second, *Citrin* slays all three heads of wrongful access when Congress only aimed at two heads. *Citrin* reads: (1) "without authorization" as applying to (a) persons that have no authority to begin with, and (b) agents with authority that do something to terminate that authority (including acquire adverse interests); and (2) "exceeds authorization access" as applying to non-agents exceeding a permitted threshold level of access. But this reading of the two separate terms ("without authorization" and "exceeding authorization") forces them to cover the entire spectrum of wrongful access (wrongful accessers *without* authorization, wrongful accessers *with* authorization, and wrongful accessers *exceeding* authorization). To be sure, the *Citrin* reading has its allure - it gets all of the wrongful accessers. Yet if that was the intent of Congress, why would it bother with "authorization" at all? That is, why wouldn't *§ 1030(a)(4)* simply read as follows: "whoever knowingly and with intent to defraud, accesses a protected computer, and by means of such conduct furthers the intended fraud and obtains anything of value . . . "? *Section 1030(a)(4)* without any reference to [*21] "authorization" reaches the same wrongful accessers as the *Citrin* reading with "authorization" in place. Yet, [HN16] when Congress aimed at an entire spectrum of wrongdoers, it did just that; it omitted any mention of "authorization." n8 In *§ 1030(a)(4),* and others like it (*§ § 1030(a)(1), (a)(2)*), Congress singled out those accessing "without authorization" (or below authorization) and those "exceeding authorization" (or above authorization) while purposefully leaving those in the middle untouched (those accessing *with* authorization), regardless of their subjective intent.

n8 For example, [HN17] in *§ 1030(a)(5)(A)(i)* Congress targeted all transmitters, regardless of authorization. *Section 1030(a)(5)(A)(i)* provides that whoever "knowingly causes the transmission of a program, information, code or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." *18 U.S.C. § 1030(a)(5)(A)(i).* Here, even transmitters *with* authorization do not escape liability, unless the damage they cause is permitted.

[*22]

Third, by reading *Restatement § 112* into "without authorization," employers suddenly have a federal cause of action whenever employees access the company computer with "adverse interests" and such access causes a statutorily recognized injury. In addition to broadening the doorway to federal court, the "adverse interest" inquiry affixes remarkable reach to the statute -- a reach that is not apparent by the statute's plain language. Under *Citrin*, would checking personal email on company time without express permission and thereby causing, however unintentionally, impairment to the computer in excess of $ 5,000 give rise to CFAA liability? It might. n9

n9 *See 18 U.S.C. § 1030(a)(5)(A)(iii)* (providing that whoever "intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage. . . ."). If conducting personal activities on the job is considered an adverse interest, it would appear that *§ 1030(a)(5)(A)(iii)* might apply to the worker checking personal email. *See* Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes, 78 N.Y.U. L. Rev. 1596, 1634 (2003)* (explaining that the apparent effect of *Shurgard* is to extend liability to "an employee's use of an employer's computer for anything other than work-related activities"); *see also* Patricia L. Bellia, *Defending Cyberproperty, 79 N.Y.U. L. Rev. 2164, 2258 (2004)* (cautioning against a broad reading of "without authorization").

[*23]

Fourth, the breadth of the statute given under the *Citrin* reading is especially disconcerting given that [HN18] the CFAA is a *criminal* statute with a civil cause of action. To the extent "without authorization" or "exceeds authorized access" can be considered ambiguous terms, the rule of lenity, a rule of statutory construction for criminal statutes, requires a restrained, narrow interpretation. *See, e.g., Pasquantino v. United States, 544 U.S. 349, 383, 125 S. Ct. 1766, 161 L. Ed. 2d 619 (2005)* (speaking of the rule of lenity, the Court explained "[w]e have long held that, when confronted with two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.") (internal quotations omitted). n10 The fact that this Court now addresses the CFAA in a civil context does not withdraw the necessity of applying the rule of lenity. *See, e.g., Leocal v. Ashcroft, 543 U.S. 1, 12 n.8, 125 S. Ct. 377, 160 L. Ed. 2d 271 (U.S. 2004)* (explaining in footnote

dictum that, if a statute has criminal applications, "the rule of lenity applies" to the Court's interpretation of the statute even in immigration cases because of the need to "interpret [*24] the statute consistently, whether we encounter its application in a criminal or noncriminal context"); *United States v. Thompson/Center Arms Co., 504 U.S. 505, 517-18, 518 n.10, 112 S. Ct. 2102, 119 L. Ed. 2d 308 (1992)* (plurality opinion) (employing the rule of lenity to interpret "a tax statute . . . in a civil setting" because the statute "has criminal applications"); *id. at 519* (Scalia, J., concurring) (invoking the rule of lenity in a concurrence joined by Justice Thomas). Thus, the view of the CFAA adopted by this Court is one that follows the statute's plain meaning, and coincidently, has the added benefit of comporting with the rule of lenity. n11

n10 *See also United States v. Wiltberger, 18 U.S. 76, 95, 5 L. Ed. 37 (1820)* ("The rule that penal laws are to be construed strictly, is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the Court, which is to define a crime, and ordain its punishment.").

[*25]

n11 Because the CFAA has largely been addressed in the civil context, courts may be adopting a more expansive view of "authorization" than they would have taken in the criminal context. As one commentator points out, it is one thing to say that a defendant must compensate a plaintiff for the harm it caused in a business dispute; "it is quite another to say that a defendant must go to jail for it." Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes, 78 N.Y.U. L. Rev. 1596, 1641-42 (2003)*.

## C. Lockheed Fails to Adequately Allege a Violation of § 1030(a)(5)(A)(i)

Count II alleges a violation of [HN19] *§ 1030(a)(5)(A)(i)*, which provides whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer[.]" *18 U.S.C. § 1030 (a)(5)(A)(i)*. The CFAA defines "damage" as "any impairment to the integrity or

Case 1:06-cv-01843-RWR    Document 5-2    Filed 10/30/2006    Page 12 of 12

Page 11

2006 U.S. Dist. LEXIS 53108, *; 19 Fla. L. Weekly Fed. D 939

availability of data, a program, a system, or information[.]" *18 U.S.C. § 1030(e)(8)* [*26] . As noted earlier in Part III(A), the loss of trade secrets does not constitute "damage" under the statute. *Resdev, LLC v. Lot Builders Ass'n, 2005 U.S. Dist. LEXIS 19099, No. 6:04-CV-1374, 2005 WL 1924743, * 4 (M.D. Fla. Aug. 10, 2005).* Likewise, while Lockheed's remedial measures (the response to the alleged conduct and subsequent damage assessment) fall under the statute's definition of "loss," such measures do not fit in the definition of "damage," which is aimed at the impairment rendered to the computer and information therein.

In its response memoranda, Lockheed requests this Court to "infer from the totality of the allegations . . . that as a result of . . . data synchronizing and the data downloading to CDs, a number of the Lockheed Martin files were permanently deleted from Lockheed Martin's computers." (Doc. 75 at 11; *see also* Doc. 71 at 12.) The Court will not infer an allegation that the Complaint does not itself allege. In the 53 pages and 165 paragraphs devoted to the Amended Complaint, the only reference to permanently deleted files is the following: "The Defendants were not authorized to damage, delete or permanently remove data files from [Lockheed] computers." (Compl. [*27] P 74.) But this statement falls short of alleging that the Employees actually *did* permanently delete or remove documents. In the paragraph of the Complaint that is devoted to providing a detailed account as to the Employees' particular actions, there is no mention of permanent deletion or removal. (Compl. P 50.) The copying of information from a computer onto a CD or PDA is a relatively common function that typically does not, by itself, cause permanent deletion of the original computer files. In the absence of an allegation of permanent deletion or removal, the Court will not create one. Count II is accordingly dismissed.

## D. Lockheed Fails to Adequately Allege a Violation of § 1030(a)(5)(A)(ii)

Count III alleges that Defendants violated [HN20] *§ 1030(a)(5)(A)(ii) of the CFAA,* which provides that whoever "intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage[.]" *18 U.S.C. § 1030(a)(5)(A)(ii).* In light of Parts III(A), (B), it is easy to see that Count III must fail because the Employees' accessed *with authorization* and did not cause *damage,* as those terms are contemplated [*28] and defined under the CFAA. Count III is accordingly dismissed.

## IV. Conclusion

Lockheed is not entitled to relief under *18 U.S.C. § 1030(a)(4)* because the Employees' access was neither "without authorization" nor "exceeding authorization" as those terms are contemplated by the CFFA. Further, relief is unavailable under *18 U.S.C. § 1030(a)(5)(A)(i)* because Lockheed fails to allege anything constituting "damage" as that term is defined under the statute. Finally, relief under *18 U.S.C. § 1030(a)(5)(A)(ii)* is unavailable because this provision requires an allegation of "without authorization" *and* "damage" - both of which Lockheed fails to adequately allege. Accordingly, it is

**ORDERED THAT** the Employees' Motions to Dismiss (Docs. 53 & 68) are **GRANTED**. The dismissal of Lockheed's claims is **without prejudice** and with leave to amend. Lockheed shall have **twenty days** to replead in a manner consistent with this Order if Lockheed chooses to do so.

**DONE and ORDERED** in Orlando, Florida on this 1st day of August, 2006.

**GREGORY A. PRESNELL**

**UNITED STATES DISTRICT** [*29] **JUDGE**

Exhibit B

LEXSEE

**PM SERVICES COMPANY, Plaintiff/Counter-Defendant, v. ODOI ASSOCIATES, INC., Defendant, and WILLIAM O'SHEA, Defendant/Counter-Claimant.**

**Civil Action No. 03-1810 (CKK)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2006 U.S. Dist. LEXIS 655**

**January 4, 2006, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff company sued defendants, a former employee and a competitor, alleging a breach of the duty of loyalty and tortious interference with advantageous relationships and contracts. The employee counterclaimed that the company violated D.C. Code § 13-1303 when it failed to pay his wages prior to his resignation and that the company violated his pension rights. Both sides moved for summary judgment. Defendants sought to strike an expert report.

**OVERVIEW:** Denying both motions, the court found that genuine issues of material fact remained as to all counts. However, no genuine issue of material fact remained with respect to the company's theory that the employee breached his duty of loyalty through solicitation leading to a "mass resignation" of the firm's employees; rather, the undisputed evidence undermined this claim. Accordingly, the court prohibited the company from presenting that theory in any trial of the case. The court found that several gaps in the record remained which prevented either party from establishing the true extent of the employee's actions vis-a-vis his fiduciary duty to the company. The record was inconclusive as to the employee's involvement with redirecting a contract, held by the company for five years, to the competitor while he was still employed by the company. If the company could establish that he did, then it could establish a breach of the fiduciary duty of loyalty. With respect to the counterclaims, the company's payment obligations remained an open issue because a breach of the employee's fiduciary duty of loyalty could result in an offset to the wages due him or monies payable on his behalf.

**OUTCOME:** The court denied both motions for summary judgment in their entireties. The court reserved judgment on the question of whether to strike the company's expert report on damages, as sought in defendants'

motion for summary judgment. Instead, the court required that defendants present the court with a full transcript of the expert's testimony.

**CORE TERMS:** email, resignation, summary judgment, expectancy, fiduciary duty, bid, bonus, project manager, loyalty, deposition, accusation, solicitation, memorandum, conversation, proprietary, customer, hired, contending, vendor, genuine issue of material fact, phone, breached, intentional interference, wage, competitive, testifying, contractor, recruited, counterclaim, engineer

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Movants*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > Nonmovants*
*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN1] A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Under the summary judgment standard, the moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. The nonmoving party, in response to the motion, must go beyond the pleadings and by his own affidavits, or depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN2] Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. The court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment. The adverse party must do more than simply show that there is some metaphysical doubt as to the material facts. Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to come forward with specific facts showing that there is a genuine issue for trial.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > General Overview*
*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
[HN3] Employees--especially managers, corporate officers, and directors--owe an undivided and unselfish loyalty to the corporation such that there shall be no conflict between duty and self interest.

*Business & Corporate Law > Agency Relationships > Causes of Action & Remedies > Breach of Fiduciary Duty > General Overview*
*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
[HN4] While concern for the integrity of the employment relationship has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation, there is an off-setting policy recognized by the courts of safeguarding society's interest in fostering free and vigorous competition in the economics sphere. The law is clear that an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal.

*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
[HN5] In general, even before the termination of his agency, an employee is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.

*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
[HN6] An employee's privilege to compete is limited. The right to make arrangements to compete is by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty. An employee's proper preparatory activities have been delineated as such: Prior to termination of employment, an officer may not solicit for himself or herself business which the position requires the employee to obtain for the employer. The officer must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of his employer.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN7] In preparing to compete, an employee may not commit wrongful acts, such as misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees. Examples of misconduct which will defeat the privilege to make arrangements to compete include misappropriation of trade secrets; misuse of confidential information; solicitation of employer's customers prior to cessation of employment; conspiracy to bring about mass resignation of employer's key employees; and usurpation of an employer's business opportunity. At the same time,

failure to disclose plans to enter into competition is not itself necessarily a breach of fiduciary duty. The ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case.

*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN8] When an employee misappropriates a firm's confidential and/or proprietary information for his own personal advantage, the employee has breached his duty of loyalty to his employer.

*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN9] Solicitation leading to a "mass resignation" of a firm's employees will lead to a breach of an employee's fiduciary duty.

*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
*Torts > Business Torts > Unfair Business Practices > General Overview*
[HN10] When an employee solicits the customers of a current employer and diverts the employer's business to himself, he breaches his fiduciary duty to his employer.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
[HN11] Solicitation of an employer's business opportunities prior to termination of employment constitute a breach of an outgoing employee's fiduciary duty of loyalty. The doctrine of corporate opportunity provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
[HN12] If a business opportunity is presented to a corporate executive, the officer cannot seize the opportunity

for himself if: (a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; (c) the corporation is interested in the opportunity. A corporate opportunity is one in which the corporation has an "interest" or "tangible expectancy," which can be explained as something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope. The degree of likelihood of realization from the opportunity is, however, the key to whether an expectancy is tangible.

*Torts > Business Torts > Commercial Interference > Contracts > General Overview*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN13] The tort of intentional interference with a prospective business advantage runs parallel to that for interference with existing contracts. As such, the United States Court of Appeals for the District of Columbia Circuit has held that to establish a claim for tortious interference with economic advantage under District of Columbia law, a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage.

*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN14] To survive a motion to dismiss, a plaintiff claiming intentional interference with a prospective business advantage must allege business expectancies, not grounded in present contractual relationships, but which are commercially reasonable to expect. For the most part the "expectancies" thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity to obtain customers. Moreover, the defendants' interference must be improper. Indeed, competitive activity does not by itself constitute intentional interference with prospective business advantage. Rather, as its name would suggest, intentional interference requires an element of intent. A general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability. As such, a plaintiff cannot establish liability without a strong showing of intent to disrupt ongoing business relationships. Motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case. Conduct must be more egregious, for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement.

*Business & Corporate Law > Corporations > Directors & Officers > Management Duties & Liabilities > Fiduciary Responsibilities > Duty of Loyalty*
*Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities*
*Labor & Employment Law > Wage & Hour Laws > Wage Payments*
[HN15] No compensation is owed an employee who has breached his duty of loyalty--indeed, the employer is entitled to its return.

**COUNSEL:** [*1] For PM SERVICES COMPANY, A Florida Corporation, Plaintiff: Kevin M. Kraham, FORD & HARRISON LLP, Washington, DC; Tracey K. Jaensch, Tampa, FL.

For ODOI ASSOCIATES, INC., A Maryland Corporation, WILLIAM O'SHEA, an individual, Defendant: James B. Astrachan, ASTRACHAN GUNST & THOMAS P.C., Baltimore, MD; Julie Rubin, ASTRACHAN, GUNST AND THOMAS, Baltimore, MD.

For WILLIAM O'SHEA, an individual, Counter Claimant: James B. Astrachan, ASTRACHAN GUNST & THOMAS P.C., Baltimore, MD; Julie Rubin, ASTRACHAN, GUNST AND THOMAS, Baltimore, MD.

For PM SERVICES COMPANY, A Florida Corporation, Counter Defendant: Tracey K. Jaensch, Tampa, FL; Kevin M. Kraham, FORD & HARRISON LLP, Washington, DC.

**JUDGES:** COLLEEN KOLLAR-KOTELLY, United States District Judge.

**OPINION BY:** COLLEEN KOLLAR-KOTELLY

**OPINION:**

### MEMORANDUM OPINION

Plaintiff PM Services Company ("PM Services"), a Florida-based company in the business of providing operations and maintenance ("O&M") services for commercial and federal buildings in the District of Columbia, Virginia, and other locations, brings this action alleging (1) a breach of the duty of loyalty against its former employee, Defendant William O'Shea ("O'Shea"), and (2) tortious [*2] interference with advantageous relationships and contracts against Defendants O'Shea and Odoi Associates, Inc. ("OAI"), in the events leading up to the General Services Administration's ("GSA") decision to

award the O&M contract for the Cohen & Switzer buildings to OAI -- and not PM Services - in 2003. *See* Compl. PP 33-36 (Count I - Breach of Duty of Loyalty), PP 37-42 (Count II - Tortious Interference). O'Shea and OAI dispute PM Services' chronicle of the relevant events, emphasizing the dearth of evidence supporting PM Services' "vague, broad-stroke allegations" and contending instead that PM Services' claims arise out of nothing more than a desire for an illegal restraint on trade, a refusal to accept its own lackluster performance, and the painful clarity of wistful hindsight. *See* Defs.' Reply at 1. Additionally, O'Shea also asserts two claims against PM Services, contending that (1) PM Services contravened D.C. Code § 32-1303 when it failed, without justification or excuse, to pay his base and bonus wages during the leave period immediately prior to his resignation from its employ; and (2) PM Services violated his pension rights when it failed [*3] to fulfill its obligations as a Participating Employer of CPF by failing to make payments and/or contributions due on his behalf. *See* O'Shea's Answer & Countercl. PP 21-23 (Count I - Violation of § 32-1303 of the D.C. Code), PP 24-27 (Violation of Pension Rights).

The Court currently has a flurry of motions before it, including: PM Services' Motion for Summary Judgment, Defendants' Opposition, Defendants' Motion for Summary Judgment, PM Services' Opposition, and Defendants' Reply. Upon a searching examination of the parties' motions and filings, all attached exhibits, the relevant case law, and the entire record herein, the Court shall deny both Plaintiff PM Services' Motion for Summary Judgment and Defendants' corresponding Motion for Summary Judgment in their respective entireties.

### I: BACKGROUND

In order to lend greater clarity and insight into its legal analysis, the Court shall carefully scrutinize the record adduced in this case. In its discussion of the background facts, the Court shall look at: (1) the background of the litigants; (2) the history of PM Services' O&M contract for the Cohen & Switzer buildings; (3) improvements following [*4] PM Services' decision to hire O'Shea; (4) the expansion of PM Services and the promotion of O'Shea through its ranks; (5) the development of problems between PM Services and O'Shea during the Spring of 2003; (6) the performance issues with PM Services' Cohen & Switzer contract that crept up in the Spring of 2003; (7) O'Shea's attempt to seek employment elsewhere, and the commencement of his discussions with OAI in May 2003; (8) the intensification of O'Shea's contact with OAI as May 2003 progressed; (9) O'Shea's June 2003 resignation from PM Services and agreement to join OAI; (10) the ultimate award of the 2003 Cohen & Switzer O&M contract to OAI, and not PM Services, in the Summer of 2003; and (11) other

conduct at issue, such as O'Shea's and OAFs alleged recruitment of PM Services employees, allegations that O'Shea disparaged PM Services, and assertions that O'Shea improperly retained PM Services' property following his resignation.

### A. Background of the Litigants

Plaintiff PM Services is a Florida corporation with its principal offices located in St. Petersburg, Florida, although it regularly conducts business in the District of Columbia as a commercial O&M service provider. [*5] Compl. PP 2, 10; Defs.' Stmt. of Mat. Facts Not in Dispute ("Defs.' Stmt.") P 1; Pl.'s Response to Defs.' Stmt. ("Pl.'s Resp.") P 1. n1 The services that PM Services provides under its various O&M contracts include the planning, programming, administration, management, and execution necessary to provide preventative maintenance, repairs, operations, and service calls, including routine, urgent, and emergency responses for facilities covered by its contracts. Pl.'s Stmt. of Mat. Facts Not in Dispute ("Pl.'s Stmt.") P 2; Defs.' Response to Pl.'s Stmt. ("Defs.' Resp.") P 2. Having been engaged in business since 1986, a substantial portion -- if not all -- of PM Services' revenues come from contracts to provide O&M services to federally-owned buildings, whose contracts are awarded through the GSA. Defs.' Stmt. P 1; Pl.'s Stmt. P 1. PM Services has been awarded GSA O&M contracts through competitive bid processes and has been "sole sourced" GSA contracts as a Small Business Administration ("SBA") Section 8(a) minority disadvantaged business. Defs.' Stmt. P 1; Pl.'s Resp. P 1. At the time relevant to this suit, PM Services had over one hundred (100) employees. Pl.'s Stmt. P 6; Defs.' Resp. [*6] P 6.

n1 The Court begins its discussion of the facts by noting that this Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7.1(h)). As such, in resolving the present summary judgment motions, this Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1. The Court also cites directly to the record, where appropriate, to provide additional information not covered in either of the parties' statements.

Contrary to Local Civil Rule 56.1, Plaintiff, in responding to Defendants' Statement of Material Facts Not in Dispute, has not provided "a separate *concise* statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to

be litigated." LCvR 56.1 (emphasis added). Rather than admitting, denying, or denying-in-part/ admitting-in-part each statement set out by Defendants in corresponding numbered paragraphs and supporting each response through citations to the record, as required by Local Civil Rule 56.1 and this Court's July 7, 2004 Scheduling Order, Plaintiff (1) regurgitates many of the allegations made in its own Statement of Material Facts when responding to Defendants' specific statements, despite a lack of connection between Defendants' factual assertion and Plaintiff's response; (2) makes frequent cross-references between its responses; (3) exhibits a glaring tendency to intersperse legal argument with its factual responses; (4) fails to provide record citations for numerous assertions; and (5) where record citations are provided, they often either bear no connection to the facts asserted or conclusion drawn or pertain so marginally that one must radically extrapolate from the record even to approach the conclusion that Plaintiff seeks to draw.

The Court finds that this deviation from the mandate of the Local Civil Rule undermines the purpose of the Rule which is to assist the Court in quickly determining which facts are in dispute. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 322 U.S. App. D.C. 35, 101 F.3d 145, 153 (D.C. Cir. 1996) ("Repeatedly blending factual assertions with legal argument, the 'relevant facts' section does not satisfy the purposes of a [Rule 56.1] statement."); *Robertson v. American Airlines,* 239 F. Supp. 2d 5 (D.D.C. 2002) (striking defendant's motion for summary judgment for noncompliance with Local Rule 7 and 56.1 because the "statement of material facts not in genuine dispute" included no citations to the record and improperly mixed factual allegations with argument); *Gibson v. Office of the Architect of the Capitol,* 2002 U.S. Dist. LEXIS 27602, Civ. No. 00-2424(CKK), 2002 WL 32713321, at *1 n.1 (D.D.C. Nov. 19, 2002) ("Plaintiff's Statement is almost completely unhelpful to the Court as its provisions rarely address the facts outlined in Defendant's Statement, instead describing in lengthy detail the 'contextual and structural background' surrounding Defendant's stated facts. Such excess, unresponsive verbiage is a clear violation of both the letter and the spirit of Local Rule 56.1."); *see also Koken v. Auburn Mfg., Inc.,* 2004 U.S. Dist. LEXIS 16738, Civ. No. 02-83B-C, 2004 WL 1877808, at *2 (D. Me. Aug. 24, 2004) (chastising plaintiff for responding to defendant's statement of material facts by failing to cite to the record and for using

cross-references that in most cases referred to other additional statements in response to defendant's singular statement, stating "presumably [plaintiff] found this technique expeditious. I, however, did not."); *Leonard v. Inhabitants of the Town of Van Buren,* 182 F. Supp. 2d 115 (D. Me. 2002) (deeming defendants' facts admitted in part because "many of Plaintiff's statements do not actually controvert the Defendants' fact that they purport to address").

While the purpose of Rule 56.1 was to "place the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record," *Finnegan,* 101 F.3d at 151, the Court shall accept the additional burden placed on it by Plaintiff and shall not - in this instance - strike Plaintiff's Response to Defendants' Statement or accept all of Defendants' facts as undisputed. Rather, the Court shall carefully parse the record and both sets of "Material Facts Not in Dispute" when outlining the background of this dispute.

[*7]

Defendant OAI is a Maryland-based company, formed in 1998, that provides commercial construction management and O&M services primarily in the District of Columbia. Defs'. Stmt. P 4; Pl's. Stmt. P 4. Like PM Services, OAI's chief source of revenue is through service contracts with the GSA. *Id.* OAI is also a Section 8(a) business, and - as such - is eligible to be awarded GSA contracts as a sole source contractor. *Id.* OAI's Chief Executive Officer Ablade Odoi-Atsem ("Odoi-Atsem") has approximately twenty-five (25) years of experience in government-owned or government-subsidized construction. *Id.* In 2003, Odoi-Atsem decided to expand the scope of OAI's services to include O&M services, and began to look for qualified and experienced employees to grow his company in the O&M field during the first half of that year. *Id.*

Defendant O'Shea was an employee of PM Services from February 2000 to June 2003, Pl's. Stmt. PP 22, 75; Defs'. Resp. PP 22, 75, and has been in the official employ of OAI since July 2003, Defs'. Stmt. P 25; Pl's. Resp. P 25. O'Shea graduated from high school in 1974, after which he completed various liberal arts courses at DeKalb Community College in Clarkston, [*8] Georgia. Defs'. Resp. P 19. Thereafter, for approximately eleven (11) years, O'Shea worked for Winn Dixie, beginning at the grocery level and rising to become the Department Manager of the meat department. Pl's. Stmt. P 19; Defs'. Resp. P 19. During his time at Winn Dixie, O'Shea often "migrated to mechanical" repairs and fre-

quently performed "a lot of little minor maintenance repairs for them as well." Defs'. Mot. for Summ. J., Ex. A (O'Shea Dep.) at 10-14. In 1991, O'Shea moved to the District of Columbia area and obtained employment as the Watch Engineer and Assistant Chief Engineer at Polinger Shannon & Luchs Company, where he was responsible for the life safety, energy management systems, the HVAC systems, the electrical and plumbing systems, and all planned maintenance and mechanical repairs. Defs'. Resp. P 20; *see also* Defs'. Opp'n to Pl's. Mot. for Summ. J. ("Defs'. Opp'n"), Ex. 1 (O'Shea's Resume and Related Documents). In his positions, O'Shea also supervised the engineering staff, managed budget and payroll issues, and maintained inventory control of supplies and equipment. *Id.* In 1992, O'Shea was certified as a Class 1 and Class 3 Stationary Engineer through the [*9] International Union of Operating Engineers, and in 1993 and 1994, was certified to engage in HVAC Level I and II work at the Frederick Community College in Frederick, Maryland. *Id.* O'Shea has no less than ten (10) additional certifications, licenses, or training in connection with skills relevant to the O&M industry. *Id.; see also* Defs'. Opp'n, Ex. 1 (O'Shea's Resume and Related Documents) at 1.

In 1995, O'Shea moved to Day & Zimmerman (nee Tate Facilities), where he was promoted to Chief Engineer and supervised approximately twelve (12) to fourteen (14) employees in Postal Square Building A, a facility covering approximately 1.2 million square feet. Defs'. Resp. P 20. In this position, O'Shea also oversaw life safety, energy management systems, HVAC systems, and the electrical and plumbing systems, including all planned maintenance and mechanical repairs. *Id.* On February 14, 2000, PM Services hired O'Shea as its Chief Engineer at the Cohen & Switzer buildings owned by the federal government. Pl's. Stmt. P 22; Defs'. Resp. P 22. During the course of his employment with PM Services, O'Shea never entered a non-competition or non-solicitation agreement with PM Services, or [*10] any other agreement containing a restrictive covenant in PM Services' favor. Defs'. Stmt. P 3 (citing Defs'. Mot. for Summ. J., Ex. 1 (Metour Dep.) at 102:16-21, 103:1-7); Pl's. Resp. P 3 (admitting).

*B. The History of PM Services" O&M Contract for the Cohen & Switzer Buildings*

Roughly one and a half (1.5) years prior to PM Services' decision to hire O'Shea, PM Services won a contract with the GSA to provide O&M services for the Cohen & Switzer buildings. Pl's. Stmt. P 9; Defs'. Resp. P 9; Defs'. Stmt. P 5; Pl's. Resp. P 5. The contract - which was the first GSA contract awarded to PM Services in the District of Columbia, Pl's. Stmt. P 8; Defs'. Resp. P 8 (noting the citation upon which Plaintiff's assertion is based does not support this contention) - was

originally awarded through the GSA's competitive bid process as a SBA set-aside, P1.'s Stmt. P 9; Defs.' Resp. P 9; Defs.' Stmt. P 5; P1.'s Resp. P 5. The contract, which commenced on October 1, 1998 ("the 1998 Contract"), was for a one-year (1) term, with four (4) consecutive one-year (1) options available at the sole discretion of the GSA. *Id.* If the GSA chose to exercise all options under the 1998 Contract, the contract [*11] would expire at the end of September 2003. *Id.* The Cohen & Switzer O&M contract was contracted through and administered by the GSA's National Capital Region, where the contracting officer was Tom Russell and later Mike Vrobel. P1.'s Stmt. P 10; Defs.' Resp. P 10. The on-site GSA representatives in the Cohen & Switzer buildings were overseen by the GSA's Section Chief of the D.C. Service Center, Scott Taylor. P1.'s Stmt. P 10; Defs.' Stmt. PP 6, 15.

During roughly the first two (2) years of the 1998 Contract, PM Services was not performing its O&M services for the Cohen & Switzer buildings at a level acceptable to the GSA. Defs.' Stmt. P 6 (citing Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 27:11-18 ("[T]he beginning part of their contract was pretty rough. You know, it wasn't functioning well."); *id.,* Ex. 11 (Russell Dep.) at 13:21-22, 14:1-11 ("On this particular contract during the first two years we were meeting about once a month because performance wasn't up to a level where we wanted it.")); P1.'s Resp. P 6 (disputing that it was not performing at an acceptable level, but offering no evidence to contradict the testimony of Taylor and Russell of the GSA). During [*12] this time period, PM Services regularly received complaints from Cohen & Switzer tenants and GSA representatives regarding PM Services' failure to provide effective or efficient O&M services. Defs.' Stmt. P 7; Defs.' Mot. for Summ. J., Ex. 12 (Sampling of Complaints Re: PM Services); P1.'s Resp. P 7 (contending that this information is immaterial, but not denying the allegation). Despite these problems, GSA continued to exercise the four (4) option years on the 1998 Contract until the completion of those options in 2003. P1.'s Stmt. P 16; Defs.' Resp. P 16.

## C. Improvements Following PM Services" Decision to Hire O'Shea

Following his hiring by PM Services on February 14, 2000, PM Services promoted O'Shea to Project Manager for the Cohen & Switzer building on April 1, 2000. P1.'s Stmt. P 23; Defs.' Resp. P 23. O'Shea had never held a project management position prior to his employment with PM Services. P1.'s Stmt. P 21; Defs.' Resp. P 21. In addition to his duties as Project Manager, O'Shea retained his responsibilities as Chief Engineer of the Cohen & Switzer until he hired, on behalf of PM Services, Charles Anthony ("Tony") Wehausen -- a former supervisor from another job - to [*13] act as Chief Engineer. P1.'s Stmt. PP 23-24; Defs.' Resp. PP 23-24. We-

hausen had been an Assistant Chief Engineer for large O&M contracts in the District of Columbia area for four (4) years, and had spent seven (7) years as a Chief Engineer for another large O&M contract. P1.'s Stmt. P 24; Defs.' Resp. P 24.

Following the twin hirings of O'Shea and Wehausen, both the GSA and the tenants of the Cohen & Switzer buildings immediately noticed an improvement in the performance of PM Services in its O&M duties. *See* Defs.' Mot. for Summ. J., Ex. 13 (Apr. 24, 2001 Letter from Taylor to PM Services) ("Notable progress has been made through the diligent efforts of your current team. We have seen a dramatic improvement ... I personally appreciate the level of commitment and professionalism demonstrated by your Project Manager, Bill O'Shea, and your Chief Engineer, Tony Wehausen."); id., Ex. 11 (Russell Dep.) at 13:21-22, 14:1-11 ("So I can't remember if it was the second or third year, but once PM Services hired I believe it was Bill O'Shea and [Tony Wehausen] . . . once they brought them on board and they brought on Jim [Butland], performance was up to speed."); *id.,* Ex. 14 (Dep. [*14] of Nico Martherus, co-owner of PM Services and its Vice President, Secretary and Chief of Operations) ("Martherus Dep.") at 18 (noting that O'Shea worked "diligently," agreeing that O'Shea "often tried to present ideas on how the company could save money," and testifying that O'Shea "worked hard to make sure that he was in touch with the employees and what they needed and how they felt").

## D. PM Services Expands and O'Shea Is Promoted

Following these successes and its certification as a Section 8(a) minority business in June 2001, PM Services expanded its operations within the District of Columbia and in the surrounding area. P1.'s Stmt. P 12; Defs.' Resp. P 12. The GSA awarded O&M contracts to PM Services for the FBI Washington Field Office and the A.V. Bryan Federal Courthouse, located in Alexandria, Virginia, in late 2002. P1.'s Stmt. P 13; Defs.' Resp. P 13. These contracts, which were each three (3) years in length, were awarded directly to PM Services by the GSA pursuant to its Section 8(a) status, as the SBA's small business bidding exception allows minority disadvantaged businesses to be awarded a contract directly, without bid, as a sole source provider. P1.'s Stmt. P [*15] 14; Defs.' Resp. P 14. In early 2003, the GSA also awarded PM Services the O&M contract for the Franconia Warehouse in the District of Columbia, this time through a competitive bid process. P1.'s Stmt. P 15; Defs.' Resp. P 15. As was the case with the 1998 Contract covering the Cohen & Switzer buildings, the GSA renewed each of its options under these contracts with PM Services. P1.'s Stmt. P 17; Defs.' Resp. P 17.

On October 1, 2002, Carole Metour, co-owner, President and Chief Operating Officer of PM Services, appointed O'Shea to the newly-created position of Interim Washington Metro Manager. Pl.'s Stmt. P 25; Defs.' Resp. P 25. As Interim Manager, O'Shea reported directly to COO Martherus. *Id.* O'Shea's authority as Interim Manager was to facilitate project management for PM Services' existing contract at the Cohen & Switzer building as well as the anticipated contracts at the A.V. Bryan Courthouse and the FBI Washington Field Office. *Id.* O'Shea's appointment also contemplated the November 2002 creation of a separate division called "the Technical Services group," which would bid on and provide more technical "reimbursable" prevention and repair work to the GSA ("RWA work") [*16] that was separately billed to, and not included in, the GSA contract specifications. Pl.'s Stmt. PP 18, 26-27; Defs.' Resp. PP 18, 26-27 (agreeing, but noting that nothing in the record supports the November 2002 date). After serving for fifteen (15) months as the Chief Engineer at Cohen & Switzer, Tony Wehausen was placed in charge of the Technical Services group and PM Services' RWA work. Pl.'s Stmt. P 27; Defs.' Resp. P 27. Wehausen and the Technical Services division operated out of the Cohen & Switzer buildings and worked with COO Martherus. *Id.* O'Shea was not involved with the creation of the Technical Services division. See Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 107 (O'Shea testifies only that the creation of the division was "a pretty good idea," that he was "not sure who came up with it," and that he had no title in the division).

On January 31, 2003, O'Shea was appointed to a different position within PM Services Interim Regional Director. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 32:1-34:12; Pl.'s Stmt. P 28; Defs.' Resp. P 28. In his new capacity, O'Shea was now charged with looking after additional buildings in the area for which PM Services [*17] had acquired O&M contracts; his responsibilities covered the Cohen & Switzer buildings, the FBI Washington Field Office, the A.V. Bryan Courthouse, and the Franconia Warehouse, as well as two other recent O&M facilities for which PM Services had contracted - McGuire Air Force Base and the E. Barrett Prettyman Courthouse in Washington, D.C. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 33:8-36:21.

In his various positions with PM Services, O'Shea had the authority to hire and fire employees, and could negotiate salaries with individuals hired by him on behalf of PM Services. *Id.* at 46:5-20. Near the end of his tenure with PM Services, O'Shea had begun to work closely with his supervisor, COO Martherus, and another PM Services employee, Vicky Stracharski, to develop proposals and numbers to assist PM Services in the bidding process for O&M contracts on other buildings. *Id.* at

46:21-47:5; 48:7-20. However, O'Shea's role in this process was somewhat limited, as Martherus clearly had control over the process; O'Shea instead concentrated on helping Martherus by "throwing out ideas of how we could maybe cut corners and make our number . . . more competitive, and it was [*18] more of less his decision." *Id.* at 46:10-20, 48:7-17. There is no evidence in the record that O'Shea worked with either PM Services' Corporate Facilities Manager Jim Butland and CEO Meteor on bidding for GSA contracts. *Compare* Pl.'s Stmt. P 30 (making certain assertions about what O'Shea "admitted" in his deposition) *with* Defs.' Resp. P 30 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 47-48, 51-52, 55:9-15, 56-57, 58) (indicating a lack of support for Plaintiff's characterization of O'Shea's testimony). Moreover, the testimony on record indicates that O'Shea did not participate in discussions with the GSA regarding PM Services' competitive bids, and was not given the authority to discuss and/or negotiate various aspects of PM Services' GSA contracts with the GSA contacting officer for the Cohen & Switzer building, Tom Russell. See Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 50:20-51:21, 56-57, 58.

While PM Services now contends that O'Shea "was privy to PM Services' proprietary information, including how PM Services calculated profit margins on bids, vendor and subcontractor lists and costs, employee lists, profit margins, wage structures and GSA contracts, [*19] " Pl.'s Stmt. P 29, the record does not completely support this wide characterization. First, PM Services' delineation of what constitutes its "proprietary" information is flawed, given that certain types of information - such as the details of its GSA contracts and an identification of its employees, subcontractors, and vendors - are listed in GSA contracts and maintained as a public record. *See* Defs.' Resp. P 29. Moreover, a reading of O'Shea's deposition testimony refutes an assertion that he had proprietary knowledge of PM Services' "profit margins" or "how PM Services calculated profit margins on bids" independent of documentation that would have refreshed his memory. *Compare* Pl.'s Stmt. P 29 (making certain allegations as to what O'Shea testified to in his deposition) *with* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 99:16-101:2 (testifying that "I don't know how corporate calculates down there ... I'm not sure what the final number was because I never saw it in 2002, but I think it was close to a halfmil, I'm talking gross now. We did half a mil or maybe 600,000. I'm not sure, close to that, I don't know exactly.").

*E. Problems Develop Between PM Services* [*20] *and O'Shea During the Spring of 2003*

Despite the growth of PM Services and the continued expansion of O'Shea's duties, certain problems began to develop between PM Services and O'Shea by the

Spring of 2003. By April 2003, CEO Metour had become concerned about O'Shea's readiness to manage at the Regional Manager level. Pl.'s Stmt. P 37; Defs.' Resp. P 37; *see also* Pl.'s Resp. P 9 ("In any case, O'Shea's performance while at PM Services was mixed and declined once he became an upper level manager. The testimony indicates that while he was a competent Chief Engineer and Project Manager, resulting in PM Services placing him in higher and higher levels of trust, his abilities in his temporary upper management position proved to be limited."). According to Metour, two incidents were the basis for this concern. First, Metour testified that O'Shea had apparently signed a contract to purchase $ 10,000 worth of new furniture and equipment without any authority, and that he had authorized or allowed three (3) lower-level employees to sign three (3) separate five (5) year contracts for leased uniforms after Metour had expressly told him that she did not yet wish to proceed to lease uniforms. [*21] Pl.'s Stmt. P 37; Defs.' Resp. P 37. Second, Metour noted that after a meeting with all local project managers and production control clerks on Friday, May 2, 2003, she was informed by one of the project managers under O'Shea that O'Shea had asked him to write down hours on O'Shea's son's time card (who worked for PM Services at the time) that his son had not worked. Pl.'s Stmt. P 40; Defs.' Resp. P 40 (noting that there is no evidence to support this allegation and the project manager who supposedly reported this no longer works for PM Services, and pointing out that Metour lacks first-hand knowledge of the incident, could not remember the approximate time period of the event, and could not identify where the former project manager now works).

As a result of Metour's apparent concerns, in approximately April 2003, PM Services removed O'Shea without explanation from his position as Regional Director and assigned him to the role of "temporary interim project manager" at the Franconia Warehouse without a change in salary for what was termed "an evaluation period." Defs.' Stmt. P 13; Pl.'s Resp. P 13. On May 27, 2003, Metour telephoned O'Shea and advised him that, in consideration of [*22] the evaluation period instituted in April 2003, he would not be reinstated as Regional Director of PM Services' District of Columbia facilities. Defs.' Stmt. P 22; Pl.'s Resp. P 22 (denying this, but providing no supporting evidence and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite); *compare with* Pl.'s Stmt. P 41 (essentially admitting the substance of Defendants' contention); Defs.' Resp. P 41. Instead, Metour gave O'Shea a four (4) hour window in which to decide whether he would accept a Project Manager position at the Cohen & Switzer buildings or at the Franconia Warehouse complex. *Id.; see also* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 230:11-15; Defs.' Mot. for Summ. J., Ex. 2

(O'Shea Aff.) P 10. Metour testified that she demoted O'Shea to Project Manager because he "did not have the capacity ... to do" the tasks associated with being Regional Manager. *Id.; see also* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 232:8-9. A PM Services memorandum dated May 27, 2003 confirms that O'Shea was demoted to Project Manager. *Id.; see* Defs.' Mot. for Summ. J., Ex. 16 (May 27, 2003 Memorandum). By this point, Metour [*23] "didn't value [O'Shea] as an employee any longer" but admitted that she had neglected to confront him about any of the problems she identified as having caused her to doubt his capacity as Regional Director. Defs.' Resp. P 37; Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 244:8-16.

At the same time, O'Shea was also becoming disenchanted with PM Services. Believing that he added value to PM Services and that he had proven his dedication to the company, O'Shea grew interested in forging a long-term contract with PM Services to provide him with the job security that at-will employment lacked. Defs.' Stmt. P 10 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 81:2-4, 174:21-22, 175:1-15); Pl.'s Resp. P 10 (contending that this fact is irrelevant and immaterial, but not denying the truth of the matter asserted). PM Services had assured O'Shea on several occasions that a contract of employment would be negotiated and offered, but - despite these assurances - had never entered into negotiations with him "because the money was not there." Defs.' Stmt. PP 11-12 (citing Defs.' Mot. for Summ. J., Ex. 14 (Matherus Dep.) at 26:17-21, 27:1-11, 29:11-14); Pl.'s Resp. PP 11-12 (cross-referencing [*24] Plaintiff's Response P 10, which contends that the fact stated is irrelevant and immaterial, but not denying the truth of the matter asserted). Given PM Services' failure to provide him with a long-term contract and his April 2003 demotion, O'Shea decided to start actively searching for a position with another firm. Defs.' Stmt. P 14 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 79:1-9, 109:6-14, 110:21-22, 111: 1-4 ("It was after I got put to the interim [at] Franconia, I thought about it for a few days ... I got depressed there for a while, but I decided I would put my feelers out, you know. You know, I just called the local to see what they had on the job line.")); Pl.'s Resp. P 14 (contending that this fact is irrelevant and immaterial, but not denying the truth of the matter asserted).

*F. Problems Develop With PM Services' Performance on the O&M Contract for the Cohen & Switzer Buildings Near the End of the 1998 Contract's Term*

During the Spring of 2003, PM Services' performance on its O&M contract for the Cohen & Switzer buildings dropped considerably. Defs.' Stmt. P 52; Pl.'s Resp. P 52 (contending that performance issues for at least part of this period [*25] would have been overseen

by O'Shea, but not denying the truth of the matter asserted). According to the GSA's Section Chief of the D.C. Service Center, Scott Taylor:

> We were not pleased with the service at the time of PM Services. They had - in all fairness they had gone through a stint of, you know, performing very well, but during the last, you know, six to eight months of that term we had a lot of complaints from tenants of the building. A lot of that was based on not responding to service calls, a lot of the hot/cold calls. The standard expectation is you respond in person, talk to the client in the space, take a temperature reading in the space. You just don't just sit downstairs and take it off the computer. Well, that's what they were doing.
>
> And believe it or not, I had complaints from my boss's boss, Jack Gott, because [PM Services] had left the Switzer building in a state where the sprinkler system, part of the sprinkler system was inoperable, and that's just - I mean that's a cardinal sin in the buildings management world. And that appeared to be nothing sort of inability to obtain and control subcontractors, which is something that we do rely on an O and M [*26] contractor to do. And we had the - that whole reimbursable job, anything that we pay extra for, we had - we had multiple problems with the crew, the current project manager and chief that were there. They are very pleasant gentlemen, don't get me wrong, you know, they were never . . . argumentative, but they over-promised and under-delivered. You know, the price would be high. They would miss deadlines. You wouldn't know about the missed deadline until you went to ask about it again, only find out, oh, yeah, well, we didn't get to it, but we will get to it, you know, by X date. X date comes, and it doesn't happen again.

Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 22-23. Despite the fact that Taylor communicated these difficulties to Metour, Martherus, and Mike Wells (the Project Manager who replaced O'Shea at the Cohen & Switzer buildings), PM Services failed to cure its performance problems. Defs.' Stmt. P 54; Pl.'s Resp. P 54 (simply

cross-referencing Plaintiff's Response P 52, which contended that performance issues for at least part of this period would have been overseen by O'Shea, but not denying the truth of the matter asserted).

### G. O'Shea Contemplates Leaving [*27] PM Services and Comes Into Contact With Odoi-Atsem

After his demotion from Regional Director in late April 2003, O'Shea began to let a few of his colleagues know that he was considering leaving PM Services' employ and was looking for a potential new employer. Defs.' Stmt. P 15; Pl.'s Resp. P 15 (not denying the truth of the assertion). One of the individuals to whom O'Shea made mention of his job search was Scott Taylor of the GSA. *Id.* Given Taylor's position as the Section Chief of the GSA's Service Center, which included the Cohen & Switzer buildings for which O'Shea had previously acted as Project Manager, O'Shea had occasion to speak with Taylor on a fairly frequent - although irregular - basis, *Id.; see also* Defs.' Mot. for Summ. J., (O'Shea Dep.) at 49:4-7, 76:16-18 (testifying that he would interact with GSA representatives daily at times, but at other times several months would go by without communication); 77:15-18 (estimating that he communicated with Taylor "a couple dozen times"); Pl.'s Mot. for Summ. J., Ex. Y (Summary of O'Shea's Nextel Phone Records) (O'Shea called Taylor on his company phone seven (7) times in May-June 2003). According to O'Shea, "I [*28] mentioned something to Scott I think about [the job search]. Basically I mentioned it to him in the context of, you know, if anybody is out there looking for somebody, let me know." Defs.' Stmt. P 15 (quoting Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 109:18-21); *see also* Pl.'s Stmt. P 43 (attempting to use phone records to determine that this conversation took place on Friday, May 2, 2003); Defs.' Resp. P 43 (pointing out that the phone records indicate the May 2, 2003 conversation between O'Shea and Taylor lasted one (1) minute). O'Shea also shared his feelings with his co-worker, Chief Engineer Tony Wehausen. Defs.' Stmt. P 16; Pl.'s Resp. P 16 (not denying the truth of the matter asserted). O'Shea testified that "Tony approached me one day and asked me ... what was going on with me because he knew I was upset, pretty upset about the ... demotion. And I told him I was looking to get another opportunity." Defs.' Stmt. P 16 (quoting Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 110:21-22, 111:1-8). In response, Wehausen shared with O'Shea that he too was considering looking for other employment because he "was pretty fed up with the way things were going." *Id.* [*29]

During the same time period, Defendant OAI, led by its Chief Executive Officer Ablade Odoi-Atsem, was looking to expand. Defs.' Stmt. P 17; Pl.'s Resp. P 17. Prior to this time, OAI provided exclusively construction management services. *Id.* Neither OAI nor Odoi-Atsem

had a background in O&M work. Pl.'s Stmt. P 54; Defs.' Resp. P 54. However, Odoi-Atsem had a considerable background in the federal contract industry, an MBA from American University in finance and international business, a degree in building technology (which included education in the fields of civil, electrical, mechanical, and structural engineering), and had honed his skills providing services in the construction management industry for approximately twenty-five (25) years. Defs.' Resp. P 54; *see also* Defs.' Mot. for Summ. J., Ex. 8 (Odoi-Atsem's Resume); *id.*, Ex. 9 (Taylor Dep.) at 38-39 (testifying that the skills involved in the construction management industry translate well into, and are compatible with, O&M work); Pl.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at 147-49 (same). Like PM Services, OAI generated most of its revenue from government contracts. Defs.' Stmt. P 17; Pl.'s Resp. P 17. [*30]

Odoi-Atsem let it be known that he was interested in growing his company in the O&M field, and, specifically, that he was seeking new employees within the industry. Defs.' Stmt. P 18; Pl.'s Resp. P 18. Having known Scott Taylor professionally since 2000, Odoi-Atsem informed Taylor in the Spring of 2003 of his intentions and his company's need for qualified, experienced employees in the O&M field. *Id.* Odoi-Atsem also had a similar conversation with Rene Lilicotch of Precision Mechanical Services during this time period. *See* Defs.' Mot. for Summ. J., Ex. 6 (Odoi-Atsem Aff.) P 5. OAI was rather small at this point, with three (3) to four (4) employees, an additional four (4) to five (5) independent contractors, and with approximately two (2) offices - one in Odoi-Atsem's home and the other in the GSA Regional Office Building. Pl.'s Stmt. P 55; Defs.' Stmt. P 55. Given its size and level of experience, it was unlikely that OAI could have obtained a sole-source contract as it was constituted during the Spring of 2003. Pl.'s Stmt. P 53; Defs.' Stmt. P 53.

After learning of the symbiotic interests of OAI and O'Shea, Rene Lilicotch -- a mutual acquaintance of both O'Shea and Odoi-Atsem [*31] -- provided O'Shea's telephone number to Odoi-Atsem and suggested that he meet with O'Shea to explore their common objectives. Defs.' Stmt. P 19; Defs.' Mot. for Summ. J., Ex. 6 (Odoi-Atsem Aff.) P 6; Pl.'s Resp. P 19 (denying this, but providing no supporting evidence and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite); Pl.'s Stmt. P 45 (pointing out that O'Shea's telephone records indicate that he had an outgoing phone call to Odoi-Atsem on May 5, 2003); Defs.' Resp. P 45 (noting that there is no record confirming Odoi-Atsem's office telephone number at this time, the handwritten legend on Plaintiff's exhibit containing the telephone records is of unknown and unidentified origin, and that the identified phone call lasted three (3) minutes). After a

few phone calls during early May between O'Shea and Odoi-Atsem, and between Odoi-Atsem and Taylor, see Pl.'s Stmt. PP 48-49, Defs.' Resp. PP 48-49 (making objections similar to its objections in Defendants' Response P 45 and noting that the identified calls lasted one (1) minute, two (2) minutes, and one (1) minute, respectively), O'Shea and Tony Wehausen met with Odoi-Atsem over lunch in [*32] early May, Pl.'s Stmt. P 49; Defs.' Resp. P 49.

The first meeting was a "get acquainted" lunch meeting with "small talk," wherein the men introduced themselves and discussed their professional backgrounds and objectives. Defs.' Stmt. P 20 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 128:4-22); Pl.'s Resp. P 20 (denying this, but providing no supporting evidence and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite). During this meeting, Odoi-Atsem expressed his interest in expanding the sphere of OAI's services to include O&M work, while O'Shea and Wehausen let Odoi-Atsem know that they would be talking with some other people and would reconnect with him in about one (1) week. *Id.* Following further phone contact between O'Shea and Odoi-Atsem, *see* Pl.'s Stmt. P 50 (identifying two calls between the two on May 13, 2003, and three conversations between the two on May 15, 2003); Defs.' Resp. P 50 (making objections similar to its objections in Defendants' Response P 45), O'Shea and Wehausen met with Odoi-Atsem at the GSA Regional Office Building, where Odoi-Atsem was performing construction management work for the GSA, [*33] *see* Pl.'s Stmt. P 51 (placing this meeting on May 19, 2003); Defs.' Resp. P 51 (pointing out that the cited deposition testimony only indicates that the second meeting was one (1) week to ten (10) days later, but does not specifically identify the day). During this second meeting, the three men discussed more specifically the possibility of working together. Defs.' Stmt. P 21 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 129:13-22, 131-134, 138); Pl.'s Resp. P 21 (denying this, but providing no supporting evidence and only generally referencing its own Statement of Material Facts Not in Dispute with no pin cite). However, no offer employment had yet been made by OAI, and no commitments of any other sort were made at that time. *Id.*

### H. O'Shea's Contact With OAI Intensifies

On May 19, 2003, O'Shea submitted a vacation leave request to PM Services for June 4 through June 10, 2003. Pl.'s Stmt. P 56; Defs.' Resp. P 56. According to O'Shea, he had not yet decided whether he would ultimately resign from PM Services when he put in his leave request. *Id.* On May 20, 2003, O'Shea sent an email from his American On-Line ("AOL") account to OAI that attached a document [*34] entitled "Contract Compensa-

tion Issues." *See* O'Shea Dep. Ex. 8-9 (May 20, 2003 Email from O'Shea to OAI); *see also* Defs.' Resp. P 57 (noting that O'Shea was not certain in his deposition if the document entitled "Contract Compensation Issues" was attached to his May 20, 2003 email). According to O'Shea, the "figures" listed in the attached document were "firm." *Id.* In his proposal, O'Shea suggested, *inter alia,* that (1) he would join OAI; (2) he should have "100% control" over its "operations & maintenance contracts"; (3) and that he, Odoi-Atsem, and Wehausen split the company's profits -- including "RWA" work - by 1/3 each. *Id.* O'Shea stressed that his ultimate contract with OAI would be "contingent" upon its "acquisition of [a] primary operations & maintenance contract." *Id.* O'Shea further commented that "there is potential for a windfall from our mechanical services provider that we conceptualized and implemented less than six (6) months ago." *Id.;* Defs.' Resp. P 57 (noting that PM Services cites no evidence in the record demonstrating or implying such a windfall, and citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 169:4-9 (O'Shea characterizes [*35] this language as him "just trying to sell myself to a prospective employer" and "running on at the mouth")). O'Shea signed off his email by suggesting, "Let me know if you wish to continue." *Id.*

1. Email Communications

Over the next few days, O'Shea sent Odoi-Atsem three significant emails. The first, sent on May 21, 2003, was entitled "Next Step." *See* O'Shea Dep. Ex. 10 (May 21, 2003 Email from O'Shea to OAI). In pertinent part, O'Shea's email stated:

> We [presumably, O'Shea and Wehausen] have met all of the 8 A sponsors that we are interested in partnering with. It is our intentional to close a deal by June 1. We have requested that all of our prospective sponsors provide us with an offer in writing by COB May 30. This will allow us to review the offer sheets and make a responsible decision by June 1 ... If and when we have an agreement, our intention will be to inform GSA of our alliance on June 1. This will allow us to immediately begin the process of preparing our technical and price proposals. After we have signed a contract (on or before June 12) we can proceed with all of the startup particulars.

*Id.; see also* Pl.'s Stmt. P 62 (misidentifying [*36] the email as having been sent on May 20, 2003); Defs.' Resp.

P 62 (admitting, but arguing that this email demonstrates that O'Shea forestalled preparing proposals until after a firm deal for employment with OAI was entered).

The second email, entitled "Phone Call," was sent by O'Shea to OAI on May 23, 2003. *See* O'Shea Dep. Ex. 11 (May 23, 2003 Email from O'Shea to OAI). This email read:

> I received a phone call from Scott [Taylor] yesterday evening. *We are going to get together next week to discuss an opportunity that has recently surfaced.* During our conversation he mentioned the meeting that he had with you this week. He alluded to the fact that *he would feel comfortable proceeding with our alliance.* I told him that we also have more of a personal comfort zone with you and your company.
>
> Additionally, he mentioned that timing is becoming increasingly critical. He cautioned me that if the offer goes out to another Company than [sic] *there will be nothing that we can do to retrieve it.* Because of these comments, it may be advantageous for us to schedule another meeting and see if we can expedite this process to make our alliance a reality. *All we will* [*37] *need to do is let him know that we are proceeding with our alliance and we can secure this excellent opportunity.* Thanks, Bill.

*Id.* (emphasis added); Pl.'s Stmt. P 63; Defs.' Resp. P 63 (admitting, but adding that O'Shea testified that he believed the email referenced a call from Taylor about RWA work that Taylor wanted OAI to perform, that he did not discuss the Cohen & Switzer contract with Taylor, and that his contact with Taylor was not as concrete as he made it sound in his emails (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 177-78); also pointing out that Taylor did not "have a clue" what the May 23 email was referencing (citing Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 69-70).

The third relevant message sent during this time period by O'Shea to Odoi-Atsem was a May 30, 2003 email entitled "Revision of Offer Letter & Service Contract Proposal." *See* O'Shea Dep. Ex. 12. This email was drafted and sent by O'Shea after his May 27, 2003 conversation with Metour, wherein PM Services informed him that he would not be returned to the position of Re-

gional Director and instead gave him the option of remaining at the Franconia Warehouse or returning [*38] to the Cohen & Switzer buildings. Pl.'s Stmt. P 67; Defs.' Resp. P 67 (noting that Metour's memorandum dated May 27, 2003 announced that O'Shea would be returning to the Cohen & Switzer buildings, but stressing that all had agreed that O'Shea's choice to remain at the Franconia Warehouse would be honored). In pertinent part, O'Shea's May 30, 2003 email to Odoi-Atsem states:

> 1) In order for your Company to issue a 1099, it is necessary for your Company to receive a Service Contract Proposal from us for your records and for your Company to issue us a Purchase Order that reflects the terms of the Service Contract Proposal.

> 2) The Offer Letter (Contract) has nothing to do with our proposed five (5) year agreement that is contingent on the procurement of the first GSA contract. *If you remember correctly, when we had our initial meetings Tony and I were going to remain with PM Services until the final hour. We were later told by Scott that it would be necessary for Tony and I to resign from our current employer, in order for us to be awarded our first contract.*

> *Nonetheless, I feel extremely confident that you will be awarded our first contract as expected.* Therefore, [*39] I added an exculpatory clause for your protection that allows us 90 days of salary in case we fail. This is for our protection as well and will allow us time to seek other employment.

> *As you are aware, Tony and I are assuming some of the risk as well, in as much as we are taking a chance with you as our sponsor.* If you recall, the reason we were introduced to one another is because we were considered to be compatible. We all agree that there is a certain amount of calculated risk that is assumed when you form a business partnership. It would be [an] unreasonable risk to request for Tony and I to agree to any contingency when it comes to the support of our families.

> On the other hand, Tony, you[,] and I are going to be very successful, even if we

don't get a contract in the first five months of our relationship. I am expecting to procure one million dollars in service work by the end of the year. Remember, last year we were able to complete over 2.5 million dollars in gross revenue performing service work at one at one [sic] facility.

O'Shea Dep. Ex. 12; Pl.'s Stmt. P 68; Defs.' Resp. P 68 (admitting, but noting that O'Shea could not remember the conversation [*40] referenced in this email, and Taylor denied that he discussed with O'Shea obtaining O&M work for another company while O'Shea was employed by PM Services) (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 184-85; *id.*, Ex. 9 (Taylor Dep.) at 72).

2. What Work Was Contemplated in These Discussions by the Expanded OAI?

Upon a plain reading of these three (3) emails drafted by O'Shea, stretching from May 21, 2003 to May 30, 2003, PM Services contends that the "excellent opportunity" and anticipated "contract[s]" contemplated by O'Shea for his new "alliance" with OAI and Wehausen constituted three types of work that were business opportunities for PM Services: (1) O&M contract work for Federal Office Building 8 ("FOB-8"), *see* Pl.'s Stmt. P 58; (2) RWA work, such as the work contemplated by PM Services' Technical Services group, *id.* PP 59-60; and (3) the O&M contract for the Cohen & Switzer buildings, a contract that PM Services held at the time but which was expiring in September 2003, *id.* PP 65-66.

In response, Defendants stress these points. First, with respect to O&M work on FOB-8, Defendants emphasize that (1) FOB-8 is a facility that PM Services did [*41] not service at any time; (2) Scott Taylor does not work with FOB-8; and (3) Odoi-Atsem had learned of and had set his sights on FOB-8 months before meeting O'Shea. *See* Defs.' Resp. P 57 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 133:14-16, 191-200; Pl.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at 48-49; Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 72:12-13); *see also* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 132-33 (testifying that Odoi-Atsem raised the possibility of FOB-8 with him at their second meeting in mid-May, and that Taylor was not the source of this information); Defs.' Resp. P 58 (noting that FOB-8 had been vacant for months during the relevant time period, and it was public knowledge that a contract for O&M services for the building was available).

Second, with respect to RWA work, Defendants emphasize that while Scott Taylor admitted discussing RWA work with O'Shea, he remembered speaking to

O'Shea only as a representative of PM Services, such that RWA work opportunities would be passed along to PM Services. *See* Defs.' Resp. P 60 (citing Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 61:6-11, 71-72); *but see* Defs.' Resp. [*42] PP 59, 63 (Taylor's testimony is somewhat in conflict with O'Shea's testimony on this point, as O'Shea believed that his "May 23 e-mail refer-enced a call from Taylor about RWA work that Taylor wanted OAI to perform," but O'Shea assumed that Tay-lor - aware of O'Shea's interest in working with Odoi-Atsem - just wanted him act as a go-between and pass this information on to OAI, which had been out of reach at that particular moment). Moreover, Defendants also contend that

> there is no evidence that O'Shea usurped, intercepted or otherwise diverted from PM Services any corporate opportunity -- RWA or otherwise - for the benefit of OAI or any other entity or individual. Nor is there any evidence identifying RWA work or substantiating that any such RWA work, in fact, ever went to OAI. At most the evidence demonstrates that GSA had determined that OAI -- not PM Ser-vices - was the preferred service provider for an unidentified RWA project and asked that O'Shea let OAI know about it.

Defs.' Resp. P 60.

Third, with respect to the upcoming contract for O&M work on the Cohen & Switzer buildings, to replace the expiring contract that PM Services previously held, Defendants stress [*43] that the contract was never a topic of discussion until after O'Shea's ultimate resigna-tion from PM Services. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 151:11-13, 152, 177-78, 196:15-19 (testifying that "the first meeting I had with Mr. Taylor about the Cohen and Switzer contract happened some-time in August of 2003," well after O'Shea had resigned from PM Services); *id.,* Ex. 9 (Taylor Dep.) at 61, 71-72 (testifying that he never discussed with O'Shea procuring O&M work for another company while O'Shea was em-ployed by PM Services); Pl.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at 58:2-12 (testifying that as of May 23, 2003, he and O'Shea had not discussed "the potential of obtaining the Cohen and Switzer contract for [OAI]" and that once the possibility of obtaining the contract materialized, he and O'Shea "were not looking forward to that building. It was too messy. So we wanted some-thing smaller. But I mean I wasn't going to turn - if it became an opportunity, I wasn't going to turn it away.").

## I. O'Shea Resigns From PM Services and Joins OAI

By a letter drafted June 2, 2003, but dated June 4, 2003 (a day of work that O'Shea missed after calling in sick), [*44] O'Shea gave PM Services notice of his res-ignation, which he noted would be "effective June 20, 2003." *See* O'Shea Dep. Ex. 6 (O'Shea's June 4, 2003 Resignation Letter, addressed specifically to COO Martherus); Defs.' Stmt. P 24; Pl.'s Resp. P 24. O'Shea's resignation letter contains words complimentary towards PM Services and Matherus in particular, and informs them that he "accepted a position that will enhance my career growth and will expose me to challenges and op-portunities which I believe are in my best interest ... My decision is irrevocable and final." *Id.*

Also on June 2, 2003, O'Shea and OAI entered two agreements: a short-term services agreement effective July 14, 2003 (twenty-four (24) days after the conclusion of O'Shea's notice of resignation) through August 31, 2003, *see* Defs.' Mot. for Summ. J., Ex. 18 (Service Pro-posal), and a thirteen (13) month employment contract commencing September 1, 2003, and expiring September 30, 2004, *see id.,* Ex. 19 (Employment Agreement). The long-term Employment Agreement contains an "Excul-patory Clause" allowing O'Shea to leave OAI's employ "within ninety (90) days from [September 1, 2003], in the event that ODOI Associates, [*45] Incorporated is unsuccessful in obtaining a one (1) year operation and maintenance contractual agreement with the General Services Administration (GSA)." *Id.,* Ex. 19 (Employ-ment Agreement) at 1.

Upon receipt of O'Shea's resignation letter, PM Ser-vices' Human Resources Director Heather Metour (daughter of CEO Carole Metour) left a message on O'Shea's answering machine, stating *in toto:*

> Hi Bill. This is Heather Metour calling from PM Services. We are in receipt of your resignation letter and we accept your resignation. We are looking at the resigna-tion as effective immediately. We will pay you through the 20th. You have until 3:30 today to drop off your phone, your phone [sic], your pager, your keys, your badge, and your laptop. If anything is missing from that laptop that is company informa-tion, rest assured we will come after you legally. That suff is to be dropped off at the AV Courthouse and handed over to Ray Short. If you cannot do this, you need to contact me on my mobile phone at [REDACTED]. Thank you.

Defs.' Mot. for Summ. J., Ex. 20 (Recording of Heather Metour's Phone Message for O'Shea); id., Ex. 21 (Transcript of Health Metour's Phone Message). [*46] As of the date of his resignation as an employee of PM Services, O'Shea received pay at the rate of thirty-eight dollars and forty-three cents ($ 38.43) per hour and received a quarterly bonus equal to five percent (5%) of his annual salary based on 2080 hours. Defs.' Stmt. P 4; Pl.'s Resp. P 4.

Despite Heather Metour's message, PM Services paid O'Shea through June 4, 2003 - not June 20, 2003. See Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 245-46; Pl.'s Resp. P 27. Moreover, PM Services did not make contributions on O'Shea's behalf to the Central Pension Fund for this period. See Defs.' Opp'n, Ex. 3 (Central Pension Funds Records) at 3. With respect to his pay for the period between June 5 and June 20, 2003, CEO Metour first testified that "[O'Shea] should have been paid his vacation pay," Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 255:1-2, but later reversed herself after a break in the deposition during re-direct, stating that O'Shea should not be paid for the period - during his vacation or otherwise - because "we felt it was an offset at that point for what he had been doing," id. at 278:7-12; see also Pl.'s Resp. P 31 (contending that PM Services [*47] did not have to pay O'Shea for this period because "he was working for another employer (OAI) and had already resigned at PM Services" in addition to the fact that O'Shea was allegedly "breaching his duty at the time . . . working for its competitor . . . and being paid for contracts and RWA work he diverted from PM Services to OAI during that same period"). On re-cross, Metour testified that she did not know how much vacation pay O'Shea had accrued, or how much of an offset PM Services calculated was appropriate to apply against O'Shea's pay. Defs.' Stmt. P 32 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 280-82); Pl.'s Resp. P 32. It is also undisputed that PM Services did not pay O'Shea any portion of his quarterly bonus, despite the fact that eighty-nine percent (89%) of the quarter had passed. Defs.' Stmt. P 40; Pl.'s Resp. P 40. According to Plaintiff, there is no record evidence that PM Services had a policy of pro rata bonuses to its employees; as such, PM Services disputes that such a policy existed, and claims that it has never paid a pro rata bonus to any employee. Pl.'s Resp. P 40. In contrast, Defendants stress that Metour admitted that PM Services did [*48] not have a policy that required employees to be "present in order to be entitled to payment of bonus[es] earned." Defs.' Stmt. P 40 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 250:8-16, 253:16-21, 254:1-6). It is undisputed that O'Shea was the only PM Services employee receiving a quarterly bonus, and the question of whether an employee had to be "present" with the firm to receive such a bonus had never been previously pre-

sented. See Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 248:19-254:7.

*J. The 2003 Cohen & Switzer O&M Contract Is Awarded to OAI, Not PM Services*

Upon the expiration of the options held by the GSA on its 1998 Contract with PM Services to provide O&M services to the Cohen & Switzer buildings in September 2003, GSA awarded a new O&M contract for the Cohen & Switzer buildings to OAI as a Section 8(a) sole-source contracting entity beginning in October 2003. Pl.'s Stmt. P 42; Defs.' Resp. P 42. Upon notification by the GSA of this decision, PM Services initiated the instant lawsuit, filing a Complaint before this Court on August 28, 2003. Id.; see also Compl.

Central to PM Services' Complaint is its assertion that "GSA had conveyed to [*49] PM Services that the [2003 Cohen & Switzer O&M] contract would be renewed to PM Services for an additional term as an 8(a) sole source contract ... Thus PM Services had and has an enforceable expectation that GSA would continue to automatically renew its Cohen & Switzer contract as an 8(a) sole source provider for three years ...." Compl. PP 16-17. Plaintiff now agrees that some of this language is inaccurate; specifically, the 2003 Contract was not a "renewal" contract, like the option years contemplated in the 1998 Contract. Defs.' Stmt. P 44; Pl.'s Resp. P 44. As such, the 2003 Contract following the expiration of the 1998 Contract's option terms "would have been a new contract," "a 'follow-on' contract to the original 1998 Contract." Pl.'s Resp. P 44; see also Defs.' Resp. P 36 (noting correctly that the 2003 Contract cannot properly characterized as a "follow-on" contract either, because the 1998 Contract was awarded competitively as a small business set aside and not under Section 8(a); when the 1998 Contract expired in September 2003, any new contract would bear no relationship whatsoever to its predecessor). However, PM Services stresses that it was repeatedly informed [*50] by the GSA in 2003 that it would be awarded the 2003 Cohen & Switzer contract, and would have been the recipient of the contract "but for" the actions of Defendants O'Shea and OAI. See Pl.'s Stmt. P 35; Pl.'s Resp. PP 44-45.

*1. Plaintiff's Characterization of the Relevant Events*

According to Plaintiff, "[i]t is undisputed that from January through March 2003, GSA representatives, including on-site GSA representative Ed Poe and his boss Scott Taylor, repeatedly told PM Services, including CEO Metour, that GSA intended to award the Cohen and Switzer contract to PM Services sole-source once the contract expired and that PM Services should begin working with them to prepare bid specifications for the follow-on contract." Pl.'s Stmt. P 35. As such, "at the end of April, beginning of May 2003, Metour and

Martherus began preparing their staffing lists and cost proposals for the Cohen & Switzer sole-source follow-on." *Id.* P 36. PM Services contends that it was not until June 23, 2003 that it was informed by Scott Taylor that the GSA would not be awarding the 2003 Cohen & Switzer O&M contract to it, but was instead awarding the contract to OAI. *Id.* P 77. PM Services notes [*51] that this turn of events was particularly shocking, given that "Taylor acknowledges that he had previously told Carole Metour and others at PM Services that he anticipated extending PM Services contract as Cohen and Switzer after it expired as a sole-source contract and admitted that he had encouraged Metour to become 8 (a) certified for that purpose." *Id.* P 73 (also contending that Tom Russell, the Cohen & Switzer contract officer prior to Mike Vrobel and now contractor with GSA for the Cohen & Switzer buildings, testified that he was told that the 2003 Contract would be awarded to PM Services).

PM Services places particular emphasis on two events that it contends were determinative in the "switch" to OAI and indicative of the "unlawful" interference of OAI and its employee O'Shea. First, on May 30, 2003, Odoi-Atsem sent an email entitled "Odoi Associates, Inc - O&M Services" to Scott Taylor. *See* O'Shea Dep. Ex. 13 (May 30, 2003 Email from Odoi-Atsem to Taylor). Odoi-Atsem's email states, in relevant part:

> This is an unsolicited memo intended to inform you that Odoi Associates, as part of its strategic plan, have started offering operations and maintenance (O&M) services [*52] for Federal facilities. As you may be aware Odoi Associates is an SBA 8(A) certified company that is currently providing other services for GSA.
>
> *We have put together a dynamic group of certified technicians most of whom have previously or [are] currently working on some of your facilities. Specifically, we would like to inform you that Odoi Associates has hired Mr. William O'Shea and Mr. Charles Wehausen both of whom are DC 1st Class Engineers.* They will start working directly for Odoi Associates as of July 14, 2003. These two gentlemen are very skilled engineers and managers. Odoi Associates will therefore appreciate any opportunity from your office to participate in managing some of your facilities.
>
> Thanking you in anticipation for your consideration.

*Id.* (emphasis added); *see also* P1.'s Stmt. P 70 (contending that Wehausen was "furious" when he learned about the email because he had not been hired by OAI at that time, and was not hired by OAI until September 2003); Defs.' Resp. P 70 (noting two points - first, that Wehausen merely testified that "Knowing me, I wasn't happy," P1.'s Mot. for Summ. J., Ex. F (Wehausen Dep.) at 88), and, second, that [*53] when she discovered this email, Metour immediately corrected Contracting Officer Mike Vrobel and informed him "that the employees were not going to work for him," Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 184); Defs.' Resp. P 69 (pointing out that GSA regularly receives unsolicited proposals, brochures, and memos promoting an entity's contract or business capacity like the one provided by OAI). On a printout of the email is this handwritten notation, presumably from Scott Taylor to Tom Russell at the GSA: "Tom - We need to discuss this - ASAP. Thx - Scott." O'Shea Dep. Ex. 13 (May 30, 2003 email from Odoi-Atsem to Taylor); *see also* P1.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 62:2-9 (Taylor did not recall the email or his notations). Around this same time, Odoi-Atsem apparently also sent a "brochure" to Scott Taylor at the GSA with a list of its employees and a staffing plan. *See* P1.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 62-63. While this document was not located during discovery, to the best of his recollection, Taylor testified that it "was a standard company brochure" similar to the "zillions" sent to the GSA that listed at least Odoi-Atsem, O'Shea, and Wehausen [*54] as OAI employees.

Second, PM Services claims that a red flag was raised by the fact that on July 18, 2003, after it was clear that OAI was obtaining the 2003 Contract, OAI's submitted proposed staffing and vendor lists for the contract - prepared by O'Shea -- "were entirely made up of then current PM Services employees and PM Services vendors." P1.'s Stmt. P 78; *see also* O'Shea Dep. Ex. 16 (June 18, 2003 Letter from Odoi-Atsem to Vrobel attaching Staffing Plan and Proposed Vendors List). n2 Defendants, while agreeing with this statement, *see* Defs.' Resp. P 78, note that (1) O'Shea specifically testified that he had not supplied OAI with a list of PM Services employees for use in the bidding process and that he believed GSA directed OAI to submit the resumes of certain PM Services employees whom GSA had identified as employees that it wanted to retain for work in the Cohen & Switzer facilities, *see* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 195:5-12; (2) to satisfy GSA, O'Shea - after his resignation from PM Services -- sought and obtained permission from the individuals listed to submit their resumes along with other OAI readiness materials, *id.* at 204-06; and [*55] (3) apart from Richard Jones and Mike Barrett, who still work for PM Ser-

vices, every individual identified on the staffing plan was fired by Carole Metour for reasons wholly unconnected with this litigation, *see* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 49-52, 117-19. *See* Defs.' Resp. P 78 (noting the possibility that one individual listed, John Frykman, might have been fired by Metour because he was interested in working for OAI and talked to others about it, *see* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 49), but the record is very unclear on this point, as the two individuals at PM Services that he allegedly talked with - Barrett and Jones - testified that Frykman did not attempt to convince them to quit PM Services).

n2 The individuals listed on OAI's June 18, 2003 "Staffing Plan" were O'Shea, Odoi-Atsem, Wehausen, John C. Frykman, Robert A. Keefer, John E. Brown, Michael Barrett, Richard W. Jones, and Ryan O'Shea. *See* O'Shea Dep. Ex. 16 (Staffing Plan).

2. A Review of the Record [*56]

A more searching examination of the record adduced by the parties reveals that the events leading up to the award of the 2003 Contract to OAI are much more nuanced than Plaintiff suggests. Three points are particularly important to understand in order to convey an accurate depiction of the relevant events.

First, the representations made to PM Services that it would be awarded the 2003 Contract are less definite and more contingent than Plaintiff's characterization of the record indicates. Importantly, PM Services did not have a "written commitment" that GSA would sole-source the 2003 Cohen & Switzer O&M contract to it at the end of the expiration of its competitively bid 1998 contract. Pl.'s Resp. P 46. According to Metour herself, the primary support for her expectation that the GSA would award her the 2003 Contract was its encouragement for PM Services to obtain a Section 8(a) certification - which it did in June 2001, Pl.'s Stmt. P 12, two (2) years prior to the expiration of the 1998 Contract. *See* Defs.' Stmt. P 45. Metour testified:

A: "They [GSA] were encouraging me to go for [an] 8(a) certification because they really wanted to keep us there, in their [*57] minds *I am assuming*, for sure, was to award it [the 2003 contract] sole source to us as an 8(a) company.

* * *

Q: Over the course of time, there were discussions about GSA's encouragement, as you put it, for PM Services to get 8(a) certified. Anything else []?

A: That's primarily it. Informal conversations, verbal support.

Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 80:6-12, 90:3-9 (emphasis). Jim Butland, PM Services' Corporate Facilities Manager, also indicated that the GSA's representations to PM Services were indefinite, tentative, contingent on certain events, and made by individuals without the ultimate decision-making authority. Defs.' Stmt. P 46. Butland testified:

Q: I will narrow the question, then, to whether or not in your recollection did Tom Russell ever commit to whatever extent he was able that PM Services would be sole sourced as an 8(a) for the Cohen and Switzer contract?

A: Let me think about that one. The contract was due to be up, I believe, by September. In January of 03 - and it was - it was stated that *we tentatively plan to use you* as a sole source 8(a) contractor, and we're in the process of putting the [*58] specifications together. This is not a - it might not be word for word, but you know, *we do not have the authority to commit you to this*, but we see no reason why we ... wouldn't get this route with you because you're already there; you're doing a good job, blah, blah, blah.

* * *

Q: Anybody else tell you that?

A: There was one of his contract specialists . . . Joyce Robinson; she alluded to it, too, also. *But again, you know, she doesn't have that -- you know, to make that decision ...*

* * *

A: But she would - and she also commented, *Now, you realize this is no commitment.*

Defs.' Mot. for Summ. J., Ex. 10 (Butland Dep.) at 22:17-22, 23:1-10, 24:1-5, 25:15-16; *compare with* Pl.'s Resp. P 49 (contending that "Butland's testimony makes clear that while the deal was not done until someone had an actual contract in hand, the expectation of everyone, including GSA, was that the contract was to be sole-sourced to PM Services").

Tom Russell and Scott Taylor testified similarly, explaining that while they encouraged PM Services to seek Section 8(a) status to increase the likelihood of an award of the 2003 Contract and to reduce costs for the [*59] GSA, receipt of the 2003 Contract was contingent upon PM Services' provision of high quality performance during the remainder of the 1998 Contract. According to Russell,

> Q: Were you ever present during any discussions between anybody at GSA and any member of PM Services' workforce where GSA indicated an intent to sole source the [2003] contract for Cohen and Switzer after the expiration of their contract? Do you understand the question?
>
> A: Yes, I do. Yes, they were talking about one time going with PM Services under the 8(a) program, yes.
>
> * * *
>
> A: Yes, because that was our intent to keep on with, you know, PM Services, as long as, you know, performance was satisfactory, and the firm was doing a good job, we have authority to go to an 8(a) contractor. So if one is there with performance up to an acceptable level, we definitely go with that firm, yes.

Defs.' Mot. for Summ. J., Ex. 11 (Russell Dep.) at 21:6-22, 22:1-4. Taylor, in his testimony, made these same distinctions:

> A: I recommended that they - that they pursue that [Section 8(a) certification]. You know, again, this is - we don't have a whole lot of qualified service contractors in the [*60] 8(a) area, you know. I think that is part of my job to try and - you know, at the time they were an extremely well performing company, you know. I

don't know anybody's background or history, but I know that, you know, if somehow you can qualify in that arena, I mean that's a very good thing.

> * * *
>
> Q: Was there ever a point after that time that they became 8(a) certified that you communicated to anyone at PM Services that they could expect or that there might be - that they could have an expectation that the contract for Cohen & Switzer would be sole sourced to them after the end of their contract was up in August of 2003?
>
> A: ... I'm sure I shared my opinion at the time, and as long as the contract is performing well - ... that would be a recommendation that I definitely would give - ... to the contracting officer, who I hope would give it to the SBA.

Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 55:16-17, 56-57.

Second, the individuals who made the "representations" to PM Services that it was likely to be awarded the 2003 Cohen & Switzer O&M contract under Section 8(a) did not have the authority to commit the 2003 Contract to PM Services on behalf [*61] of the GSA. Indeed, Carole Metour admitted that she does not know the process regarding "final authority to award a contract," or where "the authority lies" in the GSA to award a contract. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 137:3-12. Tom Russell and Scott Taylor, who are aware of the process, clearly testified that such authority did not lie with them. According to Russell, a consultant to GSA, "I don't have any authority at all over contracts. I am there to assist the contract specialist or the contracting officer when I am requested to do so." Defs.' Mot. for Summ. J., Ex. 11 (Russell Dep.) at 15:9-12. However, in the case of the 2003 Cohen & Switzer O&M contract, Mike Vrobel -- the head of contract and procurement for the GSA's District of Columbia Services - did not seek his recommendation, and Russell had no involvement in the ultimate award. *Id.* at 10:1-12, 31:6-13. Taylor likewise testified that he lacked decision-making authority, and, at best, could make recommendations to Vrobel, his superior. Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 58:1-8, 59:6-9. In this case, Taylor was one of the GSA employees that did recommend that OAI was the superior [*62] choice for the 2003 Contract; as he explained:

I think, one, there was a strong staff proposal. Two, our dealings with the President, Ablade, have been very good in the past. He is a very smart, knowledgeable man. And I believe that gave a little extra assurance, even - even in the other services or people that he provides for project management, he's -- I don't know, I think our division deals with six different contractors in that arena who provide people for those services. He is the only one that I know of that will get personally involved in a little bit of quality assurance of what his people are doing, and if you have any issues, you can go to him. Nobody else is like that in that kind of field. You know, you got a problem with that person, you either work it out with them or let them go. There is nobody in between to go to help you, you know, work it out. So that - I think that, you know, helped, that helped also.

*Id.* at 51:2-19. Here, it is undisputed that Taylor, along with Contracting Officer Representative Jerome Simmons and Juan McPhail, the Senior Building Manager for the Switzer Building, *see* Pl.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 19: [*63] 2-12, 19:19-24:1, recommended to Vrobel, an individual who had never met Defendant O'Shea, Defs.' Stmt. P 58, Pl.'s Resp. P 58, that GSA select OAI for the 2003 Cohen & Switzer O&M contract. Vrobel went along with this recommendation. Defs.' Mot. for Summ. J., Ex. 11 (Russell Dep.) at 10:1-12; *id.,* Ex. 9 (Taylor Dep.) at 9, 10:1-7, 11- 13-21, 45:7-10 (At the relevant meeting, Vrobel solicited discussion regarding the award of the 2003 Contract: "[T]he initial opinion was that we did not want to use PM Services, period. Next decision ... do we want to consider using . . . OAI." Vrobel also stated that "the reason for not going with PM Services for the sole source contract... [was] that they wanted new blood."). The award then was approved by the SBA, which had to approve OAI as a Section 8 (a) sole-source contract recipient and make a finding that the award "will cause no adverse impact on another small business concern." *See* Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 54:2-11, 65:11-22; *id.,* Ex. 23 (July 30, 2003 letter from the SBA to Mike Vrobel) (approving OAI as the Section 8(a) contractor for the Cohen & Switzer buildings and stating that OAI "has the requisite [*64] capabilities to satisfactorily perform the work" and that "[a] determination has been made that acceptance of this procurement will cause no adverse impact on another small business concern"). n3

n3 PM Services never filed an official grievance with the GSA after it awarded OAI the 2003 Contract, notwithstanding Metour's conviction that Taylor and others acted improperly in the events leading up to the award. Defs.' Stmt. P 57 (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 150-51); Pl.'s Stmt. P 57.

Third, PM Services understates the subsequent discussions it had with the GSA wherein the reasons behind the decision to award the 2003 Contract to OAI were discussed. These discussions revealed that the quality of PM Services' performance during the five (5) years under the 1998 Contract was a significant factor in its non-award. As Taylor testified,

Q: And so what I guess I am trying to get to is when you say that at that time in that meeting with Mike Vrobel that you did not want to use [*65] PM Services, period, had Tony Wehausen and Bill O'Shea stayed on with PM Services would that have also been the case?

A: If the performance would not have stayed at an upper level, I can't say, you know, we would not have liked to -- *would not have recommended staying with them anyway just because of the performance, you know.*

Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 49:10-20 (emphasis added). After the award of the 2003 Contract to OAI, Metour asked for a meeting with GSA representatives to discuss the decision. According to Taylor,

We actually had a meeting. Carole asked for a meeting with Mike Vrobel. Mike did not attend. I think it's just professional courtesy to attend and, you know, speak our opinions on these things. And, you know, I bluntly, opinion as it is, gave my opinion on that, that I thought those two, the project manager and the chief, Bill and Tony, were the key to her success at Cohen and Switzer and that I did not personally feel that, you know, they - herself or Nico [Martherus] -- were very effective.

*Id.* Metour herself admitted that Taylor had previously informed her that "he really trusted Mr. O'Shea and felt that [*66] he had done a terrific job for PM Services and that he was a visionary and so on." Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 92:11-15.

### K. Other Conduct At Issue

Three other smaller issues need to be briefly touched on before the Court can proceed with its legal analysis: (1) O'Shea's and OAI's alleged recruitment of current PM Services employees to join OAI; (2) alleged disparaging remarks made by O'Shea about PM Services; and (3) accusations that O'Shea improperly retained PM Services' property after his resignation.

#### 1. O'Shea's and OAI's Alleged Recruitment of PM Services Employees

Paragraph 29 of PM Services' Complaint alleges: "Additionally, O'Shea, [John] Brown and Wehausen on behalf of [OAI] attempted to recruit current employees of PM Services, Scott Butler, Rick Jones, Fred Johnson, Brian Schaffer [sic], David Duringer, Steve Brotherton, Craig Travel, Mike Wells, Mike Barrett, to work for [OAI]." Compl. P 29. John Brown is a former employee of PM Services and a current employee of OAI. Defs.' Stmt. P 69; Pl.'s Resp. P 69 (not contesting). Metour testified that she fired Brown (1) on the basis that he was not qualified for his position and (2) for [*67] related budgetary reasons, after which Brown sought and gained employment by OAI. *Id.* (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 51:17-21, 52:1-6). Wehausen is also now a former employee of PM Services, having joined OAI in September 2003 after he was terminated by Metour when she concluded that he was taking too long to make up his mind about whether he wanted to stay with PM Services or take another job. *Id.* (citing Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 117:13-21, 118:1-9). Of the nine (9) employees listed by PM Services in Paragraph 29 of its Complaint, only one (1) - David Duringer - is no longer with PM Services. Defs.' Stmt. P 68; Pl.'s Resp. P 68 (not contesting). Mr. Duringer now works with another firm, Johnson Controls, and Mr. Wehausen apparently aided Duringer in his quest for a position there. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 132:11-21, 133:1.

A review of the record highlights the fact that these individuals were either never recruited at all by OAI, or were recruited by O'Shea only after he had left PM Services. *See* Pl.'s Resp. PP 68-84. In sum:

. Scott Butler: Butler testified that (1) John Brown [*68] contacted him after OAI was awarded the 2003 Contract and

after PM Services had fired him, because he and Brown are friends; (2) O'Shea offered him a job at OAI after he had left PM Services; and (3) Wehausen never attempted to recruit him. Defs.' Mot. for Summ. J., Ex. 24 (Butler Dep.) at 11:19-22, 12-14.

. Rick Jones: Jones testified that (1) O'Shea offered him a job at OAI during the September 2003 time period, after he had left PM Services; and (2) neither Brown nor Wehausen tried to recruit him.

. Fred Johnson: Johnson testified that OAI and O'Shea never attempted to recruit him. Defs.' Mot. for Summ. J., Ex. 26 (Johnson Dep.) at 19:19-22, 20:1-8. Johnson also testified that slightly before Wehausen left PM Services in mid-July 2003 (during a period that Wehausen thought that he was going to work with a company called L-Core and not OAI), Wehausen simply asked him if he was going to continue working for PM Services or whether he would like a position as a maintenance mechanic at OAI. *Id.* at 15.

. Brian Shaffer: Shaffer testified that (1) neither O'Shea nor Brown ever asked him to come work with OAI; and (2) Wehausen -- besides making the fact that [*69] he was "disgruntled" with PM Services prior to his departure - never made any direct overtures either. Defs.' Mot. for Summ. J., Ex. 28 (Shaffer Dep.) at 13:13-22, 14:14, 19:18-22.

. David Duringer: Duringer worked for PM Services in a temporary position for only two months - between the end of July 2003 and the close of September 2003. Defs.' Mot. for Summ. J., Ex. 29 (Duringer Dep.) at 11, 21:6-17. Duringer testified that neither O'Shea, Brown, or Wehausen talked with him about coming to work at OAI nor did they indicate that a job opportunity was available to him. *Id.* at 17:20-22, 18:1-7, 19:14-20, 20:1.

. Steve Brotherton: Brotherton testified that he was never recruited by Messrs. O'Shea, Brown, or Wehausen. Defs.' Mot. for Summ. J., Ex. 30 (Brotherton Dep.) at 15:6-13.

. Craig Travel: Travel testified similarly, indicating that he was never approached or recruited by O'Shea, Brown, or Wehausen. Defs.' Mot. for Summ. J., Ex. 31 (Travel Dep.) at 14:5-13.

. Mike Wells: Wells also testified that he was never recruited by O'Shea, Brown, or Wehausen. Defs.' Mot. for Summ. J., Ex. 32 (Wells Dep.) at 21:5-21.

. Mike Barrett: Barrett testified [*70] accordingly, indicating that he was never recruited by the OAI team of O'Shea, Brown, and Wehausen. Defs.' Mot. for Summ. J., Ex. 33 (Barrett Dep.) at 13:12-19.

Similarly, O'Shea testified that he never encouraged any of his subordinates to leave PM Services while he remained employed there. Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 116:1-9.

2. Alleged Disparaging Remarks Made by O'Shea About PM Services

Paragraph 25 of PM Services' Complaint alleges that O'Shea breached his duty of loyalty to the company by making "false disparaging remarks about PM Services to its employees and GSA, including but not limited to, that PM Services was not financially viable and could not pay its vendors or employees, in an effort to interfere with PM Services' business and contractual relationship with GSA and PM Services' employees." Compl. P 25. According to Metour, these accusations are based solely on second-hand information that she received from the reports of Teresa Simons, a PM Services employee. Defs.' Stmt. P 88; Pl.'s Resp. P 88; see also Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 103:8-21, 109:2-5, 110-13 (testifying that she received the reports from Simons [*71] and from perhaps other employees whom she could not - and has never named). PM Services has no evidence independent of Simons' accusations that O'Shea ever disparaged PM Services in any way. Both Taylor and O'Shea have denied these accusations, see Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 85:6-14; id., Ex. 9 (Taylor Dep.) at 44:10-22 ("Bill never talked poorly, you knew, he is quite the gentleman ... I don't recall anything derogatory. Actually their staff was quite good with that. . . they are quite the ... professional gentlemen.").

PM Services' allegations flow out of a memorandum constructed by Teresa Simons on August 1, 2003 - roughly two (2) months after O'Shea had left the employ of PM Services. See Pl.'s Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour). Ms. Simons had been hired as PM Services Production Control Clerk, a position akin to an administrative assistant, in May 2003 at PM Services' Franconia Warehouse Complex. Pl.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 19-20, 45-49. n4 Ms. Simons testified that she constructed her memorandum based solely on conversations she overheard O'Shea having on the [*72] telephone through the wall while she was working on her computer in the adjoining office. See id. at 42:13-44:4. In relevant part, Ms. Simons' memorandum states:

At first Mr. O'Shea seemed to be honest and concerned for the company and wanted what was best, but he would talk on the phone to other people and it was quite the opposite.

William O'Shea mentioned to each of us, at the Franconia location, that we should leave this company, so PM Services would loose [sic] their contract because no one else would be able to find themselves around here and be able to keep this job running properly.

He also said on numerous occasions, that we could not even get supplies because they did not pay their bills, and all their accounts were closing. That had to be a lie because I have not had any problems with any supply houses, and I have contacted quite a few.

With everything that I could hear going on there was no doubt that he was looking for backing (money wise) to join a partnership or to get a percentage of the profit from another company that he was setting up with a man named La'Bladae (may be misspelled) [apparently Ablade Odoi-Atsem] and a man named Tony [*73] (he never mentioned his last name) [Wehausen].

Mr. O'Shea realized that I could hear everything, and he told me not to mention any thing I heard to any one else, and that if I did mention it to anyone, that he would strictly deny any wrong doings. He also made it a point to let me know that nobody would believe me because he had

worked for this company for a long time, and he built this company, and it would never survive without him.

Mr. O'Shea said that if any one from PM Services called for him when he was not here on the compound, to tell them that he was out on the floor. He was almost always late coming in and early leaving, I can't recall him ever getting over six hours a day in. I also know that he took a copy of all deliverables and forms on a CD that Ray Short had sent me, he told me to make sure I copied of [sic] everything I would need for this job.

Mr. O'Shea said that him and Tony [sic] were going into there [sic] own business with another man and he also mentioned that he had every record for each job around so they would be taking over all of PM Services['] jobs. He knew how much each job was bid and how much it took to run each job. He said [*74] that he had kept all kinds of records from years back and that his garage was full of records.

I started taking notes on quite a few things that was [sic] said, and some names that was [sic] mentioned, so you [Metour] could look into them for your self, but I got rid of them since you came up to this area.

P1.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1-2.

n4 Defendants focus on the fact that "one month after being hired as the Production Control Clerk - a position that Simons testified is akin to an administrative assistant - and after notifying Metour of what she believed she had overheard, Simons was promoted to Project Manager and given an eighty-two per cent (82%) raise (from seventeen dollars ($ 17) to thirty one ($ 31) dollars per hour), followed shortly by another raise to thirty-three ($ 33) dollars per hour, an overall increase of eighty-nine per cent (89%) of her original pay within approximately one month of her hire." Defs.' Stmt. P 38 (citing Defs.' Mot. for Summ. J., Ex. 22 (Simons Dep.) at 20-21). Based on these facts, Defendants argue that her memorandum is inherently "unreliable," and imply that PM Services in some way improperly influenced

her to create "false" allegations about O'Shea to support their legal theories. See Defs.' Reply to P1.'s Opp'n ("Defs.' Reply") at 10 & n.2. While Defendants' theory may well be accurate, this kind of credibility determination regarding a witness and a piece of evidence is best left for a fact-finder, not the Court on a summary judgment motion wherein it must draw inferences in favor of the non-moving party when they are supported by admissible evidence. As such, the Court shall not factor in what may well be the possible inherent unreliability of Ms. Simons herself when considering the record before it for the purposes of the pending motions.

[*75]

During her deposition, Ms. Simons testified that "it was obvious" that O'Shea was trying to start his own business because O'Shea had shared with her that he was interested in doing so and asked that she not share that with other people; however, she admitted that she did not know that O'Shea in fact had not started his own business. P1.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 44, 45:22, 46:1-17. Moreover, Simons made several concessions in her deposition testimony: (1) she was not a party to any of the overheard conversations; (2) she based her conclusions solely on what she was capable of overhearing from the next room separated by a wall; (3) she had "no idea" with whom O'Shea might have been speaking on the telephone;.(4) she did not recall any specifics about what she had heard; (5) she "knew it was impossible" for O'Shea to take over PM Services' contracts and "bring them down"; (6) if O'Shea did make such a comment, "he was just puffing"; (7) despite the fact that she told Metour that O'Shea was "looking for backing (money-wise) . . . ." he - in fact - had never said that and that she had just "assumed" that was the case; and (8) for all she knew, O'Shea could have been [*76] making reference to financing a house, which he was doing at that time. P1.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 43, 46:16-18, 49:11-16, 53:8-10, 64:1-2, 64:11-22, 65:1-5, 65:20-22, 77:8-16; see also Defs.' Mot. for Summ. J., Ex. 2 (O'Shea Aff.) P 11. This exchange also occurred in Simons' deposition:

Q: So he was on the phone making plans for the future?

A: Right. I guess so.

Q: Are you certain?

A: Nope.

Q: Are you assuming?

A: I'm assuming.

*Id.* at 68:2-7.

As far as the actual truth of the content of the alleged statement, i.e., that O'Shea stated that PM Services "could not even get supplies because they did not pay their bills, and all their accounts were closing," Pl.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1, Metour admitted during her deposition that (1) she did not know if PM Services had ever bounced an employee paycheck; (2) "it was a possibility" that PM Services had previously been reduced to a cash-only basis with a vendor due to credit problems; and (3) it was "a possibility" that PM Services' payments to vendors were late at times. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 106-08; [*77] *see* Pl.'s Resp. P 89 (disputing that "if O'Shea is admitting that he made the comments alleged in the Complaint, that they were somehow true" but providing no evidence or citation to the record to show that such comments would be untrue). O'Shea testified that when new PM Services' employees expressed a concern whether the company was stable, he would tell them that "the one thing you can count on with PM Services is that they always - you will always have your paycheck, that's top priority for the company. And I said that the only time we have ever had any trouble is we have struggled with, you know, paying vendors on time." Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 85:6-14. O'Shea further testified that PM Services had bounced his paycheck, but only once due to a clerical error, and noted that - although he did not share this with his co-workers and only discussed the issue with the corporate brass - he became aware of at least two (2) incidents of vendors either placing PM Services on a cash-only purchasing basis or refusing to extend credit for supplies and equipment. *Id.* at 82-84.

3. Accusations that O'Shea Improperly Retained PM Services Property After His Resignation [*78]

The final accusation relevant to this suit is PM Services' contention that "O'Shea . . . removed or had copied PM Services operations and business materials prior to O'Shea resigning his employment." Compl. P 30. When examined regarding this allegation, Metour testified that (1) "Mr. O'Shea did have a lot of PM Services material and documents in his possession because of his role in the company"; (2) it was possible that O'Shea worked from his home; and (3) the accusation was based upon what Ms. Simons "was overhearing." Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 133-35. In her deposition, Ms. Simons testified that O'Shea took "a copy of all deliverables and forms on a CD that Ray Short had sent

[her]." Pl.'s Mot. for Summ. J., Ex. H (Simons Dep.) at 73:17-74:10. Simons also conceded that (1) she was unaware that O'Shea's position called for him to have PM Services' materials and documents in his possession; (2) she was unaware if O'Shea worked out of his house; and (3) if O'Shea did work out of his house, it would not have been unusual for him to have records there. *Id.* at 75:16-20, 78:5-12. O'Shea has stated that he "routinely worked out of [his] home office, in New [*79] Market[, Maryland], mostly in the evenings and on the weekends." Defs.' Mot. for Summ. J., Ex. 2 (O'Shea Aff.) P 7. O'Shea also testified that he had his son - then also an employee of PM Services - drop off his common property at the A.V. Bryan United States Federal Courthouse as instructed by Heather Metour in her recorded message on his answering machine. Defs.' Stmt. P 29 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 140:19-22, 141:1-14); Pl.'s Resp. P 29 (not disputing this fact). n5

n5 PM Services does make reference to what were apparently more documents retained for a period by O'Shea. *See* Pl.'s Resp. P 95 ("Moreover, the undersigned [attorney] was forced to write a letter to the opposing counsel to obtain a box of documents O'Shea had removed following his resignation that he had in his garage. Only after this letter were all of the items returned."). However, Plaintiff does not attach the referenced letter, does not provide a date for this exchange, and nowhere describes what was in the "items returned" as a result of this letter.

[*80]

## II: LEGAL STANDARDS

[HN1] A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh,* 307 U.S. App. D.C. 185, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' spe-

cific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted). [*81]

[HN2] Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy,* 259 U.S. App. D.C. 115, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249-50, 106 S.Ct. 2505 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat [*82] an otherwise proper motion for summary judgment." *Williams v. Callaghan,* 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

## III: DISCUSSION

Three major claims are currently before the Court for its resolution: (1) PM Services' claim that O'Shea breached his fiduciary duty of loyalty to the company by usurping its contractual and corporate opportunities while still its employee, *see* Compl. PP 33-36 (Count I - Breach of Duty of Loyalty); (2) PM Services' assertion that O'Shea and OAI tortiously interfered with [*83] its contract and business relations, *id.* PP 37-42 (Count II - Tortious Interference); and (3) Defendants' two related counterclaims, which contend that (a) PM Services violated D.C. Code § 13-1303 when it failed to pay O'Shea's base and bonus wages during the leave period immediately prior to his resignation, and (b) PM Services violated O'Shea's pension rights when it failed to make payments and/or contributions due on his behalf, *see* O'Shea's Answer & Countercl. PP 21-23 (Count I - Violation of D.C. Code § 32-1303), PP 24-27 (Violation of

Pension Rights). The Court shall conduct a detailed examination into each contention in turn. The Court shall then conclude by addressing one final issue - Defendants' assertion that PM Services has failed to demonstrate that it sustained damages as a result of Defendants' alleged conduct. *See* Defs.' Stmt. PP 99-125.

### A. Breach of the Fiduciary Duty of Loyalty

Plaintiff PM Services contends that Defendant O'Shea misused his position while employed with the company from May 2003 forward by using his contacts garnered from PM Services and its non-public proprietary information to usurp the contractual and [*84] corporate opportunities of PM Services for himself and OAI in violation of his duty of loyalty. *See* Pl.'s Mot. for Summ. J. at 3. In contrast, Defendants contend that, upon analysis of the present record, it is clear that O'Shea simply "put his feelers out" during his time with PM Services and never solicited the clients, customers, and employees of PM Services during his time there, never defamed the company, and never retained property that belonged to the company. *See* Defs.' Opp'n at 5-9.

Multiple recent cases in this jurisdiction have applied the common law principles and limitations of agency law into the field of corporate employment. *See, e.g., Furash & Co. v. McClave,* 130 F. Supp. 2d 48 (D.D.C. 2001); *Riggs Inv. Mgmt. Corp. v. Columbia Partners,* 966 F. Supp. 1250 (D.D.C. 1997); *Mercer Mgmt. Consulting v. Wilde,* 920 F. Supp. 219 (D.D.C. 1996). Under this application, it has been established that [HN3] employees - especially managers, corporate officers, and directors - "owe 'an undivided and unselfish loyalty to the corporation' such that 'there shall be no conflict between duty and self interest.'" *Mercer,* 920 F. Supp. at 233 [*85] (quoting *Guth v. Loft,* 23 Del.Ch. 255, 5 A.2d 503, 510 (1939); *see also* Restatement (Second) of Agency § 387 ("Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters concerned with his agency."). Ultimately, "'an agent is subject to a duty not to compete with the principal concerning the subject matter of his agency.'" *Id.* (quoting Restatement (Second) of Agency § 393). An agent has "a duty to act solely for the benefit of his employer and to avoid conflicts of interest between his duty to his employer and his own self-interest." *Riggs Inv. Mgmt. Corp.,* 966 F. Supp. at 1265 (citations omitted).

However, [HN4] while "concern for the integrity of the employment relationship has led courts to establish a rule that demands of a corporate officer or employee an undivided and unselfish loyalty to the corporation," *Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 568 (1978), "there is an off-setting policy 'recognized by the courts . . . of safeguarding society's interest

in [*86] fostering free and vigorous competition in the economics sphere,'" *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 963 (Del. 1980) (quoting Maryland Metals, 382 A.2d at 569). "[T]he law is clear that 'an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal.'" *Mercer*, 920 F. Supp. at 233 (quoting *Sci. Accessories Corp.*, 425 A.2d at 962). [HN5] In general,

> even before the termination of the agency, [an employee] is entitled to make arrangements to compete, except that he cannot properly use confidential information peculiar to his employer's business and acquired therein. Thus, before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete.

*Id.* (quoting Restatement (Second) of Agency § 393 comment e).

However, [HN6] an employee's "privilege to compete is limited." *Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265. "The right to make arrangements to compete is [*87] by no means absolute and the exercise of the privilege may, in appropriate circumstances, rise to the level of a breach of an employee's fiduciary duty of loyalty.'" *Sci. Accessories Corp.*, 425 A.2d at 965 (quoting Maryland Metals, 382 A.2d at 569-70). An employee's proper preparatory activities have been delineated as such:

> Prior to termination of employment, an officer may not solicit for himself or herself business which the position requires the employee to obtain for the employer. The officer must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts in behalf of his employer.

*Mercer*, 920 F. Supp. at 234 (quoting William W. Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 856 (perm. ed. rev. vol. 1994)). [HN7] "In preparing to compete, an employee may not commit wrongful acts, 'such as misuse of confidential information, solicitation of the firm's customers, or solicitation

leading to a mass resignation of the firm's employees.'" *Furash*, 130 F. Supp. 2d at 53 (quoting *Mercer*, 920 F. Supp. at 234); [*88] *see also Sci. Accessories*, 425 A.2d at 965 (noting that "examples of misconduct which will defeat the privilege" to make arrangements to compete include "misappropriation of trade secrets"; "misuse of confidential information"; "solicitation of employer's customers prior to cessation of employment"; "conspiracy to bring about mass resignation of employer's key employees"; and "usurpation of employer's business opportunity"). "At the same time, failure to disclose plans to enter into competition is not itself necessarily a breach of fiduciary duty." *Mercer*, 920 F. Supp. at 234. Ultimately, various courts have recognized that "the ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case." *Furash*, 130 F. Supp. 2d at 53; *Mercer*, 920 F. Supp. at 234; *Maryland Metals*, 382 A.2d at 570; *Sci. Accessories*, 425 A.2d at 965; Fletcher Cyclopedia Corporations § 856.

Upon an analysis of the factors identified by the *Mercer* [*89] and *Science Accessories* courts in the context of the factual record adduced by the parties, the Court concludes that a genuine issue of material facts exists concerning whether O'Shea stepped over the line between privilege and loyalty, and breached his fiduciary duty to PM Services. As such, Plaintiff's Motion for Summary Judgment as to Count I of its Complaint must be denied, and Defendants' corresponding Motion for Summary Judgment as to this point also must be denied. The following considerations are relevant to the Court's conclusion.

1. Misappropriation of Confidential and/or Proprietary Information

It is clear that [HN8] when an employee misappropriates a firm's confidential and/or proprietary advantage for. his own personal advantage, the employee has breached his duty of loyalty to his employer. *See Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265 (CEO shared confidential information about employee wages and client fees to prospective employer in violation of duty of loyalty); *see also North Atlantic Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) ("an agent has a duty not to use confidential knowledge acquired in his employment [*90] in competition with his principal") (internal quotation marks omitted). Here, the strongest evidence currently before the Court that O'Shea misappropriated confidential information is Teresa Simons' August 1, 2003 Memorandum and her subsequent testimony that O'Shea -- prior to leaving PM Services -- "took a copy of all deliverables and forms on a CD that Ray Short had sent [her]" and "mentioned that he had

every record for each job around so [OAI] would be taking over all of PM Services['] jobs" because OAI would then know "how much each [PM Services'] job was bid and how much it took to run each job." *See* Pl.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1-2. However, the factual record is quite unclear if-- and when -- O'Shea returned this material, which apparently was in his garage. *See supra* Section II(K)(3). Some of the information frequently identified by Plaintiff as "proprietary information," such as the details of its GSA contracts and an identification of its employees, subcontractors, and vendors, *see* Pl.'s Stmt. P 29, are listed in GSA contracts and maintained as a public record. They cannot, therefore, be considered "confidential" information. [*91] However, PM Services' pricing and bidding information is confidential and proprietary information. In this case, it is simply unclear based on the present record: (1) what PM Services' documents O'Shea had personal possession of and/or access to during May 2003 and beyond; (2) what confidential proprietary knowledge could have been gleaned by O'Shea during his limited participation in PM Services' bids, *see* Section II(D); and (3) how such documents or knowledge was used, if at all, during the conversations leading up to O'Shea's joining of OAI and in OAI's subsequent bids.

2. Solicitation of Employer's Employees Leading to a Mass Resignation

[HN9] Solicitation leading to a "mass resignation" of the firm's employees will also lead to a breach of an employee's fiduciary duty. *See Mercer*, 920 F. Supp. at 234; *Sci. Accessories*, 425 A.2d at 965; *see also Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1265 (finding a violation of duty of loyalty where outgoing CEO "pre-solicited employees, though these pre-solicitations were generally close to his departure"). A review of the record demonstrates that PM Services cannot establish a breach of fiduciary [*92] duty by O'Shea on this point. The only major evidence suggesting that O'Shea advocated that his fellow employees leave PM Services while he was still in its employ is (1) Teresa Simons' August 1, 2003 Memorandum, which states "William O'Shea mentioned to each of us, at the Franconia location, that we should leave this company, so PM Services would loose [sic] their contract," Pl.'s Opp'n, Ex. 1 (August 1, 2003 Memo from Simons to Metour) at 1, and (2) an argument by inference that O'Shea cajoled Wehausen into considering working for OAI during May 2003 - although the only evidence on this point is that Wehausen was also "pretty fed up with the way things were going" at PM Services, *see* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 110:21-22, 111:1-8, and willingly attended all meetings in May 2003 with Odoi-Atsem on his own accord. As detailed by the Court, *see supra* Section II(K)(1), the nine (9) employees identified in Plaintiff's

Complaint - Scott Butler, Rick Jones, Fred Johnson, Brian Shaffer, David Duringer, Steve Brotherton, Craig Travel, Mike Wells, and Mike Barrett, *see* Compl. P 29 - were either never recruited at all by O'Shea and OAI, or were only recruited [*93] after O'Shea left PM Services. Even assuming *arguendo* that PM Services' employees were recruited by O'Shea while he was still employed by PM Services, there has certainly been no "mass resignation" of the type necessary to establish liability. As such, at this point, PM Services could not succeed under a "mass resignation" breach of fiduciary duty theory, while a genuine issue of material fact would exist under a "misuse of confidential information" theory. However, other types of "wrongful acts" must still be considered before turning the page on this issue.

3. Solicitation of an Employer's Customers and/or Business Opportunities

Solicitation of an employer's customers prior to cessation of employment will also trigger a violation of an employee's fiduciary duty of loyalty. *See Furash*, 130 F. Supp. 2d at 53; *Sci. Accessories*, 425 A.2d at 965; *see also Mercer*, 920 F. Supp. at 234 (finding it "unreasonable and unrealistic that any client contact prior to leaving one's employment and starting a competing business constitutes a breach of one's fiduciary duty" and requiring "overt solicitation" or "other improper actions taken [*94] in the course of defendants' client contacts" to establish a claim). As noted previously, the *Mercer* court emphasized that "prior to termination of employment... [the employee] must refrain from actively and directly competing with the employer for customers and employees, and must continue to exert his or her best efforts on behalf of his employer." *Mercer*, 920 F. Supp. at 234; *see also Am. Fed. Group, Ltd. v. Rothenberg*, 2003 U.S. Dist. LEXIS 18353, Civ. No. 91-7860(THK), 2003 WL 22349673, at *10 (S.D.N.Y. Oct. 14, 2003) ("It follows [HN10] when an employee ... solicits the customers of a current employer and diverts the employer's business to himself, he breaches his fiduciary duty to his employer."); *Ticor Tile Ins. Co. v. Cohen*, 1998 U.S. Dist. LEXIS 9700, Civ. No. 98-4001(JSM), 1998 WL 355420, at *4 (S.D.N.Y. July 2, 1998) (evidence that employee, prior to his resignation, asked clients to follow him to another company, or whether they would be willing to follow him elsewhere, established breach of fiduciary duty).

Likewise, [HN11] solicitation of an employer's business opportunities prior to termination of employment will also constitute a breach of the outgoing employee's fiduciary [*95] of loyalty. "The doctrine of 'corporate opportunity' provides that corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation." *Rothenberg*, 2003

U.S. Dist. LEXIS 18353, 2003 WL 22349673, at *12 (citations and quotation marks omitted). "Briefly summarized, the law is that [HN12] if a business opportunity is presented to a corporate executive, the officer cannot seize the opportunity for himself if: (a) the corporation is financially able to undertake it; (b) it is within the corporation's line of business; (c) the corporation is interested in the opportunity." _Sci. Accessories, 425 A.2d at 963_ (citations omitted). n6 A corporate opportunity is one in which the corporation has an "interest" or "tangible expectancy," which can be explained as "something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope." _Rothenberg, 2003 U.S. Dist. LEXIS 18353, 2003 WL 22349763, at *12_ (citation omitted). "The degree of likelihood of realization from the opportunity is, however, the key to whether an expectancy is tangible." _Id._ (quoting _Abbott Redmont Thinlite Corp. v. Redmont, 475 F.2d 85, 89 (2d Cir. 1973))._ [*96]

> n6 A "corollary" of this rule is that "when a business opportunity comes to a corporate officer, which, because of the nature of the opportunity, is not one which is essential or desirable for his corporation to embrace, being an opportunity in which it has no actual or expectant interest," then the officer or employee "is entitled to treat the business opportunity as his own and the corporation has no interest in it, provided the officer has not wrongfully embarked the corporation's resources in order to acquire the business opportunity." _Sci. Accessories, 425 A.2d at 963._

A review of the record demonstrates that through roughly May 21, 2003, O'Shea's conduct had not risen to a level that threatened his fiduciary duty of loyalty; rather, O'Shea's actions constituted permissible "feelers," plans, and arrangements for his post-PM Services' employment. _See Riggs Inv. Mgmt. Corp., 966 F. Supp. at 1265_ (noting that having "basic meetings" and sending out "'feelers' to possible investors [*97] is insufficient to "breach the fiduciary duty of loyalty"). As of this time, O'Shea had conversed several times with Taylor for short periods of time regarding his future plans; met with Odoi-Atsem and Wehausen on two separate occasions to discuss their compatibility, the possible structure of any alliance between the men, and hammer out compensation issues; and met with Section 8(a) sponsors who might be interested in partnering with an expanded OAI. The alliance was still very tentative and uncertain, with internal negotiations as the centerpiece of all contact. _See_ O'Shea Dep. Ex. 8-9 (May 20, 2003 Email from O'Shea to OAI) (O'Shea signs off the email by suggesting, "Let me know if you wish to continue.").

However, O'Shea's conduct is open to an inference that could support PM Services' theory after May 22, 2003. In a May 23, 2003 email to OAI, O'Shea details a "phone call from Scott [Taylor] yesterday evening." O'Shea Dep. Ex. 11 (May 23, 2003 Email from O'Shea to OAI). O'Shea then notes that "[w]e are going to get together next week to discuss an opportunity that has recently surfaced." _Id._ According to O'Shea, Taylor emphasized that "timing is becoming increasingly [*98] critical. He cautioned me that if the offer goes out to another Company than [sic] there will be nothing that we can do to retrieve it." _Id._ O'Shea concludes by reminding Odoi-Atsem that "all we need to do is let him know that we are proceeding with our alliance and we can secure this excellent opportunity." _Id._ Further questions arise regarding O'Shea's conduct in his May 30, 2003 email to Odoi-Atsem, which could support a theory that O'Shea was soliciting business opportunities on behalf of OAI while still employed with PM Services, and originally had planned to remain with PM Services until OAI had officially secured these opportunities. _See_ O'Shea Dep. Ex. 12 (May 30, 2003 Email from O'Shea to OAI) ("If you remember correctly, when we had our initial meetings Tony and I were going to remain with PM Services until the final hour. We were later told by Scott that it would be necessary for Tony and I to resign from our current employer, in order for us to be awarded our first contract."). O'Shea's conduct is again open to an inference supporting PM Services' theory in light of his assertion that he drafted his notice of resignation from PM Services on June 2, 2003, [*99] _see_ Defs.' Stmt. P 24, but, by May 30, 2003, OAI was representing without his objection, unlike Wehausen -- that he had been hired and was using his stature to promote itself to the GSA, see O'Shea Dep. Ex. 13 (May 30, 2003 Email from Odoi-Atsem to Taylor).

Despite this evidence, summary judgment cannot be granted on this issue, as several gaps in the record remain which prevent either party from establishing the true extent of O'Shea's actions vis-a-vis his fiduciary duty to PM Services. PM Services has consistently asserted that O'Shea's conduct constituted solicitation of one of its customers - i.e., the GSA -- and usurpation of three of its business opportunities, including (1) its RWA work, (2) O&M work for the FOB-8 building, and (3) the upcoming 2003 Cohen & Switzer contract. _See_ Pl.'s Mot. for Summ. J. at 4. Based on the present record, certain issues prevent the Court from definitively concluding that O'Shea's actions fit with PM Services' characterization.

First, with respect to RWA work, which certainly was a business of PM Services following the creation of its "Technical Services group" in November 2002, O'Shea's conduct on behalf of OAI while he was still [*100] employed with PM Services remains unclear.

Scott Taylor did not recall discussing RWA work with O'Shea except in O'Shea's capacity as a PM Services' representative until his resignation, such that O'Shea would pass the information along to PM Services. *See* Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 61:6-11, 71-72. In contrast, O'Shea does remember discussing RWA work with Taylor that would be directed to OAI, and not PM Services; indeed, O'Shea has identified the "excellent opportunity" discussed in his May 23, 2003 email to Odoi-Atsem as RWA work. *See* Defs.' Resp. PP 59, 63. However, O'Shea testified that Taylor contacted him regarding this information because Odoi-Atsem -- the intended recipient of the information could not be located at that time, and Taylor simply wanted him to act as a go-between since he was in better contact with Odoi-Atsem. *Id.* With no further information presently before the Court as to this issue, but providing each party (as corresponding non-moving parties) the proper inferences in light of a summary judgment motion, the Court must conclude that a material issue of disputed fact remains as to O'Shea's promotion of RWA for OAI while he [*101] was still at PM Services, and his alleged diversion of that work to OAI.

Second, with respect to O&M work for the FOB-8 building, O'Shea has admitted that this is certainly the same kind of work that PM Services did. *See* Pl.'s Stmt. P 58 (citing Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 185). In deposition, O'Shea implied that some discussions had occurred in late May 2003 - while he was still employed by PM Services - regarding the possibility that OAI obtain O&M work for the FOB-8 building. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 132-136 (O'Shea notes that "there [were] no conversations about any contract that I was aware of other than FOB-8 at that point in time"). However, two points prevent the Court from finding that O'Shea violated his fiduciary duty to PM Services with respect to O&M work at the FOB-8 building. First, the record is unclear as to the extent of O'Shea's involvement in the FOB-8 debate while he was still employed by PM Services: (1) the FOB-8 is a facility that PM Services did not service at any time; (2) Scott Taylor did not work with FOB-8; (3) Odoi-Atsem testified that he learned of and set his sights on FOB-8 months before [*102] meeting O'Shea; (4) Taylor testified that he was not the source of this information, and it was raised by Odoi-Atsem at their second meeting as a possibility for the business; and (5) the building had been vacant for several months and the possibility of O&M work there was public knowledge. *See* Defs.' Resp. PP 57-58. Second, the record is also unclear as to the extent of PM Services' interest in FOB-8. As the *Rothenberg* court noted, in order for a company to have a "corporate opportunity" at issue, the corporation must have something "more certain than a desire or a hope;" moreover, "the key to whether an expectancy is tangible"

is "the degree of likelihood of realization from the opportunity." *Rothenberg*, 2003 U.S. Dist. LEXIS 18353, 2003 WL 22349673, at *12. While PM Services focuses on the fact that O&M work for the FOB-8 building would be "the same kind of work PM Services did," P1.'s Stmt. P 58, such an assertion is insufficient to meet the "corporate opportunity" test described in *Rothenberg*. Simply, based on the present record, the Court cannot conclude (1) that PM Services did have an interest in obtaining O&M work for the FOB-8 building, and it was somewhat likely that it [*103] would accomplish such an interest, or(2) that O'Shea played a role in redirecting the opportunity to OAI while he was still employed by PM Services. As such, a genuine issue of material fact remains.

Third, with respect to the 2003 O&M contract for the Cohen & Switzer buildings, which appears to be the central focus of this suit, the record is simply inconclusive at this time as to O'Shea's involvement with redirecting the contract to OAI while he was still employed by PM Services. Here, Taylor, O'Shea, and Odoi-Atsem have each testified that the 2003 Contract was never a topic of discussion until after O'Shea's ultimate resignation from PM Services. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 151:11-13, 152, 177-78, 196:15-19; id., Ex. 9 (Taylor Dep.) at 61, 71-72; P1.'s Mot. for Summ. J., Ex. B (Odoi-Atsem Dep.) at 58:2-12. In contrast, read in the light most favorable to Plaintiff and in the context of the events of the Spring and Summer of 2003, the emails sent by O'Shea and Odoi-Atsem while O'Shea was still employed by PM Services could be read to discuss obtaining the 2003 Cohen & Switzer contract for OAI. Indeed, O'Shea's May 23, 2003 email discussing an "excellent [*104] opportunity" might have been referring to the Cohen & Switzer contract, and the fact that "timing" was "critical" to prevent the offer from "going out to another Company" supports this idea - if OAI got organized and properly submitted its application to the GSA as a Section 8(a) company before a competitive bidding process occurred, it could be sole-sourced the contract; however, if it waited, it might miss out on the opportunity in a competitive bid situation given its size and relative inexperience in the O&M field. *See* O'Shea Dep. Ex. 11 (May 23, 2003 Email from O'Shea to OAI). Odoi-Atsem's May 30, 2003 email to Scott Taylor of the GSA, representing that OAI had hired O'Shea and Wehausen, might have been an effort to secure the 2003 Contract, especially in light of Taylor's note to Tom Russell that they needed to discuss this particular unsolicited memorandum "ASAP," along with OAI's accompanying list of employees and staffing plan. *See* O'Shea Dep. Ex. 13 (May 30, 2003 Email from Odoi-Atsem to Taylor); Pl.'s Mot. for Summ. J., Ex. E (Taylor Dep.) at 62-63.

Here, unlike in the case of the FOB-8 building, PM Services clearly had a tangible expectancy in the corporate opportunity [*105] presented by the 2003 Cohen & Switzer O&M contract. While PM Services might have ultimately been denied that opportunity based on its prior performance under the 1998 Contract, see Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 49:10-20, that fact is irrelevant to the scope of O'Shea's fiduciary duty while at PM Services. PM Services had defeated other companies through a competitive bid to obtain the 1998 Contract for the buildings, and had received numerous assurances by the GSA -- while tentative and contingent -- that it would also receive the 2003 Contract. Accordingly, PM Services had more than a passing hope to receive the 2003 Contract: it had a prior relationship with the GSA doing the work at issue in the buildings at issue; it had a history of maintaining contracts, including as a sole-source provider; and it had been given indications that its effort to secure the 2003 Contract would prove fruitful. As such, PM Services had a tangible expectancy in the 2003 Cohen & Switzer O&M contract. While a genuine issue of fact remains concerning whether O'Shea diverted -- or took efforts to divert - that contract to OAI while still employed by PM Services, if PM Services can [*106] establish that he did (which it cannot do on this disputed record), then it can establish a breach of the fiduciary duty of loyalty by O'Shea. It is for the trier of fact to make credibility findings and resolve reasonable inferences.

4. In Sum

In sum, the Court finds that a genuine issue of material fact remains as to whether O'Shea breached his fiduciary duty of loyalty to PM Services. As such, both Plaintiff's and Defendants' Motions for Summary Judgment with respect to Count I of Plaintiff's Complaint must therefore be denied. The issue of whether O'Shea (1) misappropriated confidential and/or proprietary information from PM Services or (2) solicited the GSA in such a manner that diverted and usurped PM Services' "corporate opportunities" with respect to RWA work, O&M work for the FOB-8 building, and the 2003 Cohen & Switzer O&M contract while still employed with PM Services in the Spring of 2003 remains an issue for resolution by the jury in this case. However, no genuine issue of material fact remains with respect to PM Services' theory that O'Shea breached his duty of loyalty through solicitation leading to a "mass resignation" of the firm's employees; rather, the undisputed [*107] evidence undermines this claim. Accordingly, PM Services shall be prohibited from presenting a "solicitation of employees" theory before the jury in any upcoming trial in this case.

B. Tortious Interference With Economic Advantage

PM Services next claims that both O'Shea and OAI intentionally interfered with its advantageous business relationships when "OAI secured proprietary information from O'Shea as a result of O'Shea's breach of fiduciary duty," Pl.'s Mot. for Summ. J. at 10, and then used the information, including PM Services' "key and current employees" and "its selling points," "without [the] solicitation of the GSA" to "interfere with PM Services['] business relationships to jump-start [its] own O&M division," id. at 13. In response, Defendants O'Shea and OAI contend that the record simply does not support this accusation, as "no evidence permits the conclusion that O'Shea possessed any non-public or proprietary list and - particularly given the absence of a restrictive covenant -- O'Shea is entitled to work for OAI in competition with PM Services and to make productive use of industry knowledge - including which vendors do a good job - gained while a PM Services [*108] employee." Defs.'Opp'n at 12.

[HN13] "The tort of intentional interference with a prospective business advantage runs 'parallel to that for interference with existing contracts.'" Brown v. Carr, 503 A.2d 1241, 1247 (D.C. 1986) (quoting W. Prosser, Law of Torts § 130, at 952 (4th ed. 1971) (footnote omitted); citing DeKine v. Dist. of Columbia, 422 A.2d 981, 988 (D.C. 1980)). As such, the United States Court of Appeals for the District of Columbia Circuit has held that to establish a claim for tortious interference with economic advantage under District of Columbia law, a plaintiff must show: (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage. Bennett Enter., Inc. v. Domino's Pizza, Inc., 45 F.3d 493, 499, 310 U.S. App. D.C. 192 (D.C. Cir. 1995) (citing Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 422-23 (D.D.C. 1998); Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan, 374 A.2d 284 (D.C. 1977)); [*109] see also Furash, 130 F. Supp. 2d at 55; Sheppard v. Dickstein, Shapiro, Morin & Oshinsky, 59 F. Supp. 2d 27, 33-34 (D.D.C. 1999); Mercer, 920 F. Supp. at 239. [HN14] To survive a motion to dismiss, "a plaintiff must allege 'business expectancies, not grounded in present contractual relationships, but which are commercially reasonable to expect.'" Sheppard, 59 F. Supp. 2d at 34 (citing Democratic State Comm. of the Dist. of Columbia v. Bebchick, 706 A.2d 569, 572 (D.C. 1998)). "For the most part the 'expectancies' thus protected have been those of future contractual relations, such as the prospect of obtaining employment or employees, or the opportunity to obtain customers." Carr v. Brown, 395 A.2d 79, 84 (D.C. 1978) (citation omitted).

"Moreover, the defendants' interference must be improper." *Mercer, 920 F. Supp. at 239.* Indeed, "competitive activity does not by itself constitute intentional interference with prospective business advantage." *Int'l City Mgmt. Ass'n Ret. Corp. v. Watkins, 726 F. Supp. 1, 6 (D.D.C. 1998).* Rather, "as its name would suggest, [*110] intentional interference requires an element of intent." *Bennett Enter, 45 F.3d at 499* (emphasis in original). "[A] general intent to interfere or knowledge that conduct will injure the plaintiff's business dealings is insufficient to impose liability." *Id.* (quoting *Genetic Sys., 691 F. Supp. at 423*). As such, a plaintiff cannot establish liability without a "'strong showing of intent' to disrupt ongoing business relationships." *Id.* (quoting *Genetic Sys., 691 F. Supp. at 423*). "Motive or purpose to disrupt ongoing business relationships is of central concern in a tortious interference case ... Conduct must be more egregious, for example, it must involve libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *Sheppard, 59 F. Supp. 2d at 34* (quoting *Genetic Sys., 691 F. Supp. at 423*); *see also Mercer, 920 F. Supp. at 239* (requiring that the competitive activity be accomplished "by wrongful or improper means, such as fraud") (quoting *Int'l City Mgmt. Ass'n, 726 F. Supp. at 6;* citing *Restatement (Second) of Torts § 768* [*111] (same)).

PM Services can meet three (3) of the four (4) relevant *Bennett Enterprises* requirements with relative ease. As noted previously, the Court has concluded that PM Services has evidence to support a "valid business expectancy" in the 2003 Cohen & Switzer O&M contract, while it remains possible that it might have also had "valid business expectancies" in the RWA work targeted by O'Shea for OAI and in O&M work for the FOB-8 building. Given the fact that PM Services had handled O&M work for the Cohen & Switzer buildings for the previous five (5) years, the 1998 Contract was a public record, PM Services was making efforts to obtain the 2003 Contract, and PM Services had been given some assurances by the GSA that it might well be awarded that contract (assurances of which O'Shea was aware), it can be assumed that Defendants had knowledge of the relationship or expectancy. PM Services was also clearly injured, as OAI was awarded the 2003 Contract despite PM Services' past relationship, present efforts, and the representations of GSA officials.

The third prong - "intentional interference inducing or causing a breach or termination of the relationship or expectancy," *Bennett Enter., 45 F.3d at 499* [*112] - is more complex. As the *Sheppard* court described, the conduct at issue must involve egregious conduct such as "libel, slander, physical coercion, fraud, misrepresentation, or disparagement." *Sheppard, 59 F. Supp. 2d at 34* (quoting *Genetic Sys., 691 F. Supp. at 423*). Here, the

only evidence supporting an accusation that O'Shea somehow libeled, slandered, or disparaged PM Services is Teresa Simons' August 1, 2003 memorandum, which states that O'Shea allegedly "said on numerous occasions, that we could not even get supplies because [PM Services] did not pay their bills, and all their accounts were closing." P1.'s Opp'n, Ex. 1 (Aug. 1, 2003 Memo from Simons to Metour) at 1. PM Services has no evidence independent of Simons' accusations that O'Shea ever disparaged PM Services in any way, and both O'Shea and Taylor have denied PM Services' assertions in this regard. *See* Defs.' Mot. for Summ. J., Ex. 3 (O'Shea Dep.) at 85:6-14; *id.,* Ex. 9 (Taylor Dep.) at 44:10-22. Moreover, even assuming the truth of Simons' accusations, her memorandum recounts only that O'Shea disparaged PM Services to its employees at the Franconia Warehouse - it makes no reference [*113] to disparagement by O'Shea with respect to PM Services' current or prospective clients. As such, this accusation is insufficient to constitute intentional interference, as there is no causal link between the alleged disparagement and any loss of expectancy.

However, two alleged actions by Defendants might be sufficient - if proven - to meet the requirement of "egregious conduct" sufficient to establish intentional interference. First, as noted previously by the Court, a genuine issue of material fact remains as to whether Defendant O'Shea misappropriated PM Services' confidential and/or proprietary information, or breached his duty of loyalty to PM Services in other ways by knowingly and intentionally using his position and relationship to Taylor and others within the GSA to divert business opportunities away from his employer at the time to his prospective new venture with OAI. Use of this information by OAI to obtain the 2003 Cohen & Switzer contract would be sufficient to establish intentional interference with PM Services' business expectancy. Second, Odoi-Atsem's May 30, 2003 email to Scott Taylor representing that Defendant OAI had hired both O'Shea and Wehausen, along with [*114] OAI's corresponding brochure listing its employees and staffing plan, contained certain misrepresentations that - given their extent - might well constitute intentional interference as well.

In addition to "egregious conduct," the intentional interference prong also requires that the Defendants' actions induced or caused a breach or termination of the relationship or expectancy. Defendants focus on this requirement, and repeatedly stress that the GSA would have refused to award the 2003 Cohen & Switzer contract to PM Services based on its poor performance during the 1998 Contract, irrespective of the conduct of Defendants. *See supra* Section II(J)(2). However, a review of the record indicates that this argument arises wholly out of Scott Taylor's testimony, which is quite equivocal

on this issue. *See* Defs.' Mot. for Summ. J., Ex. 9 (Taylor Dep.) at 49:10-20. Moreover, given the questions remaining regarding the type and extent of Defendants' conduct, the Court finds that it cannot conclusively determine - assuming the truth of Plaintiff's contentions in light of the evidence adduced - that Defendants did not induce or cause a termination of PM Services' expectancy in the 2003 [*115] Cohen & Switzer contract. Rather, the Court concludes that a genuine issue of material fact remains as to the question of whether Defendants O'Shea and OAI intentionally interfered with PM Services' prospective economic advantage. Given that the issue remains one for the jury to decide, Plaintiff's and Defendants' corresponding Motions for Summary Judgment must therefore be denied as to Count II of Plaintiff's Complaint.

### C. O'Shea's Counterclaims

Defendant O'Shea has brought two related counterclaims, which contend that (1) PM Services violated D.C. Code § 13-1303 when it failed to pay O'Shea's base and bonus wages during the leave period immediately prior to his resignation, and (2) PM Services violated O'Shea's pension rights when it failed to make payments and/or contributions due on his behalf, see O'Shea's Answer & Countercl. PP 21-23 (Count I - Violation of D.C. Code § 32-1303), PP 24-27 (Violation of Pension Rights).

With respect to O'Shea's first counterclaim, concerning his base and bonus wages, the Court finds that a genuine issue of material fact remains, and summary judgment must therefore be denied to both parties. Two issues prevent [*116] the Court from awarding summary judgment. First, with respect to his quarterly bonus, while O'Shea is correct that PM Services did not have a policy that required employees to be present in order to be entitled to payment of bonuses earned, *see* Defs.' Stmt. P 40, PM Services is equally correct that O'Shea has failed to establish evidence that it had a *pro rata* policy with respect to bonuses, or that it had ever awarded a *pro rata* bonus previously. Indeed, the evidence on record indicates that O'Shea was the only PM Services employee receiving a quarterly bonus, and the question of whether an employee had to be "present" with the firm to receive such a bonus had never been previously presented. *See* Defs.' Mot. for Summ. J., Ex. 1 (Metour Dep.) at 248:19-254:7. Given these divergent facts, the Court has no way of concluding whether or not O'Shea was actually due his bonus.

Second, it is apparently uncontested that O'Shea was due vacation pay and wages from PM Services through June 20, 2003; indeed, Heather Metour orally promised to pay O'Shea these wages in her answering machine message, *see* Defs.' Mot. for Summ. J., Ex. 20 (Re-

cording of Heather Metour's Phone Message [*117] for O'Shea) ("We are in receipt of your resignation letter and we accept your resignation. We are looking at the resignation as effective immediately. We will pay you through the 20th."), and Carole Metour admitted in deposition that O'Shea "should have been paid vacation pay," *id.*, Ex. 1 (Metour Dep.) at 254:19-255:2. *But see id.*, Ex. 1 (Metour Dep.) at 281:10-283:5 (Metour notes that there is a dispute between whether O'Shea would be owed thirty-nine (39) hours of vacation pay, or only eighteen (18) vacation hours). However, as PM Services correctly asserts, the law is clear that [HN15] "no compensation is owed an employee who has breached his duty of loyalty" - indeed, the employer "is entitled to its return." *See Riggs Inv. Mgmt. Corp.*, 966 F. Supp. at 1266 (citing *Radio TV Reports Inc. v. Ingersoll*, 742 F. Supp. 19, 23 (D.D.C. 1990)). Given that substantial issues of material fact remain regarding whether O'Shea breached his fiduciary duty of loyalty to PM Services, which could result in an offset to the wages due him, the Court cannot grant summary judgment to either party with respect to this claim. Accordingly, Plaintiff's and Defendants' [*118] corresponding Motions for Summary Judgment must be denied with respect to O'Shea's first counterclaim.

With respect to O'Shea's second counterclaim, which concerns an accusation that PM Services violated O'Shea's pension rights when it failed to make payments and/or contributions due on his behalf, the Court must also deny summary judgment. With respect to this claim, O'Shea contends that "PM Services failed to fulfill its obligations under the collective bargaining agreement by failing to make a contribution to the IUOE's Health and Welfare Trust Fund for O'Shea's benefit for the month of June 2003." *see* O'Shea's Answer & Countercl. P 20. It is undisputed that PM Services did not make contributions on O'Shea's behalf to the Central Pension Fund for the period in question - stretching from June 4, 2003 to June 20, 2003 - despite the terms of the relevant collective bargaining agreement. *See* Defs.' Opp'n, Ex. 3 (Central Pension Funds Records) at 3. However, given the connection of this counterclaim to O'Shea's first counterclaim, and the fact that O'Shea's alleged actions might constitute a basis for PM Services to withhold these contributions as an offset, it is clear that [*119] the extent and nature of PM Services' payment obligations vis-a-vis O'Shea remains an open issue inappropriate for resolution at this time.

### D. PM Services' Damages Claim

PM Services' Complaint alleges that the company "has been damaged as a result of the damage to its relationship, contract, and prospective contracts with GSA, its prospective economic advantage with GSA, which damages include, but are not limited to, lost profits, the lost Cohen and Switzer contract, injured customer good-

will, diminished value of its contracts, and loss of reputation with its customers and potential customers, and other compensatory damages." Compl. PP 36, 41. To support a calculation of its damages theory, PM Services offered the expert report and deposition testimony of Wilber G. Van Scoik. In this case, given the existing material disputes as to liability, the issue of the adequacy of Van Scoik's expert report would only arise if PM Services succeeded on the merits of its liability claim, and then sought to establish damages. However, Defendants, in their Motion for Summary Judgment, essentially make a preemptive "motion to strike" the report by contending that Van Scoik's expert report falls [*120] well below established industry standards and fails the test established by *Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)*. To support their claim, Defendants have attached a fifteen (15) page excerpt of Van Scoik's deposition to suggest that Van Scoik himself agreed that his work was limited, incomplete, without detailed analysis, and below his usual - and the industry's - standards. *See* Defs.' Reply at 11-15. Plaintiff, in response, essentially evades the issue, failing to directly support Van Scoik's report and falling back instead on other theories of damages and excuses for the apparently incomplete nature of the report. *See* Pl.'s Resp. PP 100-125; Pl.'s Opp'n at 10-11.

At the present time, the Court shall reserve on the question of whether to strike Van Scoik's expert report. Instead, the Court shall require that Defendants present the Court with a full transcript of Van Scoik's testimony. Upon review of that testimony, the Court shall determine (1) whether further briefing on the issue is necessary, and shall notify the parties if it decides accordingly; or (2) whether enough of a conflict exists for a [*121] *Daubert* hearing before any trial in this case, and shall notify the parties if it decides accordingly in order to schedule a hearing.

## IV: CONCLUSION

For the reasons set forth above, the Court shall deny both Plaintiff PM Services' Motion for Summary Judgment and Defendants' corresponding Motion for Summary Judgment in their entireties. An Order accompanies this Memorandum Opinion.

Date: January 4, 2006

COLLEEN KOLLAR-KOTELLY
United States District Judge

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, it is, this 4th day of January, 2006, hereby

**ORDERED** that [34] Defendants' Motion for Summary Judgment is DENIED; it is further

**ORDERED** that [38] Plaintiff's Motion for Summary Judgment is DENIED; it is further

**ORDERED** that Defendants are to provide the Court with a complete copy of Mr. Wilber G. Van Scoik's deposition testimony by Wednesday, January 11, 2006, so that the Court may address the one issue on which the Court's ruling has reserved - i.e., the adequacy of Mr. Van Scoik's expert report.

**SO ORDERED.**

COLLEEN KOLLAR-KOTELLY
United States District Judge

Exhibit C

LEXSEE

**GEORGETTE H. BYNUM, Plaintiff, v. EQUITABLE MORTGAGE GROUP, et al., Defendants.**

**Civil No. 99 CV 2266-SBC-JMF**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2005 U.S. Dist. LEXIS 6363**

**April 7, 2005, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff mortgagor filed an action against defendants, an assignee of the mortgage and her broker, among others, alleging violations of, inter alia, the Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq.; the Home Ownership and Equity Protection Act (HOEPA); and the Mortgage Lender and Broker Act (MLBA), D.C. Code § 26-1101 et seq. The assignee asserted an equitable subrogation counterclaim. The parties cross-moved for summary judgment.

**OVERVIEW:** The mortgagor contended that she desired a $ 10,000 home improvement loan but was induced to acquire a $ 75,000 loan that contained undisclosed terms and exorbitant charges. The court first held that any of the mortgagor's claims against the assignee, other than her action for rescission, were precluded based on her acceptance of a Fed. R. Civ. P. 68 offer from the original mortgagee. The court then held that the mortgagor had the right to rescission under 15 U.S.C.S. § 1635(f) because when certain qualifying fees were added to the broker fee, the loan clearly qualified for HOEPA protection and because the failure to include a closing fee in the finance charge was a violation of TILA. However, the mortgagor failed to establish that the deed was invalid because the improper notarization was cured by D.C. Code Ann. § 42-403. In addition, the assignee's equitable subrogation counterclaim failed because 15 U.S.C.S. § 1635(b) governed in TILA actions. Finally, the court held that the mortgagor's claims against her broker for, inter alia, promissory estoppel, conversion, and breach of fiduciary claim failed because she failed to establish the necessary elements for her claims.

**OUTCOME:** The assignees' motion for summary judgment on the substantive HOEPA, TILA, and state law claims (except rescission) was granted. The mortgagor's request for declaratory relief was granted, and the court declared the loan was governed by HOEPA. The parties were ordered to brief TILA's application to the mortgagor's rescission claim, and the broker's partial summary judgment motion was granted.

**CORE TERMS:** equitable, rescission, lender, borrower, summary judgment, settlement, deed of trust, broker, assignee, security interest, mortgage, deed, finance charge, disclosure, finance, summary judgment motion, acknowledgment, home improvement, consumer, obligor, right to rescind, calculation, rescind, notarization, total loan, contractor, genuine issue of material fact, loan application, promissory estoppel, recordation

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Opposition > General Overview*
*Civil Procedure > Summary Judgment > Standards > Materiality*
[HN1] See U.S. Dist. Ct., D. D.C., Civ. R. 56.1, 7(h).

*Civil Procedure > Pleading & Practice > Pleadings > General Overview*
*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > General Overview*
[HN2] Where matters outside the complaint are presented to the court in support of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such motion shall be treated as a motion for summary judgment and disposed of under Fed. R. Civ. P. 56. When addressing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court may not consider facts outside the four corners of the complaint

unless it treats the motion to dismiss as a motion for summary judgment. Fed. R. Civ. P. 12.

**Civil Procedure > Summary Judgment > Burdens of Production & Proof > Scintilla Rule**
**Civil Procedure > Summary Judgment > Standards > Appropriateness**
**Civil Procedure > Summary Judgment > Supporting Materials > Affidavits**
[HN3] Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Once a moving party meets its burden, the non-movant must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the opposing party; however the non-movant must establish more than the existence of a mere scintilla of evidence in support of its position. Fed. R. Civ. P. 56(c). The non-movant may not rely solely on allegations or conclusory statements, and if the non-movant's evidence is merely colorable or is not significantly probative, summary judgment may be granted.

**Antitrust & Trade Law > Clayton Act > Defenses**
**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Transfers > General Overview**
[HN4] Generally, the Home Ownership and Equity Protection Act (HOEPA) subjects mortgage assignees to increased liability for HOEPA loans. Congress enacted HOEPA to force the high cost mortgage market to police itself, and made HOEPA loan assignees subject to all claims and defenses, whether under the Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., or other law, that could be raised against the original lender. Ordinarily, a HOEPA loan assignee's argument that it is not liable for the mistakes of the assignor is without merit.

**Civil Procedure > Settlements > Offers of Judgment > Time Limitations**
[HN5] See Fed. R. Civ. P. 68.

**Civil Procedure > Settlements > Offers of Judgment > Acceptances**

**Civil Procedure > Settlements > Offers of Judgment > Making of Offers**
**Civil Procedure > Judgments > General Overview**
[HN6] An accepted Fed. R. Civ. P. 68 offer of judgment constitutes a settlement between the parties making and accepting the offer. A Rule 68 judgment that does not dispose of all claims and parties does not constitute a final judgment against all claims and parties.

**Contracts Law > Performance > Novation**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Transfers > General Overview**
[HN7] An assignee merely steps into the shoes of the assignor. Accordingly, an assignee's liability can be no greater than the assignor's.

**Banking Law > Consumer Protection > Truth in Lending > Disclosure**
**Governments > Legislation > Statutory Remedies & Rights**
**Real Property Law > Financing > Secondary Financing > Lien Priorities**
[HN8] A consumer credit transaction secured by the consumer's principal dwelling is considered a high cost mortgage covered by the Home Ownership and Equity Protection Act (HOEPA) when points and fees payable by the consumer at closing exceed 8 percent of the total loan amount. 15 U.S.C.S. § 1602(aa). A high cost mortgage under § 1602(aa) subjects the consumer to HOEPA protections and requirements, including the provision of specific disclosures. 15 U.S.C.S. §§ 1639(a)-(b), 1641. The required disclosures must be made not less than three business days prior to the transaction's consummation. 15 U.S.C.S. § 1639(b)(1). If not disclosed in a timely manner, the consumer acquires a statutory right to rescind the transaction. 15 U.S.C.S. § 1635(a),(f). The Act provides the right to rescind exists against the original lender as well as any subsequent assignee. 15 U.S.C.S. § 1641(c).

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act**
[HN9] The total loan amount, for purposes of the Home Ownership and Equity Protection Act (HOEPA), is calculated by subtracting points and fees from the amount financed. The HOEPA 8 percent trigger is then calculated by using the formula: (1) principal amount of the loan -- total points and fees = total loan amount; (2) total loan amount x .08 = HOEPA trigger amount.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Real Property Law > Brokers > Right to Commissions*
*Real Property Law > Financing > Mortgages & Other Security Instruments > General Overview*
[HN10] Points and fees, for purposes of the Home Ownership and Equity Protection Act (HOEPA), generally include: (1) all finance charges; (2) compensation paid to mortgage brokers; and (3) costs listed in 15 U.S.C.S. § 1605(e) unless the charge is reasonable, the creditor receives no direct or indirect compensation, and the charge is paid to a third party unaffiliated with the creditor. 15 U.S.C.S. § 1602(aa)(4); 12 C.F.R. § 226.32(b)(1). Thus, HOEPA points and fees include finance charges imposed by creditors and third parties, fees paid to mortgage brokers, and real estate fees unless the real estate fees are reasonable and compensate neither the creditor nor the creditor's affiliate.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act*
[HN11] Flood certification inspection fees are not included in a Home Ownership and Equity Protection Act (HOEPA) points and fees calculations when the fee is reasonable and when the fee is not paid to the creditor. 15 U.S.C.S § 1605(e)(5); 12 C.F.R. § § 226.4(c)(7)(iv), 226.32(b)(1)(iii).

*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Mortgagee's Interests*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Mortgagor's Interests*
[HN12] D.C. Code Ann. § 1115(b) prohibits a lender from requiring the escrow of hazard insurance if the borrower has equity worth more than 20 percent of the property's fair market value.

*Real Property Law > Brokers > Discipline, Licensing & Regulation*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN13] The District of Columbia Mortgage Lender and Broker Act, D.C. Code Ann. § 26-1101 et seq., clearly applies to all licensed mortgage lenders.

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN14] See 12 C.F.R. § 226.4(a)(2).

*Banking Law > Consumer Protection > Truth in Lending > Disclosure*
*Real Property Law > Financing > Federal Regulations > Home Owners Equity Protection Act*
[HN15] The amount financed under the Home Ownership and Equity Protection Act constitutes the amount of credit provided to the borrower. 12 C.F.R. § 226.18(b). The finance charge constitutes the cost charged to the borrower for making the loan, including interest over the life of the loan and up-front charges. 12 C.F.R. § 226.4(a).

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN16] See 15 U.S.C.S. § 1605(a).

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
[HN17] Failure to disclose the proper finance charge and amount financed constitutes a material violation that entitles the borrower to rescind the loan within three years of the transaction's consummation. 15 U.S.C.S. § 1635(a), (f); 15 U.S.C.S. § 1602(u). A single violation of the Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., even if technical, extends a borrower's period of rescission. Generally, for rescission purposes, disclosure of the finance charge shall be treated as accurate if the amount disclosed does not vary from the actual finance charge by more than one-half of one percent of the total amount of credit extended. 15 U.S.C.S. § 1602(f)(2)(a). If a borrower rescinds after initiation of foreclosure proceedings, the disclosure of the finance charge shall be treated as accurate if the amount disclosed does not vary from the actual finance charge by more than $ 35. 15 U.S.C.S. § 1635(i)(2).

*Banking Law > Consumer Protection > Truth in Lending > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN18] While 15 U.S.C.S. § 1605(a) provides finance charges do not include fees and amounts imposed by third party closing agents, the exclusion only applies if the creditor does not require the imposition of the charges. In general, fees charged by third party closing agents are finance charges when the creditor requires the

particular services for which the consumer is charged. 12 C.F.R. § 226.4(a)(2)(i).

**Governments > Courts > Judicial Precedents**
[HN19] The United States District Court for the District of Columbia is not bound by a decision of the Superior Court of the District of Columbia.

**Contracts Law > Negotiable Instruments > Dishonor & Presentment > Protests**
**Governments > State & Territorial Governments > Licenses**
**Real Property Law > Deeds > Enforceability**
[HN20] Under District of Columbia law, a notarial act includes taking an acknowledgment, administering an oath or affirmation, taking a verification upon oath or affirmation, witnessing or attesting a signature, noting a protest of a negotiable instrument, or any other similar act authorized by law. D.C. Code Ann. § 42-141(4). Notarial acts pertain to witnessing and acknowledging that the person who appears before the officer and makes the acknowledgment is the person whose true signature is on the instrument. D.C. Code Ann. § 42-142(a).

**Governments > State & Territorial Governments > Licenses**
**Real Property Law > Deeds > Enforceability**
[HN21] See D.C. Code Ann. § 42-204.

**Governments > State & Territorial Governments > Licenses**
**Real Property Law > Deeds > Enforceability**
**Real Property Law > Deeds > Execution Formalities**
[HN22] An improper notarization affects an acknowledgment, but the D.C. Code does not mandate invalidation of a deed on account of an improper acknowledgment.

**Real Property Law > Deeds > Covenants of Title**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**
[HN23] The District of Columbia distinguishes between absolute deeds, and mortgages or deeds of trust.

**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**
[HN24] See D.C. Code Ann. § 42-801.

**Real Property Law > Deeds > Covenants of Title**
**Real Property Law > Deeds > Enforceability**
[HN25] D.C. Code Ann. § 42-801's provision that a deed of trust "may be acknowledged and recorded" in the same manner as absolute deeds implies that the acknowledgment pertains to recordability of the instrument as opposed to validity.

**Real Property Law > Deeds > Enforceability**
[HN26] D.C. Code Ann. § 42-407 provides the recorder of deeds shall not record an instrument if improperly acknowledged.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
[HN27] 15 U.S.C.S. § 1635(b) of the Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., governs the return of money or property when a borrower exercises a right to rescind under the Act.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
[HN28] See 15 U.S.C.S. § 1635(b).

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
**Contracts Law > Secured Transactions > General Overview**
[HN29] According to 15 U.S.C.S. § 1635(b), a security interest becomes void upon rescission and a borrower is no longer liable for any finance or other charges. Within 20 days of receiving notice of rescission, the creditor is to return any money or property and reflect termination of the security interest. When the creditor has met these obligations, the borrower is to tender the property. The sequence of rescission and tender must be followed unless the court directs otherwise. 15 U.S.C.S. § 1635(b).

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
[HN30] 15 U.S.C.S. § 1635(b) is clearly designed to restore the parties as much as possible to the status quo ante. A court may condition the granting of rescission upon plaintiff's repayment of the principal amount of the loan to the creditor.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**

[HN31] The Truth in Lending Act's (TILA), 15 U.S.C.S. § 1601 et seq., statutory rescission procedures do not alter the equitable nature of the rescission remedy. Courts are free to exercise equitable discretion to modify rescission procedures, and rescission under TILA may be conditioned on the debtor's return of any money or property received. The court may impose conditions on rescission that assure the borrower meets her obligations once the creditor has performed its obligations. Nevertheless, whether to alter the sequence of § 15 U.S.C.S. § 1635's procedures and whether to place conditions upon the release of the security interest, requires case by case consideration. Factors to consider include the Act's underlying legislative policy requiring full disclosure, the remedial penal nature of the Act's remedies, the egregiousness of the TILA violations, and the nature of benefits received.

**Banking Law > Consumer Protection > Truth in Lending > General Overview**
[HN32] A security interest becomes void under 15 U.S.C.S. § 1635 when the creditor acknowledges the right to rescind or when the appropriate decision maker determines a right to rescind is available, not when the borrower merely asserts right to rescind.

**Antitrust & Trade Law > Private Actions > Costs & Attorney Fees > Clayton Act**
**Banking Law > Consumer Protection > Truth in Lending > Liability**
**Civil Procedure > Remedies > Costs & Attorney Fees > Attorney Expenses & Fees > Statutory Awards**
[HN33] The Truth in Lending Act's (TILA), 15 U.S.C.S. § 1601 et seq., provides that a right to rescind against the original lender also applies to any assignee. 15 U.S.C.S. § 1641(c). Typically, a creditor's failure to respond to a rescission notice pursuant to 15 U.S.C.S. § 1635(b), constitutes a separate violation of the Act. 15 U.S.C.S. § 1635(g). However, although 15 U.S.C.S. § 1641(c) provides that a material violation by a creditor creates a right to rescind against the creditor's assignee, TILA's civil liability provision only permits creditors' to beheld liable for a monetary penalty or award of attorney's fees for a TILA violation. 15 U.S.C.S. § 1640(a). Neither 15 U.S.C.S. § 1641(c) nor any other violation of TILA provides for a statutory penalty or award of attorney's fees against an assignee for failure to respond to a valid rescission notice.

**Contracts Law > Negotiable Instruments > Enforcement > Duties & Liabilities of Parties > Conversion of Instruments**

**Criminal Law & Procedure > Accessories > Aiding & Abetting**
**Torts > Intentional Torts > Conversion > Elements**
[HN34] The elements of conversion are: (1) the unlawful exercise, (2) of ownership, dominion, or control, (3) of another's personal property, (4) in denial or repudiation of that person's property rights.

**Torts > Procedure > Multiple Defendants > Concerted Action > Civil Aiding & Abetting**
**Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > General Overview**
[HN35] The District of Columbia does not recognize independent causes of action for civil conspiracy or aiding and abetting.

**Criminal Law & Procedure > Criminal Offenses > Inchoate Crimes > Conspiracy > Elements**
**Torts > Procedure > Multiple Defendants > Concerted Action > Civil Conspiracy > Elements**
[HN36] The elements of civil conspiracy are: (1) an agreement between two or more persons, (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) injury caused by a party to the agreement's actions, (4) pursuant to and in furtherance of the common scheme.

**Contracts Law > Consideration > Promissory Estoppel**
**Contracts Law > Types of Contracts > General Overview**
[HN37] A party may not assert a promissory estoppel claim where there is an enforceable contract.

**Contracts Law > Consideration > Detrimental Reliance**
**Contracts Law > Consideration > Enforcement of Promises > General Overview**
**Contracts Law > Consideration > Promissory Estoppel**
[HN38] The requisite elements for promissory estoppel are (1) a promise; (2) reasonable reliance on the promise; (3) injury due to detrimental reliance; and (4) enforcement would be in the public interest and would prevent injustice.

**Governments > Legislation > Statutory Remedies & Rights**
**Labor & Employment Law > Wage & Hour Laws > Remedies > General Overview**
**Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation**

[HN39] D.C. Code Ann. § 26-1113(a)(1) provides that a licensee -- defined in D.C. Code Ann. § 26-1101(8) to include mortgage brokers and lenders -- shall provide the borrower with a financing agreement executed by the lender. D.C. Code Ann. § 26-1113(b)(1) provides the financing agreement executed by the lender shall be delivered to the borrower at least 72 hours before settlement. However, a borrower aggrieved by any violation of this section shall be entitled to bring a civil suit against the lender. D.C. Code Ann. § 26-1113(b)(3). Accordingly, § 26-1113 does not provide a private cause of action against mortgage brokers.

*Governments > Legislation > Statutory Remedies & Rights*
*Real Property Law > Brokers > Discipline, Licensing & Regulation*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN40] D.C. Code Ann. § 26-1118 delineates the actions the Superintendent of the Office of Banking and Financial Institutions may pursue to suspend, revoke and enforce violations of the statute, but provides individuals are not precluded from bringing actions to recover for violations. D.C. Code Ann. § 26-1118 does not affect D.C. Code Ann. § 26-1113(b)(3)'s express provision of a cause of action against only lenders.

*Governments > Legislation > Interpretation*
[HN41] A basic rule of statutory construction, expression unius est exclusion alterius, provides that when a legislature makes express mention of one thing, the exclusion of other is implied.

*Banking Law > Consumer Protection > State Law > Remedies*
*Criminal Law & Procedure > Criminal Offenses > Sex Crimes > General Overview*
*Real Property Law > Financing > Mortgages & Other Security Instruments > Definitions & Interpretation*
[HN42] The Consumer Protection Procedures Act (CPPA), D.C. Code Ann. § 28-3901 et seq., is a comprehensive statute with an extensive regulatory framework designed to remedy all improper trade practices. The CPPA applies to home mortgage finance transactions.

*Criminal Law & Procedure > Criminal Offenses > Sex Crimes > Child Pornography > General Overview*
*Evidence > Procedural Considerations > Burdens of Proof > General Overview*

*Torts > Business Torts > Fraud & Misrepresentation > General Overview*
[HN43] A claim for fraudulent or intentional misrepresentation under the Consumer Protection Procedures Act (CPPA), D.C. Code Ann. § 28-3901 et seq., requires the same burden of proof as does a common law claim for such misrepresentation -- the clear and convincing standard.

**COUNSEL:**   [*1]   For GEORGETTE H. BYNUM, Plaintiff: James T. Sugarman, AMERICAN ASSOCIATION OF RETIRED PERSONS, Legal Counsel for the Elderly Department, Washington, DC.

For FIRST GOVERNMENT MORTGAGE AND INVESTORS CORPORATION, Defendant: Nathan I. Finkelstein, FINKELSTEIN & HORVITZ, Bethesda, MD.

For EQUITATABLE MORTGAGE GROUP INC, Defendant: Seymour Glanzer, DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP, Washington, DC.

For CONTIMORTGAGE CORP, Cross Claimant: Griffin Vann Canada, Jr., MILES & STOCKBRIDGE, Rockville, MD.

For FIRST GOVERNMENT MORTGAGE AND INVESTORS CORPORATION, Cross Defendant: Nathan I. Finkelstein, FINKELSTEIN & HORVITZ, Bethesda, MD.

For EQUITATABLE MORTGAGE GROUP INC, Cross Defendant: Seymour Glanzer, DICKSTEIN SHAPIRO MORIN & OSHINSKY LLP, Washington, DC.

For GEORGETTE H. BYNUM, Counter Defendant: James T. Sugarman, AMERICAN ASSOCIATION OF RETIRED PERSONS, Legal Counsel for the Elderly Department, Washington, DC.

For VALLEY TITLE CO INC, Defendant: Joseph Frank Cunningham, Arlington, VA.

For MANUFACTURERS & TRADERS TRUST COMPANY, Defendant: David Adam Rosen, BIERMAN, GEESING & WARD, LLC, Bethesda, MD; Griffin Vann Canada, Jr., MILES & STOCKBRIDGE, [*2] Rockville, MD.

**JUDGES:** Suzzane B. Conlon, United States District Judge.

**OPINION BY:** Suzzane B. Conlon

## OPINION:

### MEMORANDUM OPINION AND ORDER

Georgette Bynum, a paralyzed, seventy-nine year old widow, brings suit over the refinancing of her home mortgage. Bynum contends she desired a $ 10,000 home improvement loan but was induced to acquire a $ 75,000 loan that contained undisclosed terms and exorbitant changes. Bynum asserts she did not receive money for home repairs, and that she was unable to afford the mortgage. Foreclosure proceedings were instituted against her.

Bynum sues Manufacturers and Traders Trust ("Manufacturers"), holder and assignee of her mortgage, for violating the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., the Home Ownership and Equity Protection Act ("HOEPA"), codified as amendments to TILA, the District of Columbia Interest and Usury Statute, D.C. Code § 28-3301(f), the District of Columbia Mortgage Lender and Broker Act("MLBA"), D.C. Code § 26-1101 et seq., the District of Columbia Consumer Protections Procedure Act ("CPPA"), D.C. Code § 28-3901 [*3] et seq., and for rescission, fraud and breach of contract. See 3rd Am. Compl. at Counts I-VI, IX-X. Manufacturers asserts an equitable subrogation counter-claim.

Bynum sues Equitable Mortgage Group, Inc. ("Equitable"), her mortgage broker, under the MLBA and CPPA, and for promissory estoppel, breach of fiduciary duty and conversion, conspiracy to convert and aiding and abetting conversion. See 3rd Am. Compl. at Counts VII-XI. Finally, Bynum sues Dimarcus Waldo, proprietor of Dutchmans Home Improvement Co., under the CPPA and for conversion, conspiracy to convert and aiding/abetting conversion. See 3rd Am. Compl. at Counts VII, X Bynum seeks damages, rescission and declaratory relief. Only two defendants remain. n1 Before the court are Manufacturers' motions to dismiss and for summary judgment, Equitable's motion for summary judgment, and Bynum's motion for partial summary judgment. n2

n1 Bynum originally sued First Government Mortgage and Investors Corp., ContiMortgage Corp., Valley Title Co., Equitable Mortgage and Waldo/Dutchmans. Bynum accepted First Government's Rule 68 offer of judgment. Dkt. No. 22-1. ContiMortgage filed a suggestion of bankruptcy; Manufacturers intervened in ContiMortgage's place and ContiMortgage was dismissed. Dkt. No. 62-1. Summary judgment was granted in Valley Title's favor. Dkt 63-1. The clerk entered default against Waldo on 9/23/03. Dkt. No.

82-1. Bynum's motion to file a third amended complaint against defendants Manufacturers, Equitable and Waldo/Dutchmans was granted on 12/31/03. Dkt. No. 94-1. Manufacturers and Equitable answered the third amended complaint. Dkt. 101, 106.

[*4]

n2 On March 11, 2005, this case was reassigned by the Chief Justice of the United States to the Honorable Suzanne B. Conlon, District Judge for the Northern District of Illinois. See Dkt. No. 125.

## BACKGROUND

### A. Loan Application with Equitable

The following material facts are undisputed unless otherwise noted. n3 Georgetta Bynum resides in Washington, D.C. In 1997, Bynum contacted Equitable, a licensed mortgage broker, about refinancing her home mortgage. Bynam had previously refinanced her mortgage on three occasions, and sought a fourth refinancing to obtain $ 10,000 in cash for home improvements. On November 18, 1997, Bynum signed several documents provided by Equitable, including: (1) a loan application that reflected an estimated total loan amount of $ 85,000 and a prospective interest rate of 9.99%; (2) an agreement to obtain a loan commitment, which identified Equitable as a mortgage broker, set forward the brokerage agreement terms between Bynum and Equitable, estimated an $ 8,000 broker fee due at closing, and declared Equitable did not owe Bynum a fiduciary duty; and [*5] (3) a good faith estimate of the costs and fees Bynum would face in connection with the loan. See Equitable Exs. K, L-M. The documents Bynum signed and dated November 18, 1997, are also signed and dated by Equitable representative Kenneth Thompson. See id The loan application reflects it was obtained in a "face to face interview." See id. at Ex. K. Thompson contends he met with Bynum at her home on November 18, 1997, where he explained the documents to her, explained Equitable's status as a broker who would help her find a lender, and answered her questions. Thompson submits a detailed affidavit describing his meeting with Bynum. Equitable Ex. B. At her deposition, Bynum did not recall meeting with Thompson; her affidavit attests Thompson did not come to her home. See Bynum. Ex. A at P 4; Ex. B at 11-12.

n3 Bynum fails to respond to Equitable's statement of undisputed facts as required by local

rules. See L.R. 7(h); 56.1 (opposition to summary judgment "shall be accompanied by a separate concise statement of genuine issues" of material fact). Equitable's statement of facts is deemed admitted. *See* [HN1] L.R. 56.1, 7(h) ("In determining a motion for summary judgment the court may assume that facts identified by me moving party in its statement of material facts are deemed admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion"); *Twist v. Meese*, 272 U.S. App. D.C. 204, 854 F.2d 1421, 1425 (D.C. Cir. 1988); *Flowers v. Internal Revenue Serv.*, 307 F. Supp. 2d 60, 62 n.1 (D.D.C. 2004).

[*6]

Bynum's refinancing loan application and background financial information were submitted to Thompson's supervisor, Charles Ruiz, and to First Government, a mortgage leader. First Government agreed to offer Bynum a $ 75,000 refinancing loan at a 9.9% interest rate. Bynum initially qualified for and accepted a 10.5% interest rate, but First Government lowered the rate when Equitable voluntarily surrendered a portion of its own compensation to allow her the benefit of the reduced rate. As a result, Equitable ultimately received a $ 5,475 fee instead of the originally estimated $ 8,000 fee. Alter forwarding the materials to First Government, Equitable had no further involvement in the negotiation, structure and settlement of Bynum's loan.

**B. Loan Settlement with First Government and Valley Title**

Settlement of the refinancing loan occurred at Bynum's home on February 28, 1998, Prior to settlement, First Government provided Bynum with a finance agreement and loan commitment, which set forth the $ 75,000 loan amount, term, interest rate and annual percentage rate of Bynum's loan. Bynum signed and initialed each document. Alan Friedman, a settlement agent with Valley Title Company, [*7] reviewed First Government's loan documents with Bynum, as well as the HUD-1 statement that Valley Title prepared pursuant to First Government's instructions. Bynum signed the documents Friedman presented including: (1) the HUD-1 statement reflecting the final terms of the loan, including the amount, term, interest rate and fees and charges; and (2) a letter to Wilshire Credit regarding payoff of her prior mortgage loan. Bynum executed a deed of trust securing repayment of the $ 75,000 loan by encumbering her properly and a promissory note evidencing the $ 75,000 loan made to her by First Government. At the conclusion of settlement, Friedman signed a settlement agent affidavit before a notary public attesting Bynum signed the refinancing documents. Further, Friedman

notarized Bynum's deed of trust His notary seal reflects he is a certified notary in "Baltimore County, Maryland."

Bynum's home was given a $ 130,000 appraisal value. The February 28th settlement reflects insurance and property reserve charges. Bynum did not receive a separate written statement indicating that she could pay taxes and insurance directly, nor did she receive a HOEPA early warning disclosure at least three [*8] days before settlement. Bynum had previously executed a promissory note in the principal amount of $ 62,000 payable to Crusader Savings Bank, the repayment of which was secured by a deed of trust encumbering the property. Accordingly, Bynum's loan from First Government refinanced the loan secured by the Crusader deed of trust. The proceeds of the loan executed by the First Government deed of trust paid: (1) $ 53,417.24 to retire Bynum's Crusader deed of trust; and (2) $ 3,680.81 to the District of Columbia to fully pay delinquent real estate taxes.

**C. Bynum Endorses Her Loan Check**

Shortly following settlement, Bynum received a $ 9,162.55 check from Valley Title dated March 5, 1998. The check was made payable to Bynum and reflected the funds generated to her from the refinancing. After receiving the check from Valley Title, a man named Tim Byrd came to Bynum's home. Bynum had previously met with Byrd on several occasions to discuss her desired home improvements. Byrd told Bynum he worked for Equitable. Byrd pressured Bynum to endorse the check and told her the repair work would not begin unless she gave the check to him. He further indicated the check would be placed in an escrow [*9] account. When Bynum resisted Byrd's request, he purportedly telephoned his boss, who spoke with Bynum and informed her the endorsed check was needed for her home repairs. Bynum endorsed the check and gave it to Byrd. No repair work was done to Bynum's home.

Bynum telephoned First Government, the Better Business Bureau, her District of Columbia council member and Equitable regarding Byrd's actions. Upon calling Equitable, Bynum spoke with Ruiz. She explained that she had signed the check and given it to Byrd, who told her he worked for Equitable, and Bynum admitted Byrd had not presented her with a business card or any paperwork evidencing a relationship with Equitable. Nevertheless, Ruiz told Bynum he would try to locate Byrd to find out what happened to her check and why the home repair work was not done. Ruiz first spoke to Thompson, who

did not know anything about Bynum's home improvement work or her incident with [*10] Byrd. Ruiz then contacted Dimarcus Waldo, Dutchmans' owner, who told Ruiz that Byrd had cashed the check and disappeared. Ruiz forwarded Waldo's explanation to Bynum. Equitable had no further contact with Bynum.

Equitable never employed Byrd. Dutchmans' bank records subsequently established that Bynum's check was improperly negotiated for deposit into Dutchmans' account, and was altered by an unauthorized party to read "Dutchmans. For Deposit Only" above Bynum's signature. Bynum acknowledges Dutchmans received the check proceeds.

### D. Assignment of Bynum's Promissory Note and Deed of Trust

First Government subsequently assigned Bynum's promissory note and deed of trust to ContiMortgage. ContiMortgage filed a suggestion of bankruptcy and Manufacturers became the holder of the February 28th promissory note and deed of trust. n4 Manufacturers was not involved in the application or closing of Bynum's loan. Bynum ceased making payments on the loan after February 5, 1999, and foreclosure proceedings were initiated. Bynum sent a letter to ContiMortgage and First Government on August 3, 1999, providing notice of her intent to rescind and cancel the note and deed of trust.

n4 Manufacturers admits that it is the holder of the note. *See* Manufacturers Statement of Facts at P 2. Bynum asserts she does not know whether Manufacturers is the holder of the note and deed of trust. *See* Bynum Resp. to Manufacturers Facts at P 2. Nevertheless, Bynum contends Manufacturers' liability stems from its status as assignee of the note and deed of trust. *Id.* at P 4. Given Bynum's pursuit of her claims against Manufacturers as assignee, Manufacturers' possession of the note and deed of trust is deemed admitted.

[*11]

### DISCUSSION

### I. Motion to Dismiss

On January 15, 2004, Manufacturers moved to dismiss Counts I-VI, VIII of the complaint pursuant to Rule 12(b)(6). Manufacturers answered Bynum's third amended complaint on February 24, 2004, Manufacturers' summary judgment motion on Counts IX-X was filed on March 17, 2004. [HN2] "Where matters outside the complaint are presented to the court in support of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), such motion shall be treated as a motion for summary judgment

and disposed of under Fed. R. Civ. P. 56." *Romero-Ostolaza v. Ridge*, 370 F. Supp. 2d 139, 2005 U.S. Dist. LEXIS 5189, *2 , No. 03-1890 (D.D.C. 2005). When addressing a motion to dismiss under Rule 12(b)(6), the court may not consider facts outside the four corners of the complaint unless it treats the motion to dismiss as a motion for summary judgment. *See* Fed. R. Civ. P. 12; *Currier v. Postmaster Gen.*, 353 U.S. App. D.C. 272, 304 F.3d 87, 88 (D.C. Cir. 2002). Manufacturers' motion to dismiss and Bynum's response require consideration of matters outside the complaint [*12] and will be treated as a summary judgment motion.

### II. Legal Standard

[HN3] Summary judgment is appropriate when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P.56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548(1986). Once a moving party meets its burden, the non-movant must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 US. at 248*. The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the opposing party, however the non-movant must establish more than the existence of a mere scintilla of evidence in support of its position. Fed. R. Civ. P. 56(c); *Anderson, 477 U.S. at 252*; [*13] *Celotex, 477 U.S. at 325*. The non-movant may not rely solely on allegations or conclusory statements, and if the non-movant's evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson, 477 U.S. at 249-50*; *Greene v. Dalton*, 334 U.S. App. D.C. 92, 164 F.3d 671, 675 (D.C. Cir. 1999).

### III. Bynum's Substantive Claims Against Manufacturers -- Assignee Liability

Manufacturers argues it is entitled to summary judgment on all of Bynum's substantive HOEPA, TILA and state law claims because Bynum accepted First Government's Rule 68 offer of judgment. Manufacturers asserts it is a privy to First Government, the alleged offending party, as assignee of Bynum's note and security interest. Because Bynum has recovered for First Government's liability. Manufacturers contends Bynum may not pursue claims against it as assignee. Manufacturers argues Bynum has recovered for any of First Government's substantive violations of law, and is not entitled to recover twice for the same alleged wrongful conduct

Bynum contends an assignee of a HOEPA loan is subject to liability for any claim that could be asserted against the original [*14] lender, and that a Rule 68 judgment accepted on behalf of one defendant does not resolve the claims against all defendants. Bynum's claims must be rejected.

[HN4] Generally, HOEPA subjects mortgage assignees to increased liability for HOEPA loans. *Cooper v. First Gov't Mortgage and Investors Corp.*, 238 F. Supp. 2d 50, 55-56 (D.D.C. 2002). Congress enacted HOEPA to force the high cost mortgage market to police itself, and made HOEPA loan assignees subject to "all claims and defenses, whether tinder TILA or other law, that could be raised against the original lender." *Id.* Ordinarily, a HOEPA loan assignee's argument that it is not liable for the mistakes of the assignor is without merit. *See Cooper*, 238 F. Supp. 2d at 55-56; *see also In re Rodrigues*, 278 B.R. 683, 688 (Bankr. R.L.2002). It is not clear, however, how a Rule 68 judgment against the original lender affects assignee liability for the lender's substantive violations of the Act.

[HN5] Rule 68 provides:

At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the [*15] defending party for the money or properly or to the effect specified in the offer, with costs then accrued.

Therefore, Bynum correctly notes that [HN6] an accepted Rule 68 offer of judgment constitutes a settlement between the parties making and accepting the offer. *See e.g.*, *Marek v. Chesny*, 473 U.S. 1, 5, 87 L. Ed. 2d 1, 105 S. Ct. 3012 (1985) (characterizing Rule 68 offer as pretrial settlement and stating "the plain purpose of Rule 68 is to encourage settlement and avoid litigation"); *Delta Airlines v. August*, 450 U.S. 346, 350, 67 L. Ed. 2d 287, 101 S. Ct. 1146 (Rule 68 pertains to settlement offers). A Rule 68 judgment that docs not dispose of all claims and parties does not constitute a final judgment against all claims and parties. *See e.g.*, *Acceptance Indent, Ins. Co. v. Southeastern Forge, Inc.*, 209 F.R.D. 697, 699-700 (M.D. Ga. 2002) (reading Rule 68 in light of Rule 54(b) and holding accepted Rule 68 offer not a final judgment against any party that did not participate in the offer).

The fact that a Rule 68 judgment with one party does not automatically bar claims against other parties is the reason. Bynum's claims against Equitable *are* not subject to dismissal based on her acceptance [*16] of

First Government's offer of judgment However, Bynum's claims against Manufacturers are exclusively premised on its relationship as assignee and holder of First Government's note. Bynum's acceptance of First Government's offer of judgment was predicated on her understanding that First Government did not hold her loan and was thus unable to provide her with the rescission, remedy. *See* Equitable Mem. Ex. U. Therefore, First Government's offer of judgment did not resolve Bynum's rescission claim. However, while Bynum's acceptance further purported to reserve her other claims against Manufacturers, her acceptance stated that the offer of judgment is "a resolution of First Government's liability in this matter." *Id.* In exchange for her release of all claims and resolving First Government's liability, Bynum received $ 3,600. Thereafter, she dropped all claims against First Government.

[HN7] An assignee merely steps into the shoes of the assignor. *See e.g.*, *SEC v. Bilzerian*, 363 U.S. App. D.C. 143, 378 F.3d 1100, 1108 (D.C. Cir. 2004). Accordingly, an assignee's liability can be no greater than the assignor's. While the Act provides an assignee is subject to any claims that may be brought against [*17] the assignor, Bynum may no longer bring her claims against the assignor -- she has obtained, a judgment on those claims. Bynum makes no claim that Manufacturers independently violated her rights under federal and state law. Rather, all claims are based on First Government's actions, for which she received full satisfaction. By maintaining her substantive claims against Manufacturers, Bynum seeks a double recovery for the lender's violations. Accordingly, Manufacturers' summary judgment motion on Bynum's substantive HOEPA, TILA and state law claims (except rescission) must be granted.

## IV. Bynum's Rescission Claims Against Manufacturers

Bynum moves for summary judgment on her claims that she validly rescinded the deed of trust under TILA, HOEPA and on account of improper notarization. Specifically, Bynum alleges her mortgage constitutes a high cost loan under HOEPA, 15 U.S.C. § 1602(aa). Bynum contends she validly rescinded the deed of trust on August 9, 1999 under §§ 1635(a), (f), 1639(b)(1) and 1602(u) because First Government failed to make required disclosures three or more days prior to the transaction's completion in violation of § 1639(b)(1). [*18] Bynum further argues the rescission was valid under TILA because First Government failed to accurately disclose and characterize the loan's finance charges and amount financed under §§ 1632(a), 1635. Accordingly, Bynum moves for summary judgment on her rescission claim against Manufacturers as holder of (he promissory note and deed of trust Finally, Bynum contends the deed

is invalid because it was illegally notarized under D.C. Code § § 42-401, 42-404. Specifically, Bynum contends Friedman's notarial acts were improper because he was not certified by the District of Columbia. Bynum contends the improper notarization invalidates the February 29, 1998 conveyance.

Manufacturers contends Bynum's loan is not covered by HOEPA. Further, Manufacturers asserts the TILA disclosures were proper and Bynum's right to rescind expired three days after settlement Manufacturers admits the notarization should have been completed by a District of Columbia notary, but contends the error should be considered an. omission of acknowledgment under D.C. Code § § 42-403, 42-404(a)(1), not warranting voidance of the deed. In the event the court finds Bynum properly [*19] rescinded the deed or that the deed is invalid, Manufacturers seeks summary judgment on its equitable mortgage counterclaim.

### A. Background

Congress enacted TILA to prevent consumers from being misled as to financing costs and to assure a meaningful disclosure of credit terms. *See Cooper v. First Gov't Mortg. & Investors Corp.*, 238 F. Supp. 2d 50, 54 (D.D.C. 2002). Faced with increasing reports of abusive practices in home mortgage lending, Congress amended TILA and enacted HOEPA to require greater disclosures to borrowers involved in high cost loans and to stop certain loan terms and practices. n5 *Id.* [HN8] A consumer credit transaction secured by the consumer's principal dwelling is considered a high cost mortgage covered by HOEPA when points and fees payable by the consumer at closing exceed 8% of the total loan amount. 15 U.S.C. § 1602(aa). A high cost mortgage under § 1602(aa) subjects the consumer to HOEPA protections and requirements, including the provision of specific disclosures. *See Id.* at § § 1639(a)-(b), 1641. The required disclosures must be made not less than three business days prior to the transaction's consummation. [*20] 15 U.S.C. § 1639(b)(1). If not disclosed in a timely manner, the consumer acquires a statutory right to rescind the transaction. 15 U.S.C. § 1635(a),(f). The Act provides the right to rescind exists against the original lender as well as any subsequent assignee. 15 U.S.C. § 1641(c).

n5 The Board of Governors of the Federal Reserve System Introduced Regulation Z to implement TILA and HOEPA. *Cooper*, 238 F. Supp. 2d at 54; 12 C.F.R. § 226.1 *et seq.*

### B. HOEPA Rescission Claim

Bynum contends her loan is covered by HOEPA and she did not receive the required disclosures at least three days prior to the transaction's consummation. Manufacturers does not dispute that HOEPA disclosures were not timely provided, but disagrees that the points and fees Bynum paid at closing exceeded 8% of the total loan amount

Manufacturers defines the total loan amount as the principal amount of the loan, $ 75,000, [*21] and states the points and fees must exceed 8% of $ 75,000, or $ 6,000, to be covered by HOEPA. This argument has twice been rejected by the district court and is contrary to the Act's official commentary. Instead, [HN9] the total loan amount is calculated by subtracting points and fees from the amount financed. *See* 4/28/00 Order, Dkt. No. 39-1; 5/23/00 Order, Dkt. No. *52-1; Hays v. Bankers Trust Co. of California*, 46 F. Supp. 2d 490, 498 n. 14 (S.D. W. Va. 1999); 12 C.F.R. Pt. 226, Supp. I, *Official Staff Commentary, Comment* 32(a)(1)(ii). The HOEPA 8% trigger is then calculated by using the formula: (1) principal amount of the loan -- total points and fees = total loan amount; (2) total loan amount x .08 = HOEPA trigger amount *Cooper*, 238 F. Supp. 2d at 59-60.

[HN10] Points and fees generally include: (1) all finance charges; (2) compensation paid to mortgage brokers; and (3) costs listed in 15 U.S.C. § 1605 (e) "unless the charge is reasonable, the creditor receives no direct or indirect compensation, and the charge is paid to a third party unaffiliated with the creditor." 15 U.S.C. § 1602(aa)(4); 12 C.F.R. § 226.32(b)(1) [*22] . Thus, "HOEPA points and fees include finance charges imposed by creditors and third parties, fees paid to mortgage brokers, and real estate fees unless the real estate fees are reasonable and compensate neither the creditor nor the creditor's affiliate." *Cooper*, 238 F. Supp. 2d at 58. Bynum contends she *was* charged the following points and fees that must be included in the HOEPA calculation:

| | |
|---|---|
| Broker Fee | $ 5,475.00 |
| Flood Cert. Reimburse to First Gov't | $ 20.00 |
| Hazard Insurance Reserve | $ 218.76 |
| Settlement Fee | $ 395.0 |
| Judgment Reports | $ 64.00 |
| Recordation Walk Through Affidavit | $ 85.00 |

Total Points and Fees:                    $ 6,257.76

---

Both parties agree the $ 5,475 broker fee paid to Equitable constitutes a point and fee for the loan under 15 U.S.C. § 1602(aa)(4)(B). Because the broker fee does not reach the 8% trigger alone, n6 the court must consider whether any of the other fees should be included and whether the fees, added to the broker fee, reach the 8% threshold.

N6 ($ 75,000 - $ 5,475) x .08 = $ 5,562. Therefore, the broker's fee is $ 87.00 less than the 8% trigger.

[*23]

### 1. Recordation Affidavit

The settlement statement reflects Bynum was charged $ 85.00 for a "Recordation Walk Through Affidavit." The charge appears on the statement's section pertaining to "Government Recording and Transfer Charges." Bynum contends (he government does not charge for recordation walk through affidavits and only fees actually paid to government officials may be excepted from the total points and fees under § 1605(d)(1) and 12 C.F.R. § 226.4(e)(1). Further, Bynum argues the affidavit fee lists no payee and no actual affidavit exists. However, Manufacturers does not assert that the fee was paid to the District of Columbia, Rather, Manufacturers provides an affidavit from two Valley Title officers who attest the recordation walk through affidavit is a document required by Valley Title. In addition, the officers attest the fee was paid "to the person" who recorded the document in the office of the Recorder of Deeds. Resp. Ex. 1. Manufacturers therefore asserts the charge was a title-related charge imposed by Valley Title, was not imposed by First Government and was not paid directly or indirectly to First Government Manufacturers' evidence [*24] of the charge's validity is vague and suspect Nevertheless, for summary judgment purposes, Bynum has failed to present undisputed evidence that the affidavit charge was not *bonafide* or reasonable, or that the charge was retained by First Government 12 C.F.R. 226.32(b)(1)(iii); *Cooper*, 238 F. Supp. 2d at 60-61. Accordingly, the affidavit charge shall not be included in the points and fees calculation.

### 2. Flood Certification

Bynum contends she was charged $ 20 for a flood certification that should be included in the points and fees category because it was paid to First Government Flood certificates are expressly excluded from finance charges pursuant to § 1605(e)(5) (items exempted include "flood hazard inspections conducted prior to closing"), and the charge is clearly labeled as a reimbursement to First Government Manufacturers asserts the $ 20 fee was advanced by First Government on Bynum's behalf and Bynum does not dispute that the fee was a reimbursement [HN11] Flood certification inspection fees are not included in the HOEP A points and fees calculations when the fee is reasonable and when the fee is not paid to the creditor. *See* [*25] 15 U.S.C. § 1605(e)(5); 12 C.F.R. § § 226.4(c)(7)(iv), 226.32(b)(1)(iii). The flood certification charge shall not be included in the points and fees calculation.

### 3. Hazard Insurance

Bynum contends the $ 218.76 charge for hazard insurance should be included in points and fees. Although § 1605(e)(3) excludes escrows for insurance from finance charges, Bynum argues the charge was not *bona-fide* or reasonable because it was illegal under the MLBA, D.C. Code § 26-1115(b), [HN12] Section 1115(b) prohibits a lender from requiring the escrow of hazard insurance if the borrower has equity worth more than 20% of the property's fair market value. Because the lender appraised Bynum's home at $ 130,000, while lending her only $ 75,000, Bynum asserts she possessed at least 42% equity and the lender could not lawfully require an insurance escrow. Further, Bynum contends she was not provided a separate required notice in writing that she could pay her own hazard insurance directly. D.C. Code § 26-1115(b).

Manufacturers docs not dispute that Bynum had more than 20% [*26] equity in her home or that the required disclosure was not provided. Further, Manufacturers provides no evidence regarding the reasonableness of the fee in light of § 26-115's prohibitions. Manufacturers argues, without legal or factual support, that Bynum's hazard insurance was previously cancelled and that state law prohibitions cannot be employed to include insurance escrows within the HOEPA computations. These arguments must be rejected. Manufacturers does not argue the MLBA did not apply to First Government Indeed, [HN13] the MLBA clearly applies to all licensed mortgage lenders. Moreover, Manufacturers does not dispute § 26-1115 was violated. Accordingly, the $ 218.76 fee, imposed in violation of the MLBA, cannot be considered reasonable and must be included in the points and fees calculation.

### 4. Settlement Closing Fee

Bynum contends the settlement closing fee of $ 395 is a finance charge under 12 C.F.R. § 226.4(a)(2) be-

cause First Government required the use of a settlement agent to close the loan. Further, Bynum contends the fee is not excludable under § 1605(e) or § 226.4(c)(7) because it was unreasonable and duplicative of the $ 495 title examination [*27] fee. In support, Bynum presents an affidavit from Richard Eisen, a settlement attorney, who attests the closing fee appears duplicative, a typical and unreasonably high. However, as Manufacturers points out, Eisen does not attest he examined any of the loan documents to determine the amount of time required to close the transaction and he states "each settlement agent characterizes the services and charges differently and I have seen a large variety of characterizations and amounts on settlement statements." Mot at Ex.L.

Nevertheless, [HN14] "fees charged by a third party that conducts the loan closing . . . *are finance charges* only if the creditor: (i) requires the particular services for which the consumer is charged; (ii) requires the imposition of the charge; or (iii) retains a portion of the third-party charge, to the extent of the portion retained." 12 C.F.R. § 226.4(a)(2) (emphasis added). Bynum attaches a "Disclosure of Settlement Attorney" form which indicates First Government required the loan be closed by a First Government-approved title insurance company, and that fees for settlement attendance were required. n7 Reply Ex. D. Therefore, the settlement [*28] closing fee is a finance charge that must be included in the points and fees calculation.

> n7 First Government's "Disclosure of Settlement Attorney" form provides "The Lender requires that the loan be closed by an attorney or a Title Insurance Company approved by the Lender." Further, "You may, if you choose, select the attorney or Title Insurance Company. If you do choose an attorney other than the Lender's attorney, *you will still be obligated to pay the attorney for the Lender fees for the following:* (a) Preparation of Closing Documents; (b) Review of Closing Documents prepared by the attorney you choose; (c) *Attendance at settlement*." Reply Ex. D (emphasis added).

### 5. Judgment Reports

Finally, Bynum contends the $ 64 she was charged for judgment reports must be included in the points and fees calculation because no such documents exist and the charge is unreasonable. Manufacturers refers to the Valley Title officers' affidavit attesting the charge was incurred by Valley Title as part of the [*29] title examination process to determine whether any judgment liens encumbered Bynum's property. However, Bynum was charged $ 495 for the title examination process at line

1103. While the affidavit attests the charge was "in addition to the judgment report given by the abstractor related to the Superior Court of the District of Columbia," Bynum was already charged $ 185 for "abstract or title search to Abstractor" on line 1102. Because a judgment constitutes a lien on the property, any registered judgment would have appeared during the title examination or abstractor search. The judgment reports were thus duplicative, not *bonafide* and unreasonable. The $ 64 fee must be included in the HOEPA points and fees calculations.

### 6. HOEPA Calculations

The $ 218.76 hazard insurance fee, the $ 395 closing fee and the $ 64 abstract, when added to the $ 5,475 broker fee, clearly qualify Bynum's loan for HOEPA protection; ($ 75,000 - ($ 5,475 + $ 218.76 + $ 395 + $ 64)) x .08 = $ 5,507.88. n8 In this calculation, 8% of the total loan amount equals $ 5,507.88, yet Bynum paid $ 6,152.76 in total points and fees. Accordingly, the ban is a high cost loan covered by HOEPA.

> n8 The loan qualifies for HOEPA protection even if the court adds only the $ 218.76 hazard insurance fee to the mortgage broker fee: ($ 75,000 - ($ 5,475 + $ 218.76)) x .08 = $ 5,544.50. In this calculation, 8% of the total loan amount equals $ 5,544.50, yet Bynum paid $ 5,693.76 in total points and fees.

[*30]

It is undisputed that Bynum did not receive required HOEPA disclosures in a timely fashion. Due to First Government's failure to provide the mandatory disclosures in the prescribed time period. Bynum acquired a statutory right to rescind the deed of trust within three years of the transaction's consummation. 15 U.S.C. § 1635(f). The February 28, 1998 loan between Bynum and First Government is subject to the Home Ownership and Equity Protection Act

### C. TILA Rescission Claim

Bynum further contends she acquired a right to rescind the loan under TILA because TILA requires lenders to disclose the amount financed and finance charges conspicuously and accurately. 15 U.S.C. § 1632(a). [HN15] The amount financed constitutes the amount of credit provided to the borrower. 12 C.F.R. § 226.18(b). The finance charge constitutes the cost charged to the borrower for making the loan, including interest over the life of the loan and up-front charges. *Id.* at § 226.4(a). [HN16] Finance charges are defined as:

The sum of all charges, payable directly or indirectly by the person to whom credit is extended, and imposed directly [*31] or indirectly by the creditor as an incident to the extension of credit. The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges. . . .

15 U.S.C. § 1605(a). [HN17] Failure to disclose the proper finance charge and amount financed constitutes a material violation that entitles the borrower to rescind the loan within three years of the transaction's consummation. See 15 U.S.C. § 1635 (a), (f); § 1602(u). A single violation of TILA, even if technical, extends a borrower's period of rescission. See Wiggins v. Avco Fin. Servs., 62 F. Supp. 2d 90, 94 (D.D.C. 1999). Generally, for rescission purposes, disclosure of the finance charge shall be treated as accurate if the amount disclosed does not vary from the actual finance charge by more than one-half of one percent of the total amount of credit extended. See 15 U.S.C. § 1602(f)(2)(A). If a borrower rescinds after initiation [*32] of foreclosure proceedings, the disclosure of the finance charge shall be treated as accurate if the amount disclosed does not vary from the actual finance charge by more than $ 35. 15 U.S.C. § 1635(i)(2).

Bynum asserts the only fee included in the finance charge was the broker fee. Because the $ 85 recordation affidavit and $ 395 settlement fee were not included, the finance charge was never accurately disclosed and was understated by more than $ 35. Manufacturers contends § 1605(a) clearly states that charges imposed by third parties and not retained by the lender are excludable from the finance charge. Accordingly, Manufacturers asserts the finance charge was accurately disclosed and Bynum's right of rescission expired three business days after closing.

As previously discussed, there is a question of fact as to whether the recordation affidavit was bonafide and reasonable, and who retained the $ 85 fee. The recordation fee, for summary judgment purposes, is not clearly a finance charge that was improperly disclosed. However, the $ 395 settlement fee should have been included in the finance charge. [HN18] While § 1605(a) provides finance charges do not include [*33] fees and amounts imposed by third party closing agents, the exclusion only applies "If the creditor does not require the imposition of the charges." In general, fees charged by third party closing agents are finance charges when the creditor requires

the particular services for which the consumer is charged. 12 C.F.R. § 226.4(a)(2)(i). As evidenced by First Government's "Disclosure of Settlement Attorney" form, First Government required the particular services for which the $ 395 fee was imposed. Accordingly, the closing fee should have been disclosed as a finance charge, and the total finance charge was thus understated by at least $ 395. Bynum acquired a statutory right to rescind the deed of trust within three years of closing. 15 U.S.C. § 1635(f).

### D. Improper Notarization

Finally, Bynum contends the deed is invalid because it was illegally notarized under D.C. Code § § 42-401, 42-404. Although Friedman took Bynum's acknowledgment, witnessed her signature and certified the deed in her home, Bynum argues notarial acts may only be performed in the District of Columbia by a notary licensed in the District [*34] Friedman was not a certified notary public in the District of Columbia, rather he was a notary public certified by the State of Maryland. Bynum contends the improper and illegal notarization invalidates the February 29, 1998 conveyance.

Bynum relies on a case from the Superior Court of the District of Columbia that invalidated an absolute deed granting property in the District when the deed was notarized by a notary public from Maryland. In Jackson v. Byrd, No. 825-01 RP (D.C. Sup. Ct. Aug. 25, 2003), the court determined the notary's failure to obtain a license to notarize documents in the District of Columbia invalidated the deed and did not merely constitute an improper acknowledgment. The court reasoned, in part, that a notary acts as a final gatekeeper against fraud and to protect vulnerable citizens and the integrity of public records. Id. at 6. [HN19] This court is not bound by the Superior Court's decision and respectfully declines to adopt its reasoning.

[HN20] Under District of Columbia law, a notarial act includes "taking an acknowledgment, administering an oath or affirmation, taking a verification upon oath or affirmation, witnessing or attesting a signature, noting a [*35] protest of a negotiable instrument, or any other similar act authorized by law." D.C. Code § 42-141(4). Notarial acts pertain to witnessing and acknowledging that the "person who appears before the officer and makes the acknowledgment is the person whose true signature is on the instrument" D.C. Code § 42-142(a). The Code further provides that:

[HN21] The failures in the formal requisites of an instrument that may be cured by this act are:

(1) An omission of an acknowledgment or a defective or improper acknowledgment;

(2) A failure to attach a clerk's certificate;

(3) An omission of a notary seal or other seal; or

(4) An omission of an attestation.

D.C. Code § 42-404. It is apparent that [HN22] an improper notarization affects the acknowledgment, but that the D.C. Code does not mandate invalidation of a deed on account of an improper acknowledgment.

Unlike *Jackson*, this case involves a deed of trust, not an absolute deed. [HN23] The District of Columbia distinguishes between absolute deeds, and mortgages or deeds of trust [HN24] D.C. Code § 42-801 provides:

Mortgages [*36] and deeds of trust to secure debts, conveying any estate in land, shall be executed and *may be acknowledged and recorded in* the same manner as absolute deeds; and they shall take effect both **as** between the parties thereto and as to others, bonafide purchasers and mortgagees and creditors, in the same manner and under the same conditions as absolute deeds.

[HN25] The statute's provision that a deed of trust "may be acknowledged and recorded" in the same manner as absolute deeds implies that the acknowledgment pertains to recordability of the instrument as opposed to validity.

Finally, [HN26] D.C. Code § 42-407 provides the recorder of deeds shall not record an instrument if improperly acknowledged. There is no dispute that the deed of trust was accepted for recordation. The *Jackson* court's concern regarding fraud is not implicated here. Bynum does not dispute that she executed the deed. To hold that improper notarization renders the deed void would encourage parties to obtain improper notarizations and avoid responsibilities based on a technicality. Further, voiding a deed based on an improper notarization would provide windfalls to parties where [*37] security interests are invalidated, and would create forfeitures for parties on account of a notary's failure to perform duties properly. Bynum has failed to establish the deed as invalid as a matter of law and summary judgment on the claim of illegal notarization must be denied. All notarial acts or omissions in the execution or recordation of the February 29, 1998 deed of trust are cured by D.C. Code § 42-403.

### E. Remedy

Manufacturers' security interest in Bynum's home is subject to rescission due to HOEPA and TILA violations. Bynum gave her intent to rescind within the three year statutory period. Manufacturers contends dismissal of its security interest will result in a forfeiture and will provide Bynum with a windfall. Thus, Manufacturers seeks summary judgment on equitable subrogation counterclaim.

Manufacturers argues the court should apply the equitable subrogation doctrine to find the First Government deed of trust constitutes a lien on the property "to the extent of $ 53,417.24 which was the amount paid to retire the indebtedness secured by the Crusader deed of trust and $ 3,680.812 to pay delinquent real estate taxes . . . together [*38] with interest thereon from the date of such payments less any sums paid by the Plaintiff thereafter." Manufacturers Mot. to Dismiss at 17. "It is difficult to imagine any situation in which the Plaintiff would be more unjustly enriched than in this case by permitting the Plaintiff to enjoy the benefit of the payment of the prior loan held by Wilshire Credit in the amount of $ 53,417.25 and $ 3,680.81 in delinquent real property taxes and, in turn, disavow the indebtedness owed." Manufacturers Reply to MSJ at 17.

Manufacturers' motion for summary judgment on the equitable subrogation counterclaim must be denied. Preliminarily, the doctrine appears to apply when priority of competing liens is at issue, as opposed to situations where no lien exists. *See e.g., Eastern Sav. Bank, FSB v. Pappas, 829 A.2d 953 (D.C. App. 2003)*; Restatement (Third) of Property, § 7.6 (equitable subrogation exists to determine priority of liens). Nevertheless, the court need not determine the applicability of the equitable subrogation doctrine because [HN27] § 1635(b) of TILA governs the return of money or property when a borrower exercises a right to rescind under the Act.

[HN28] Section 1635(b) provides: [*39]

Return of money or property following rescission. When an obligor exercises his right to rescind under subsection (a), he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect

the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon, the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, [*40] ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by (his subsection shall apply except when otherwise ordered by a court.

Therefore, [HN29] according to § 1635(b), the security interest becomes void upon rescission and a borrower is no longer liable for any finance or other charges. Within 20 days of receiving notice of rescission, the creditor is to return any money or property and reflect termination of the security interest. When the creditor has met these obligations, the borrower is to tender the property. The sequence of rescission and tender must be followed *unless the court directs otherwise.* n9 *See* 15 U.S.C. § 1635(b); *see also* 12 C.F.R. § 226.23(tracks the language of § 1635 and implements the statute).

N9 Section 1635(b)'s provision permitting a court to modify the sequence of procedures was added after courts held the statute need not be interpreted literally as requiring the creditor to remove its security interest prior to the borrower's tender of proceeds. *See e.g., Yamamoto v. Bank of New York*, 329 F.3d 1167, 1170 (9th Cir. 2003).

[*41]

In *Brown v. Nat'l Permanent Federal Sav. and Loan Assoc.*, 683 F.2d 444, 447 (D.C. Cir. 1982), the borrower refinanced a mortgage to obtain funds for home repair work. The balance due on the original mortgage and money for the rehabilitation work was paid out of the newly executed promissory note. The lender moved to foreclose on the loan when the borrower slopped making payments, and the borrower sought rescission under TILA. The appellate court affirmed the district court's grant of summary judgment to the borrower on her re-

scission claim. Further, the district court correctly noted the statute docs not require the debtor to tender first; rather the creditor must tender before the borrower's obligation arises. *Id* at 447. However, the district court erred by failing to recognize that the rescission remedy remains subject to equitable considerations and that the court possessed the equitable power to condition rescission upon return of the loan proceeds. [HN30] The statute is clearly designed to restore the parties as much as possible to the *status quo ante." Id.* at 448 (citation omitted). "A court may condition the granting of rescission upon plaintiff's repayment [*42] of the principal amount of the loan to the creditor." *Id.* at 447, *quoting Etta v. Seaboard Enter., Inc.*, 218 U.S. App. D.C. 254, 674 F.2d 913 (D.C. Cir. 1982). The case was remanded to the district court for a determination of whether the borrower received any benefit and whether rescission should be conditioned on the borrower's return of any benefit gained. n10

n10 The *Brown* holding is consistent with that of other courts. *See e.g., Yamamoto v. Bank of New York*, 329 F.3d 1167, 1171 (9th Cir. 2003) ("A trial judge has the discretion to condition [TILA] rescission on tender by the borrower of the property he had received by the lender . . . whether a decree of rescission should be conditional depends upon the equities present in a particular case . . ."]; *Rudisell v. Fifth Third Bank*, 622 F.2d 243 (6th Cir. 1980) (where borrowers argued they were entitled to rescind, receive back all money they paid to lender, and keep the property received, court conditioned rescission on borrowers return of reasonable value of the property received); *Powers v. Sims and Levin*, 542 F.2d 1216 (4th Cir. 1976) (when borrower rescinded but refused to return the amount the lender expended in discharging prior debts, lender merely sought "legal due" in seeking reimbursement Section 1635 does not "limit the power of a court in equity to circumscribe the right of rescission to avoid the perpetration of stark inequity . . . [courts] may condition the borrowers' continuing right of rescission upon their tender to the lender of all of the funds spent by the lender in discharging the earlier indebtedness of the borrowers").

[*43]

[HN31] TILA's statutory rescission procedures do not alter the equitable nature of the rescission remedy. *See Brown*, 683 F.2d at 447. Courts are free to exercise equitable discretion to modify rescission procedures, and rescission under TILA may be conditioned on the

debtor's return of any money or property received. *Id.; see also Yamamoto, 329 F.3d at 1173* (affirming dismissal of rescission claim when borrowers could not establish their ability -- after being given sixty days to do so -- to tender the proceeds of the loan if they prevailed); *see also Velazquez v. Home American Credit, Inc., 254 F. Supp. 2d 1043, 1045-47 (N.D. Ill. 2003)* ("[a] scheme that requires the creditor to act first by canceling its security interest without assurance that the consumer will do her part risks leaving the creditor high and dry, an unsecured creditor forced to rely on the consumer's good graces and ability to tender . . . equity may require that we order [the borrower] to return the money simultaneous with [the lender's] release of its security interest").

The court may impose conditions on rescission that assure the borrower meets her obligations [*44] once the creditor has performed its obligations. Nevertheless, whether to alter the sequence of *§ 1635*'s procedures and whether to place conditions upon the release of the security interest, requires case by case consideration. *See Brown, 683 F.2d at 447; Yamamoto, 329 F.3d at 1171.* Factors to consider include the Act's underlying legislative policy requiring full disclosure, the remedial penal nature of the Act's remedies, the egregiousness of the TILA violations, and the nature of benefits received. *Id*

Bynum contends the entire loan transaction and security interest are void, but does not acknowledge the benefits she received, or suggest a method for returning those benefits. n11 There is no genuine dispute that the loan executed by the First Government deed of trust paid $ 53,417.24 to retire the indebtedness secured by the Crusader deed of trust and $ 3,680.81 to the District of Columbia to pay delinquent real estate taxes. It is possible Bynum simply contends it is equitable to order an unconditional release of the security interest and place Manufacturers in an unsecured position as to the funds advanced on her behalf. However, neither [*45] party briefed the implications of *§ 1635(b)*'s return of property provisions. The court is unaware of Bynum's ability or willingness to structure a return of the $ 57,098.05 benefit -- less any finance or other charges and any payments she made on the loan through February 5, 1999 -- before the security interest will be released. The court declines to order rescission of the security interest without input from the parties as to how the rescission remedy should be structured. Accordingly, on the court's own motion, the parties shall brief *15 U.S.C. § 1635*'s application to Bynum's rescission claim. In doing so, consideration should be given to the cases and equitable circumstances discussed in this section.

n11 Bynum repeatedly contends the security interest is void because she rescinded. To clarify, the security interest did not automatically become void when she expressed her intention to rescind. *See e.g., Yamamoto, 329 F.3d at 1172* (argument that rescission is accomplished automatically upon decision to rescind and communication thereof "makes no sense" when lender contests the grounds for rescission); *Large v. Conseco Fin. Servicing Corp., 292 F.3d 49, 54-55 (1st Cir. 2002)* [HN32] (security interest becomes void when creditor acknowledges right to rescind or when appropriate decision maker determines right to rescind available, not when borrower merely asserts right to rescind).

[*46]

A final note pertaining to rescission remedies is warranted. [HN33] The Act provides that a right to rescind against the original lender also applies to any assignee. *15 U.S.C. § 1641 (c).* Typically, a creditor's failure to respond to a rescission notice pursuant to *§ 1635(b)*, constitutes a separate violation of the Act. *Id.* at *§ 1635(g).* However:

> Although *15 U.S.C. § 1641(c)* provides that a material violation by a creditor creates a right to rescind against the creditor's assignee, TILA's civil liability provision only permits creditors' to beheld liable for a monetary penalty or award of attorney's fees for a TILA violation. *15 U.S.C. § 1640(a).* Neither *15 U.S.C. § 1641(c)* nor any other violation of TILA provides for a statutory penalty or award of attorney's fees against an assignee for failure to respond to a valid rescission notice.

*Kane v. Equity One, Inc., 2003 U.S. Dist. LEXIS 23810, *17-18, No. 03-3931 (E.D. Pa. Nov. 21, 2003).* Therefore, Manufacturers is not subject to liability for challenging Bynum's ground for rescission and not responding [*47] to Bynum's rescission notice.

## V. Bynum's Claims Against Equitable

Equitable moves for summary judgment on all claims. Bynum failed to respond to Equitable's statement of undisputed facts as required by local rules. *See L.R. 7(h); 56.1* (opposition to summary judgment "shall be accompanied by a separate concise statement of genuine issues" of material fact). Equitable's statement of facts is deemed admitted. *See L. R. 56.1, 7(h)* ("In determining a motion for summary judgment the court may assume that facts identified by the moving party in its statement of

material facts are deemed admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion"); *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988); *Flowers v. Internal Revenue Serv.*, 307 F. Supp. 2d 60, 62 n.1 (D.D.C. 2004). Bynum's admission of Equitable's facts is not cured by her submission of a sworn statement opposing summary judgment Bynum's sworn statement is conclusory, contains mere denials of the facts Equitable alleges in support of summary judgment, and is insufficient to create a genuine issue of material fact. *See e.g.,* [*48] *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir. 1993) ("mere unsubstantiated allegation . . . creates no genuine Issue of fact' and will not withstand summary judgment"); *Bryant v. Brownlee*, 265 F. Supp 52, 68 (D.D.C. 2003) (conclusory allegations in affidavit opposing summary judgment do not raise genuine issue of material fact); *Sage v. Broad. Publs.*, 997 F. Supp. 49, 53 (D.D.C. 1998) ("mere denial of the facts alleged in a properly supported motion for summary judgment is not enough to meet the non-moving party's burden").

## A. Conversion Claims (Count VII)

Equitable moves for summary judgment on Count VII. Bynum contends Equitable converted, conspired to convert, and aided and abetted conversion of the $ 9,162.00 proceeds from the loan. [HN34] The elements of conversion are: (1) the unlawful exercise, (2) of ownership, dominion, or control, (3) of another's personal property, (4) in denial or repudiation of that person's property rights. *See Equity Group v. Painewebber Inc.*, 839 F. Supp. 930, 933 (D.D.C. 1993). Bynum has not satisfied these elements and does not produce any evidence establishing Equitable's involvement in the [*49] alleged conversion of the check and its proceeds. Indeed, Bynum admits that Byrd took her check and that Waldo and Dutchmans received the proceeds. *See e.g.,* Bynum Ex. B at 39-41. Her conversion claim against Equitable fails.

Bynum's conspiracy and aiding and abetting claims also fail. Preliminarily, the district court has previously held that [HN35] the District of Columbia does not recognize independent causes of action for civil conspiracy or aiding and abetting. *See* 02/25/03 Order, Dkt. No. 63-1 at 9. Even if these claims were available, Bynum has produced no evidence of an agreement between Equitable and Dutchmans or Waldo. [HN36] The elements of civil conspiracy are: (1) an agreement between two or more persons, (2) to participate in an unlawful act or a lawful act in an unlawful manner, (3) injury caused by a party to the agreement's actions, (4) pursuant to and in furtherance of the common scheme. *See Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994). Bynum argues a conspiracy may be inferred based on several assumptions lacking record support. For example, there is no evidence

that Equitable sent Byrd to her home. Viewing the facts in her favor, the undisputed evidence [*50] simply does not support Bynum's claims. Bynum asserts Byrd told her he worked with Equitable, but admits Byrd did not tell her his boss' name, nor did she know who was called when he telephoned his "boss" from her home. *See* Bynum Ex. Bat 36, 88-91. Rather, the undisputed evidence reflects: (1) Equitable was not aware of Bynum's experience with Byrd until she telephoned Ruiz; (2) Equitable did not know of Bynum's contacts or negotiations with Dutchmans and Byrd regarding home improvements (Bynum admits Bryd visited her home two or three times -- *see* Bynum Ex. B at 92-93); and (3) Byrd was never an Equitable employee. Bynum fails to present evidence raising a genuine issue of material fact regarding her conversion claims. Equitable's summary judgment motion on Count VII must be granted.

## B. Promissory Estoppel (Count VIII)

Equitable moves for summary judgment on Count VIII. Bynum contends: (1) Equitable promised to provide her with home improvements and financing for the improvements; (2) she relied on Equitable promises; (3) Equitable did not make any repairs and sent a representative of an "unlicensed, unregistered, unbonded, sole proprietorship which coerced [her] [*51] to sign over loan proceeds to an escrow account and then made no repairs;" and (4) after she called Equitable for help, Equitable promised to send the contractor out to perform the promised work but no such work occurred. *See* 3rd Am. Compl. Count VIII

[HN37] A party may not assert a promissory estoppel claim where there is an enforceable contract. *See e.g., Bldg. Servs. Co. v. Amtrak* 305 F. Supp. 2d 85, 95-96 (D.D.C.2004) ("District of Columbia law presupposes that an express, enforceable contract is absent when the doctrine of promissory estoppel is applied"). Because Bynum and Equitable entered into a valid brokerage agreement, the doctrine of promissory estoppel does not apply.

Even if promissory estoppel were applied, Bynum fails to establish [HN38] the requisite elements: (1) a promise; (2) reasonable reliance on the promise; (3) injury due to detrimental reliance; and (4) enforcement would be in the public interest and would prevent injustice. *Id. at 95; see also District of Columbia v. McGregor Prop., Inc.*, 479 A.2d 1270, 1273 (D.C. 1984). Critically, Bynum provides no evidence that Equitable promised to obtain home improvements or [*52] her, or to send a contractor to perform home improvement work. Bynum contends "she relied on Equitable's promise to perform home repairs when they sent Byrd out to her home." Resp. at 16 However, the premise for Bynum's promissory estoppel claim, that Equitable sent Byrd to her

home, is totally unsupported. Bynum fails to present evidence raising a genuine issue of material fact regarding her promissory estoppel claim. Equitable's summary judgment motion on Count VIII must be granted.

### C. D.C. Mortgage Lender and Broker Act (Count IX)

Equitable moves for summary judgment on Count IX. Bynum contends Equitable failed to provide her with certain disclosures at least three days prior to the loan settlement as required by D.C. Code § 26-1113. Preliminarily, Bynum signed a written loan commitment that contained an agreed and accepted date of February 25, 1998. The loan commitment was therefore received three days before closing.

Moreover, [HN39] § 26-1113(a)(1) provides that a licensee -- defined in § 26-1101(8) to include mortgage brokers and lenders -- shall provide the borrower with a financing agreement executed by the lender. Section 26-1113(b)(1) provides [*53] the financing agreement executed by the lender shall be delivered to the borrower at least 72 hours before settlement. However, "a borrower aggrieved by any violation of this section shall be entitled to bring a civil suit . . . *against the lender*" D.C. Code § 26-1113(b)(3)(emphasis added). Accordingly, § 26-1113 docs not provide a private cause of action against mortgage brokers.

Bynum's argument that § 26-1118(e) permits her to bring an action against brokers for violations of § 26-1113 must fail. [HN40] Section 26-1118 delineates the actions the Superintendent of the Office of Banking and Financial Institutions may pursue to suspend, revoke and enforce violations of the statute, but provides individuals are not precluded from bringing actions to recover for violations. Section 26-1118 does not affect § 26-1113(b)(3)'s express provision of a cause of action against only lenders. [HN41] A basic rule of statutory construction, *expression unius est exclusion alterius*, provides that "when a legislature makes express mention of one thing, the exclusion of other is implied." *McCray v. McGee*, 504 A.2d 1128, 1130 (D.C. 1986); *see also Indep. Ins. Agents of America, Inc. v. Hawke*, 341 U.S. App. D.C. 211, 211 F.3d 638, 643-44 (D.C. Cir. 2000) [*54] ("all words in a statute are to be assigned meaning . . . nothing therein is to be construed as surplusage"). The court must presume the District of Columbia intentionally chose to provide a remedy only against lenders.

Bynum also contends Equitable violated D.C. Code § 26-1114(a)(8) because it received compensation in the form of a $ 5,475 brokerage fee prior to delivery of the financing agreement Again, Bynum signed a written loan commitment that contained an agreed and accepted date of February 25, 1998 -- three days before the loan closed. In any event, Bynum's claim must fail because she pre-

sents no evidence reflecting when Equitable received its fee. Therefore, she has not established Equitable received compensation prior to provision of the three day notice. Equitable's summary judgment motion on Count IX must be granted.

### D. D.C. Consumer Protections Procedure Act (Count X)

Equitable moves for summary judgment on Count X. Bynum contends Equitable violated the CPPA, D.C. Code § 28-3901 et seq. [HN42] "The Consumer Protection Procedures Act is a comprehensive statute with an extensive regulatory framework designed to [*55] remedy all improper trade practices." *Osbourne. v. Capital City Mortgage Corp.*, 727 A.2d 322, 325 (D.C. 1999) (quotations omitted); *see also* 02/25/03 Order, Dkt. No. 63-1 at 7. The CPPA applies to home mortgage finance transactions. *DeBerry v. First Gov't Mortgage and Investors Corp*, 743 A.2d 699, 703 (D.C. 1999). Bynum contends Equitable violated the CPPA, D.C. Code § 28-3904 when it:

1. Misrepresented it would create a $ 10,000 home improvement and refinance loan without stating it was not the lender, but the broker which would charge a large fee for referring the loan, or that the loan would include amounts other than the $ 10,000 and the previous mortgage, such as other debts and real estate taxes;

2. Included amounts in the loan without her consent, including debts she of which she was unaware, real estate taxes and settlement fees that were not *bonafide* or reasonable;

3. Misrepresented that it would obtain an actual home improvement contractor for her but instead sent her a contractor that was unlicensed and that had been sued repeatedly for stealing money from individuals;

4. Failed to [*56] provide her with her notice of right to cancel the home improvement contract and home solicitation sales as required by law;

5. Failed to provide the promised home improvements;

6. Received compensation for services prior to completion of work, prior to de-

livery of required consumer disclosures and without being licensed as a home improvement contractor;

7. Made and enforced unconscionable contracts; and

8. Failed to provide a financing agreement containing the terms of the loan at least seventy-two hours before settlement of the loan,

The record is devoid of evidence supporting Bynum's assertions and summary judgment must be granted.

[HN43] A claim for fraudulent or intentional misrepresentation under the CPPA "requires the same burden of proof as does a common law claim for such misrepresentation -- the clear and convincing standard." *See* 02/25/03 Order, Dkt. No. 63-1 at 7, *quoting Osbourrne v. Capital City Mortgage Corp.*, 727 A.2d 322, 325 (D.C. 1999). Bynum fails to present clear and convincing evidence that Equitable engaged in the purported misrepresentations. There is no evidence that Equitable represented itself as a lender, instead [*57] of a broker, that it failed to tell her she would be charged a brokerage fee, that it told her she would receive $ 10,000, that it promised to obtain a home improvement contractor or that it sent one to her home. Thompson attests he went to Bynum's home, gathered information for Bynum's loan application, and explained that Equitable, as a broker, would submit Bynum's loan application materials to a potential lender. Equitable Ex. B. At her deposition, Bynum did not recollect meeting with Thompson, but she now attests that Thompson never came to her home. *See* Bynum Ex. A at P 4; Ex. B at 11-12. Regardless, Bynum signed a brokerage agreement reflecting Equitable's status as a broker and its entitlement to fees from loan proceeds. *See* Equitable Ex. L.

There is no evidence Equitable had any role in the preparation of the actual loan or the fees and debts paid from loan proceeds. As a broker, Equitable assisted Bynum in preparing a loan application. The negotiation, structuring and settlement of the loan involved Bynum, First Government and Valley Title. Because Equitable was not the alleged home improvement contractor, it cannot be held liable for the purported failure to provide [*58] her with a "notice of right to cancel the home improvement contract and home solicitation sales," or the alleged receipt of compensation for services "prior to completion of work, prior to delivery of required consumer disclosures and without being licensed as a home improvement contractor." ·

Finally, there is no evidence that Equitable made or enforced an unconscionable agreement The only contract Bynum entered into with Equitable was the brokerage agreement entitled "Agreement to Obtain Loan Commitment." Bynum has produced no evidence that the commitment was unreasonably favorable to Equitable. *See Urban Inv. v. Branham*, 464 A.2d 93, 99 (D.C. 1993). Indeed, Equitable received a $ 5,475 fee, less than the $ 8,000 Bynum agreed to in the agreement, by obtaining a reduction in the interest rate on her loan from First Government and waiving a portion of its compensation. While Bynum's affidavit from Richard Eisen, opines as to the reasonableness of some closing fees, it does not question the reasonableness of the broker fee. Bynum's arguments opposing summary judgment on her CPPA claims are unsupported and fail to raise a genuine issue of material fact. Equitable's summary [*59] judgment motion on Count X must be granted.

**E. Breach of Fiduciary Duty (Count XI)**

Equitable moves for summary judgment on Count XI. Bynum contends Equitable, as a mortgage broker, owed her a fiduciary duty and that it breached that duty. Bynum must establish the existence of a fiduciary duty and a breach of that duty. *See Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 363(D.C. 1984); *see also* 02/25/03 Order, Dkt. No. 63-1 at 8. On February 25,2003, the district court granted Valley Title's summary judgment motion and held no breach of fiduciary duty claim existed because Bynum signed an acknowledgment that Valley Title did not have "any fiduciary obligadons for or toward her." *See* 02/25/03 Order, Dkt. No. 63-1 at 8. On November 18, 1997, Bynum signed a similar acknowledgment in her brokerage agreement with Equitable:

It is agreed that this Agreement is solely a contractual agreement and does not create any type of agency relationship fiduciary *responsibility* or other trust relationship between the parties hereto.

Mot Ex. L at P 6. Accordingly, Bynum's fiduciary duty claim fails.

Bynum does not deny signing the disclaimer, but [*60] she argues a fiduciary duty should be imposed because of Equitable's position as a broker, her position, as a severely ill borrower, and because she was not given a copy of the document she signed. Bynum's arguments miss the mark. First, even if Equitable's position as a broker could arguably create a fiduciary relationship, Bynum acknowledged that no fiduciary relationship existed. Second, while it is undisputed that Bynum is para-

lyzed, she presents no evidence to support her insinuation that an illness prevented her from understanding the document she signed. Finally, Bynum. cites no authority for the proposition that her waiver is invalidated because she did not retain a copy of the document

Even if a fiduciary duty arguably existed, Bynum fails to establish a breach of that duty. While she contends Equitable only sent her loan application to one lender, sent an unlicensed home improvement contractor to her home, and failed to help her when no repairs were performed, her claims are factually unsupported. Nor does she provide legal support that the purported actions constitute a breach of a fiduciary duty. The undisputed evidence reflects that Ruiz attempted to help locate Byrd [*61] after Bynum telephoned. Bynum fails to present evidence raising a genuine issue of material fact regarding her breach of fiduciary duty claim, Equitable's summary judgment motion on Count XI must be granted.

## CONCLUSION

Bynum's summary judgment motion is granted in part. The court grants Bynum's request for declaratory relief and declares the February 28, 1998 loan between Bynum and First Government is subject to the Home Ownership and Equity Protection Act. On the court's own motion, the parties shall brief 15 U.S.C. § 1635's application to Bynum's rescission claim. In doing so,

consideration shall be given to the cases and equitable circumstances discussed in this memorandum opinion. Counsel for Bynum and Manufacturers shall meet and confer by April 15, 2005 regarding a mutually agreeable rescission plan. If on agreement is reached, a joint proposed judgment order shall be submitted to the court by April 22, 2005. If no agreement is reached, Bynum's brief shall be filed no later than April 22, 2005. Manufacturers shall respond by May 2, 2005. Courtesy copies of all filings shall be sent directly to the assigned judge. The briefs shall not exceed 15 pages, including proposed [*62] judgment orders.

All notarial acts or omissions in the execution or recordation of the February 29, 1998 deed of trust are cured by D.C. Code § 42-403. Manufacturers' summary judgment motion on its counterclaim is denied, and its summary judgment motion on Counts I-II, IV-VI, IX-X of the Third Amended Complaint is granted. Equitable's summary judgment motion is granted.

April 7, 2005

ENTER:

Suzzane B. Conlon

United States District Judge

Exhibit D

LEXSEE

**STAFFAN I. KAEMPE, Plaintiff, v. GEORGE C. MYERS, JR., et at. Defendants.**

**Civil Action No. 01-02636 (ESH)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**2002 U.S. Dist. LEXIS 27610**

**March 21, 2002, Decided**
**March 22, 2002, Filed**

**SUBSEQUENT HISTORY:** As Amended April 2, 2002. Summary judgment granted by, Complaint dismissed at Kaempe v. Myers, 2003 U.S. Dist. LEXIS 25969 (D.D.C., Mar. 5, 2003)
Affirmed by Kaempe v. Myers, 361 U.S. App. D.C. 335, 367 F.3d 958, 2004 U.S. App. LEXIS 10025 (2004)

**DISPOSITION:** Defendant's motion to dismiss was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee sued defendants, alleging, inter alia, conversion of patent rights. Pursuant to Fed. R. Civ. P. 12(b)(6), defendants moved to dismiss the conversion count of the complaint.

**OVERVIEW:** Defendants contended that under District of Columbia law, the tort of conversion did not apply to intangible property interests, and that even if it did, the patentee could not prove any set of facts to support his claim that the patent was, in fact, converted. The patentee failed to state a claim. Patents had the attributes of personal property and were entirely a creature of statute. Although patents were a form of personal property, they had always been considered intangible property.

**OUTCOME:** Defendant's motion to dismiss the conversion count was granted.

**CORE TERMS:** patent, conversion, intangible property, personal property, motion to dismiss, right to exclude, cause of action, repudiation, intangible, ownership, merged, conversion claim, pump, tunc

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims*
[HN1] Under Fed. R. Civ. P. 12(b)(6), dismissal is appropriate only where a defendant has shown beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Torts > Intentional Torts > Conversion > Elements*
[HN2] Under District of Columbia law, the elements of conversion are: (1) an unlawful exercise; (2) of ownership, dominion, or control; (3) of the personal property of another; (4) in denial or repudiation of that person's rights thereto.

*Torts > Intentional Torts > Conversion > General Overview*
[HN3] Traditionally, intangible property interests have not been subject to conversion.

*Torts > Intentional Torts > Conversion > General Overview*
[HN4] The process of expansion of the tort of conversion has stopped with the kind of intangible rights which are customarily merged in, or identified with, some document.

*Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use*
*Patent Law > Ownership > Patents as Property*
*Torts > Intentional Torts > Conversion > General Overview*
[HN5] In the context of a conversion claim, patents are a form of personal property that have always been considered to be intangible property.

Page 1

**COUNSEL:** [*1] For STAFFAN I. KAEMPE, Plaintiff: John R. Price, JOHN R. PRICE & ASSOCIATES, Indianapolis, IN; Wayne Richard Hartke, HARTKE & HARTKE, Falls Church, VA.

For GEORGE C. MYERS, JR., Individually, Defendant: James Patrick Schaller, JACKSON & CAMPBELL, P.C., Washington, DC; Richard Henry Streeter, BARNES & THORNBURG, Washington, DC.

For WIGMAN, COHEN, LEITNER & MYERS, P.C., A Professional Corporation, Defendant: James Patrick Schaller, JACKSON & CAMPBELL, P.C., Washington, DC; Richard Henry Streeter, BARNES & THORNBURG, Washington, DC.

For BLANK ROME COMISKY & MCCAULEY, LLP, A Professional Partnership, Defendant: James Patrick Schaller, JACKSON & CAMPBELL, P.C., Washington, DC; Richard Henry Streeter, BARNES & THORNBURG, Washington, DC.

**JUDGES:** ELLEN SEGAL HUVELLE, United States District Judge.

**OPINION BY:** ELLEN SEGAL HUVELLE

**OPINION:**

AMENDED MEMORANDUM OPINION

Pursuant to Fed. R. Civ. P. 12(b)(6), defendants have moved to dismiss Count I of plaintiffs complaint, for conversion of patent rights. Defendants contend that the District of Columbia does not apply the tort of conversion to intangible property interests, and that even if it did, plaintiff can not prove any set of facts to support [*2] his claim that the patent was, in fact, converted. Having considered the pleadings and the record contained therein, the Court finds that no cause of action exists for conversion of patent rights under District of Columbia law, and defendant's motion to dismiss will therefore be granted.

Plaintiff Staffan Kaempe is a former manager of Cartridge Technology Hydraulics, LLC. Kaempe and Dennis Ewald were co-inventors of a hydraulic pump. Defendant George Myers was the attorney retained by Kaempe and Ewald to prepare the patent application for the pump. (Complaint P 9.) After they obtained the patent, a dispute arose between Kaempe and Ewald, leading Kaempe to retain new counsel. (Complaint PP 11-20.) Myers subsequently terminated his relationship with Kaempe. (Complaint P 45.) Plaintiff alleges that Myers and his co-defendants took actions to convert the rights owned by Kaempe in his patent, and that they committed legal malpractice in doing so, because they were Kaempe's attorneys at the time. Defendants have moved to dismiss only the conversion claim.

[HN1] Under Rule 12(b)(6), dismissal is appropriate only where a defendant has "shown beyond doubt that the plaintiff can prove no set of [*3] facts in support of his claim which would entitle him to relief.'" In re Swine Flu Immunization Products Liability Litigation, 279 U.S. App. D.C. 366, 880 F.2d 1439, 1442 (D.C. Cir. 1989) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1955)). [HN2] Under District of Columbia law, the elements of conversion are "(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) of the personal property of another, (4) in denial or repudiation of that person's rights thereto." O'Callaghan v. District of Columbia, 741 F. Supp. 273, 279 (D.D.C. 1990) (citing Duggan v. Keto, 554 A.2d 1126, 1137 (D.C. 1989)).

[HN3] "Traditionally, intangible property interests have not been subject to conversion." Primedical, Inc. v. Allied Inv. Corp., 1994 U.S. Dist. LEXIS 4517, 1994 WL 149139, at *7 (D.D.C. Mar. 31, 1994) (citing Equity Group, Ltd. v. Painewebber, Inc., 839 F. Supp. 930, 933 (D.D.C. 1993)). Primedical and Equity Group appear to be the only cases that discuss whether District of Columbia law has evolved to permit claims for conversion of intangible property. Both noted that "some courts have loosened the restriction and have permitted [*4] suits for conversion of intangibles, but [HN4] the process of expansion has stopped with the kind of intangible rights which are customarily merged in, or identified with some document. Thus, a plaintiff may bring a suit for conversion of a promissory note, a check, a bank book, or an insurance policy, but not for conversion of a debt, the good will of a business, or an idea." Primedical, 1994 U.S. Dist. LEXIS 4517, 1994 WL149139 at *7 (citing Equity Group, 839 F. Supp. at 933; W. Page Keeton et at., Prosser and Keeton on the Law of Torts § § 15, at 92 (5th ed. 1984)) (internal citations omitted). And both courts concluded that District of Columbia law did not permit a claim for conversion of the intangible property at issue - "management expertise, respect in the business community, business opportunity, or uncompensated incidental benefits'" in Primedical, 1994 U.S. Dist. LEXIS 4517, 1994 WL 149139 at *7, and "a business or a marketing system" in Equity Group, 839 F. Supp. at 933.

This Court finds the reasoning set forth in Primedical and Equity Group to be compelling, and will therefore dismiss Count I of plaintiffs complaint for failure to state a claim. A patent "is [*5] the right to exclude others for a limited time from the unauthorized manufacture, use or sale of the patented invention. A patent, by itself, gives the inventor no right to use his or her own invention. It merely gives the right to exclude others. Patents have the

attributes of personal property and are entirely creatures of statute." Gregory E. Upchurch, *Intellectual Property Litigation Guide § § 1.01 (1995)*. [HN5] Although they are a form of personal property, patents have always been considered to be intangible property. *See La Belle Iron Works v. United States, 256 U.S. 377, 389, 65 L. Ed. 998, 41 S. Ct. 528, 56 Ct. Cl. 476 (1921)*. While patent rights are recorded in a document, those rights are not "merged in, or identified with" that document; rather, they are granted through the United States Patent and Trademark Office. Because each patent originates with and is regulated by a federal agency in this way, a cause of action for conversion of a patent by one individual against another makes little sense: one person simply cannot exercise ownership, dominion, or control of a patent in repudiation of the actual owner's rights to the patent. *See The Marley Co. v. FE Petro, Inc., 38 F. Supp. 2d 1070, 1077 (S.D. Iowa 1998)* [*6] (patent not subject to conversion claim).

For the aforementioned reasons, defendants' motion to dismiss Count I of the complaint is granted. A separate Order accompanies this Opinion.

ELLEN SEGAL HUVELLE

United States District Judge

Nunc pro tunc to March 21, 2002

**ORDER**

Upon consideration of the pleadings and the entire record therein, and for the reasons set forth in the accompanying Memorandum Opinion, defendants' motion to dismiss [4-1] is **GRANTED** .

This matter is set for an initial scheduling conference on April 12, 2002 at 9:45 a.m. **SO ORDERED** .

ELLEN SEGAL HUVELLE

United States District Judge

Dated: Nunc pro tunc to March 21, 2002

Exhibit E

LEXSEE

**PRIMEDICAL, INC., et al., Plaintiffs, v. ALLIED INVESTMENT CORPORATION, Defendant.**

**Civil Action No. 90-1802 (NHJ)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

**1994 U.S. Dist. LEXIS 4517**

**March 30, 1994, Decided**
**March 31, 1994, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, corporation and corporate and individual investors, brought an action against defendant company alleging breach of fiduciary duty, tortious interference with business relationship, breach of contract, and conversion in the company's purchase of a large number of health clinics from a third party. The company filed a motion for summary judgment.

**OVERVIEW:** The company contended the applicable statutes of limitations barred three of plaintiffs' claims, and that the fourth claim, conversion, was entirely unsupported by the record. The court agreed and granted the company's motion for summary judgment. The court concluded that the plaintiffs' causes of action for breach of fiduciary duty and for tortious interference with business relations were barred by the three-year limitations period set forth in D.C. Code Ann. § 12-301(8) (1989) and that the breach of contract action for was barred by § 12-301(7). The court found that the tort causes of action accrued when plaintiffs' business opportunity ceased to be "reasonably likely to develop" when its prospects of obtaining financing evaporated. The contract action accrued at the time of the breach. No conversion claim existed because plaintiffs could not bring an action for conversion of intangibles such as management expertise, respect in the business community, business opportunity, or uncompensated incidental "benefits." Further, any use the company made of plaintiffs' tangible property was apparently entirely consensual.

**OUTCOME:** The court granted the company's motion for summary judgment and dismissed the case.

**CORE TERMS:** clinics, financing, conversion, shareholders, investor, statute of limitations, breach of contract, acquire, capital structure, letter of intent, stock, began to run, desk, tortious interference, intangible, business relations, cause of action, damaged, breach of fiduciary duty, business opportunity, plaintiffs claim, breached, reasonably likely, accrued, proposed agreement, summary judgment, oral contract, sixty-eight, commingled, ownership

**LexisNexis(R) Headnotes**

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > Accrual of Actions > Occurrence of Tort*
[HN1] A cause of action will accrue and start the limitation period running, when the elements of a tortious act by defendant and a legal injury to plaintiff coalesce. Thus, the cause of action is said to have accrued when the last of all the elements of a tort necessary for the successful maintenance of an action occurs, only when forces wrongfully put in motion produce injury.

*Torts > Business Torts > Commercial Interference > Business Relationships > Defenses*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Defenses*
*Torts > Business Torts > Commercial Interference > Prospective Advantage > Elements*
[HN2] The essence of the tort of tortious interference with prospective business relations is the use of 'intentional and improper methods of diverting or taking business from another which are not within the privilege of fair competition. To establish such a claim under District of Columbia law, a plaintiff must show that the defendant intentionally interfered with business opportunities that were "commercially reasonable to anticipate."

*Governments > Legislation > Statutes of Limitations > Time Limitations*
*Torts > Procedure > Statutes of Limitations > General Overview*
[HN3] For a statute of limitations to begin to run, it is clear that a plaintiff need not have suffered all injury to which he will ultimately fall prey. Rather, the clock begins ticking when the fact of injury is sufficiently plain for plaintiffs' cause of action to accrue even though the extent and precise nature of the injury has not yet developed.

*Contracts Law > Breach > General Overview*
*Contracts Law > Defenses > Statutes of Limitations*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN4] An action for breach of contract runs from the time of the breach. Actions for breach of contract are governed by a three-year statute of limitations, D.C. Code Ann. § 12-301(7) (1989).

*Torts > Intentional Torts > Conversion > Elements*
[HN5] The elements of conversion are (1) an unlawful exercise, (2) of ownership, dominion, or control, (3) of the personal property of another, (4) in denial or repudiation of that person's rights thereto.

*Contracts Law > Negotiable Instruments > Enforcement > Duties & Liabilities of Parties > Conversion of Instruments*
*Torts > Intentional Torts > Conversion > General Overview*
[HN6] Intangible property interests have not been subject to conversion. A plaintiff may bring a suit for conversion of a promissory note, a check, a bank book, or an insurance policy, but not for conversion of a debt, the good will of a business, or an idea. The tort of conversion does not permit recovery for intangibles such as businesses or business relationships.

*Torts > Business Torts > General Overview*
*Torts > Intentional Torts > Conversion > General Overview*
[HN7] Plaintiffs cannot sue for conversion of such intangibles as management expertise, respect in the business community, business opportunity, or uncompensated incidental "benefits."

*Civil Procedure > Discovery > Methods > Admissions > Responses*
*Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN8] Fed. R. Civ. P. 56 places a burden on the non-moving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

*Criminal Law & Procedure > Criminal Offenses > Fraud > Computer Fraud > General Overview*
*Torts > Intentional Torts > Conversion > Defenses*
*Torts > Intentional Torts > Defenses > Consent*
[HN9] No one suffers a legal wrong as the result of an act to which, unaffected by fraud, mistake or duress, he freely consents or to which he manifests apparent consent.

**JUDGES:** [*1] JOHNSON

**OPINION BY:** NORMA HOLLOWAY JOHNSON

**OPINION:**

### MEMORANDUM OPINION

Plaintiffs in this action are Primedical Incorporated ("PI"), an owner and operator of ambulatory health care facilities, and several corporate and individual investors who allege interests in PI. On September 25, 1992, the Court granted defendant's motion to dismiss several counts of the third amended complaint. This case is now before the Court on defendant's motion for summary judgment with respect to the remaining counts, Count III (breach of fiduciary duty), Count VI (tortious interference with business relationship), Count X (breach of contract), and Count XI (conversion).

### FACTS

The following facts are undisputed. In 1986 PI became interested in purchasing a large number of health clinics from Humana, Inc. On March 23, 1987, Humana and PI signed a nonbinding n1 "letter of intent" in which Humana agreed to sell sixty-eight clinics in eight metropolitan areas to PI for $ 37.5 million. The letter of intent contemplated that the parties would negotiate and execute "definitive agreements" no later than April 3, 1987, and provided that the letter would expire by its own terms on that date if such agreements were not executed. [*2] On March 30, 1987, defendant Allied sent a proposed financing agreement to PI's officers, Stanford Ellsworth and Randolph Old, in which Allied agreed to

provide $ 3 million to "a new company to be formed" in return for certain interests in the new company's assets and securities. The proposed agreement provided that Allied's obligations would become effective only if certain conditions were fulfilled, and among these conditions was the requirement that Ellsworth and Old obtain a commitment from a financial institution to provide lease financing of $ 10 million on terms acceptable to Allied. The proposed agreement also contemplated a capital structure in which Ellsworth and Old would each own five percent of the new company's stock, Allied and its group of investors would own sixty percent, and the shareholders of PI who exchanged their PI shares for stock in the new company would own thirty percent.

n1 In its opinion of September 25, 1992, the Court determined that the letter of intent did not bind the parties and therefore was not a contract. See Opinion of Sept. 25, 1992, at 8-9.

[*3]

The deal between PI and Humana was never consummated, and the letter of intent expired on April 3, 1987. Immediately thereafter, Ellsworth and Old organized a new company, Primedical Corporation ("PC"). Ellsworth and Old established the capital structure of PC upon its formation, issuing ninety percent of the stock to Allied and its group of investors and taking five percent apiece for themselves. Ellsworth and Old, acting on behalf of PC, signed the financing agreement with Allied on April 10, 1987. Despite their efforts to obtain financing, however, Ellsworth and Old were unable to meet the condition of the agreement requiring that they obtain a commitment from a financial institution to lend them $ 10 million. On April 23, therefore, PC (acting through Ellsworth and Old) signed another investment agreement with Allied that terminated the first agreement and contained different terms. The second agreement contained no reference to the capital structure described in the first agreement, under which PI investors would be able to receive thirty percent of the PC stock. Instead, the second agreement recognized that Allied and its group of investors had received shares that gave them [*4] a ninety percent ownership interest in PC. See Ex. A to Investment Agreement of Apr. 23, 1987.

In the meantime, on April 7 Humana and PC signed an "agreement of sale" providing for the sale to PC of the same sixty-eight clinics that had been the subject of the March 23 letter of intent. The first closing under this agreement, which involved the transfer of eleven clinics from Humana, occurred on April 23. The second closing, which involved the remaining clinics, took place on August 4. PC soon defaulted on its obligation to make pay-

ments to Humana, and after other developments Allied and its group of investors eventually sold their interests in PC to a Massachusetts corporation.

Plaintiffs filed their complaint on August 1, 1990, alleging that Allied had harmed them by usurping PI's opportunity to purchase the Humana clinics. Plaintiffs argue that although Allied and its officers held no formal positions as officers or board members of PI, Allied nevertheless exercised considerable control over PI because Allied had invested substantially in PI. Plaintiffs claim that Ellsworth and Old created PC at Allied's insistence, and that Allied then used PC as a means of excluding PI shareholders [*5] from the Humana deal. Plaintiffs also claim that Allied breached its contract with PI by failing to provide PI shareholders with the opportunity to exchange their shares for thirty percent of PC's stock. Finally, plaintiffs claim that Allied is liable for conversion because PC took control of PI's assets and property at Allied's instigation.

DISCUSSION

A. The Statute of Limitations Bars Plaintiffs' Claims for Tortious Interference with Business Relationship and Breach of Fiduciary Duty

When a plaintiff seeks to recover for tortious injury, "it is generally held that [HN1] a cause of action will accrue and start the limitation period running, when the elements of a tortious act by defendant and a legal injury to plaintiff coalesce." Perkins v. Nash, 697 F. Supp. 527, 532 (D.D.C. 1988) (citing 1 Stuart M. Speiser et al., The American Law of Torts § 5:27, at 881 (1983)). Thus, "the cause of action is said to have accrued when the last of all the elements of a tort necessary for the successful maintenance of an action occurs, only when forces wrongfully put in motion produce injury." 1 Speiser et al., supra, § 5:27, at 881.

The parties agree that [*6] plaintiffs' causes of action for breach of fiduciary duty and for tortious interference with business relations are governed by the three-year limitations period set forth in D.C. Code Ann. § 12-301(8) (1989). The parties disagree, however, with respect to the question of when plaintiffs' causes of action accrued. Defendant argues that the statute of limitations began to run in April 1987 because PI irrevocably lost its opportunity to acquire the Humana centers in that month. Plaintiffs argue that the statute began to run on August 4, 1987, the date of the second closing between PC and Humana, because it was at that moment that plaintiffs were damaged" and "until the moment of the closing the defendant could have prevented the injury." Because plaintiffs filed their complaint on August 1, 1990, barely less than three years after the second closing, the ques-

1994 U.S. Dist. LEXIS 4517, *

tion of when plaintiffs suffered injury is potentially dispositive of their claims.

[HN2] The essence of the tort of tortious interference with prospective business relations is "the use of 'intentional and improper methods of diverting or taking business from another which are not within the privilege of fair competition.'" 9 Speiser [*7] et al., supra, § 31:74, at 9. To establish such a claim under District of Columbia law, a plaintiff "must show that the defendant intentionally interfered with business opportunities that were 'commercially reasonable to anticipate.'" Whelan v. Abell, 293 U.S. App. D.C. 267, 953 F.2d 663, 673 (D.C. Cir. 1992) (quoting Carr v. Brown, 395 A.2d 79, 84 (D.C. 1978)). Plaintiffs bear the burden of showing that the alleged business opportunities were likely to materialize. See 9 Speiser et al., supra, § 31:74, at 12 ("Plaintiff must demonstrate that, absent such interference, business relations were reasonably likely to develop in fact.") (citing Carr, 395 A.2d at 84). n2

n2 Because plaintiffs' breach of fiduciary duty claim is based upon the alleged diversion of PI's business opportunity to acquire the Humana centers, the Court will treat it as identical to the plaintiffs' tortious interference claim in this discussion. Although the elements of the two torts are different, the injury alleged here is precisely the same, and the critical question in the current inquiry is whether that injury occurred before or after August 1, 1987.

[*8]

Plaintiffs are thus mistaken in their claim that they could not have suffered injury until the second closing. Regardless of whether "defendant could have prevented the injury" up until the moment that title to the clinics actually passed from Humana to PC, the tort of which plaintiffs complain was not completed when development of business relations became impossible, but when it was no longer reasonably likely. To determine when the statute of limitations began to run, therefore, the Court must locate the point in time when PI could no longer reasonably have expected to acquire the Humana clinics. PI could conceivably have reached this point before or after the passage of title from Humana to PC.

The record evidence indicates that PI lost all reasonable expectation of acquiring the Humana clinics in April 1987. As explained above, plaintiffs bear the burden of demonstrating that the opportunity to acquire the clinics was likely to materialize. The most significant evidence plaintiffs have presented on this point is the March 23, 1987, letter of intent between PI and Humana, which expired by its own terms on April 3. Although PI's business opportunity might conceivably have [*9] persisted beyond this date, plaintiffs have presented no evidence that it did. Rather, the evidence seems to indicate that PI's opportunity to purchase the clinics may have disappeared even earlier.

The record shows that Ellsworth and Old, who were the officers of both PC and PI, operated almost as if the two corporations were the same company. PC was created "in order to make the investment [in the Humana deal] clean to new investors," Dep. of Randolph Old at 40, and was operated under the assumption "that Primedical Inc. was going to become part of Primedical Corp.," id. at 9. The distinction between the two companies apparently was not very clear. See id. at 54 ("it was a very blurry time with these two companies coming together"); see also Dep. of Daniel Luciano at 41 ("to my mind, the relationship of Inc. and Corp. were almost identical"). Because PC was created primarily for the purpose of concluding the Humana deal, therefore, Old and Ellsworth had no incentive to continue to seek financing on behalf of PI after PC was formed.

PI could not have purchased the Humana clinics without obtaining such financing. Ample evidence in the record indicates that PI would have [*10] needed to assemble $ 37.5 million in cash before completing the deal with Humana, and that it intended to rely upon financing from others (including Allied) in order to obtain these funds. See, e.g., Dep. of Stanford Ellsworth at 73, 78; Dep. of Randolph Old at 89-90. However, on March 30, 1987, Allied sent a proposed financing agreement to Ellsworth and Old in which Allied agreed to provide $ 3 million in financing not to PI, but to "a new company to be formed" -- in other words, to PC -- which Old and Ellsworth created the following week. Allied's proposed agreement also contemplated that the "new company" would obtain $ 34 million in financing from other sources. Some $ 24 million of this was to have come from a "sale-leaseback" arrangement with Gary Pyles. See Def.'s Ex. 10 at 8; Dep. of Stanford Ellsworth at 68, 93. Old and Ellsworth could not have completed the Humana deal without the involvement of Allied and Pyles. See id. at 73. Plaintiffs have not shown that Allied and Pyles were still willing to provide financing to PI. Nor have they shown that PI could have obtained financing from other sources, or that PI's officers were actively engaged in seeking such financing. [*11] Instead, the record demonstrates that by early April Ellsworth and old had decided to finance the deal between PC and Humana with money from the very same entities upon which PI had earlier hoped to rely.

Because PI could not have purchased the clinics without financing, PI's business opportunity ceased to be "reasonably likely to develop" when its prospects of obtaining financing evaporated. Although the record does

Page 4

not show precisely when this occurred, it had probably already taken place in late March when Allied prepared the proposed financing agreement. By then both Ellsworth and Old had agreed with Allied that a new corporation should be formed to acquire the clinics, and they had apparently decided that the corporation would rely on Allied and Pyles for financing. At the latest, PI certainly lost its opportunity to obtain financing on April 10, 1987, when Ellsworth and Old -- acting on behalf of PC, not PI -- signed the financing agreement with Allied.

If this event did not terminate any reasonable prospect that PI might acquire the clinics, then PC's contract with Humana, signed on April 23, 1987, surely did. After the contract was executed PC became the equitable owner of [*12] the real estate and leases listed in the sales agreement -- of the ground on which the clinics stood, so to speak -- and PC could have secured specific performance of the contract even if Humana had sought to withdraw. See 11 Samuel Williston & Walter H.E. Jaeger, A Treatise on the Law of Contracts § 1418A, at 664 (3d ed. 1968) ("a contract to convey land is specifically enforceable by the purchaser"); see also id. at 677 (contract to convey leasehold is specifically enforceable). Plaintiffs can hardly argue that PC might have decided to cancel the deal at this point, in view of their repeated claims that Allied had virtually complete control over PC and was using it as a puppet to benefit itself. By April 23, 1987, therefore, PI no longer had any reasonable prospect of acquiring the Humana clinics and had suffered the injury of which plaintiffs complain. Allied's allegedly tortious conduct was complete, and the statute of limitations began to run. Because plaintiffs did not file their complaint until August 1, 1990, more than three years later, their claims are barred.

Because plaintiffs place such great weight on the fact that the closing did not take place until August [*13] 4, 1987, however, it is worthwhile to consider the limitations question from another perspective. If the Court were to assume, arguendo, that plaintiffs suffered no injury until title to the clinics actually passed, then the Court would nevertheless reject plaintiffs' argument because it ignores the closing that occurred on April 23. Although the parties closed on most of the sixty-eight clinics on August 4, Humana transferred eleven of the clinics to PC on April 23. See Ex. 45 to Pls.' Opp'n at 1; Ex. 54 to Pls.' Opp'n at 6. Plaintiffs do not argue that the closing on August 4 amounted to an independent act of wrongdoing; rather they merely claim that "it was at that moment that plaintiffs were damaged." By plaintiffs' own reasoning, however, PI suffered substantial injury on April 23 as well, even if the injury flowing from Allied's alleged torts was not complete until August 4.

[HN3] For a statute of limitations to begin to run, "it is clear that plaintiff need not have suffered all injury to which he will ultimately fall prey." Perkins, 697 F. Supp. at 532 (citing Fitzgerald v. Seamans, 180 U.S. App. D.C. 75, 553 F.2d 220, 227 (D.C. Cir. 1977)). [*14] Rather, the clock begins ticking when "the fact of injury [is] sufficiently plain for [plaintiffs'] cause of action to accrue even though the extent and precise nature of the injury [has] not yet developed." Fitzgerald, 553 F.2d at 227. The transfer of eleven clinics on April 23, at a time when Allied had completed all the elements of the alleged torts, rendered PI's injury "sufficiently plain" and made the torts actionable even though PI would still suffer additional injury in August. The statute of limitations therefore began to run in April, not August. Thus, even if the Court accepts plaintiffs' argument that injury did not occur until title to the clinics actually passed to PC, plaintiffs still suffered sufficient injury in April 1987 to bar their claims today.

**B. The Statute of Limitations Bars Plaintiffs' Claim for Breach of Contract**

Plaintiffs' breach of contract claim reads as follows:

111. On or about March 20, 1987 Allied, Venture and the management of [PI] entered into an agreement which facilitated the creation of PC, for the purpose of acquiring the aforementioned Humana Medfirst facilities. Allied, Venture and PC agreed [*15] with [PI] that the individual plaintiff shareholders in [PI] would receive, collectively, a 30% ownership interest . . . in PC.

112. On or about April 3, 1987, PC was formed. Defendants Allied and Venture were one investor in a group who acquired 90% of PC. In contravention to the aforementioned agreement, no opportunity was accorded the individual plaintiff shareholders in [PI] to participate in the ownership of PC.

113. As a direct and proximate result of the breach of contract by Allied, Venture and PC, plaintiffs have been damaged in the sum of sixty million dollars ($ 60 million).

Third Am. Compl. at 30-31. These allegations are thus fairly straightforward: plaintiffs claim that the proposed financing agreement of March 1987 constituted a contract in which PC and Allied agreed to provide PI shareholders with a thirty percent interest in PC, and that Al-

lied breached this contract in April when Ellsworth and Old established the capital structure of PC, issuing ninety percent of the stock to Allied's group and splitting the remaining ten percent between themselves. The defect in this claim is also fairly obvious, for the complaint itself states that Allied's wrongful conduct [*16] was completed by April 3, 1987. Because [HN4] "an action for breach of contract runs from the time of the breach," Computer Data Sys., Inc. v. Kleinberg, 759 F. Supp 10, 15 (D.D.C. 1990), and because actions for breach of contract are governed by a three-year statute of limitations, see D.C. Code Ann. § 12-301(7) (1989), the limitations period on this claim had already expired when plaintiffs filed their complaint on August 1, 1990.

In their opposition to defendant's motion for summary judgment, plaintiffs claim that Allied "entered into an oral contract to include the plaintiffs in the corporate life of the Humana purchase." n3 Although plaintiffs do not expressly argue that the existence of this oral contract defeats defendant's statute of limitations argument, some evidence in the record might seem, at first glance, to breathe new life into plaintiffs' breach of contract claim. Specifically, deposition testimony shows that when Old, Ellsworth, and others complained to David Gladstone, Allied's President, about the failure to allocate a thirty percent share in PC to PI shareholders, Gladstone said, "we'll fix it later." Dep. of Daniel Luciano at 66; [*17] see also Dep. of Randolph Old at 73. Although the record does not indicate exactly when Gladstone made these statements, he certainly made them after the second financing agreement was prepared. See Dep. of Daniel Luciano at 66-68. The possibility exists, therefore, that Gladstone made some of his promises to "fix" the problem after August 1, 1987, and that plaintiffs' breach of contract claim might be timely because Gladstone failed to keep these promises. See, e.g., Pls.' Ex. 45 (draft letter from Gladstone, dated May 21, 1987, stating that PI "will be merged into [PC] by September 30, 1987").

n3 Although the complaint does not allege existence of an oral contract, the parties have briefed the issue and the Court must therefore address it as if it were an amendment to the complaint. See Kulkarni v. Alexander, 213 U.S. App. D.C. 243, 662 F.2d 758, 762-73 (D.C. Cir. 1978) (citing Fed. R. Civ. P. 15(b)).

The problem with this theory is that nothing in the record [*18] indicates that any of Gladstone's promises created a new contract. Plaintiffs have already alleged in their complaint that the March 1987 financing agreement obligated Allied to provide PI shareholders with a thirty percent interest in PC. This agreement was breached in April, when the capital structure of PC was fixed and the PI shareholders received nothing. Even if Gladstone later promised to provide PI shareholders with their thirty percent, therefore, he was merely promising to do something which the March agreement already obligated him to do. His promises did not create contracts, because "where a party does or promises to do what he is legally obligated to do . . . he has not incurred detriment" and his promise is not supported by consideration. John D. Calamari & Joseph M. Perillo, The Law of Contracts § 4-9, at 204 (3d ed. 1987). Nor have plaintiffs argued that Gladstone's promises were supported by some substitute for consideration, such as detrimental reliance. Plaintiffs' cause of action therefore accrued when Allied allegedly breached the written contract, not when Gladstone promised "to fix it later." Plaintiffs cannot argue that Gladstone's gratuitous promises, [*19] made after the capital structure of PC was established, somehow rejuvenated the original contract and re-set the limitations clock. The PI investors were shut out of PC in April, the alleged breach occurred in April, and plaintiffs' claim became actionable in April. Plaintiffs' filing in August 1990, more than three years afterwards, was simply too late.

C. Plaintiffs Have Failed to Substantiate Their Conversion Claim

Finally, plaintiffs claim that Allied, operating through PC, converted PI's assets and used them for its own benefit. This count of the complaint alleges:

> During and after the time PC was formed, corporate assets of [PI] were commingled with the corporate accounts of PC, were used for the exclusive benefit of Allied, Venture and PC, and were diverted from their intended uses.

Third Am. Compl. at 31. [HN5] The elements of conversion are "(1) an unlawful exercise, (2) of ownership, dominion, or control, (3) of the personal property of another, (4) in denial or repudiation of that person's rights thereto." O'Callaghan v. District of Columbia, 741 F. Supp. 273, 279 (D.D.C. 1990) (citing Duggan v. Keto, 554 A.2d 1126, 1137 (D.C. 1989)). [*20]

Nothing in the record supports plaintiffs' claims that PC or Allied converted property belonging to PI. As plaintiffs explained in their responses to defendant's requests for admissions, most of the "corporate assets" for which plaintiffs seek to recover were intangible:

Obviously, there was something to this thing called Primedical, its name, its people, and the respect that the industry has for its stature as a company. There was a management team, a design for each center, method of operation, staffing techniques, equipment and supply schedules, accounting and billing procedures to name a few. These were developed over time, often by trial and error, using investors' money. These management assets, and the company's name, were used by [PC]. Also, the asset, the obligation of Humana to sell their centers to [PI], was an obligation which was taken over by [PC] without completing the transaction of merging [with PI].

Pls.' Responses to Def.'s Interrogs., quoted in Ex. 1 to Def.'s Mot. for Summ J. at 1. The record evidence also suggests that PC may have benefited indirectly from some expenditures made by PI, and that PC did not reimburse PI for these expenditures. See [*21] Dep. of Randolph Old at 53-54 None of these allegations can support a claim for conversion, however, because "traditionally, [HN6] intangible property interests have not been subject to conversion." The Equity Group, Ltd. v. Painewebber Inc., 839 F. Supp. 930, 933 (D.D.C. 1993). Some courts have loosened this restriction and have permitted suits for conversion of intangibles, but "the process of expansion has stopped with the kind of intangible rights which are customarily merged in, or identified with some document." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 15, at 92 (5th ed. 1984). Thus a plaintiff may bring a suit for conversion of a promissory note, a check, a bank book, or an insurance policy, see id. at 91, but not for conversion of a debt, the good will of a business, or an idea, see id. at 90. Although the District of Columbia Court of Appeals does not appear to have ruled on the issue, at least one federal decision in this district has held that under District of Columbia law the tort of conversion does not permit recovery for intangibles such as businesses or business relationships. See The Equity Group, Ltd. 839 F. Supp. at 933. [*22] The Court agrees with the rationale of this decision. The Court therefore holds that [HN7] plaintiffs cannot sue for conversion of such intangibles as management expertise, respect in the business community, business opportunity, or uncompensated incidental "benefits."

The only cognizable portion of plaintiffs' conversion claim, therefore, is their assertion that PC appropriated "an assortment of fixed assets in the way of computers, chairs, desks, and filing cabinets" and that certain unspecified other assets were "commingled, damaged, or taken" by PC. Pls.' Responses to Def.'s Interrogs., quoted in Ex. 1 to Def.'s Mot. for Summ. J. at 2. Plaintiffs have failed, however, to come forward with any evidence that PC exercised "ownership, dominion, or control" over any such property. Deposition testimony clearly shows that PC and PI maintained separate bank accounts and that their funds were not commingled. See Dep. of Randolph Old at 55. Nor have plaintiffs pointed to any evidence in the record that PC ever used a single chair, desk, computer, or other chattel belonging to PI. Indeed, the only indication in the record that PC might have appropriated such property is plaintiffs' own [*23] response to defendant's request for admissions, a response that consists of nothing but conclusory assertions and which completely fails to identify the precise nature of the property taken. [HN8] Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). By failing to identify the allegedly converted property with sufficient specificity, plaintiffs have failed to meet this burden.

Furthermore, even if plaintiffs had come forward with such evidence, they would still have failed to show that PC's use of such property was "in denial or repudiation of [PI's] rights thereto" and therefore amounted to a conversion. Ample evidence in the record indicates that Ellsworth and Old operated PC and PI as if they were the same company. The alleged conversion therefore seems to have been entirely consensual. For example: if Ellsworth or Old, acting as officers [*24] of PC, ever sat at a desk owned by PI, they would not necessarily have been "denying or repudiating" Pi's rights in the desk, especially because either of them might have sat at the same desk later in the day in his capacity as an officer of PI. Put simply, PI seems to have quite willingly permitted PC to share its office space. PC therefore cannot be liable for conversion, because [HN9] "no one suffers a legal wrong as the result of an act to which, unaffected by fraud, mistake or duress, he freely consents or to which he manifests apparent consent." Restatement (Second) of Torts § 892A cmt. a (1977).

4. Conclusion

The statute of limitations bars three of plaintiffs' remaining four claims, and the fourth is entirely unsupported by the record. Defendant's motion for summary judgment will therefore be granted and this case will be dismissed. An appropriate order will issue.

NORMA HOLLOWAY JOHNSON

1994 U.S. Dist. LEXIS 4517, *

UNITED STATES DISTRICT JUDGE

Date: March 30, 1994

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

NATSOURCE LLC,            )
                                 )
         **Plaintiff,**      )
   **v.**                         )
                                 )  **Civil Action No.: 06 CV 1843**
**FLAVIO RUFINO GAZANI,**    )
                                 )
        **Defendant.**    )
                                 )
                                 )
                                 )
                                 )

## AFFIDAVIT OF DEFENDANT FLAVIO GAZANI IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

I, Flavio Rufino Gazani, being duly sworn and subject to the penalty of perjury, hereby depose and state:

1.    I am over the age of eighteen (18) and am otherwise competent to make this Affidavit. I am not under the influence of any medications that may affect my testimony, and know of no reason why I would not otherwise be able to truthfully swear to the facts in this Affidavit.

2.    I am a Brazilian national and I am well-known in my field. I have published, taught, and spoken extensively on my area of expertise which is the Clean Development Mechanism ("CDM") created by the Kyoto Protocol, through which developing countries sell credits. (Attached hereto as Exhibit A is a true and correct copy of my Curriculum Vitae.)

2.    I was recruited away from my former employer by Natsource to go to work for Natsource. I went to work for the company in October 2005, initially as a CDM Regulatory

Analyst, and I was later promoted to Senior CDM/JI Regulatory Analyst. I was specifically

hired for Natsource's Greenhouse Gas-Credit Aggregation Pool ("GG-CAP"). Natsource

advised me that they were hiring me because my vast knowledge in this field, as evidenced by

the H-1B visa paperwork submitted by Natsource on my behalf. (Attached hereto as Exhibit B is

a true and correct copy of excerpts of the immigration paperwork submitted to the U.S.

Department of Homeland Security on my behalf by Natsource regarding my job description and

related information.)

3.    I was neither asked nor required to execute any confidentiality agreement or non-

compete agreement before starting employment with Natsource, or at any time during the course

of my employment with Natsource.

4.    I set up a company in 2004, well before my employment with Natsource, called

International Solutions. This company was designed to identify potential projects for reducing

emissions that did not exist yet (primarily in my home country of Brazil), and consult with

project developers to put the idea to paper, thereby generating credits that could later be sold.

This is the topic of a lengthy book I wrote, which was published in 2002 and even contains a

checklist for identifying such projects. International Solutions has not been an operating

company since it was set up (*e.g.*, it has no revenues, etc.). Even if International Solutions was

operational, it would not be conducting the same business that Natsource does, because as a

general rule, Natsource works with identified CDM or JI projects to purchase credits.

5.    It was no secret that I was involved with International Solutions. Before I was

even hired by Natsource, I advised Natsource of my involvement with that company. This

information was publicly available online, and I assumed Natsource would learn of it, so I

2

wanted to be sure to bring it to their attention before I commenced employment. For example, attached hereto as Exhibit F is a printout of U.S. government program website "Methane to Markets" Project Network Member Profile, which has been available online since well before I began employment with Natsource, and clearly designates me as a Director of International Solutions.

6.    When I advised Mr. Feldman, my supervisor, that I was leaving Natsource and was considering returning to Brazil to identify opportunities to develop CDM projects, Mr. Feldman indicated that Natsource would be interested in working with me to pursue such projects. Rather than being competitive, my business of generating additional credits to be available for purchase would be a symbiotic relationship with Natsource's business, because without the generation of credits, there would be nothing for Natsource buyers to purchase.

7.    Natsource claims that I emailed to my personal email address a document entitled "Technology CDM Opportunity Guide" that Natsource was sharing with business partners regarding project opportunities in Brazil. At that time, I was still working with Natsource. Moreover, the document was not marked confidential and was intended for distribution to outside parties. And I contributed to the content of that document based on information provided by one of my contacts in Brazil, and the remainder of the information was publicly available. There was nothing in the Guide that either I did not already know or could not get publicly (and in any event, the information would be long outdated by now, being about six months old).

8.    I occasionally accessed my personal email account from my company laptop computer. However, this was routinely done in the office by Natsource employees, because we

would rather use our own personal accounts than use the company's email system for personal email messages.

9.     I announced my intention to leave Natsource effective December 2006, providing Natsource with plenty of notice so it would have time to secure a replacement for me.  Natsource shortly after that advanced my termination date, and terminated my employment immediately, effective October 12.  This meant that I either had to leave the country or secure a new visa sponsor within ten days.  Mr. Feldman, at the time he terminated my employment, demanded that I allow him unfettered access to my home computer.  I chose not to do this prior to consulting with an attorney.

10.     Natsource still has not paid me my accrued compensation, despite my several requests (through counsel) that it provide me with such payment.  Nor has Natsource responded to my repeated requests through counsel to cover my return airfare to Brazil, as it is required to do under federal law as my H-1B visa sponsor.

11.     Not long before I announced my intent to resign my employment with Natsource, I began exploring the possibility of pursuing other business opportunities through my pre-existing company, International Solutions.  To that end, I contacted a few CDM project developers (referred to by Natsource as "Project Development Document writers" or "PDD writers") from my personal MSN email account.  One of the CDM project developers I contacted was a non-exclusive vendor of Natsource, Quality Tonnes (none of the others were vendors of Natsource).  The email I sent did not utilize or disclose any information of Natsource, let alone any information that could conceivably be deemed to be a trade secret; rather, it was merely an inquiry about a potential partnership with International Solutions.

4

12.    As noted above, I made very similar inquiries of a few other CDM project developers I located on the internet, including Carbon Ventures, which is not a vendor used by Natsource. The identity of CDM project developers is publicly available information.

13.    I did engage in personal and other business endeavors while I was on a trip to London. However, contrary to Natsource's intimations, this trip did not involve any Natsource business, nor did I engage in any improper conduct by meeting with a CDM project developer while I was there. It was a personal day that I took off of work with permission from Mr. Feldman.

14.    Shortly after my abrupt termination, an attorney for Natsource and NAR forwarded a harshly-worded letter to me by courier, electronic mail and overnight delivery. (A true and correct copy is attached hereto as Exhibit C.) The letter even said that I could face "up to a ten-year term of imprisonment." As a result of Natsource's threats in the letter and in Mr. Feldman's comments to me, I retained an attorney, who responded at length to the attorney's letter on October 18. In that response letter, we offered to return the single compact disk of information I still had in my possession after my abrupt termination, and offered an affidavit from me confirming that I did not have any other information of Natsource. (A true and correct copy of this letter is attached hereto as Exhibit D.) Natsource and NAR's counsel accepted this offer, and I executed an affidavit confirming that I had returned all information (including the compact disk referenced above), I did not have any additional information (including copies), and I did not intent to use any such information for my own benefit or disclose it to others. The affidavit and compact disk were provided to Natsource's counsel on October 20, 2006. (Attached hereto as Exhibit E is a true and correct copy of that Affidavit.) On October 26, 2006,

my attorney was advised that Natsource intended to pursue a temporary restraining order against me, as well as a preliminary injunction, and lawsuit.

15.    It is my understanding that the information that Natsource contends I have used or disclosed belongs not to Natsource, but to NAR, which charges different Natsource entities for its use.

16.    Natsource refers to a "significant performance failure" by it says I made. Specifically, Natsource claims that I failed to attend a CDM Executive Board meeting in Germany, required by my job, because I neglected to ensure that I was registered for it. However, Natsource – and any other private company – is *prohibited* by the United Nations Secretariat from having representatives at such meetings.  Instead, Natsource would register its representatives through a non-governmental organization (NGO) that was permitted to attend. With respect to the meeting at issue, I *could not* have registered myself to attend.  What actually occurred was that the NGO that was allowing Natsource to circumvent the prohibition on attendance (Environmental Resources Trust) had failed to register me for the meeting.

_Flavio Rufino Gazani_

Flavio Rufino Gazani

_District of Columbia_

Subscribed and sworn to me, a notary public, this 27th day of October, 2006, at Washington, DC.

_Notary Public_

Notary Public

My commission expires: _____

ANNE H. SMART
Notary Public, District of Columbia
My Commission Expires April 30, 2010

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing AFFIDAVIT OF FLAVIO GAZANI IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER, has been hand-served upon the following person:

> Susan F. Wiltsie
> Hunton & Williams LLP
> 1900 K Street, NW
> Washington, DC  20006
> Attorneys for Plaintiff

Dated this 30th day of October, 2006.

_____
Christine A. Samsel, Esq.

Exhibit A

# FLAVIO RUFINO GAZANI

1830 17th Street, N.W. #403
20009- Washington, D.C.
(202) 487-3607
flaviogazani@msn.com

## EDUCATION

**American University - Washington College of Law**, Washington, D.C.
Master of Laws in International Legal Studies, Graduated December 2003
Concentration: International Environmental Law
Scholarships:  Brazilian International Institute of Education (IIEB), partial tuition remission 2003
          American University Washington College of Law, partial tuition remission 2003
Research Papers: Enforcement and Compliance for Emission Trading Programs, Spring 2003
          International Financial Institutions Policies on Disclosure of Information, Falls 2003
Independent Study: Accountability and Disclosure of Greenhouse Gases Liabilities

**Universidade de São Paulo**, Law School and Public Health School, São Paulo, Brazil
Specialization in Environmental Law (*Latu Sensu* post graduation), Graduated August 2001
Research Paper: Climate Change, Implementation of the Clean Development Mechanism in Brazil

**Faculdades Metropolitanas Unidas**, School of Law, São Paulo, Brazil
Bachelor of Laws (J.D. equivalent), Graduated December 1999

## PROFESSIONAL EXPERIENCE

**Natsource LLC**, Washington, D.C.
Senior CDM/JI Regulatory Analyst, Since September 2005
- Provide analysis in support of company's Greenhouse Gas-Credit Aggregation Pool - GG-CAP.
- Advise GG-CAP on Emissions Reductions (ERs) purchases.
- Track and assess CDM Executive Board and Joint Implementation Supervisory Committee decisions, policies and precedents.
- Track and assess host country and Annex I country policies affecting the crediting and registration of CDM project activities.
- Provide recommendations to GG-CAP Investment Manager regarding which projects would make the best candidate CDM projects for GG-CAP given emerging rules on the CDM regulatory process.
- Formulate and apply modeling and other optimizing methods to develop and interpret information to assist management in decisions making, policy formulation and other managerial functions.
- Understand and report policy developments to facilitate transfer of ERs from CDM/JI projects to buyers' registries.

**Inter-American Development Bank**, Washington, D.C.
Consultant, Office of External Relations, January 2004 - August 2005
- Developed and drafted instructions for the implementation of newly revised Bank's Information Disclosure Policy.
- Analyzed Bank's internal structure and workflow of data and documents to provide

recommendations on disclosure procedures and dissemination of information available to the public and prepared training materials and arranged briefings for Bank staff.
- Prepared materials for consultations with civil society and other external groups on contacts and implementation of new Information Disclosure Policy.
- Prepared publications and related materials describing the new Information Disclosure Policy (e.g. Handbook, posters, etc.).
- Developed and implemented tracking systems, jointly with other Bank departments, to ensure compliance with Information Disclosure Policy provisions for ("new") products (e.g., loan contracts) previously undisclosed.
- Represented the Office of External Relations at the Bank's Committee on Environment and Social Impacts, which analyses all projects financed by the Bank.
- Periodic monitored Board of Executive Directors' deliberations on proposed modification of the Independent Investigation Mechanism (and possible creation of a "Consultation" or "Problem-solving" function) for implications affecting the Office of External Relations.
- Authored web stories for IDB web site related to items above ("transparency" and "governance") and other subjects.

**Consultant**, Washington, D.C.
World Bank - ELETROBRÁS/PUC-RJ Energy Efficiency Project in Brazil, January – December 2004 on a part time basis.
- Part of team of experts responsible for providing advice on the Brazilian Energy Efficiency Project sponsored by the World Bank.
- Provide legal advice in the areas of energy and climate change and all other environmental legal issues pertaining the implementation of the project.

**Inter-American Development Bank**, Washington, D.C.
Intern, Legal Department, Falls 2003
- Assisted private sector Legal Department attorneys in drafting legal documentation related to their projects, and gathering legal materials regarding Bank's private sector lending policy and procedures, and preparation of opinions and reports.
- Prepared brief summaries and met on regular basis with attorneys to discuss key policies affecting projects under execution.

**Pinheiro Pedro Law Firm**, São Paulo, Brazil
Associate, Environmental Department, November 2000 - December 2002
- Supervised Environmental Consultancy team composed of three lawyers and two trainees. Reported directly to partners; consulted with clients and facilitated problem-solving inquiries related to environmental law and policy.
- Provided legal advice to national and multinational companies such as General Electric and Phillips. Performed research and analysis of environmental laws and regulations, and summarized and drafted memoranda related to these issues. Designed and presented the annual General Electric do Brasil (GE) environmental law Plant Manager Training.
- Researched, drafted and filed legal documentation pertaining to Brazilian state and federal environmental protection agencies.
- Managed and contributed to numerous interdisciplinary environmental impact assessment studies.
- Conducted environmental licensing processes before competent state and federal agencies.
- Advised Brazilian Business Council for Sustainable Development (affiliated of the World

Business Council for Sustainable Development) on environmental legal aspects of corporate performance and responsibilities.
- Provided environmental legal advice to city halls and members of the Congress, including the President of the Congress Special Commission for the Brazilian National Policy on Solid Waste Management on the preparation of a bill that still pending in Congress.
- Represented law firm interests and participated as speaker in several opportunities before the American Chamber of Commerce, the German Chamber of Commerce and the São Paulo State Industrial Federation.

**Brazilian International Institute of Education (IIEB)**, Brasilia, Brazil
Research Associate, Climate Change Program, February - September 2002
- Presented and developed research project supported by IIEB Climate Change Program, with financial support from the Embassy of the Netherlands, which resulted in the publication of the book "Viabilização Jurídica do Mecanismo de Desenvolvimento Limpo (MDL) no Brasil" [Legal Viabilization of the Clean Development Mechanism (CDM) in Brazil].

**Brazilian Business Council for Sustainable Development**, Rio de Janeiro, Brazil
Consultant, September 2000
- As a consultant for Pinheiro Pedro Law Firm advised in the formulation of the National Model for Business Activity in Climate Change, presented at The Hague on the Sixth Conference of the Parties (COP-6)

**Instituto ECOAR para a Cidadania (Non-Governmental Organization)**, São Paulo, Brazil
Consultant, February - August 2000
- Advised in the preparation of the initial phase of the Carbon Sequestration Project

## TEACHING EXPERIENCE

**University of São Paulo**, Public Health School, São Paulo, Brazil
Professor of Environmental Law, Master and Doctorate degrees in Environmental Policy and Management, 2002 (Substitute Professor for one course), 2002
**University São Judas Tadeu**, São Paulo, Brazil
Professor of Environmental Law, Specialization in Environmental Management, 2002
**University of Mogi das Cruzes**, Mogi das Cruzes, Brazil
Professor of Environmental Law, Specialization in Environmental Administration, 2002
- Designed the Environmental Law courses mentioned above. Researched and prepared class materials and lectures. Taught Environmental Law, and conducted the students' research and writing assignments.

## LANGUAGES

Portuguese (native), English (fluent) and Spanish (fluent)

## SPEECHES

**CEMIG,** the electric energy utility of Minas Gerais, Belo Horizonte, Brazil about "Legal issues evolving purchase of Certified Emissions Reductions" in October 2004; **American Chamber of**

Commerce - **AMCHAM**, São Paulo, Brazil about "Environmental Funds" in November 2002 and about "Environmental Insurance and Risk" in April 2002; **Universidade Paranaense**, Paraná, Brazil about "Environmental Law Principles" July 2002; **Federação das Indústrias do Estado de São Paulo - FIESP**, São Paulo/SP, Brazil [São Paulo State Industrial Federation] about "Legal Viabilization of the Clean Development Mechanism (CDM) in Brazil" in June 2002 and about "Legal Management of Environmental Cleanup Responsibility" also in June 2002; **Instituto de Pesquisa Ambiental da Amazônia - IPAM**, Belém do Pará, Brazil about "Juridical Implementation of the *United Nations Framework Convention on Climate Change* in Brazil in June 2002; **Fundação Getúlio Vargas - FGV**, São Paulo Administration School, São Paulo, Brazil - VI ENGEMA - Encontro Nacional sobre Gestão Empresarial e Meio Ambiente about "The Biomass Utilization and the Clean Development Mechanism Implementation in Brazil" in November 2001.

**Swedish National Energy Administration**, Eskilstuna, Sweden - International Workshop on Implementation Strategies for Biomass Utilization in Europe and Developing Countries about "Legal Issues of CDM - The Biomass Utilization in Brazil and the Clean Development Mechanism Implementation" in November 2001; **SIMAI**, São Paulo, Brazil - III International Workshop of the Industrial Environment, about the theme - "Liability and Environmental Licensing" held on October 19th, 2001 at Expomart Fairs and Events in São Paulo/SP; and **Via Rápida Cursos e Treinamento** about "The Brazilian Environmental Law Highlights and The Importance of the Environmental Impact Study" in January 2000.

## INTERNATIONAL CONFERENCES AND MEETINGS

**23rd and 24th meetings of the CDM Executive Board, Bonn, Germany** as an observer representing Natsource in February and May 2006 respectively. **Eleventh Session of the Conference of the Parties - COP 11, Montreal, Canada** as an observer representing Natsource in December 2005. **22nd meeting of the CDM Executive Board, Montreal, Canada** as an observer representing Natsource in December 2005. **Tenth Session of the Conference of the Parties - COP 10, Buenos Aires, Argentina** as a member of the Brazilian Delegation in December 2004; **Eighth Session of the Conference of the Parties - COP 8, *New Delhi, India*** as an observer representing the Instituto de Pesquisa Ambiental da Amazônia - IPAM (Amazon Environmental Research Institute) in October - November 2002; **5th UNCTAD/Earth Council Policy Forum on Trade and Climate Change, *Rio de Janeiro, Brazil*** representing Pinheiro Pedro Law Firm - August 2001; **Sixth Session of the Conference of the Parties - COP 6, *The Hague, Netherlands*** as a member of the Brazilian Delegation representing the Brazilian Business Council for Sustainable Development (CEDBS) in November 2000; and **Royal Institute of International Affairs, *London, England*** meeting about the results of the Sixth Session of the Conference of the Parties - COP6 sponsored by the Institute for Global Environmental Strategies (Japan); the World Bank National Strategies Studies Program; and the Dutch National Institute of Public Health and the Environment in December 2000.

## MEMBERSHIP

Member of the American Society of International Law – ASIL; Brazilian Society of International Environmental Law – SBDIMA; Brazilian Association of Environmental Lawyers - ABAA; Environment Committee of the American Chamber of Commerce - AMCHAM/SP; Risks and Insurance Committee of the American Chamber of Commerce - AMCHAM/SP; Special Committee on Climate Change of the Brazilian Bar Association - OAB/SP; Environmental Insurance Working Group of the National Federation of Private Insurance Companies – FENASEG; and Co-author of the Programa Educacional Futuras Gerações (Future Generations Educational Program).

# FLAVIO RUFINO GAZANI

1830 17th Street, N.W. #403
20009- Washington, D.C.
(202) 487-3607
flaviogazani@msn.com

## LIST OF PUBLICATIONS

### BOOKS

- Direito Ambiental, visto por nós advogados [Environmental Law, viewed by us lawyers], (Co-author of the publication with text entitled "Enforcement and Compliance for Emission Trading Programs") published by Editora Del Rey, Minas Gerais, Brazil, July 2005.

- "Questões de Direito Ambiental" [Environmental Law Issues], (Co-author of the publication "Coleção Estudos e Pesquisas Ambientais"), published by Editrora Signus, São Paulo, Brazil, October 2004.

- "Viabilização Jurídica do Mecanismo de Desenvolvimento Limpo (MDL) no Brasil" [Legal Viabilization of the Clean Development Mechanism (CDM) in Brazil], (joint with Flavia Witkowski Frangetto), published by Editora Fundacão Peiropólis, São Paulo, Brazil, December 2002.

### PAPERS

- "O Mecanismo de Desenvolvimento Limpo: Seria uma solução factível para a crise ecológica mundial?" [The Clean Development Mechanism: Could it be a possible solution to the world's ecological crises?] - presented at the 6th International Conference on Environmental Law realized by the Public Prosecution Service and Lawyers for a Green Planet Institute held on July, 2002 in São Paulo/SP.

- "Legal Issues of CDM - The Biomass Utilization in Brazil and the Clean Development Mechanism Implementation" - presented at the International Workshop on Implementation Strategies for Biomass Utilization in Europe and Developing Countries - Swedish National Energy Administration.

- "The Biomass Utilization and the Clean Development Mechanism Implementation in Brazil" - presented at the VI National Meeting on Business Management and Environment - VI ENGEMA (FGV / USP)

### ARTICLES

- "Public Accessibility to International Financial Institutions: A Review of Existing Inspection Mechanisms and Interim Experiences" - report published on the American University Washington College of Law LLM Global Network Volume 13, Nº Spring 2003

- "Biomass Utilization and the Clean Development Mechanism" - published on the Boletim Ambiente Legal [Legal Environment Bulletin] (YEAR 1 - N4)

- "Mudanças no Clima, reversão e negócios" [Climate Change, reversion and business] - published on the Boletim Ambiente Legal [Legal Environment Bulletin] (YEAR 1 - N2)

- "Environmental Insurance" - published on the session of Environmental Legislation of Revista Gerenciamento Ambiental [Environmental Management Magazine] (YEAR 3 - N16).

Exhibit B

U.S. Department of Justice
Immigration and Naturalization Service

**Notice of Action**

## THE UNITED STATES OF AMERICA

| RECEIPT NUMBER<br>EAC-05-226-53607 | CASE TYPE  I129<br>PETITION FOR A NONIMMIGRANT WORKER |
|---|---|
| RECEIPT DATE<br>August 15, 2005 | PRIORITY DATE | PETITIONER<br>NATSOURCE LLC |
| NOTICE DATE<br>September 20, 2005 | PAGE<br>1 of 1 | BENEFICIARY<br>GAZANI, FLAVIO H. |

| | |
|---|---|
| ALAN L. RUPE<br>KUTAK ROCK LLP<br>8301 EAST 21ST STREET NORTH<br>SUITE 370<br>WICHITA KS 67206-2935 | Notice Type: Approval Notice<br>Class: H1B<br>Valid from 09/20/2005 to 09/01/2008 |

The above petition and change of status have been approved. The status of the named foreign worker(s) in this classification is valid as indicated above. The foreign worker(s) can work for the petitioner, but only as detailed in the petition and for the period authorized. Any change in employment requires a new petition. Since this employment authorization stems from the filing of this petition, separate employment authorization documentation is not required. Please contact the IRS with any questions about tax withholding.

The petitioner should keep the upper portion of this notice. The lower portion should be given to the worker. He or she should keep the right part with his or her Form I-94, Arrival-Departure Record. This should be turned in with the I-94 when departing the U.S. The left part is for his or her records. A person granted a change of status who leaves the U.S. must normally obtain a visa in the new classification before returning. The left part can be used in applying for the new visa. If a visa is not required, he or she should present it, along with any other required documentation, when applying for reentry in this new classification at a port of entry or pre-flight inspection station. The petitioner may also file Form I-824, Application for Action on an Approved Application or Petition, with this office to request that we notify a consulate, port of entry, or pre-flight inspection office of this approval.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

THIS FORM IS NOT A VISA NOR MAY IT BE USED IN PLACE OF A VISA.

---

Please see the additional information on the back. You will be notified separately about any other cases you filed.
IMMIGRATION & NATURALIZATION SERVICE
VERMONT SERVICE CENTER
75 LOWER WELDEN STREET
SAINT ALBANS VT 05479-0001
Customer Service Telephone: (300) 375-5283
Form I797A (Rev. 09/07/93)N



PLEASE TEAR OFF FORM I-94 PRINTED BELOW, AND STAPLE TO ORIGINAL I-94 IF AVAILABLE

---

Detach This Half for Personal Records

Receipt # EAC-05-226-53607
I-94# 554842586 11
NAME GAZANI, FLAVIO H.
CLASS H1B

VALID FROM 09/20/2005 UNTIL 09/01/2008

PETITIONER: NATSOURCE LLC
100 WILLIAM STREET SUITE 2005
NEW YORK NY 10038

---

**554842586 11**

Receipt Number EAC-05-226-53607
Immigration and
Naturalization Service
I-94
Departure Record           Petitioner: NATSOURCE LLC

| 14. Family Name<br>GAZANI | |
|---|---|
| 15. First (Given) Name<br>FLAVIO | 16. Date of birth<br>06/20/1973 |
| 17. Country of Citizenship<br>BRAZIL | |



NATSOURCE®LLC

1120 19th Street, N.W. • Suite 730 • Washington • DC 20036
202.496.1423·PHONE • 202.496.1416·FAX

August 4, 2005

www.natsource.com

## NOTICE OF EMPLOYMENT OF H-1B NON-IMMIGRANT

## CLEAN DEVELOPMENT MECHANISM (CDM) REGULATORY ANALYST
(15-2031 – Operations Research Analyst)

Please take notice that NATSOURCE LLC intends to hire one (1) H1-B Non-Immigrant as a CLEAN DEVELOPMENT MECHANISM (CDM) REGULATORY ANALYST. The duties to be performed include:

Provide analysis in support of company's Greenhouse Gas-Credit Aggregation Pool (GG-CAP). Make GG-CAP and greenhouse gas (GHG) emission reductions purchases on behalf of corporate clients to ensure clients' compliance with the Kyoto Protocol and the EU Emissions Trading Scheme. Track and assess CDM Executive Board decisions, policies and precedents. Track and assess host country and Annex I country policies affecting the crediting and registration of CDM project activities. Work with team to provide recommendations to GG-CAP Investment Manager regarding which projects would make the best candidate CDM projects for the GG-CAP given emerging rules on the CDM regulatory process. Formulate and apply modeling and other optimizing methods to develop and interpret information to assist management in decision making, policy formulation and other managerial functions. Understand and report policy developments to facilitate transfer of Certified Emission Reductions from CDM projects to buyers' registries.

BA/BS Required. Graduate Degree in relevant field preferred. Full-time (Monday to Friday, 40 hours/week). October 1, 2005 to October 1, 2008. [PORTION REDACTED]

H1-B Non-Immigrant to be employed at Natsource LLC, 1120 19th Street NW, Suite 730, Washington, DC 20036. Complaints alleging misrepresentation of material facts in the Labor Condition Application and/or failure to comply with the terms of the Labor Condition Application may be filed with any office of the Wage and Hour Division of the United States Department of Labor.

This notice is being posted in accordance with the Immigration and Nationality Act of 1990, and in accordance with the applicable regulations enacted and amended thereto.

Benjamin Feldman
Managing Director

**The above notice was posted in two conspicuous and visible places at the above workplace for a period of ten (10) working days.**

Benjamin Feldman
Managing Director

♻ 100% Post - Consumer Recycled Paper

**KUTAK ROCK LLP**

SUITE 370
8301 EAST 21ST STREET NORTH
WICHITA, KANSAS 67206-2935

316-609-7900
FACSIMILE 316-630-8021

www.kutakrock.com

ATLANTA
CHICAGO
DENVER
DES MOINES
FAYETTEVILLE
IRVINE
KANSAS CITY
LITTLE ROCK
LOS ANGELES
OKLAHOMA CITY
OMAHA
PASADENA
RICHMOND
SCOTTSDALE
WASHINGTON

August 12, 2005

**By Federal Express**

U.S. Department of Homeland Security
Citizenship and Immigration Services
Vermont Service Center
Premiun Processing Unit
30 Houghton Street
Saint Albans, VT 05478-2399

**NOT SUBJECT TO THE H-1B CAP (U.S. EARNED MASTER'S DEGREE)**

Re:        **I-129 (H-1B) Petition**
           **Petitioner:    NATSOURCE LLC**
           **Beneficiary:   GAZANI, Flavio**

Dear Sir or Madam:

The above-named Petitioner, Natsource LLC, an asset management, transaction and advisory services group that specializes in the analysis, consulting and trading of environmental credits, now wishes to file an I-129 (H-1B) petition for a non-immigrant worker on behalf of Flavio Gazani, a native and citizen of Brazil, to employ him in a specialty occupation, to wit, as a CDM Regulatory Analyst.

Accordingly, please find enclosed the following documents:

1.    Form I-907 – Request for Premium Processing

2.    Form G-28 – Notice of Entry of Appearance of Attorney

3.    Form I-129 – Petition for Nonimmigrant Worker

4.    Form I-129 Supplement H

5.    Form I-129 H-1B Data Collection Supplement

6.    Form ETA 9035, Labor Condition Application - Certified by the Department of Labor

7.    Copy of Beneficiary's *Curriculum Vitae*

**KUTAK ROCK LLP**

U.S. Department of Homeland Security
Citizenship & Immigration Services
August 12, 2005
Page 2 of 4

8.  Copies of the Beneficiary's diplomas, transcripts, and translations (where necessary), including:

    a.  Master of Laws in Legal Studies
        American University (Washington, DC, USA)

    b.  Post Graduate Studies in Environmental Law
        University of Sao Paolo (Sao Paulo, Brasil)

    b.  Bachelor of Law
        FMU Cento Universitario (Sao Paulo, Brazil)

9.  Information about Petitioner, Natsource LLC and its business

    a.  Introduction to Natsource LLC from its website (www.natsource.com)

    b.  Primer of The Kyoto Protocol (http://en.wikipedia.org/wiki/Kyoto_Protocol)

    c.  Primer on the Clean Development Mechanism (www.weathervane.rff.org)

10. Copies of Job Postings (Internal Posting and Advertisement)

11. Copy of the Beneficiary's Form I-94 (Arrival and Departure Record)

12. Copy of the Beneficiary's Visa Stamp

13. Copy of Biographical Page from Beneficiary's Passport

14. Petitioner's checks in payment of the filing fees:

    a.  $1,000.00 for Form I-907
    b.  $2,185.00 to be distributed as follows:
        o  $185.00          for Form I-129
        o  $500.00          for the Fraud Prevention & Detection fee
        o  $1,500.00        for the ACWIA fee

In addition, please note the following:

A.  The Petitioner, Natsource LLC ("Natsource"), is a global company that provides advisory, transaction, and asset management services in the highly specialized field of environmental commodities trading and management. Natsource is only one of a handful of organizations that performs this type of work. They are hired by companies, firms and foreign governments to evaluate and comply with international regulations regarding greenhouse gases and other environmental emissions.

**KUTAK ROCK LLP**

B.     While greenhouse gases and pollution control has long been a global concern, compliance deadlines set by the Kyoto Protocol (Kyoto Protocol to the United Nations Framework Convention on Climate Change) and its managing bodies, including the Clean Development Mechanism (CDM), ensure that the demand for Natsource's services will grow exponentially.

> *"The Kyoto Protocol is a legally binding agreement under which industrialized countries will reduce their collective emissions of greenhouse gases by 5.2% compared to the year 1990 (but note that, compared to the emissions levels that would be expected by 2010 without the Protocol, this target represents a 29% cut). The goal is to lower overall emissions from six greenhouse gases - carbon dioxide, methane, nitrous oxide, sulfur hexafluoride, HFCs, and PFCs - calculated as an average over the five-year period of 2008-12. National targets range from 8% reductions for the European Union and some others to 7% for the US, 6% for Japan, 0% for Russia, and permitted increases of 8% for Australia and 10% for Iceland."*
> Press Release from The United Nations Environment Program.

B.     One of the ways a company, firm or government can meets its compliance obligations is to manage and purchase market instruments or "credits" according to CDM policies and regulations. Natsource's divisions offer its clients complete management consulting to meet their obligations. Natsource's three divisions are as follows:

    a.     *Advisory Services*- Natsource Advisory and Research staff have participated in the development of policies that have created markets for greenhouse gases and conventional air pollutants.  Our staff assist clients to assess impacts and capture market opportunities.

    b.     *Transaction Services*- Natsource's Transaction Services Unit has developed one of the largest organizations in the world that assists counterparties to structure transactions for environmental commodities and renewable energy.  The unit's transaction services experts are located in Europe, North America and Japan.

    c.     *Asset Management Services*- Natsource Asset Management (NAM) has developed the Greenhouse Gas Credit Aggregation Pool (GG-CAP) to assist private firms and governments to comply with GHG emission reduction requirements.

C.     This amalgam of fields requires Natsource to hire the best talents in the fields of finance, environmental law, natural sciences, economics, international studies, business and public administration so that it may provide adequate services to its clients.

D.     In this petition, Natsource seeks to employ Flavio Rufino Gazani as a **Clean Development Mechanism (CDM) Regulatory Analyst.**

E.     A CDM Regulatory Analyst provides analysis in support of Natsource's Greenhouse Gas-Credit Aggregation Pool (GG-CAP).  Duties include: tracking and assessing CDM Executive Board decisions, policies and precedents, tracking and assessing host country and Annex I country policies affecting the crediting and registration of CDM project activities; working with a team to provide recommendations to the GG-CAP Investment Manager regarding which projects would make the best candidate CDM projects for the GG-CAP given emerging rules on the CDM regulatory

**KUTAK ROCK LLP**

process; and understanding policy developments in order to advise Investment Manager on how to transfer Certified Emission Reductions from CDM projects to buyers' registries.

F.     The above job duties require the candidate to be highly intelligent and analytical, detail-oriented, motivated, able to quickly assess large amounts of information, a team player and have excellent writing skills.

G.     Because of the complexity of the duties and high degree of accountability, the position requires at the very least a **graduate degree** in law, environmental studies, public policy or business administration.

H.     For all of these reasons, it is respectfully submitted that the position of CDM Regulatory Analyst is a specialty occupation in accordance with federal regulations at 8 C.F.R. § 214.2(h)(4)(iii)(A).

I.     After an extensive search, Natsource has decided to offer the position to Flavio Henrique Rufino Gazani, a Brazilian attorney who has specialized in international environmental law and regulatory compliance.   In addition to a Bachelor's degree in Law,  Post-graduate work in Environmental Law earned in Sao Paolo, Brazil and extensive experience in the field, Mr. Gazani possesses a Master's of Law in International Studies from The Washington College of Law at American University in Washington, DC.   Thus, Mr. Gazani is eminently qualified for the position and for H-1B classification.

As Natsource's CDM Regulatory Analyst position is a specialty occupation by virtue of its required knowledge and complex duties and Mr. Gazani qualifies for the requested classification by virtue of his education and experience, we would thus greatly appreciate the expeditious processing of this petition.

If you require additional information, please do not hesitate to contact this office.   Thank you for your time and attention to this matter.

Very truly yours,

KUTAK ROCK, LLP

Alan I. Rupe

Enclosures

Exhibit C



HUNTON & WILLIAMS LLP
1900 K STREET, N.W.
WASHINGTON, D.C. 20006-1109

TEL     202 • 955 • 1500
FAX     202 • 778 • 2201

SUSAN F. WILTSIE
DIRECT DIAL: 202-955-1546
EMAIL: swiltsie@hunton.com

FILE NO: 67857.1

October 13, 2006

**BY COURIER, ELECTRONIC MAIL**
**AND OVERNIGHT DELIVERY**

Mr. Flavio Rufino Gazani
1830 17th Street, N.W., #403
Washington, D.C. 20009

Dear Mr. Gazani:

Our firm represents Natsource LLC and Natsource Advisory & Research LLC (collectively, "Natsource"). As you know, your employment with Natsource was terminated effective yesterday, October 12, 2006. It has come to our attention that you have been and are currently serving as the Director of International Solutions, which is, or seeks to be, a competitor to Natsource and that you are in possession of certain of Natsource's confidential and trade secret information. The purpose of this letter is to place you on notice concerning certain of your continuing legal obligations to Natsource. As a former employee, you are not permitted to possess, use or reveal trade secret or other confidential information to the general public, especially Natsource's competitors.

This information specifically includes the valuable information concerning Natsource customers and potential investments you learned as a Natsource employee and possessed in both electronic and hard copy. The use and disclosure of such information is prohibited under the laws of most states, including Virginia, Maryland and the District of Columbia. In addition to private legal remedies including damages and injunctive relief, there are potential criminal consequences for the theft of trade secrets, including 18 U.S.C. § 1832 which provides for fines and up to a ten-year term of imprisonment. Should you refuse to return to Natsource all of its physical and intellectual property or cause any harm to Natsource by using or disclosing its trade secret and confidential information for your benefit or the benefit of any Natsource competitor, Natsource will seek all available legal remedies against you. This includes seeking immediate action by a court to prevent you from using this information, including in connection with your activities at International Solutions.

We understand that while you were still a Natsource employee, you used confidential customer and other proprietary information and approached at least one existing business contact of



Mr. Flavio Rufino Gazani
October 13, 2006
Page 2

Natsource seeking to enter into a business relationship with them that would be the same relationship as they have with Natsource. This action was a violation of your fiduciary duty of loyalty to the company. Should any damages occur as a result of your actions, Natsource will pursue legal action against you.

In addition, you must not retain in your possession nor remove, transfer or duplicate any of Natsource's confidential information, including, without limitation electronic or hard copies of trade secret and confidential information of Natsource in your possession. Any such property or information must be returned immediately to Natsource's office, or you will face legal repercussions for your refusal to do so.

Natsource's primary objective in this matter is to protect and account for its confidential and trade secret information and to otherwise protect itself from unfair competition. You may avoid the consequences of litigation by immediately contacting me to (a) arrange a return of Natsource's property, and (b) agree upon a methodology to ensure Natsource that its rights will not be subject to further infringement.

Also, we are concerned that certain electronically stored information in your possession relevant to this matter will be destroyed or overwritten. You are now on notice that litigation is anticipated with respect to the above-referenced matters and you must refrain from altering and/or erasing active, deleted files or file fragments on any electronic media that may have any relation to this matter. This prohibition also applies to any hard copy documents or information in your possession.

Please contact me, or have your attorney, contact me immediately regarding these matters.

Thank you.

Sincerely,

Susan Wiltsie

Susan F. Wiltsie

SFW:rij

Exhibit D

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

▬▬▬▬▬▬ Attorneys at Law

CHRISTINE A. SAMSEL
202.887.4164/fax: 202.887.4288
csamsel@akingump.com

October 18, 2006

VIA FACSIMILE

Susan F. Wiltsie
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C.  10006-1109

**Re:  Flavio Gazani adv. Natsource LLC**

Dear Ms. Wiltsie:

Please be advised that this firm represents Mr. Gazani in connection with his former employment with Natsource LLC ("Natsource") as a Senior CDM (Clean Development Mechanism)/JI (Joint Implementation) Regulatory Analyst.  (We note that, although your letter implies otherwise, Mr. Gazani was not employed by "Natsource Advisory & Research LLC," according to the payroll information and immigration documents we have seen.)

Your letter of October 13, 2006 regarding Mr. Gazani's separation from employment with Natsource has been forwarded to us for response.  As you may be aware, Mr. Gazani announced his resignation from Natsource on October 3, 2006, with an agreed-upon effective date of December 15, 2006, in order to provide sufficient time for Natsource to secure a replacement for Mr. Gazani.  Your client unilaterally advanced that date to October 12, 2006.  Given Mr. Gazani's immigration and visa status, this leaves him in a very untenable position, as your client is fully aware.  Moreover, your client has failed to pay Mr. Gazani for any of the days he worked in October (*i.e.,* October 1 through October 12).  Nor has Mr. Gazani received paperwork regarding COBRA benefits to which he is entitled.  Finally, your client, as Mr. Gazani's visa sponsor, also will be responsible for reimbursing Mr. Gazani for his return flight to Brazil.  We trust that you will address these issues with your client in the near future.

With respect to the issues raised in your letter, it appears from your letter that you have not been provided with full and accurate facts.  Preliminarily, for instance, as Natsource was well aware, Mr. Gazani was designated as the Director of International Solutions well before he ever accepted employment with Natsource.  Moreover, International Solutions is not, and has no intention of being, in competition with Natsource.  Rather, International Solutions is focused on the seller's side of carbon credits, whereas Natsource (specifically, the Greenhouse Gas-Credit Aggregation Pool, or GG-CAP, the area in which Mr. Gazani worked) is focused on the buyer's side as asset manager of a buyer's pool.  (*See, e.g.,* 11/4/05 letter from Benjamin Feldman "To

**A K I N  G U M P**
**S T R A U S S  H A U E R  &  F E L D** LLP
━━━━━━━━━━ Attorneys at Law

Susan F. Wiltsie
October 18, 2006
Page 2

Whom It May Concern"; *see also* 8/12/05 letter from Kutak Rock LLP to U.S. Department of Homeland Security on behalf of Petitioner Natsource LLC.) Indeed, when Mr. Gazani announced his resignation from Natsource, he made Natsource aware that it was likely that he would be going back to Brazil to identify projects there (which he intended to do with International Solutions), and Natsource even expressed an interest in potentially working with Mr. Gazani in that regard. As you may be aware, Natsource does not currently do any business in Brazil, nor to our knowledge did it have any plans to begin doing any such business. Thus, International Solutions is not in competition with Natsource.

Please rest assured that Mr. Gazani is well aware of his obligations under the law of the District of Columbia (where he resided and worked for Natsource, and where Natsource's offices are located) with respect to trade secret information. Your threat of potential criminal consequences for theft of trade secrets, including "up to a ten-year term of imprisonment," borders on unethical and is misguided. Although your letter is extremely vague as to what information Natsource believes Mr. Gazani possesses, Mr. Gazani does not, to his knowledge, have any information that would constitute a trade secret under District of Columbia law. (*See* D.C. Code § 36-401(4).) Moreover, it would be difficult for your clients to demonstrate that the information you reference is trade secret, where Natsource did not take the most fundamental of steps to protect that information, *i.e.*, requiring Mr. Gazani to execute a confidentiality agreement.

As you should be aware, Mr. Gazani was permitted to work remotely from his home and elsewhere. However, he did this using his Natsource-issued computer, which is in the possession of Natsource. Mr. Gazani did not use his personal home laptop for Natsource work. Nor does Mr. Gazani have hard copies of any Natsource documents or other information (other than his own immigration paperwork and related personnel documentation). Mr. Gazani does have a computer disk containing a few Natsource files on which he has worked that he intended to return to Natsource. Although we do not believe these files contain trade secrets as defined under District of Columbia law, Mr. Gazani certainly would not be liable for misappropriation of such information given that it was obtained by him in the course of his work with Natsource and he has neither used nor disclosed such information, nor does he intend to use or disclose such information. (*See* D.C. Code § 36-401(2).) Nonetheless, we are happy to return these files to you. Mr. Gazani also is willing to provide you with an affidavit confirming the facts set forth in this paragraph.

Although this also is not set forth in your letter, we understand that you have expressed concern that Mr. Gazani has all, or portions of, a "Delivery Risk Model" ("DRM") program of Natsource on his computer. Please be advised that Mr. Gazani does not have the DRM program or any part thereof, and indeed, did not even have access to that program during his employment

**A K I N   G U M P**
**S T R A U S S   H A U E R   &   F E L D** LLP
━━━━━━━━━━ Attorneys at Law

Susan F. Wiltsie
October 18, 2006
Page 3

with Natsource. In fact, Mr. Gazani's only involvement with the DRM program was in the twice-yearly update of the program, and his involvement was limited to the "carbon regulatory risk," which is but a small part of the risk assessed by the program. Moreover, as your client is well aware, that program required a password to access, and Mr. Gazani did not have such a password. We are happy to provide you with an affidavit to this effect as well.

We deduce that the "existing business contact" of Natsource referenced in your letter is Quality Tonnes, based on Mr. Gazani's prior conference with Mr. Feldman of Natsource. Your information relating to Mr. Gazani in this regard is inaccurate as well. Quality Tonnes is a non-exclusive contractor of Natsource that provides product development services. Mr. Gazani inquired of Quality Tonnes about the potential for using that entity to provide product development for projects in Brazil through International Solutions. As discussed above, International Solutions is not, and does not intend to be, a competitor of Natsource. Nor was any "confidential customer and other proprietary information" utilized in connection with these communications. Nor did Mr. Gazani attempt to induce Quality Tonnes to cease doing business with Natsource. Rather, Mr. Gazani approached a vendor in his non-working time to inquire about having that vendor perform the services the vendor offers to the public at large.

As you should have been informed, Natsource never required Mr. Gazani to execute any confidentiality agreement, non-compete covenant, or other documentation that would impose any contractual limitations on his ability to work in any field, or to approach vendors to provide services to other entities. You would be hard-pressed to demonstrate that making inquiries of a non-exclusive vendor on behalf of another entity, particularly where, as here, there is no imaginable detriment to Natsource, is a breach of fiduciary duty. Nor is making reasonable plans for transitioning into a new position while still employed (indeed, shortly before leaving) unlawful.

We caution your clients against interfering with Mr. Gazani's ability to engage in his chosen occupation or attempting to besmirch his professional reputation. As Natsource was well aware when it hired Mr. Gazani and sponsored him for a visa, and as documented by your client in the immigration paperwork submitted with respect to Mr. Gazani, Mr. Gazani is highly regarded in the industry. Should we learn that your clients are interfering with, or attempting to interfere with, Mr. Gazani's efforts to engage in his trade, or are defaming or otherwise disparaging Mr. Gazani, we will not hesitate to take swift and appropriate legal action.

You, on behalf of your clients, have threatened to institute legal action against Mr. Gazani. We trust that the foregoing has alleviated your clients' concerns regarding the subject of your letter. If your clients insist on initiating a meritless action against Mr. Gazani notwithstanding the information outlined above, please be advised that Mr. Gazani will

**A K I N   G U M P**
**S T R A U S S   H A U E R   &   F E L D** LLP
———————— Attorneys at Law

Susan F. Wiltsie
October 18, 2006
Page 4


vigorously defend any such action and will seek all appropriate remedies, including sanctions against you and your clients and prevailing party attorneys' fees under D.C. Code § 36-404(1).

If there is additional information beyond that set forth in your letter of October 13, 2006 of which you believe we need to be aware, kindly forward that information to my attention at your earliest convenience. In the meantime, if you have any questions or wish to discuss this matter further, please do not hesitate to contact me. We look forward to your response to the foregoing.

Sincerely,

Christine A. Samsel

cc:     Mr. Flavio Gazani

# AKIN GUMP
# STRAUSS HAUER & FELD LLP
**Attorneys at Law**

## FAX TRANSMISSION

### October 18, 2006

| To | Company | Fax | Phone |
|---|---|---|---|
| Susan F. Wiltsie | Hunton & Williams | 202.778.2201 | 202.955.1546 |

**From:** Christine A. Samsel

**Total Pages:** 5

**Direct Dial:** 202.887.4164

**Re:** Flavio Rufino Gazani

**Message:**

---

490006.0012/007199

Floor:  DC-824

☒ Return fax via Interoffice Mail

Sender's email: csamsel@akingump.com

Secretary: Pat Williford

☐ Hold fax for pickup

Sender's fax: 202.887.4288

Ext: 25342

Fax Operation Verification: _____

The information contained in this facsimile message is attorney-client privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us by mail at the address below.

Robert S. Strauss Building / 1333 New Hampshire Avenue, N.W. / Washington, D.C. 20036-1564 / 202.887.4000 / fax: 202.887.4288 / akingump.com

```
***********************
***   TX REPORT   ***
***********************

TRANSMISSION OK

TX/RX NO            1451
CONNECTION TEL      490006#0012#7782201#
SUBADDRESS
CONNECTION ID
ST. TIME            10/18 18:16
USAGE T             02'16
PGS. SENT              5
RESULT             OK
```

# AKIN GUMP
# STRAUSS HAUER & FELD LLP
_____ Attorneys at Law

## FAX TRANSMISSION

### October 18, 2006

| To | Company | Fax | Phone |
|----|---------|-----|-------|
| Susan F. Wiltsie | Hunton & Williams | 202.778.2201 | 202.955.1546 |

**From:** Christine A. Samsel

**Total Pages:** 5

**Direct Dial:** 202.887.4164

**Re:** Flavio Rufino Gazani

**Message:**

490006.0012/007199                    Sender's email: csamsel@akingump.com        Sender's fax: 202.887.4288

Floor: DC-824                         Secretary: Pat Williford                    Ext: 25342

☒ Return fax via Interoffice Mail      ☐ Hold fax for pickup                       Fax Operation Verification: _____

Exhibit E

## AFFIDAVIT OF FLAVIO RUFINO GAZANI

Flavio Rufino Gazani, being duly sworn and subject to the penalty of perjury, deposes and states:

1.     I am over the age of eighteen (18) and am otherwise competent to make this affidavit. I am not under the influence of any medications and know of no reason why I would not otherwise be able to truthfully swear to the facts in this Affidavit.

2.     I was formerly employed by Natsource LLC ("Natsource") as a Senior CDM/JI Regulatory Analyst. In my position, I did not have access to Natsource's Delivery Risk Model ("DRM") program. My only involvement with the DRM program was in the twice-yearly update of the program and my involvement was limited to the "carbon regulatory risk," which is a small part of the risk assessed by the program. The DRM program required a password to access, and I did not have such a password at any time during my employment by Natsource.

3.     While employed by Natsource, I did not use my personal home laptop to do any Natsource work. After the termination of my Natsource employment, I did not retain any hardcopies of any Natsource documents or other information, other than my own immigration paperwork and related personnel documentation. I also do not have any part of Natsource's DRM program, any of its output assessments, or any lists of projects favorably assessed by the DRM. I did retain one computer disk containing a few Natsource files on which I worked and intended to return to Natsource. After

signing this Affidavit, I will deliver the computer disk to Natsource's attorneys. I
will not keep copies of this information and do not intend to use it for my own
benefit or disclose it to others. I do not otherwise have any Natsource property.

    4.    While I was an employee of Natsource, I made an inquiry to Quality
Tonnes, a non-exclusive contractor in product development services. I contacted
Quality Tonnes on behalf of International Solutions, a company of which I am a
Director, regarding the development of projects in Brazil. No confidential or
proprietary information was used in connection with these communications.

Flavio Rufino Gazani

Subscribed and sworn to me, a notary public, this 26th day of October,
2006, at MiamiBeach  FLA.
    [City]        [State]

Judith E. Robertson
Commission #DD220794
Expires: Jun 08, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

Notary Public

My Commission Expires: 6|8|07

67857.000001 WASHINGTON 635649v2

Exhibit F

Case 1:06-cv-01843-RWR    Document 5-7    Filed 10/30/2006    Page 36 of 36

Home > Project Network Members > Project Network Member Profile

**Methane to Markets**

## Project Network Member Profile

| International Solutions | |
|---|---|
| Location | 4000 Massachusetts Ave., NW<br>Washington, DC 20016<br>United States |
| Contact | Flavio Gazani, Director |
| Phone | 202-487-3607 |
| Fax | |
| Description of Services | International Solutions provide consulting services for implementation of Clean Development Mechanism - CDM projects, mainly in Brazil and other Latin American countries. |
| Area of Interest | Coal Mines, Landfills |
| Type of Organization | Private Sector |

**Update My Information**