**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 06-cv-01843 (RWR) |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

**PLAINTIFF'S NOTICE OF FILING OF AFFIDAVITS**

Pursuant to this Court's Order, dated October 31, 2006, requesting supplemental

affidavits regarding information related to Plaintiff Natsource LLC's ("Natsource's")

Motion for Temporary Restraining Order and Preliminary Injunction, undersigned

counsel submits the attached supplemental affidavits of Benjamin Feldman, Philip

Rodokanakis and Marcela Aray.

Respectfully submitted,

NATSOURCE LLC

_____/s/ Scot A. Hinshaw_____
Counsel

Susan F. Wiltsie (DC Bar #429625)
Scot A. Hinshaw (DC Bar #449723)
HUNTON & WILLIAMS LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 955-1500
(202) 778-2201 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on the 2nd day of November, 2006 the foregoing Plaintiff's Notice of

Filing of Affidavits was served via the Court's Electronic Case Filing system upon:

> Christine A. Samsel, Esq.
> Akin, Gump, Strauss, Hauer and Feld LLP
> 1333 New Hampshire Avenue, NW
> Washington, D.C. 20036

and electronic mail to flaviogazani@msn.com and by overnight mail to

> Flavio Gazani
> 1830 17th Street, NW
> Apt. 403
> Washington, DC 20009

     /s/ Scot A. Hinshaw       

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATSOURCE LLC )
)
     Plaintiff )    Civil Action No. 06-cv-1843 (RWR)
)
    v. )
)
FLAVIO RUFINO GAZANI )
)
    Defendant )

### SUPPLEMENTAL AFFIDAVIT OF BENJAMIN FELDMAN

Benjamin Feldman, being duly sworn, deposes and states:

1.    I am over the age of eighteen (18) and am otherwise competent to make this affidavit. The information contained in this affidavit is based on my personal knowledge.

2.    I am providing this affidavit in response to questions posed by the court in an Order dated October 31, 2006. Some of the court's inquiry can be answered by reviewing the sequence of events leading up to the filing of Natsource's Complaint and Motion for a Temporary Restraining Order and Preliminary Injunction ("TRO Motion").

3.    On October 20, 2006, I reviewed Mr. Gazani's first affidavit in this matter. I have attached a copy of it to this supplemental affidavit at Tab 1. He had signed it that same day. In it, Mr. Gazani swore that he had <u>one</u> computer disk that contained a few Natsource files that he worked on and intended to return to Natsource. On October 24, 2006, Mr. Gazani's attorney sent by overnight mail what was purported to be this one computer disk. I have attached the cover letter for the CD ROM delivery to this supplemental affidavit at Tab 2. In the letter, Mr. Gazani's attorney represented that "[n]o copies have been made of this CD, and no copies of the documents thereon have

been retained by this office or by Mr. Gazani." However, as stated in Natsource's memorandum in support of its TRO Motion to the Court, the CD ROM was blank.

4.     This misrepresentation greatly concerned Natsource because the day before Natsource learned from its computer forensic expert that a CD ROM containing multiple Natsource files, including components of the DRM program itself, had been accessed on Mr. Gazani's Natsource-issued laptop.  Because of the computer forensic findings, Natsource's directed its counsel to resume preparation to file this lawsuit.  The misrepresentation about the blank CD ROM made it that much more imperative to file this action because (a) Mr. Gazani's counsel admitted that he had a CD ROM with Natsource files, and (b) the forensic report told us what files he had, but (c) what Mr. Gazani's attorney delivered to us was blank.

5.     As represented in Natsource's memorandum in support of its TRO Motion, Natsource's attorneys alerted Mr. Gazani's attorney that the CD ROM was blank and that this lawsuit would be filed with the TRO Motion.  Later that day, Mr. Gazani's attorney sent by hand two more CD ROM disks.  I have attached the cover letter to this supplemental affidavit at Tab 3.  The cover letter stated, "enclosed please find two CDs, one of which I believe is blank, and the other of which should be the correct CD containing all of the documents Mr. Gazani has from his employment with Natsource." Mr. Gazani's counsel represented that she did not retain a copy or review the disks.

6.     Thus, Mr. Gazani's story had changed.  Originally, he claimed to have just one Natsource CD ROM.  When told it was blank, his story was that he had two Natsource CD ROM disks, one of which was blank and one of which had files on it.  But, by including two CD ROM disks in the October 26 delivery, Mr. Gazani was admitting

2

that he had three Natsource disks -- two were blank (because Natsource had already been given what was represented to be the original blank CD ROM), and one had files. This was another change in his story. Upon reviewing a list of the contents of the two CD ROM disks sent on October 26, I found that, contrary to Mr. Gazani's counsel's letter, neither was blank. Both the CD ROM disks had Natsource files.

7.    The files on the two CD ROM disks included the files that Philip Rodokanakis had reported to Natsource as having been accessed on Mr. Gazani's Natsource-issued laptop on September 27, 2006. Plus, there were numerous other files on the CD ROM disks that may not have been access from the laptop on September 27. I have attached print outs of the file names contained on both CD ROMs at Tabs 4 and 5 to this affidavit. On Tab 4, the list could not be printed from one screen, so the second page reflects the remainder of the files visible after scrolling down on the screen.

8.    Thus, Mr. Gazani had even more on the CD ROM disks than Natsource believed when the lawsuit was filed. Obtaining the CD ROM disks confirmed all of Natsource's suspicions about what Mr. Gazani possessed. Given the misrepresentations by Mr. Gazani about what CD ROM disks he had, Natsource continues to be very concerned about what Mr. Gazani copied from the CD ROM disks to his personal computer or other disks, whether he sent the files to third-parties by e-mail and to whom.

9.    With that background, I can better address the Court's questions. First, the court seeks a more precise description of what DRM files were on the CD ROM disk accessed by Gazani on September 27 and confirmed to have been in his possession by his recent return of two CD ROM disks which included those same files (Question 3). From

my further review of the file listings[1], the CD ROM disks show that on September 27,

between 2:40 p.m. and 3:42 p.m., someone copied 37 Natsource files to two CD ROM

disks. I have provided the list of file names to Marcela Aray, a Senior CDM/JI

Regulatory Analyst for Natsource, and asked her to review all those files on Natsource's

network. Ms. Aray has provided an affidavit to provide the Court with a more precise

description of the contents of the relevant confidential files on the CD ROMs, which

include the files Mr. Rodokanakis found were also accessed on Mr. Gazani's Natsource

laptop on September 27.

    10.    I have reviewed Ms. Aray's affidavit regarding the contents of the files on

the CD ROMs. While these CD ROMs do not contain a complete set of all DRM

operating and informational files, there are significant components of the DRM on those

CD ROMs that would give Mr. Gazani the advantage of the DRM that no one else in the

industry has.

    11.    In response to Question 4, Mr. Gazani was not authorized to access and

copy every DRM file that is on the two CD ROM disks. He was one of five or six people

who had the authority to access DRM files for Natsource business only and his need for

access was quite limited given his responsibilities at Natsource. Mr. Gazani had no day-

to-day involvement with the DRM and therefore no legitimate reason to copy

components of the DRM to a CD ROM. He was not authorized to copy these files to a

CD ROM disk. No one at Natsource had the authority to copy these files onto portable

electronic media. Also, he was not authorized to access these files on behalf of himself,

his business International Solutions, or for any other third party, including one in

---

[1] I have been on travel since October 27, 2006 and have not yet been able to
review the specific contents of the files on the CD ROMs obtained from Mr. Gazani.

competition with Natsource. He could access the files on Natsource's network if he was at work or working remotely. Mr. Gazani had network and remote access to the DRM for those rare occasions when he had reason to access it.

12.     Question 5 asks about the significance of the CD ROMs, how they came into existence, the fact that they were on Mr. Gazani's work laptop, and the injury that will come to Natsource if Mr. Gazani distributes the information on the CD ROMs to others. The CD ROM file listings show that on September 27, from 2:40 p.m. to 3:42 p.m., someone saved 37 Natsource files onto two CD ROMs. We do not know with certainty that Mr. Gazani was the person who did this. We can only assume it was him because he had these CD ROMs in his possession and he has repeatedly lied about their existence. Also, the timing implicates Mr. Gazani. These files were copied the day after I orally reprimanded him for failing to make sure that he was registered for the CDM Executive Board meeting. That same day, Mr. Gazani sent an email to Eric Cullenberg, who it appears was working with Mr. Gazani on behalf of International Solutions, telling Mr. Cullenberg that I was pretty mad and so Mr. Gazani "need[ed] to act faster now." See paragraphs 29 and 30 of my original affidavit. More distressing is that Mr. Gazani's counsel represented to Natsource's counsel that he took files he had worked on. Many of the files on these CD ROMs are files that would not have been accessed by Mr. Gazani in the normal course of performing his responsibilities for Natsource and to which he made no contribution.

13.     The Court asks in Question 5(c) what the significance is of the injury to Natsource if the information on the CD ROMs were distributed to unauthorized persons. If Mr. Gazani already has distributed or does distribute the information on the CD ROMs

to additional unauthorized persons, then Natsource would suffer the injury I discussed in my previous affidavit. The injury would include using the components of the DRM and the confidential input information to use Natsource's own trade secret information to compete against it in the industry. Within these files are Natsource's methods for deriving the investment risk ratings for projects, which would enable market participants to act on the information to exploit it for their benefit or influence the scoring of a project and the negotiations of contracts regarding the projects. Competitors or other third parties could also use the information in these files as reference points, thus facilitating the identification of opportunities that only these DRM components can do in this particular manner. With the algorithms in some of these files, project developers and owners could determine the DRM's methods of scoring projects and use it to their own advantage. No competitor has the files that are on those disks. If one were to obtain this information, Natsource would lose the advantage it has in the market as a result of these specific files. The files could also be sold to a third-party buyer or seller of Certified Emission Reductions, some of which have previously solicited Natsource to purchase them. Once Natsource loses possession of the files on those CD ROM disks, it cannot recover them except to sue every single third party that obtained them, assuming the third parties could be identified. Even then, the third party would have gained the knowledge and Natsource could not reverse that, injuring it indefinitely and irreparably.

14.     Relevant to the previous response, Mr. Gazani makes significant factual misrepresentations in his opposition papers, two of which need to be corrected here. First, he states that Natsource is not permitted to attend the CDM Executive Board meetings. This is false. Natsource, like other private entities, have employees registered

6

to attend the meetings through non-governmental organizations. The non-governmental organizations disclose to the United Nations that they are sending a representative that is with a private company, whether it be Natsource or one of its competitors. This is not unusual and is not improper in any way. Second, Mr. Gazani asserts that he is not competing with Natsource because International Solutions is only involved in the seller side of the CDM market. Natsource does not know the extent of International Solutions' involvement in the market. Even if International Solutions is only working on the seller side, it still would be competing with Natsource. Natsource works on both the buyers' and sellers' sides of this industry. Mr. Gazani's assertion that the DRM belongs to Natsource Advisory & Research LLC ("NAR") is patently false. In fact, development of the DRM was substantially completed by Natsource LLC prior to the formation of NAR in May 2005, and ownership of the DRM has never been transferred to NAR.

15. Question 6 is about the present whereabouts of the CD ROMs and Question 7 and Question 8 ask about knowledge of any copies of the CD ROMs and the distribution of those copies. As noted above, Natsource has been told by Mr. Gazani that it has the CD ROMs he took containing Natsource's confidential and trade secret information. However, as I discussed, the false representations around obtaining those disks causes Natsource to continue to seek the relief sought in its motion for a temporary restraining order, including but not limited to identification of what copies have been made, what third parties have been given any of the files through e-mail or on a disk and whether any Natsource files are or have been on Mr. Gazani's personal computer. We now know incontrovertibly that Mr. Gazani possessed a portable version of all these files and could have done any number of things with them. His lies to Natsource and this

Court regarding these CD ROMs do not create confidence in any of his representations. For the court's information, Natsource's attorneys made three copies of the CD ROM disks containing Natsource files after obtaining them on October 27. One copy was retained by outside counsel. One copy was sent to my office for my review when I return from traveling, and one copy was given to Natsource's corporate counsel. The three original CD ROMs (two containing files and one blank) returned by Mr. Gazani are held by Natsource's outside counsel.

16.    Question 9 seeks information known on October 27, 2006. From the context of the questions, it appears that the court intends to ask about September 27, 2006, when Mr. Gazani was still employed; and I will answer them based on that assumption. In response to Questions 9(a) through (c), on September 27, it is my belief that Mr. Gazani had physical possession of the second Natsource laptop issued to him, which is the same laptop that was analyzed by Mr. Rodokanakis. I have no reason to believe anyone else had the laptop that day, but I also do not recall physically seeing Mr. Gazani's Natsource laptop on September 27. Mr. Gazani was at Natsource's offices on September 27 during his normal work day.

17.    Questions 9(d) and 9(e) ask what the likelihood is that someone else could have accessed the CD ROM with the DRM files on September 27, and if Natsource thinks someone else did, who the person was. Based on the new information we have that I have discussed above, I think it is clear that Mr. Gazani transferred these files onto two CD ROM disks that day while he was at Natsource and kept them after he was terminated. The only way someone else could have accessed the CD ROM disks would be if they had access to Mr. Gazani's Natsource laptop and the CD ROM disks later that

evening. Natsource has no information that anyone else had access to Mr. Gazani's laptop.

18.    Question 10 asks about the significance of the password to the DRM files. There are two passwords to get into the DRM component files -- the individual employee login password and a second password shared only with the five or six persons who are authorized to access the DRM component filles. As described by Michael Grande in paragraphs 4 and 5 of his affidavit and as I describe in paragraphs 9 and 10 of my prior affidavit, the password protection provided to DRM files is significant because it demonstrates the level of security and protection attributed to those files so that they cannot be obtained by Natsource employees without authority, competitors or other third parties. The password protection of those files is only one of the multiples efforts we make to maintain the secrecy of the DRM files. In paragraph 10 of my prior affidavit, I referred only to the output assessments, or packaged results, that are created from the DRM itself. Those output assessments can be accessed on the network by people that I have explicitly authorized.

19.    Question 11 asks about what access Mr. Gazani had to each of the DRM files during his employment. As I describes in my prior affidavit, Mr. Gazani's work required that he be given access to the DRM itself, as well as the DRM output assessments and results. Mr. Gazani had the authority to twice yearly contribute to an update of the DRM. He did not have the authority to copy, and would have no business reason to copy, any DRM files to a CD ROM. The risk of that such a CD ROM being lost or ending up in the hands of a third party is too great. He certainly did not have the

authority to obtain any of the DRM files in order to compete with Natsource or on behalf of someone else, or to retain copies after his employment ended.

20.    In response to Question 12, Natsource understands that Mr. Gazani has a residence in the District of Columbia which is set forth in the Complaint. Natsource has been told by Mr. Gazani's counsel that he has returned to Brazil.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of 10 pages including this signature page, is true and correct. Executed on November ___, 2006.

Benjamin Feldman

10

TAB 1

## AFFIDAVIT OF FLAVIO RUFINO GAZANI

Flavio Rufino Gazani, being duly sworn and subject to the penalty of perjury, deposes and states:

1.    I am over the age of eighteen (18) and am otherwise competent to make this affidavit. I am not under the influence of any medications and know of no reason why I would not otherwise be able to truthfully swear to the facts in this Affidavit.

2.    I was formerly employed by Natsource LLC ("Natsource") as a Senior CDM/JI Regulatory Analyst. In my position, I did not have access to Natsource's Delivery Risk Model ("DRM") program. My only involvement with the DRM program was in the twice-yearly update of the program and my involvement was limited to the "carbon regulatory risk," which is a small part of the risk assessed by the program. The DRM program required a password to access, and I did not have such a password at any time during my employment by Natsource.

3.    While employed by Natsource, I did not use my personal home laptop to do any Natsource work. After the termination of my Natsource employment, I did not retain any hardcopies of any Natsource documents or other information, other than my own immigration paperwork and related personnel documentation. I also do not have any part of Natsource's DRM program, any of its output assessments, or any lists of projects favorably assessed by the DRM. I did retain one computer disk containing a few Natsource files on which I worked and intended to return to Natsource. After

signing this Affidavit, I will deliver the computer disk to Natsource's attorneys. I will not keep copies of this information and do not intend to use it for my own benefit or disclose it to others. I do not otherwise have any Natsource property.

4.     While I was an employee of Natsource, I made an inquiry to Quality Tonnes, a non-exclusive contractor in product development services. I contacted Quality Tonnes on behalf of International Solutions, a company of which I am a Director, regarding the development of projects in Brazil. No confidential or proprietary information was used in connection with these communications.


_____
Flávio Rufino Gazani

Subscribed and sworn to me, a notary public, this 20th day of October, 2006, at MiamiBeach  FLA  .
         [City]              [State]

Judith E. Robertson
Commission #DD220794
Expires: Jun 08, 2007
Bonded Thru
Atlantic Bonding Co., Inc.

_____
Notary Public

My Commission Expires: 6/8/07

TAB 2

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

————————— Attorneys at Law

**CHRISTINE A. SAMSEL**
202.887.4164/fax: 202.887.4288
csamsel@akingump.com

October 24, 2006

VIA OVERNIGHT MAIL

Susan F. Wiltsie
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C. 10006-1109

    **Re: Flavio Gazani adv. Natsource LLC**

Dear Ms. Wiltsie:

    Enclosed please find Mr. Gazani's original executed affidavit, as well as the original CD containing the few work documents that were in his possession. No copies have been made of this CD, and no copies of the documents thereon have been retained by this office or by Mr. Gazani. Consequently, pursuant to our prior telephone discussions, please ensure that the original has been retained without alteration until any threat of litigation between the parties has passed. Please let me know if you need anything else from Mr. Gazani in this regard.

    As noted in my correspondence to you of last week, there are several outstanding employment-related issues that must be addressed. Specifically, for instance, Mr. Gazani has not been paid his accrued salary for October 1 through October 12. Nor has he received his COBRA paperwork. Mr. Gazani has outstanding work-related charges on his corporate American Express card that we need to ensure are timely paid so as not to adversely affect his credit, etc. Please contact me at your earliest convenience to discuss these various issues.

    Thank you for your attention to the foregoing matters, and I look forward to speaking with you.

Sincerely,

Christine A. Samsel

TAB 3

# AKIN GUMP
# STRAUSS HAUER & FELD LLP

<u>■■■■■■</u> Attorneys at Law

**CHRISTINE A. SAMSEL**
202.887.4164/fax: 202.887.4288
csamsel@akingump.com

October 26, 2006

**<u>VIA HAND DELIVERY</u>**

Susan F. Wiltsie
Hunton & Williams LLP
1900 K Street, N.W.
Washington, D.C.  10006-1109

**Re:  Flavio Gazani adv. Natsource LLC**

Dear Ms. Wiltsie:

Per our discussion, enclosed please find two CDs, one of which I believe is blank, and the other of which should be the correct CD containing all of the documents Mr. Gazani has from his employment with Natsource.  Once again I have not maintained a copy of the CDs, nor have I reviewed them.  I apologize for the confusion in erroneously sending you a blank CD last week. If you have any further questions, please feel free to contact me.

Sincerely,

Christine A. Samsel

TAB 4



CD Drive (D:)

File  Edit  View  Favorites  Tools  Help

Back ▼ ⚬ ▼ 🔍 Search 📁 Folders ▦ ▶

Address 🖭 D:\

**File and Folder Tasks**
📄 Make a new folder
📄 Publish this folder to the Web
📄 Share this folder

**Other Places**
💻 My Computer
📁 My Documents
🖧 My Network Places

**Details**

| Name △ | Size | Type | Date Modified |
|---|---|---|---|
| 🗷 0253_Sensitivity_Analyses_MPLv7.4.xls | 30 KB | Microso… | 9/27/2006 3:42 PM |
| 📄 0491_RevisedPAR_Shenma_Mar15_06.pdf | 38 KB | Adobe … | 9/27/2006 3:29 PM |
| 📄 0491_ShenMa_PAR_Jan10_06.pdf | 58 KB | Adobe … | 9/27/2006 3:30 PM |
| 📄 0517_Medco_PAR_Apr6_06.pdf | 23 KB | Adobe … | 9/27/2006 3:30 PM |
| 📄 0550_Chenrez_PAR_Apr6_06.pdf | 24 KB | Adobe … | 9/27/2006 3:35 PM |
| 📄 0555_CHIN_RENWIN_WULI_Alternate_Sc… | 43 KB | Microso… | 9/27/2006 3:30 PM |
| 📄 0555_Urumqi_PAR_Apr6_06.pdf | 23 KB | Adobe … | 9/27/2006 3:33 PM |
| 📄 CDM and JI Process Tables.doc | 56 KB | Microso… | 9/27/2006 3:42 PM |
| 🗷 Draft_0555_CHIN_RENWIN_WULI_PAR_D… | 51 KB | Microso… | 9/27/2006 3:33 PM |
| 📄 DRM Project Screening Guidelines.doc | 59 KB | Microso… | 9/27/2006 3:42 PM |
| 🗷 EBDatabaseOUTPUTv10.0_Aug18_06.xls | 593 KB | Microso… | 9/27/2006 3:38 PM |
| 🗷 EBDatabaseProgramv9.0.xls | 135 KB | Microso… | 9/27/2006 3:37 PM |
| 🗷 Final_0555_Urumqi_PAR_Apr6_06.xls | 54 KB | Microso… | 9/27/2006 3:32 PM |
| 🗷 Final_ProjectModelSpreadsheetv9.0.xls | | | 3:36 PM |
| 📄 Fuel Switch.doc | | | 3:41 PM |
| 📄 Fuxin 2nd addendum_DD_Dec22_05.doc | 37 KB | Microso… | 9/27/2006 3:41 PM |
| 📄 Fuxin delivered draft memo_Oct24_05.doc | 84 KB | Microso… | 9/27/2006 3:40 PM |
| 📄 Fuxin memo 1st addendum Nov11.doc | 41 KB | Microso… | 9/27/2006 3:38 PM |
| 📄 KrW_General_Conditions_280104.doc | 183 KB | Microso… | 9/27/2006 3:39 PM |
| 📄 Natsource Review Anode Project HINDALC… | 182 KB | Microso… | 9/27/2006 3:39 PM |
| 📄 Novos Projetos.doc | 72 KB | Adobe … | 9/27/2006 3:40 PM |
| 📄 P1 Annex4 - Baking Furnace PPC_25th Oct… | 1,129 … | Microso… | 9/27/2006 3:37 PM |
| 📄 P2 Annex4 - Smelter Plant (Slotted Anode… | | | |
| 📄 PDD Format Changes.pdf | | | |
| 🗷 RisoCDMpipelineINPUTv10.0.xls | | | |

Type: Microsoft Excel Worksheet
Author: ARibas
Date Modified: 9/27/2006 3:32 PM
Size: 54.0 KB



## CD Drive (D:)

File   Edit   View   Favorites   Tools   Help

Back ▼  ⊙  ◎  Search  Folders  ⊞▼

Address  D:\                                                        ▼  → Go

**File and Folder Tasks**

Make a new folder
Publish this folder to the Web
Share this folder

**Other Places**

My Computer
My Documents
My Network Places

**Details**

| Name ▲ | Size | Type | Date Modified |
|---|---|---|---|
| 0555_CHIN_RENWIN1_WULI_Alternate_Sc... | 43 KB | Microso... | 9/27/2006 3:30 PM |
| 0555_Urumql_PAR_Apr6_06.pdf | 23 KB | Adobe ... | 9/27/2006 3:33 PM |
| CDM and JI Process Tables.doc | 56 KB | Microso... | 9/27/2006 3:42 PM |
| Draft_0555_CHIN_RENWIN1_WULI_PAR_D... | 51 KB | Microso... | 9/27/2006 3:33 PM |
| DRM Project Screening Guidelines.doc | 59 KB | Microso... | 9/27/2006 3:42 PM |
| EBDatabaseOUTPUTv10.0_Aug18_06.xls | 593 KB | Microso... | 9/27/2006 3:38 PM |
| EBDatabaseProgramv9.0.xls | 135 KB | Microso... | 9/27/2006 3:37 PM |
| Final_0555_Urumql_PAR_Apr6_06.xls | 54 KB | Microso... | 9/27/2006 3:32 PM |
| Final_ProjectModelSpreadsheetv9.0.xls | 756 KB | Microso... | 9/27/2006 3:36 PM |
| Fuel Switch.doc | 22 KB | Microso... | 9/27/2006 3:41 PM |
| Fuxin 2nd addendum_DD_Dec22_05.doc | 58 KB | Microso... | 9/27/2006 3:34 PM |
| Fuxin delivered draft memo_Oct24_05.doc | 383 KB | Microso... | 9/27/2006 3:35 PM |
| Fuxin memo 1st addendum Nov11.doc | 387 KB | Microso... | 9/27/2006 3:34 PM |
| KW_General_Conditions_280104.doc | 37 KB | Microso... | 9/27/2006 3:41 PM |
| Natsource Review Anode Project HINDALC... | 84 KB | Microso... | 9/27/2006 3:40 PM |
| Novos Projetos.doc | 41 KB | Microso... | 9/27/2006 3:38 PM |
| P1 Annex4 - Baking Furnace PPC_25th Oct... | 183 KB | Microso... | 9/27/2006 3:39 PM |
| P2 Annex4 - Smelter Plant (Slotted Anode... | 182 KB | Microso... | 9/27/2006 3:39 PM |
| PDD Format Changes.pdf | 72 KB | Adobe ... | 9/27/2006 3:40 PM |
| RsoCDMpipelineINPUTv10.0.xls | 1,129 ... | Microso... | 9/27/2006 3:37 PM |
| Shenma_General Information on the Cons... | 66 KB | Microso... | 9/27/2006 3:29 PM |
| shenmadd3306.pdf | 55 KB | Adobe ... | 9/27/2006 3:28 PM |
| Urumql weather.doc | 85 KB | Microso... | 9/27/2006 3:31 PM |
| Urumql_RegMemo_3rdDraft_31May06.doc | 89 KB | Microso... | 9/27/2006 3:32 PM |
| UrumqlFinalMemo.pdf | 54 KB | Adobe ... | 9/27/2006 3:31 PM |

TAB 5



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 06-cv-1843 (RWR) |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

### SUPPLEMENTAL AFFIDAVIT OF PHILIP RODOKANAKIS

Philip Rodokanakis, being duly sworn, deposes and states:

1.      I am over the age of eighteen (18) and am otherwise competent to make this affidavit. The information contained in this affidavit is based on my personal knowledge.

2.      I am providing this affidavit in response to questions posed by the court in an Order dated October 31, 2006. I have listed the court's exact questions and my responses below.

3.      *Question 1(A). Is it possible to determine whether the files on the CD-ROM described in ¶ 10 ("THE CD-ROM") were copied? If it is possible and you did not make such a determination, why not? If it is possible and you did make such a determination, what is your determination?* Absent other corroborating evidence, it is usually not possible to determine whether any files were copied by examining a hard disk drive image from a laptop or other type of computer such as the one I acquired during the forensic examination of Flavio Gazani's laptop.

4.      *Question 1(B). Is it possible to determine whether the files on THE CD-ROM were emailed? If it is possible and you did not make such a determination, why not? If it is possible and you did make such a determination, what is your determination?*

I was asked to look for files that may have been placed on an external storage medium (e.g., CD-ROM disk, USB[1] jump drive[2], etc.). Once I identified a number of shortcuts[3] pointing to files stored on the CD-ROM drive of the laptop, I was not asked to determine whether any of those files were also sent as e-mail attachments. Separately however, I was asked to identify all e-mails to or from flaviogazani@MSN.com on the laptop. Presuming the Court seeks to find out if any of the CD-ROM files were emailed from the laptop, I did not see any e-mails with any of the file names (as found in the shortcuts pointing to files on the CD-ROM) attached to any messages from Mr. Gazani's Natsource e-mail account that were stored on the hard disk drive of the laptop.

5.    As far as e-mail messages sent from Mr. Gazani's personal MSN Hotmail[4] account, it is not readily possible to ascertain whether any personal e-mail messages sent from this laptop computer contained e-mail attachments by examining the hard disk drive's image. When using an Internet browser to access a web-based e-mail account (like Gazani's MSN Hotmail account) the browser usually leaves an HTML-formatted[5]

---

[1] USB (Universal Serial Bus) is a plug-and-play port in a computer that allows the sharing of information between a computer and external add-on devices.

[2] A jump drive - also known as a USB drive, flash drive, keychain drive, or disk-on-key - is a plug-and-play portable storage device that uses flash memory and is lightweight enough to attach to a key chain. A jump drive, which looks very much like an ordinary highlighter marker pen, can be used in place of a floppy disk, Zip drive disk, or CD. When the user plugs the device into their USB port, the computer's operating system recognizes the device as a removable drive and assigns it a drive letter.

[3] A shortcut file is a pointer to a file somewhere on a computer system. When one clicks on the shortcut it is like clicking on the target file and the associated program should then start and run on the computer. Shortcut files bear the .LNK file extension.

[4] MSN.com is an online service provider that provides a number of different Internet-based services; one of these services includes the Hotmail e-mail accounts.

[5] HTML: Hyper Text Mark-Up Language, the commonly used coding to format files usually stored on Internet servers.

file in the Temporary Internet Files folder. However for outgoing e-mail messages, these files are not always saved in the Temporary Internet Files folder and the ones that are found there do not necessarily portray the final version of the outgoing message. In other words, just because I do not find a file reference pointing to any file attachments having been sent through Gazani's MSN Hotmail account, that does not prove conclusively that such files were not actually sent as e-mail attachments. Furthermore, one must keep in mind that the MSN Hotmail remnants are stored on the computer's hard disk drive as temporary files and are subject to being overwritten by the file system at any time. Remnants from such files could also be located in the drive's unallocated disk clusters (also referred to as free disk space). However, to undertake an exhaustive search of the data (i.e., remants) still existing in the unallocated disk clusters would be extremely time consuming and given the other considerations already outlined in this affidavit would not provide for conclusive results. It should also be noted that the list of shortcut files found on the laptop in question pointing to files being accessed from the CD-ROM drive, is in all likelihood not all inclusive. In other words, a shortcut file may be generated when a file is accessed; at the same time, the absence of additional shortcuts cannot be interpreted to mean that additional files did not or may not have existed on the same CD-ROM disk. If other files on the disk were not accessed from the computer in question, no corresponding shortcut files would have been generated.

6. *Question 1(C). What is the scientific likelihood of error in the conclusion of fact stated in ¶ 10? In other words, what is the likelihood that THE CD-ROM was never in Gazini's work laptop computer ("work laptop")?* In order to generate a shortcut file pointing to a particular file being accessed from the CD-ROM drive, one or more CD-ROM disks containing the files names which were accessed from the particular

3

laptop computer in question must have been placed in the CD-ROM drive of this specific laptop. I am reasonably certain[6] that one or more CD-ROM disks containing the file names of the files for which shortcut files were generated and stored on this laptop's hard disk drive were accessed on this specific computer.

7.    *Question 2. Could a forensic analysis of Gazini's work laptop lead to a determination as to whether Gazini downloaded and sent DRM files through his personal "msn" email account?* The answer to this question was previously provided in response to question 1.C.

8.    I would like to reserve the right to supplement this affidavit upon further review of the laptop computer that I may be asked to do or do as a matter of the Court's order.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of 4 pages including this signature page, is true and correct. Executed on November 1, 2006.

Phillip Rodokanakis

---

[6] Computer generated files (e.g., shortcuts) are generally presumed to be factual; however, this would not preclude a savvy user from possibly manipulating such system files. For example, a user could copy a shortcut file from another computer to the computer under examination--although such manipulation is rather unlikely in my opinion.

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATSOURCE LLC | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No. 06-cv-1843 (RWR) |
| | ) | |
| v. | ) | |
| | ) | |
| FLAVIO RUFINO GAZANI | ) | |
| | ) | |
| Defendant | ) | |

**SUPPLEMENTAL AFFIDAVIT OF MARCELA ARAY**

Marcela Aray, being duly sworn, deposes and states:

1.      I am over the age of eighteen (18) and am otherwise competent to make

this affidavit.  The information contained in this affidavit is based on my personal

knowledge.

2.      I am currently employed at Natsource Asset Management Corporation, in

its Ottawa, Ontario, Canada, a wholly-owned subsidiary of Natsource LLC

("Natsource").  My position is Senior CDM/JI Project Analyst.

3.      I was given a list of files to locate on Natsource's internal network and

review to provide a description of their contents.  I reviewed all the files on the network

and am now familiar with their contents.  In the interests of efficiency for this lawsuit, I

have limited my descriptions to the most relevant confidential Natsource files.

4.      Although the lists of files do not include a complete set of all DRM

operating and informational files, the list contains vital information for the operation of

the Delivery Risk Model ("DRM"), such as the Final_ProjectModelSpreadSheet_v9.0.

Many of these files reveal Natsource's sources and methods for the analysis of Clean

Development Mechanism and Joint Implementation projects.  In addition, as illustrated

below, the list contains output assessments in the form of DRM outputs and project assessment reports ("PAR"). A PAR is similar to the DRM output. However, more detailed information is provided on each of the risk categories in a PAR. A PAR also highlights the strengths and weakness for the particular project. The PAR enables a user to draw inferences that would be applicable to similar projects.

5.     Appendix 1 at Tab 1 to this affidavit is a categorization of the files on the list.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing affidavit, consisting of $\underline{4}$ pages including this signature page, is true and correct. Executed on November $\underline{2}$, 2006.

Marcela Aray

2

## **APPENDIX 1**

### **DRM Components, Methods and Procedures on CDs**

***File name:***
*Final_ProjectModelSpreadsheetv9.0.xls*
Using this file it is possible to replicate the ranges of delivery exposure, which in turn
yields the quantity of CERs we forecast a project will produce based on its specific
characteristics. All the important information to provide an analysis for a project is based
on the scores stored in the MSS. The MSS is used by the Project Risk Evaluator program
in order to calculate the projected delivery rate. Without this sheet, the risk evaluator
could not calculate the delivery rate.

***File name:***
*DRM Project Screening Guidelines.doc*
This document contains guidelines for screening the projects that will be added to the
database. It identifies the key elements that drives our risk assessment. It is used to train
staff that operate the DRM to identify the elements required to perform a DRM analysis.

***File name:***
*AllComparisonTables_Jun06_REVISED.xls*
Provides a summary of changes in the risk ratings we have made from a particular
version to another of the DRM. Basically, it illustrates the changes in risk ratings in the
DRM based on our evolving understanding of risks.

***File name:***
*CountryInvestment_DailyCheck.xls*
This file allows the DRM operator to confirm country risk ratings in between DRM
updates.

***File names:***
*Input Updating Process_Jun06.doc*
*Input Updating Process_Jun06_RC.doc*
*Input Updating Process_Jun06_RC_AR.doc*
Contains guidelines for the input update process from June 2006, indicating tasks and
responsibilities for each employee.

## DRM Output on CDs

*File Name:*
*0555_CHIN_RENWINi_WULI_Alternate_Scenario_DRM_Output_up_to_2012_v8.4*

## PARs on CDs

*File name:*
*0491_RevisedPAR_Shenma_Mar15_06.pdf*

*File name:*
*0491_ShenMa_PAR_Jan10_06.pdf*

*File name:*
*0517_Medco_PAR_Apr6_06.pdf*

*File name:*
*0550_Chemrez_PAR_Apr6_06.pdf*

*File name:*
*Draft_0555_CHIN_RENWINi_WULI_PAR_DRM_up_to_2012_v8.4*

*File name:*
*0555_Urumqi_PAR_Apr6_06.pdf*

*File name:*
*Final_0555_Urumqi_PAR_Apr6_06.xls*

*File name:*
*Natsource Review Anode Project HINDALCO*